Eric Kanefsky
CALCAGNI & KANEFSKY, LLP
1085 Raymond Blvd., 14th Floor
Newark, New Jersey 07102
Telephone: (862) 397-1796
eric@ck-litigation.com

*Attorney for Plaintiff and the Proposed Class*

[Additional Counsel on the Signature Page]


## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CRIMSON CANDLE SUPPLIES LLC, on behalf of itself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>DSM-FIRMENICH AG, FIRMENICH INTERNATIONAL SA, FIRMENICH INC., AGILEX FLAVORS & FRAGRANCES, INC., GIVAUDAN SA, GIVAUDAN FRAGRANCES CORP., GIVAUDAN FLAVORS CORP., UNGERER & COMPANY, INC., CUSTOM ESSENCE INC., INTERNATIONAL FLAVORS & FRAGRANCES INC., SYMRISE AG, SYMRISE INC., AND SYMRISE US LLC<br><br>*Defendants*. | No.: 2:23-cv-03875-WJM-JSA<br><br><u>CLASS ACTION</u> |


**OPPOSITION TO THE "UNOPPOSED" MOTION FOR APPOINTMENT OF CO-LEAD COUNSEL, AND CROSS-MOTION FOR THE APPOINTMENT OF COHEN MILSTEIN AND QUINN EMANUEL (THE "MARKET-ALLOCATION GROUP") AS INTERIM CO-LEAD COUNSEL <u>AND FOR CONSOLIDATION OF ALL DIRECT PURCHASER CASES</u>**

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................1

STATEMENT OF FACTS ......................................................................................5

    I.     Procedural History ....................................................................................5

    II.    The Market-Allocation Group's Proprietary Theory, Motivation, and
          Evidence ..................................................................................................7

    III.   The Approach of the Price-Fixing Group ..............................................10

ARGUMENT .......................................................................................................11

    I.     The Market-Allocation Group Has Done the Most to Investigate and
          Challenge Defendants' Conduct for the Benefit of the Class ..................11

    II.    The Market-Allocation Group Has Significant Experience and Deep
          Knowledge of the Applicable Law ........................................................17

    III.   The Market-Allocation Group Has Brought and Will Bring
          Extensive Resources to Litigate this Proposed Class Action ..................28

    IV.   Other Factors Weigh in Favor of the Market-Allocation Group...............31

         1.    The Comparative Sizes of the Groups Weighs in Favor of the
             Market-Allocation Group ............................................................31

         2.    Courts Respect "Private Ordering" Only When There Is
             Unanimous Agreement—Which Is Not the Case Here .................33

CONCLUSION ....................................................................................................34

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashton Woods Holdings L.L.C. et al v. USG Corp.*,
  No. 4:15-cv-01247-HSG (N.D. Cal) .................................................................20

*B&E Assocs. v. Firmenich SA*,
  No. 23-cv-03050 (D.N.J.)................................................................................6, 10

*Borozny v. Raytheon Techs. Corp.*,
  No. 21-cv-1657 (D. Conn.) .................................................................................21

*Candle Shop of the Poconos, Inc. v. Givaudan S.A.*,
  No. 23-cv-03049 (D.N.J.)................................................................................6, 10

*City of Providence, R.I. v. AbbVie Inc.*,
  No. 20-CV-5538 (LJL), 2020 WL 6049139 (S.D.N.Y. Oct. 13,
  2020)...................................................................................................................16

*In re Comverse Tech., Inc. Derivative Litig.*,
  No. 06-CV-1849 NGG RER, 2006 WL 3761986 (E.D.N.Y. Sept.
  22, 2006), *objections overruled*, No. 06-CV-1849 NGG RER, 2006
  WL 3511375 (E.D.N.Y. Dec. 5, 2006)................................................................12

*Cospro Dev. Corp. v. Int'l Flavors & Fragrances*,
  No. 23-cv-03368 (D.N.J. June 20, 2023) .......................................................6, 10

*In re Credit Default Swaps Antitrust Litig.*,
  No. 13-md-02476 (S.D.N.Y.)........................................................................29, 31

*Crimson Candle Supplies LLC v. DSM-Firmenich AG*,
  No. 23-cv-03875, (D.N.J.)........................................................................ *passim*

*Crop Protection Products Loyalty Program Antitrust Litigation*,
  No. 1:23-md-03062 (M.D.N.C.).........................................................................24

*Demeter F.L. Inc. v. Int'l Flavors & Fragrances Inc.*,
  No. 23-cv-03265 (D.N.J.)................................................................................6, 10

*In re Domestic Drywall Antitrust Litigation*,
  No. 2:13-md-02437 (E.D. Pa.) ...........................................................................25

*Electronic Books Antitrust Litig.*,
 No. 11-md-02293 (S.D.N.Y.)..................................................................23

*Fashion Originators' Guild of Am. v. Fed. Trade Comm'n*,
 312 U.S. 457 (1941) ........................................................................8, 13

*FCA US LLC v. Yazaki Corp.*,
 No. 2:17-cv-14138 (E.D. Mich.) .........................................................20

*Garbaccio v. St. Joseph's Hosp. & Med. Ctr. & Subsidiaries*,
 No. CV 16-2740 (JMV), 2017 WL 1196458 (D.N.J. Mar. 13,
 2017).............................................................................................11

*Hanna's Candle Co. v. Int'l Flavors & Fragrances Inc.*,
 No. 23-cv-03266 (D.N.J.)..............................................................6, 10

*In re Int. Rate Swaps Antitrust Litig.*,
 2016 WL 4131846 (S.D.N.Y. Aug. 3, 2016) ....................................32

*In re Int. Rate Swaps Antitrust Litig.*,
 No. 1:16-md-02704 (S.D.N.Y.)....................................................21, 24

*In re Interest Rate Swaps Litigation*,
 No. 1:16-md-02704 (S.D.N.Y. Aug. 3, 2016).................................4, 11

*Iowa Public Employees' Retirement System v. Bank of America Corp.*,
 No. 1:17-cv-06221 (S.D.N.Y.) ...........................................................24

*ISDAfix Antitrust Litig.*,
 No. 14-cv-7126 (S.D.N.Y.) .................................................................20

*Lifewatch Servs., Inc. v. Highmark Inc.*,
 902 F.3d 323 (3d Cir. 2018) ..............................................................13

*Malasky v. IAC/Interactivecorp*,
 No. 04-cv-7447(RJH), 2004 WL 2980085 (S.D.N.Y. Dec. 21,
 2004)...........................................................................................32

*In re Mun. Derivatives Antitrust Litig.*,
 252 F.R.D. 184 (S.D.N.Y. 2008)...................................................12, 20

*Our Own Candle Co. v. Givaudan S.A.*,
 No. 2:23-cv-2174 (D.N.J.)........................................................ *passim*

*Outten v. Wilmington Tr. Corp.*,
   281 F.R.D. 193 (D. Del. 2012) ..........................................................................16

*In re: Plasma-Derivative Protein Therapies Antitrust Litigation*,
   No. 1:09-cv-07666 (N.D. Ill.) ...........................................................................25

*In re Polyurethane Foam Antitrust Litig.*,
   No. 10-md-02196 (N.D. Ohio) ..........................................................................20

*In re Remicade Antitrust Litig.*,
   No. 17-CV-4326, 2018 WL 514501 (E.D. Pa. Jan. 23, 2018) .........................31

*In re Scrap Metal Antitrust Litig.*,
   No. 1:02-CV-0844, 2002 WL 31988203 (N.D. Ohio Aug. 5, 2002) ................16

*Stires v. Eco Science Solutions Inc.*,
   No. 17-cv-3707, 2018 WL 5784817 (D.N.J. 2018)...........................................12

*Sutter Health Antitrust Litigation*,
   No. CGC-14-538451 (San Fran. Cnty., Cal.) .....................................................23

*In re Treasury Sec. Auction Antitrust Litig.*,
   No. 1:15-md-02673 (S.D.N.Y.) ..........................................................................21

*In re Urethane Antitrust Litigation*,
   MDL No. 1616 (D. Kan. July 29, 2018) .............................................................23

*In re Wells Fargo & Company Securities Litigation*,
   No. 1:20-cv-04494 (S.D.N.Y.) ...........................................................................25

Plaintiff Crimson Candle Supplies LLC, by and through its attorneys—Quinn Emanuel Urquhart & Sullivan, LLP, Cohen Milstein Sellers & Toll LLP, and Calcagni & Kanefsky LLP (collectively, the "Market-Allocation Group")— respectfully (a) oppose the "unopposed" motion for appointment of Linda Nussbaum Law Group, P.C., Korein Tillery, P.C., and Hausfeld LLP (collectively the "Price-Fixing Group") as co-lead counsel, *Our Own Candle Co. v. Givaudan S.A.*, No. 2:23-cv-2174, Dkt. 32 (D.N.J. June 30, 2023) ("PFG Mot."), and (b) cross-move for the appointment of Cohen Milstein and Quinn Emanuel as co-lead counsel, and Calcagni & Kanefsky LLP as liaison counsel, as well as for the consolidation of all Direct Purchaser cases.

## **<u>INTRODUCTION</u>**

This Court should appoint the Market-Allocation Group to lead this case on behalf of the class.  The Market-Allocation Group offers a markedly different theory of the case, as well as a superior complaint, both produced through an extensive investigation, demonstrating how our work, experience, and resources will most benefit the class.  Indeed, we style ourselves the Market-Allocation Group because of the unique market-allocation theory we have developed, which stands in contrast to the traditional price-fixing allegations in all the other complaints filed in related

cases.[1]  Simply put, the firms and lawyers comprising the Market-Allocation Group—Quinn Emanuel, Cohen Milstein, and Calcagni & Kanefsky—have brought, and will bring, resources to bear on behalf of the class that no competing firms can match.

Quinn Emanuel is the largest firm in the world devoted exclusively to business litigation.  It has 32 offices in 11 countries—over *1,000* litigators who have tried over 2,500 cases, winning 86% of them.  It is the "most feared law firm" in the country—the firm that, according to numerous surveys, litigants least want to see representing the other side.  String citations of its victories could go on for pages:  it has won nearly $80 billion in verdicts and settlements for plaintiffs, including many billions in the antitrust class-action space, specifically.  Quinn Emanuel is consistently ranked among the top five firms in virtually every category of business litigation.  Quinn Emanuel's global presence—including an office in Switzerland where many Defendants are located, as well as seasoned competition lawyers in France and Great Britain where the other dawn raids took place—will also be an asset to the class.

---

[1] For this reason, we refer to the other counsel moving to be appointed interim co-lead counsel as the Price-Fixing Group.

Cohen Milstein is one of the oldest, largest, and most prestigious plaintiffs'-side firms in the country—with approximately 100 lawyers devoted almost entirely to Plaintiffs'-side class action litigation.  It has one of the most decorated and accomplished antitrust groups in the country.  Calcagni & Kanefsky brings significant New Jersey governmental experience to the table—including multiple partners who held high level positions at the US Attorney's Office for the District of New Jersey—a critical resource for a case with a parallel governmental proceeding in New Jersey.  Collectively, the Market-Allocation Group can and will add more value for the class than any other firm or group of firms seeking lead counsel.

The Court need not take our word for this—the Market-Allocation Group has already demonstrated what its resources can achieve.  After a thorough investigation involving hundreds of hours of factual and legal investigation, we identified that the fragrance cartel likely operated differently, and had a different motivation, than what those who rushed to court first appear to have presumed.  We allege a market segmentation cartel.  Our complaint details how Defendants agreed to allocate products and customers in the fragrance market. *See Crimson Candle Supplies LLC v. DSM-Firmenich AG*, No. 23-cv-03875, Dkt. 1 ¶¶ 72-78 (D.N.J. July 20, 2023) ("Compl.").  Defendants did so by agreeing not to copy each other's fragrances even though they had the technological and legal ability to do so, thereby giving up their ability to compete for each other's customers by offering competing products at

lower prices. *Id.* *None* of the Complaints filed by the Price-Fixing Group make *any* of these allegations.

We believe such a conspiracy fits the known facts better. For instance, our complaint cites industry commentary that Defendants reached a "non-appropriation consensus" for "olfactory creations"—that is, they agreed not to duplicate each other's fragrances and not to compete for specific customer's contracts. *Id.* ¶ 76. We also cite statements from 2016 that Defendants entered into a "tacit agreement," "informal understanding," and "gentleman's agreement" that they "would not cannibalize each other by manufacturing competing products based on formulas of a competitor acquired through reverse engineering." *Id.* ¶ 75. The complaint further quotes recent pledges made collectively by Defendants not to "plagiari[ze]" each other's fragrances. *Id.* ¶¶ 77-78.

Simply stated, the Market-Allocation Group has unique and superior resources and experience and has already done more to benefit the class than any other movant. It should therefore lead this case. *See* FED. R. CIV. PROC. 23(g)(1); *In re Interest Rate Swaps Litigation*, No. 1:16-md-02704, Dkt. 99 at 6-7 (S.D.N.Y. Aug. 3, 2016) (appointing Quinn Emanuel and Cohen Milstein co-lead counsel where "the Court's assessment is that the efforts undertaken by Quinn Emanuel and Cohen Milstein were more generative and exceeded the investigative work of the other applicants by an order of magnitude").

## STATEMENT OF FACTS

### I.   Procedural History

On March 7, 2023, the European Commission carried out unannounced raids on the facilities of several Defendants.  The raids were carried out in conjunction with the United States Department of Justice, the United Kingdom Competition and Markets Authority, and the Swiss Competition Commission, all of which have opened an investigation into Defendants for collusive behavior.  Compl. ¶¶ 55-58. On the same day, the Antitrust Division of the DOJ served a grand jury subpoena on International Flavors & Fragrances, Inc., the only Defendant parent company incorporated in the United States.  *Id.* ¶ 59.

In April 2023, certain lawyers in the Price-Fixing Group filed a complaint. The complaint did not allege market allocation, but instead alleged only that the four main fragrance manufacturers and some of their subsidiaries engaged in a traditional price-fixing conspiracy.  *See Our Own Candle Co. v. Givaudan S.A.*, No. 23-cv-02174, Dkt. 1 (D.N.J. Apr. 18, 2023).  Approximately one month after filing, these same lawyers filed a motion to be appointed interim class counsel.  *Id.* Dkt. 5. (D.N.J. May 19, 2023).  Shortly after, the Court denied that motion without prejudice, explaining that there were no overlapping suits pending at that time.  *Id.* Order, Dkt. 13 (D.N.J. June 7, 2023).

Throughout June, lawyers associated with the Price-Fixing Group filed five

additional complaints asserting a substantially similar theory, largely based on the same allegations. *See Candle Shop of the Poconos, Inc. v. Givaudan S.A.*, No. 23-cv-03049, Dkt. 1 (D.N.J. June 2, 2023); *B&E Assocs. v. Firmenich SA*, No. 23-cv-03050, Dkt. 1 (D.N.J. June 2, 2023); *Demeter F.L. Inc. v. Int'l Flavors & Fragrances Inc.*, No. 23-cv-03265, Dkt. 1 (D.N.J. June 14, 2023); *Hanna's Candle Co. v. Int'l Flavors & Fragrances Inc.*, No. 23-cv-03266, Dkt. 1 (D.N.J. June 14, 2023); *Cospro Dev. Corp. v. Int'l Flavors & Fragrances*, No. 23-cv-03368, Dkt. 1 (D.N.J. June 20, 2023).   At the end of the month, the Price-Fixing Group again moved for appointment as interim class counsel, this time with a larger group of attorneys (including some of those who had filed complaints after the initial motion to appoint interim class counsel). *See generally* PFG Mot.  The Court set the motion for August 7, establishing July 24 as the final day for oppositions.[2]

On July 20, 2023, after several months of intensive proprietary investigation, undertaken without the participation of any attorneys in the Price-Fixing Group, the Market-Allocation Group filed our complaint. *See generally* Compl.

Prior to filing, we notified the Price-Fixing Group of our plan to file a complaint and our intent to oppose their motion and to cross-move for our

---

[2] On July 14, the Price-Fixing Group also moved to consolidate all of the existing cases. *Our Own Candle Co.*, No. 23-cv-02174, Dkt. 43.

appointment as interim co-lead counsel.  Given the limited time between the filing of our complaint and the deadline for opposing their motion, we proposed that they withdraw their "unopposed motion" and that all parties agree to a briefing schedule for lead counsel motions.  The Price-Fixing Group declined, choosing to keep their "unopposed" motion on the calendar.  It was only after these events that the Market-Allocation Group filed this opposition brief, along with our cross-motion.

## II.   The Market-Allocation Group's Proprietary Theory, Motivation, and Evidence

The Market-Allocation Group's complaint breaks new ground and offers a more compelling and supported theory of antitrust liability.  Unlike the Price-Fixing Group, our complaint alleges that Defendants engaged in a *per se* violation of the antitrust laws by allocating the market for fragrances and fragrance ingredients.  Our complaint explains that, "[i]n order to allocate customers, Defendants agreed to each produce only a specific subset of fragrances and fragrance ingredients and not to produce other fragrances and fragrances ingredients produced by their competitors." Compl. ¶ 72.  The complaint further reveals that this agreement allocated products and customers and limited price competition by ensuring that Defendants would not offer overlapping and competing products.  *Id.* ¶¶ 10-11, 72-74.

Thus, the Market-Allocation Group has identified and specifically alleged a different type of cartel, one that makes the most sense based on how the fragrance

industry works. Indeed, the theory is consistent with the Swiss Competition Commission's announced "suspicions" that Defendants "prohibited their competitors from supplying certain customers and limited the production of certain fragrances." *Id.* ¶ 57. It is also much simpler cartel to prove -- under our theory of the case, Plaintiffs need only demonstrate that Defendants agreed to carve up the market and stay out of each other's way.

Our complaint is also unique in the amount of evidence that supports it. As the complaint details, as far back as 2012, Defendants reached a "non-appropriation consensus"—meaning they agreed not to copy each other's fragrances. *Id.* ¶ 76. This "consensus" was put in place in the face of threatened price competition spurred by the increased ability to reverse-engineer fragrances. It was against this backdrop that Defendants reached a "gentlemen's agreement" to not "cannibalize each other by manufacturing competing products." *Id.* ¶ 75.

Our investigation also found that Defendants created and agreed to "ethical" codes that bound them to the principle that "[p]lagiarism is not tolerated." *Id.* ¶¶ 77. In other words, Defendants' code considered it *unethical* to *compete* on overlapping product lines. But the Supreme Court has made it clear that such attempts by competitors to combine together to prevent copying are condemned by the antitrust laws. *See Fashion Originators' Guild of Am. v. Fed. Trade Comm'n,* 312 U.S. 457, 461-65 (1941) (noting that "Petitioners call this practice of copying unethical and

immoral" but holding that agreement among competitors to prevent copying is "well within the inhibition of the policies declared by the Sherman Act itself").

Our approach is also distinct in identifying Defendants' motive to conspire. As alleged, intellectual property laws do not usually protect fragrances, and technology allowing the reverse-engineering of fragrance compounds is widely available and accurate. This created a motive to conspire because, in a competitive market, Defendants would not be able to "rely on their proprietary fragrance compounds to maintain customers because a competitor c[ould] copy that fragrance compound and compete on price." Compl. ¶¶ 67. In fact, "a client could use its ability to reverse-engineer its fragrance as a cudgel: unless its manufacturer lowered its prices, that customer could take the fragrance to another manufacturer to make the fragrance at a lower cost." Id. ¶ 69. But, by agreeing to allocate customers and products, "Defendants were able to nullify the competitive effects of Defendants' ability to reverse-engineer each other's fragrances." Id. ¶ 73.

As further support for our allegations, we reached deeper for evidence within the finer details of Defendants' operational data: While there are about 3,000 fragrance ingredients, each Defendant produces only a small subset of those—and as to *which* subset, Defendants' offerings were strikingly different. Id. ¶¶ 75-77. This non-overlap in product offerings cannot be explained by normal market forces. Id. ¶¶ 78-80.

### III.   The Approach of the Price-Fixing Group

The first complaint filed by the Price-Fixing Group was just 21-pages long; it described the industry, flagged obvious "plus factors," and noted the existence of the government investigations.  Based on this information alone, it alleged a "price-fixing conspiracy to protect [Defendants'] earnings in the face of the rising cost of raw materials."  *See Our Own Candle Co. v. Givaudan S.A.*, No. 23-cv-02174, Dkt. 1 (D.N.J. Apr. 18, 2023) at ¶¶ 51-58.  It then quoted a few statements about financial results in order to show Defendants were successful in keeping prices high and "at times reported their price increases within several weeks of one another."  *Id.* ¶ 59.

The later-filed Price-Fixing Group complaints added some detail, but continued to advance only a price-fixing theory of liability.[3]  For instance, one later complaint expands on every section of the first-filed complaint, but still presents the same "conspiracy to fix prices," motivated by "increased costs of the raw materials needed to manufacture Fragrances," and evidenced by "Defendants' suspicious[] report[s of] increasing prices around the same time."  *B&E Assocs. v. Firmenich SA*, No. 23-cv-03050, Dkt. 1 ¶¶ 5, 63-89 (D.N.J. June 2, 2023).  While we understand

---

[3]   *See Candle Shop of the Poconos, Inc. v. Givaudan S.A.*, No. 23-cv-03049, Dkt. 1 ¶¶ 69-78 (D.N.J. June 2, 2023); *Demeter F.L. Inc. v. Int'l Flavors & Fragrances Inc.*, No. 23-cv-03265, Dkt. 1 ¶¶ 33-49 (D.N.J. June 14, 2023); *Hanna's Candle Co. v. Int'l Flavors & Fragrances Inc.*, No. 23-cv-03266, Dkt. 1 ¶¶ 35-50 (D.N.J. June 14, 2023); *Cospro Dev. Corp. v. Int'l Flavors & Fragrances*, No. 23-cv-03368, Dkt. 1 ¶¶ 49-50 (D.N.J. June 20, 2023).

the risk of "friendly fire" and so will not argue against the plausibility of other plaintiffs' allegations, we do invite the Court to consider which set of allegations it finds more plausible and supported.

## **ARGUMENT**

### I.   **The Market-Allocation Group Has Done the Most to Investigate and Challenge Defendants' Conduct for the Benefit of the Class**

Rule 23(g)(1)(A)(i)—"the work counsel has done in identifying or investigating potential claims in the action"—strongly favors the Market-Allocation Group.  As discussed above, *see* § II, following news reports of "raids," we invested the time to thoroughly investigate and master this industry and determine what claims to pursue.  This work created demonstrable value for the class in the form of the most developed and plausible complaint alleging a market allocation theory.[4]

---

[4] *See Garbaccio v. St. Joseph's Hosp. & Med. Ctr. & Subsidiaries*, No. CV 16-2740 (JMV), 2017 WL 1196458, at *3 (D.N.J. Mar. 13, 2017), *report and recommendation adopted*, No. CV 16-2740, 2017 WL 1181575 (D.N.J. Mar. 29, 2017) (appointing leadership to firms, including Cohen Milstein, whose "Complaint pleads additional theories of relief providing a more comprehensive protection for plaintiffs and the class."); *In re Interest Rate Swaps Litigation*, No. 1:16-md-02704, Dkt. 99 (S.D.N.Y. Aug. 3, 2016) (appointing Quinn Emanuel and Cohen Milstein co-lead counsel where "the Court's assessment is that the efforts undertaken by Quinn Emanuel and Cohen Milstein were more generative and exceeded the investigative work of the other applicants by an order of magnitude"); *In re Mun. Derivatives Antitrust Litig.*, 252 F.R.D. 184, 186 (S.D.N.Y. 2008) (appointing as interim co-lead counsel the firms, including Cohen Milstein, that "expended substantially more effort and resources and obtained more substantial and more valuable and reliable information.").

11

Our complaint also contains factual support dating back to at least 2012, and is supported by a much longer class period that could result in far greater damages for the class.  *Cf. Stires v. Eco Science Solutions Inc.*, No. 17-cv-3707, 2018 WL 5784817, at * 1 n.2 (D.N.J. 2018) (holding the "longer period encompasses more potential members and covers more of the time in which Defendants' alleged improper behavior was underway.") (internal quotations omitted); *In re Comverse Tech., Inc. Derivative Litig.*, No. 06-CV-1849 NGG RER, 2006 WL 3761986, at *4 (E.D.N.Y. Sept. 22, 2006), *objections overruled*, No. 06-CV-1849 NGG RER, 2006 WL 3511375 (E.D.N.Y. Dec. 5, 2006) (applying Rule 23(g) to hold that the "breadth of the allegations" related to "the relevant period" in appointed counsels' Complaint indicates they "have done more to investigate the factual predicates of this [] action, and to press for the most extensive recovery period, thus setting them apart from their colleagues."). Compared to the previously filed complaints, the Market-Allocation complaint offers a stronger theory of liability (Defendants' agreement to allocate the fragrance market by agreeing not to copy each other's fragrances) with a different motivation (to stem increased price competition from the now-widespread ability to reverse-engineer fragrances).  It also supports these claims with detailed facts that no other complaint references.   This evidence includes industry commentary, dating back to 2012, that Defendants reached a "non-appropriation consensus" for "olfactory creations," Compl. ¶ 76, and entered into a "tacit

12

agreement," "informal understanding," and "gentleman's agreement" to "not cannibalize each other by manufacturing competing products based on formulas of a competitor acquired through reverse engineering." *Id.* ¶ 75.

Defendants also signed "Codes of Ethics," and are affiliated with trade organizations, that expressly prohibit "plagiarism"—which in the fragrance industry means recreating a competitor's fragrance to compete for that competitor's customers. *Id.* ¶¶ 77-78. Similar sorts of agreements have been condemned by the Supreme Court as being *per se* violations of the antitrust laws. *See Fashion Originators' Guild of Am. v. Fed. Trade Comm'n*, 312 U.S. 457, 465 (1941).

The complaint also includes powerful circumstantial evidence. *See Lifewatch Servs., Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018) (explaining plaintiffs may demonstrate an agreement that violates the antitrust laws through circumstantial evidence including parallel conduct and plus factors). In addition to alleging several plus factors, Compl. ¶¶ 94-127, our complaint is the only one to allege parallel conduct that fits with the market segmentation theory of the case: that each Defendant, at the same time, produced only a subset of available fragrance ingredients and refrained from making specific fragrance ingredients that competed with those of the other Defendants. *Id.* ¶¶ 79-81.

Importantly, the complaint is unique in putting forward a plausible motive that accords with the market-allocation theory: Given competitors' abilities to reverse-

engineer their fragrances and the lack of patent protection in the fragrance industry, Defendants were incentivized to collude to prevent wide-scale copying of fragrances. *Id.* ¶¶ 61-71. And only the Market Allocation Group's complaint alleges a mechanism for enforcement of a market allocation conspiracy—that Defendants relied on each other to source ingredients they did not themselves produce. *Id.* ¶¶ 137-38. The complaint also details how Defendants utilized "core lists"—developed by customers to preselect suppliers to whom they would give exclusive access to new bidding opportunities—to prevent smaller manufacturers from competing with them because only a small subset of major fragrance suppliers were included on the lists. *Id.* ¶¶ 97-98.

Having developed a stronger claim that is supported by more evidence, the Market-Allocation Group's pre-suit investigation was more extensive than and superior to any other firm (or group of firms). We also devoted more time and effort to our investigation. Working with investigators, we identified over 40 former employees of the defendants, current and former employees of the defendants' customers, wholesalers, independent perfumers, and an intellectual property expert. We reached out to 39 of those sources and spoke with 22 individuals, including former executive assistants, account executives (sales representatives), manufacturing plant staff, division directors, global sales representatives, laboratory

technicians, and senior marketing employees.  We also retained and have consulted with an expert in the fragrance industry.

We also reviewed a broad range of written sources, including litigation records, news articles, blogs, perfume forums, public and private social media groups, trade association websites and publications, and fragrance industry newsletters and publications.  We reviewed Defendants' earnings call transcripts, financial conference transcripts, websites and SEC filings, and domestic and international academic publications.   Finally, we watched fragrance industry conference panels that included Defendants' employees.

No other firm or group of firms argue with any specificity that they did an investigation this extensive.

Our investigation is also ongoing.  Since we filed our complaint last Thursday, the Market-Allocation Group has already uncovered additional evidence from a former employee of two Defendants, who identified Defendants as "the cartel."  The former employee explained that in response to the increasing use of "core lists" by Defendants customers, Defendants colluded to coordinate their bids to be included in customer core lists.  We expect our investigation will continue to turn up valuable evidence if we are appointed interim co-lead counsel.

By contrast, as seen above, *see* § III, the Price-Fixing Group largely focuses not on the scope and quality of their investigation, but on being the first to rush to

Court.  PFG Mot. at 9.  If they had discovered the case through their own private investigation, that would be one thing.  But this is not a "proprietary" case.  Rather, news reports regarding government investigations made all counsel aware of the alleged cartel at the same time.  In such a situation, being the first to have filed, without developing detailed allegations as to *how* the cartel operated, does not create value for the class.[5]  *See Outten v. Wilmington Tr. Corp.*, 281 F.R.D. 193, 199 (D. Del. 2012) (holding "the first-to-file factor when appointing lead counsel has been rejected so as to avoid a 'race to the courthouse'"); *In re Scrap Metal Antitrust Litig.*, No. 1:02-CV-0844, 2002 WL 31988203, at *1 (N.D. Ohio Aug. 5, 2002) ("Absent evidence that the first-to-file should be credited with conducting substantial investigative efforts to ferret out the alleged improprieties, no weight is generally accorded to the timing of a particular plaintiff's complaint."); *City of Providence, R.I. v. AbbVie Inc.*, No. 20-CV-5538 (LJL), 2020 WL 6049139, at *5 (S.D.N.Y. Oct. 13, 2020) (discounting first-to-file factor, and instead appointing Cohen Milstein as co-lead counsel, where earlier-filed claims lacked "originality" and "were based

---

[5]   While certain members of the Price-Fixing Group took additional time to undertake "investigations" that expanded on some allegations, PFG Mot. at 10, these investigations did not change the nature and scope of the case or yield direct evidence of a conspiracy, and thus did not create nearly the value that our investigation did.

largely on publicly filed documents," and observing that counsel who "was not the first out of the block … may have been the more deliberate").

Trying to parlay being first into a longer checklist of virtues, the Price-Fixing Group points out they were the first to reach out to defendants, the first to reach scheduling stipulations, etc.  But these are simply standard procedural steps that would have been done by whoever filed first.  And these cases are all still in their infancy—even the Price-Fixing Group admits that the next step will be the filing of a consolidated complaint which is to be the responsibility of the appointed lead counsel.  PFG Mot. at 5.  Just as who filed first weighs little on the facts of this case, so too should the Court not be swayed by how many ways counsel can say they were "first" to tick a procedural box (a common tactic to pad leadership applications), when the Market-Allocation Group has created more meaningful value with its substantive contributions.

## II.    The Market-Allocation Group Has Significant Experience and Deep Knowledge of the Applicable Law

The factors in Rule 23(g)(1)(A)(ii) and (iii)—"counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action" and "counsel's knowledge of the applicable law"—also strongly favor the Market-Allocation Group.  Initially, the Court can determine who has *actually demonstrated* greater expertise by way of the complaint-comparison exercise

described above, but even more generally, the Market-Allocation Group is uniquely qualified to lead the prosecution of this case.

*Quinn Emanuel* is the largest law firm in the world devoted solely to business litigation.  It has over 1,000 attorneys, most of whom graduated from one of the nation's top law schools, and many of whom are former federal prosecutors, circuit-level clerks, and Supreme Court clerks.  Quinn Emanuel is consistently ranked among the top five firms in virtually every category of business litigation.  It is the "most feared law firm" in the country: three times in the past four years, a survey of over 350 major companies conducted by independent BTI Consulting Group identified Quinn Emanuel as the firm they least wanted to face as opposing counsel. Quinn Emanuel has been ranked in the "fearsome foursome" for twelve years.

Quinn Emanuel has also been named a "litigation powerhouse" by *The American Lawyer*, and a "global force in litigation" by *The Wall Street Journal*. String-cites of the firm's successes could go a mile-long, with Quinn Emanuel partners racking up thousands of trial victories, and the firm obtaining four 10-figure verdicts, seven 9-figure jury verdicts, fifty-one 9-figure settlements, and twenty 10-figure settlements.  Quinn Emanuel has won nearly $80 billion for plaintiffs; $28 billion in a recent two-year period.

Quinn Emanuel's deep bench has allowed it to develop the nation's premier practice for handling massive antitrust cases, particularly from the plaintiffs' side.

The *Global Competition Review* named Quinn Emanuel's antitrust and competition practice among the "25 Global Elite 2023," and number five in their list of the world's top 10 competition litigation practices.  The firm has been ranked a "Tier One" antitrust practice by *Benchmark Litigation*, "Antitrust Litigation Department of the Year" by *The Recorder*, and "Class Action Group of the Year" by Law360.

Quinn Emanuel has recovered billions for clients in the antitrust space specifically.  For instance, Quinn Emanuel served as co-lead counsel in *In re Credit Default Swaps Antitrust Litigation*, where the Court approved $1.87 billion in settlements and, in a report recommending approval, the mediator Judge Weinstein (Ret.), said that "in 30-plus years of mediating high-stakes disputes, this was one of the finest examples of efficient and effective lawyering by plaintiffs' counsel that I have ever witnessed."  No. 13-md-02476, Dkt. 447 at 2 (S.D.N.Y. Oct. 16, 2015); *id.*, Dkt. 557 at 22-23 (S.D.N.Y. Apr. 25, 2016).

The Honorable Judge Denise Cote also explained the settlement and its size in particular "is attributable in no small measure to the skill of class counsel and the litigation strategy it employed."  *Id.*, Dkt. 557 at 22-23 (S.D.N.Y. Apr. 25, 2016). *See also, e.g.*, *ISDAfix Antitrust Litig.*, No. 14-cv-7126 (S.D.N.Y.) ($500 million in settlements in antitrust class action); *In re Polyurethane Foam Antitrust Litig.*, No. 10-md-02196 (N.D. Ohio) ($430 million in settlements in antitrust class action).

Quinn Emanuel also has a track record of success even in the narrower space of antitrust cases involving segmentation and allocation issues. *See, e.g.*, *FCA US LLC v. Yazaki Corp.*, No. 2:17-cv-14138 (E.D. Mich.) (billion-dollar antitrust action arising out of a the largest criminal investigation in U.S. history, in case involving allegations of, among other things, allocating customers in the market for automobile wire harnesses; successfully resolved after summary judgment briefing); *Ashton Woods Holdings L.L.C. et al. v. USG Corp.*, No. 4:15-cv-01247-HSG (N.D. Cal) (multi-district litigation arising out of a conspiracy among drywall manufacturers to, among other things, allocate customers for wallboard products; successfully resolved right before trial).

Unlike most traditional plaintiff firms, Quinn Emanuel operates on both sides of the "v."  In the past three years alone, Quinn Emanuel represented defendants in class actions dozens of times, including in *antitrust* class actions.  Quinn Emanuel's ability to operate on both sides gives it unique insights into the strategies employed by antitrust defendants and creates credibility with courts and adversaries.

As this case has its roots in government investigations, it merits emphasis that Quinn Emanuel has one of the most elite investigations and government enforcement practices in the world.  Quinn Emanuel includes among its partners numerous former federal prosecutors and DOJ and FTC antitrust lawyers.  Quinn Emanuel regularly works with the DOJ and FTC in parallel antitrust enforcement matters, including

(currently) the aerospace "no-poach" case in Connecticut. *Borozny v. Raytheon Techs. Corp.*, No. 21-cv-1657 (D. Conn.)). *See also In re Int. Rate Swaps Antitrust Litig.*, No. 1:16-md-02704 (S.D.N.Y.); *In re Treasury Sec. Auction Antitrust Litig.*, No. 1:15-md-02673 (S.D.N.Y.).

The Quinn Emanuel team will be led by Daniel Brockett, Manisha Sheth, and Jeremy Andersen.  Mr. Brockett is Quinn Emanuel's Chair of Financial Institution Litigation practice.  He is a Chambers-ranked lawyer recognized as an "elite trial strategist" by his peers and "a very good lawyer who is always willing to roll the dice."  He has been consistently ranked among the top litigators by multiple leading publications.  In 2018, he was ranked by Benchmark Litigation as one of the Top 100 Trial Lawyers in America.  Law360 also recently recognized Mr. Brockett as a "Competition MVP," and in 2016 the *National Law Journal* named him one of its "Litigation Trailblazers."  In 2021 and 2022, he was named one of LawDragon's 500 Leading Plaintiff Financial Lawyers.  Known as a cut-to-the-chase litigator with significant jury trial experience, Mr. Brockett has recovered billions for major institutional clients.

Ms. Sheth is Co-Chair of Quinn Emanuel's Government and Regulatory Litigation Practice.  Ms. Sheth is a seasoned trial lawyer with over 24 years of experience in both private practice and government prosecutions, and she recently served as the Executive Deputy Attorney General for the Division of Economic

Justice at the Office of the New York Attorney General, where she supervised all of the Office's complex commercial investigations and led a Division of 250 attorneys and staff.

Mr. Andersen has an accounting background that has allowed him to succeed in complex financial litigation. He has been a core member of many of Quinn Emanuel's recent antitrust class-action successes. Three of his recent antitrust matters each resulted in over $100 million in recoveries, and a fourth recovered $95.5 million. Overall, he has helped victims recover over $3 billion. He is a Legal 500 "Next Generation Partner" and a Law360 "rising star."

***Cohen Milstein*** is one of the oldest, largest, and most successful law firms in the nation dedicated primarily to the prosecution of class actions. Cohen Milstein's antitrust prowess has been recognized by numerous industry associations and legal publications. For instance, Cohen Milstein has been chosen: by The Legal 500 for nine straight years as one of the top antitrust class action firms in the country; by American Lawyer Media and The National Trial Lawyers as their Antitrust Law Firm of the Year; as The Legal 500's Leading Plaintiff Class Action Antitrust Firm; as the *National Law Journal*'s Elite Trial Lawyers—Antitrust; and as a Law 360 Competition Practice Group of the Year. *Forbes* has called Cohen Milstein a "class action powerhouse," while *Inside Counsel* has dubbed Cohen Milstein "[t]he most

effective law firm in the United States for lawsuits with a strong social and political component."

Cohen Milstein secured the largest ever price-fixing jury verdict in U.S. history, resulting in a $1.06 billion judgment. Remarking on Cohen Milstein's efforts, United States District Judge John W. Lungstrum wrote, "In almost 25 years of service on the bench, this Court has not experienced a more remarkable result." *In re Urethane Antitrust Litigation*, MDL No. 1616, Dkt. 3273 at 10-11 (D. Kan. July 29, 2018). Other notable Cohen Milstein antitrust wins include its $575 million settlement on the eve of trial in *Sutter Health Antitrust Litigation*, No. CGC-14-538451 (San Fran. Cnty., Cal.) and its $560 million settlement in *Electronic Books Antitrust Litig.*, No. 11-md-02293 (S.D.N.Y.). *See also In re Broiler Chicken Antitrust Litig.* ("*In re Broilers*"), No. 1:16-cv-08637 (N.D. Ill.) ($181 million in settlements to date). Relevant to this case's roots in a governmental investigation, Cohen Milstein worked hand-in-glove with the attorneys general from 33 U.S. states en route to recovering more than $560 million for the class in *eBooks*. Similarly, in *Sutter*, Cohen Milstein partnered with the California AG and recovered $575 million for the class along with injunctive relief.

The Cohen Milstein team will be led by Michael Eisenkraft, Laura Posner, Daniel Silverman, and Christopher Bateman. Mr. Eisenkraft has recovered more than $1 billion in class actions and serves as co-lead counsel in a number of complex

antitrust class actions with Quinn Emanuel, including *In re Interest Rate Swaps Antitrust Litig.*, No. 1:16-md-02704 (S.D.N.Y.), *In Re: Treasuries Securities Auction Antitrust Litigation*, No. 1:16-md-02704 (S.D.N.Y.); *Iowa Public Employees' Retirement System v. Bank of America Corp.*, No. 1:17-cv-06221 (S.D.N.Y.), and *Crop Protection Products Loyalty Program Antitrust Litigation*, No. 1:23-md-03062 (M.D.N.C.) as well as a number of other class cases both individually and with other firms. His work has been widely honored by the legal industry, including by Benchmark Litigation as a "Litigation Future Star" (2023) and in its "40 & Under Hot List" (2018 and 2019), by Legal 500 as a "Next Generation Partner" (since 2020), and by New York Super Lawyers (Rising Star 2013-2019, Super Lawyer 2022-2023). He has been rated "AV Preeminent" by Martindale-Hubbell for a number of years and is a former law clerk for United States Circuit Judge Barrington D. Parker of the U.S. Court of Appeals for the Second Circuit.

Before joining Cohen Milstein, Laura Posner served as the Bureau Chief for the New Jersey Bureau of Securities (New Jersey's top securities regulator). At Cohen Milstein, she has served as lead or co-lead counsel in a number of class actions, including *In re Wells Fargo & Company Securities Litigation*, No. 1:20-cv-04494 (S.D.N.Y.), in which the Court recently granted preliminary approval of a historic $1 billion settlement. For her work, Ms. Posner has received numerous peer

and industry recognitions, including *The National Law Journal's* 2021 Elite Trial Lawyers "Elite Women of the Plaintiffs Bar Award" and *Crain's New York Business* 2020 "Notable Women in Law." Annually, she is honored as a New York Super Lawyer, as a member of *Benchmark Litigation's* "40 & Under Hot List" and "Future Stars List," and as one of Lawdragon's Leading Plaintiff Financial Lawyers. In 2017, Ms. Posner received NASAA's 2017 "Outstanding Service Award."

Daniel H. Silverman is highly regarded for his deep engagement with economic experts and for successfully shepherding cases through class certification. In 2022, Law360 named him a "Rising Star - Antitrust," the only plaintiffs' lawyer to be so named. Mr. Silverman has played a crucial role in litigating several complex antitrust class actions including *In re Domestic Drywall Antitrust Litigation*, No. 2:13-md-02437 (E.D. Pa.) ($190 million in settlements) and *In re: Plasma-Derivative Protein Therapies Antitrust Litigation*, No. 1:09-cv-07666 (N.D. Ill.) ($128 million). Prior to joining the firm in 2012, Mr. Silverman served as the Executive Director of Legal Economics, LLC, supporting expert economic testimony on behalf of Harvard Law School Professor Einer Elhauge, a leading antitrust authority, in a variety of antitrust matters and providing him unique insight into the inner workings of expert testimony in antitrust matters.

Recognized as a New York Metro Rising Star by *Super Lawyers* since 2021, Christopher Bateman has played a significant role as co-lead counsel in a number of

25

antitrust class actions with Quinn Emanuel and others.  He is a former law clerk to United States District Judge Naomi Reice Buchwald of the Southern District of New York and Vice Chair of the American Bar Association's Antitrust Section's U.S. Comments & Policy Committee, and he served as a Guest Lecturer at the New York University School of Law.

*Calcagni & Kanefsky* will serve as Liaison Counsel.  Calcagni & Kanefsky is an elite New Jersey litigation boutique made up of exceptionally talented former federal and state prosecutors and regulators, and seasoned trial attorneys.  They have the talent and experience to take this case to trial before a New Jersey jury.  The attorneys on this case already include: Eric Kanefsky, Thomas Calcagni, Ralph Marra, and Martin Gandelman.

Before founding Calcagni & Kanefsky, Mr. Kanefsky served as Director of the Division of Consumer Affairs for the State of New Jersey, a 600-person civil law enforcement and regulatory agency within the Office of the Attorney General, an Assistant U.S. Attorney in the District of New Jersey's elite Special Prosecutions Division which tried to verdict a number of prominent cases, and, before then, worked at one of the country's preeminent plaintiffs' litigation firms, where he helped recover hundreds of millions in settlements.

Mr. Calcagni began his career as a law clerk for United States District Judge Katharine S. Hayden in the District of New Jersey, and for Appellate Judge Donald

26

S. Coburn in the Superior Court of New Jersey, Appellate Division, before joining a prominent litigation firm.  From there, Mr. Calcagni joined the U.S. Attorney's Office for the District of New Jersey, where he tried high profile matters and served as the Environmental Crimes Coordinator.  In addition to his service in the U.S. Attorney's Office, Mr. Calcagni was the First Assistant Attorney General for New Jersey, the State's second highest-ranking prosecutor, and also served for two years as New Jersey's Director of the State Division of Consumer Affairs.

Mr. Marra previously served as Acting United States Attorney for the District of New Jersey.  He was the state's chief federal law enforcement officer, directing the work of approximately 140 federal prosecutors and overseeing all criminal and civil matters involving the United States government.  This capped a twenty-five-year career as a federal prosecutor in New Jersey, during which he served in additional key leadership roles including First Assistant U.S. Attorney, Executive Assistant U.S. Attorney, and Senior Litigation Counsel.  Prior to his government service, Mr. Marra was in private practice for seven years handling various litigation matters.

Mr. Gandelman came to Calcagni & Kanefsky from the New Jersey Attorney General's office where he served as a Deputy Attorney General and received the prestigious New Jersey Attorney General Award.

***In sum***, Defendants know that we can take this case through trial, win it, and then defend that win on appeal.  That will benefit the class.

### III.   The Market-Allocation Group Has Brought and Will Bring Extensive Resources to Litigate this Proposed Class Action

The Market-Allocation Group is also unrivaled with respect to Rule 23(g)(1)(A)(iv)—"the resources that counsel will commit to represent the class."

***Human and capital resources.*** As noted, Quinn Emanuel is the world's largest litigation firm, and offers resources to the class beyond anything other firms can match.  At last count, 318 of the firm's attorneys (or 35.3%) were law review editors in law school, 242 have clerked at least once for judges, and 24 partners were law school professors.  Because Quinn Emanuel works on both sides of the "v," it is a very diversified, well-capitalized firm that is not beholden to contingent income. This allows the firm to make investments that will benefit class plaintiffs whenever meritorious cases (such as this one) require.

Cohen Milstein is one of the largest firms in the country dedicated to prosecuting class actions, with more than 100 lawyers across eight U.S. cities.  Many of its attorneys are former federal law clerks, with several playing a leading role in litigating major antitrust cases on behalf of the federal government as attorneys in the Department of Justice's Antitrust Division.   The firm is well capitalized, consistently advances millions of dollars in litigation costs in matters of comparable

size and complexity, and is willing and able to do so here. Cohen Milstein also possesses a robust and experienced investigatory team, which was integral in discovering evidence of Defendants' market-allocation conspiracy here.

*Trial resources.* This is an area where we even further distance ourselves from the field. Quinn Emanuel tries more major business cases than any other law firm. Courts recognize that Quinn Emanuel attorneys are "trial lawyers who can actually go into court and try a case." *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-02476 (S.D.N.Y.), Dkt. 244 at 37-38. At least once each year, the firm is in a trial or an arbitration prosecuting or defending against a claim for over $1 billion in damages. Quinn Emanuel's partners have tried over 2,500 cases and arbitrations, winning 86% of them. Quinn Emanuel is one of a few firms to have actually tried multiple *class actions* to verdict.

Cohen Milstein likewise has substantial class and mass action trial experience. For example, it served as co-lead counsel in *Urethanes Antitrust Litigation*, which resulted in the largest price-fixing jury verdict in U.S. history, and its Antitrust group includes several former DOJ Antitrust Division trial attorneys.

Calcagni & Kanefsky is made up primarily of former prosecutors who have extensive experience trying (and winning) cases before juries in New Jersey.

*Appellate resources.* Winning this case may require winning appeals. Quinn Emanuel is home to one of the nation's leading appellate practices, headed by named

partner Kathleen Sullivan, who is repeatedly recognized as one of the nation's preeminent appellate advocates. Cohen Milstein attorneys have successfully argued class-action appeals before a number of federal appellate courts and have argued major class-action questions before the United States Supreme Court.

*Geographic resources.* In addition to its large New York office, Quinn Emanuel has seven other offices throughout the United States and numerous offices overseas, including offices in London, Switzerland, France, Brussels, and Germany, with leading EU competition practitioners. This international presence is an important factor given that this action may require discovery of foreign-based individuals and entities, as several of the Defendants are based in Europe and the "raids" that touched off the filing of all the complaints occurred in France, Switzerland, and London—all places where Quinn Emanuel has offices. And while global in scale, Quinn Emanuel operates as a single firm across offices, which will enable the seamless tapping of resources wherever the evidence and case require.

Cohen Milstein has multiple offices in the United States, including in New York, where one of the Defendants is based, Washington, D.C. (where the government prosecution is being coordinated), as well as Florida, Massachusetts, Minnesota, Pennsylvania and North Carolina.

*Technological resources.* The Market-Allocation Group can offer the class unrivaled in-house litigation services, direct attention, and tried-and-true analytical

tools. Both Quinn Emanuel and Cohen Milstein boast expertise in cutting-edge litigation and discovery technology, such as harnessing the power of artificial intelligence in document review. These analytical tools will allow us to effectively and efficiently cut through the massive volumes of documents that will likely be produced in this case, thus saving the class attorney time and money. Indeed, courts have appointed Quinn Emanuel as interim co-lead class counsel in complex antitrust class actions (like this one) precisely because Quinn Emanuel has the resources to "run massive discovery cases[.]" *In re Credit Default Swaps Antitrust Litig.*, Dkt. 244 at 37-38.

## IV.   Other Factors Weigh in Favor of the Market-Allocation Group

### 1.   *The Comparative Sizes of the Groups Weighs in Favor of the Market-Allocation Group*

On the surface, the Price-Fixing Group is proposing a leadership structure of three co-lead firms, compared to our proposal of two co-leads. Courts are often hesitant to appoint more than two co-lead firms because of the potential inefficiencies with larger structures. *See In re Remicade Antitrust Litig.*, No. 17-CV-4326, 2018 WL 514501, at *2 (E.D. Pa. Jan. 23, 2018) ("With attorneys from three firms working on behalf of the proposed class, the [proposed leadership group] naturally runs a greater risk of increased costs, difficulties in managing the litigation, and efficiently delegating tasks."); *Malasky v. IAC/Interactivecorp*, No. 04-cv-

7447(RJH), 2004 WL 2980085, at *5 (S.D.N.Y. Dec. 21, 2004) ("[T]here is some risk that three law firms may compromise the class through disagreement and/or duplicative or unnecessary legal fees."). But even if the three-firm co-lead has some precedent, the question is whether it is in the best interest of the class in this case.

"The types of appointments and assignments of responsibilities [of counsel] will depend on many factors. The most important is achieving efficiency and economy without jeopardizing fairness to the parties." Manual for Complex Litigation (Fourth) § 10.221. Even under the best of circumstances, larger structures present larger risks of administrative waste and redundant effort. The more firms that are involved, for instance, the more firms will have to be reviewing files just to stay up-to-date. *See generally, e.g.*, *In re Int. Rate Swaps Antitrust Litig.*, 2016 WL 4131846, at *4 (S.D.N.Y. Aug. 3, 2016) (appointing Quinn Emanuel and Cohen Milstein in a two-firm leadership structure; noting that "having more than two interim co-lead counsel will likely yield needless duplication of effort and inefficient decision making"); Manual for Complex Litigation (Fourth) § 10.221 (noting that "[c]ommittees of counsel can sometimes lead to substantially increased costs"). Given that Quinn Emanuel and Cohen Milstein have ample capacity to run the case, there is no reason to risk inefficiencies with additional actors.

The risk of inefficiencies with the Price-Fixing Group may be even greater than "two" versus "three." Given the biggest-in-the-world resources available at the

leadership level by way of Quinn Emanuel, combined with the sizable additional might of Cohen Milstein, we do not need to lean on additional firms to do work.

It is far less clear how the Price-Fixing Group intends to operate in practice. But that the month of June saw a flurry of copycat complaints filed by over a dozen often-overlapping law firms (all but one who shared the same local counsel)—who then quickly all agreed to "vote" for each other as a single unit in a joint "unopposed" (now opposed) leadership application—should at least raise flags that the Price-Fixing Group plans to dole out assignments to non-lead firms in an inefficient way.

2.    <u>Courts Respect "Private Ordering" Only When There Is<br>Unanimous Agreement—Which Is Not the Case Here</u>

The Price-Fixing Group argues that "private ordering" is "common" and "encouraged." PFG Mot. at 2, 8. But all that refers to is the uncontroversial observation that that *where all counsel can be brought into a single agreement*, courts can adopt the proposal after ensuring it is sufficiently efficient and adequate for the class. Manual for Complex Litigation (Fourth) § 21.272.

Now that the leadership application is contested, arguments about "private ordering" are irrelevant. Where there is a dispute, as here, courts do not simply count "votes." To the contrary "the judge selects from counsel who have filed actions" when they are "unable to agree on a lead class counsel" based on "an examination of the factors listed in" Rule 23. *Id.* Accordingly, that the Price-Fixing Group

33

application is backed by "[m]ore than a dozen law firms," PFG Mot. at 7, in no way binds this Court.  Indeed, if anything it could be viewed as a warning sign with respect to efficiency.

**<u>CONCLUSION</u>**

For the reasons discussed above, we respectfully request that the Court appoint Cohen Milstein and Quinn Emanuel as interim co-lead counsel, and Calcagni & Kanefsky as liaison counsel and deny the motion to appoint Linda Nussbaum Law Group, P.C., Korein Tillery, P.C., and Hausfeld LLP as interim co-lead counsel.

Dated: July 24, 2023

Respectfully submitted,

/s/ *Eric Kanefsky*
Eric Kanefsky (N.J. Bar No. 024292002)
Ralph J. Marra, Jr. (Atty No. 020761978)
Thomas R. Calcagni (Atty No. 044801997)
Martin Gandelman (Atty No. 015592011)
CALCAGNI & KANEFSKY, LLP
1085 Raymond Boulevard, 14th Floor
Newark, New Jersey 07102
Telephone: (862) 397-1796
Fax: (862) 902-5458
eric@ck-litigation.com
rmarra@ck-litigation.com
tcalcagni@ck-litigation.com
mgandelman@ck-litigation.com

*Counsel for Plaintiff and the Proposed Class*

Michael Eisenkraft
Laura Posner (*pro hac vice* forthcoming)
Christopher Bateman (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-0177
Fax: (212) 838-7745
meisenkraft@cohenmilstein.com
lposner@cohenmilstein.com
cbateman@cohenmilstein.com

Zachary Krowitz (*pro hac vice* forthcoming)
Nina Jaffe-Geffner (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave NW, Fifth Floor
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
zkrowitz@cohenmilstein.com
njaffegeffner@cohenmilstein.com

Daniel H. Silverman (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
769 Centre Street, Suite 207
Boston, MA 02130
Tel: (617) 858-1990
Fax: (202) 408-4699
dsilverman@cohenmilstein.com

*Counsel for Plaintiff and the Proposed Class*

Daniel L. Brockett (*pro hac vice* forthcoming)
Manisha M. Sheth (*pro hac vice* forthcoming)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
manishasheth@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice* forthcoming)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com
*Counsel for Plaintiff and the Proposed Class*

Curt Lockhart (*pro hac vice* forthcoming)
LOCKHART IP
68 S 200 W A
Bountiful, Utah 84010
Telephone: (713) 487-6624
curt@usipconsulting.com
*Counsel for Plaintiff and the Proposed Class*