# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: FRAGRANCE DIRECT PURCHASER ANTITRUST LITIGATION** | Case No. 2:23-cv-02174-WJM-JSA<br><br>Jury Trial Demanded |

## <u>DIRECT PURCHASERS' CONSOLIDATED COMPLAINT</u>

**TABLE OF CONTENTS**

NATURE OF THE ACTION ............................................................................1

JURISDICTION AND VENUE .......................................................................5

PARTIES.........................................................................................................6

    A.    Plaintiffs ....................................................................................6

    B.    Defendants................................................................................7

    C.    Agents and Co-Conspirators ..................................................14

FACTUAL ALLEGATIONS .........................................................................14

    A.    The Fragrance Industry ..........................................................14

        1.    The Production of Fragrances.................................16

            a.    Upstream Suppliers.....................................17

            b.    Fragrance Ingredient and Compound Production .........18

            c.    Downstream Customers.................................23

        2.    Defendants' Fragrance Products Are Interchangeable ............24

        3.    Defendants Supply Each Other with Fragrance Ingredients...................................................27

    B.    The Structure and Characteristics of the Fragrance Market Support the Existence of a Conspiracy ................................28

        1.    The Market Is Highly Concentrated and the Defendants Are the Dominant Firms ........................................28

        2.    Defendants are Vertically Integrated ........................34

        3.    Barriers to Entry Are High........................................35

        4.    The Buy-Side of Market Is Not Concentrated ..........................38

        5.    Demand for Fragrances Is Inelastic ..........................................39

6. Fragrance Products Are Commodities ......................................40

7. Fragrances are Nondurable Products .......................................40

8. Industry Associations Provided Defendants Forums to Collude and Assisted Defendants in Carrying out Their Conspiracy ................................................................................40

C. Defendants Coordinated Parallel Price Increases During the Class Period..............................................................................................48

D. Defendants Monitored Their Conspiracy............................................62

E. Defendants' Pretextual Reasons for Their Prices Increases................63

F. Defendants' Coordinated Parallel Price Increases Substantially Improved Their Profitability .................................................................67

G. Defendants Restrained and Allocated the Supply of Key Fragrance Ingredients ...........................................................................71

H. Government Authorities Conduct Dawn Raids on Defendants ..........76

DEFENDANTS' FRAUDULENTLY CONCEALED THEIR CONSPIRACY ....84

CLASS ACTION ALLEGATIONS ........................................................................86

INTERSTATE TRADE AND COMMERCE .........................................................90

ANTITRUST INJURY ............................................................................................91

CLAIM FOR RELIEF ............................................................................................92

REQUEST FOR RELIEF .......................................................................................94

JURY DEMAND .....................................................................................................96

"Odors have a power of persuasion stronger than that of words, appearances, emotions, or will.  The persuasive power of an odor cannot be fended off, it enters into us like breath into our lungs, it fills us up, imbues us totally.  There is no remedy for it . . . He who ruled scent ruled the hearts of men."[1]

Plaintiffs B & E Associates, Inc., Cospro Development Corp., Demeter F.L., Inc., Hanna's Candle Company, and Our Own Candle Company, Inc. ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to the federal antitrust laws and demands a trial by jury on all matters so triable.

## NATURE OF THE ACTION

1.     This lawsuit arises from an unlawful conspiracy to fix, raise, or maintain the prices for fragrance ingredients and fragrance compounds (collectively, "Fragrance Products" (further defined below)) by Defendants Firmenich International SA, Givaudan SA, International Flavors & Fragrances Inc. ("IFF"), and Symrise AG, and certain entities owned or controlled by them, as described below (collectively, "Defendants") in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

2.     Companies, such as Plaintiffs and the Class, add Fragrances Products (scent) to consumer goods such as candles, soaps, lotions, cosmetics, perfumes, detergents, fabric care, and household cleaners to make those products smell

pleasant.  A product's smell helps establish a positive olfactory (and emotional) association with the product.  Fragrance Products are therefore a key input in such consumer goods.

3.     Defendants are the four largest producers of Fragrance Products, controlling nearly two-thirds of the global and U.S. markets.  Defendants acquire raw materials and convert them into Fragrance Products, before selling them on to companies, such as Plaintiffs and other Class members.  Defendants' sale of Fragrance Products is a multi-billion dollar business in the United States.

4.     Beginning at least as early as January 1, 2018, Defendants entered into an unlawful agreement to increase the prices of Fragrance Products charged to Plaintiffs and the Class.  Upon information and belief, Defendants' conspiracy to fix prices for Fragrance Products began in response to increased costs of the raw materials needed to manufacture Fragrance Products, which threatened Defendants' profitability.  To protect their profits, Defendants conspired to restrain the supply, coordinate the prices, and allocate the markets for Fragrance Products.  Tellingly, however, after raw materials prices began to subside, Defendants continued to increase the prices of Fragrance Products in a coordinated fashion.

5.     Plaintiffs learned of Defendants conspiracy no earlier than March 7, 2023.  On that date, the European Commission ("EC") announced that it had carried out dawn raids at several suppliers and an industry association in the Fragrance

2

Products industry in coordination with the Swiss Competition Commission ("COMCO"), the U.S. Department of Justice Antitrust Division ("DOJ"), and the U.K. Competition and Markets Authority ("CMA").[1]

6.     The same day, CMA provided further insight into the dawn raids, announcing that it "has reason to suspect anti-competitive behaviour [*sic*] has taken place involving suppliers of Fragrance Products for use in the manufacture of consumer products such as household and personal care products," and named Firmenich International SA, Givaudan SA, International Flavors & Fragrances Inc., and Symrise AG as the subjects of the investigation.[2]

7.     The next day, COMCO revealed that the dawn raids were based on "indications that several undertakings active in the production of fragrances have violated cartel law."[3] COMCO identified the same Defendants as targets of the dawn raids and disclosed that "[t]here are suspicions that these undertakings have

---

[1]     European Commission Press Release IP/23/1532, Antitrust: Commission Confirms Unannounced Inspections in the Fragrance Sector (Mar. 7, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_1532.

[2]     *CMA Launches Investigation into Fragrances and Fragrances Ingredients*, CMA COMPETITION & MARKETS AUTHORITY (last updated Mar. 8, 2023), https://www.gov.uk/government/news/cma-launches-investigation-into-fragrances-and-fragrance-ingredients.

[3]     The Swiss Competition Commission Press Release, Frank Stüssi & Andrea Graber Cardinaux, COMCO Investigates Possible Collusions in the Fragrance Market (Mar. 8, 2023), https://www.weko.admin.ch/weko/en/home/medien/press-releases/nsb-news.msg-id-93502.html.

coordinated their pricing policy, prohibited their competitors from supplying certain customers and limited the production of certain fragrances."[4]

8.      In a May 10, 2023 filing with the U.S. Securities and Exchange Commission ("SEC"), IFF acknowledged the investigation and disclosed that it had received a criminal grand jury subpoena from the DOJ,[5] meaning the DOJ is considering a criminal prosecution against IFF and/or its co-conspirators. According to Section F.1 of Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual, "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Similarly, Firmenich also disclosed that it received a subpoena from the DOJ.[6]

9.      On January 17, 2024, CMA revealed that it had extended its probe of Givaudan, Firmenich, and IFF to include allegations that they engaged in further anticompetitive behavior in the form of so-called no-poach agreements. Specifically, CMA stated that the companies may have engaged in unlawful

---

[4]      *Id.*

[5]      International Flavors & Fragrances Inc., Quarterly Report (Form 10-Q) (May 10, 2023).

[6]      Firmenich, Financial Statements 2023 (June 30, 2023), at 48, https://www.dsm-firmenich.com/content/dam/dsm-firmenich/corporate/documents/firmenich-sa-annual-report-fy2023.pdf.

coordination involving reciprocal arrangements relating to the hiring or recruitment of certain staff involved in the supply of Fragrance Products.[7]

10.     As a direct result of Defendants' conspiracy, Plaintiffs directly purchased Fragrance Products from one or more Defendants at artificially inflated prices and were thereby injured in their business or property.  Plaintiffs bring this action on behalf of themselves and a Class of direct purchasers of Fragrance Products during the period from January 1, 2018 until the effects of the conspiracy have ceased (the "Class Period") as defined in more detail below.

### JURISDICTION AND VENUE

11.     Plaintiffs bring this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

---

[7]    *Suspected anti-competitive conduct in relation to fragrances and fragrance ingredients (51257)*, CMA COMPETITION & MARKETS AUTHORITY (updated January 17, 2024), https://www.gov.uk/cma-cases/suspected-anti-competitive-conduct-in-relation-to-fragrances-and-fragrance-ingredients-51257.

13.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

**PARTIES**

A.     **Plaintiffs**

14.     Plaintiff B & E Associates, Inc. (d/b/a Keystone Candle Company) is a Pennsylvania corporation with its principal place of business located at 7241 Paxton Street, Harrisburg, Pennsylvania 17111.  During the Class Period, Plaintiff B & E Associates, Inc. directly purchased Fragrance Products from one or more Defendants.

15.     Plaintiff Cospro Development Corp. is a Pennsylvania corporation that manufacturers beauty products, hair-care products, and cosmetics.   Cospro Development Corp. is headquartered at 105 Washington Avenue, Reading, Pennsylvania 19601.  During the Class Period, Plaintiff Cospro Development Corp. directly purchased Fragrance Products from one or more Defendants.

16.     Plaintiff Demeter F.L., Inc. (d/b/a Demeter Fragrance Library) is a New York corporation that designs and sells a library of fragrances.  Demeter F.L., Inc. is headquartered at 12 North Gate Road, Great Neck, New York 11023.  During the

Class Period, Plaintiff Demeter F.L., Inc. directly purchased Fragrance Products from one or more Defendants.

17.    Plaintiff Hanna's Candle Company is an Arkansas company located at 3655 South School Avenue, Fayetteville, Arkansas 72701.  Hanna's Candle Company is one of the largest candle companies in the United States and manufactures and sells candles, potpourri, air fresheners, and room sprays.  During the Class Period, Plaintiff Hanna's Candle Company directly purchased Fragrance Products from one or more Defendants.

18.    Plaintiff Our Own Candle Company, Inc. is a Pennsylvania corporation with its principal place of business located at 2779 North Road, Findley Lake, New York 14736.  Our Own Candle Company, Inc. is engaged in the business of the manufacturing and sale of candles, soaps, fragrance oils, room sprays, aromatherapy, and related products.  During the Class Period, Plaintiff Our Own Candle Company, Inc. directly purchased Fragrance Products from one or more Defendants.

19.    As a direct result of Defendants' conspiracy alleged in this Complaint, each Plaintiff and the Class members suffered damages because they paid more for Fragrance Products than they would have in the absence of Defendants' conspiracy.

**B.    Defendants**

20.    **IFF Defendant**.  Defendant International Flavors & Fragrances Inc. ("IFF") is a New York corporation that manufactures and sells flavors and

fragrances.  IFF maintains its principal place of business at 521 West 57th Street, New York, New York 10019.  IFF is listed on the New York Stock Exchange under the ticker symbol IFF.  During the Class Period, IFF manufactured and/or sold Fragrance Products to purchasers in the United States directly or through predecessors, affiliates, or subsidiaries.

21.    **Givaudan Defendants**.    Defendant Givaudan SA is a Swiss corporation that manufactures and sells flavors and fragrances.  Givaudan SA is headquartered at Chemin de la Parfumerie 5, 1214 Vernier, Switzerland.  Givaudan SA is listed on the SIX Swiss Exchange under the ticker symbol GIVN.  Givaudan SA has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates.  During the Class Period, Givaudan SA manufactured and/or sold Fragrance Products to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, or subsidiaries.

22.    Defendant Givaudan Fragrances Corporation is a U.S. subsidiary of Givaudan SA incorporated under the laws of Delaware.  Givaudan Fragrances Corporation maintains its principal place of business at 717 Ridgedale Avenue, East Hanover, New Jersey 7936.  During the Class Period, Givaudan Fragrances Corporation manufactured and/or sold Fragrance Products to purchasers in the United States directly or through predecessors, affiliates, or subsidiaries.  Givaudan

SA controls Givaudan Fragrances Corporation both generally and with respect to the conduct of Givaudan Fragrances Corporation in furtherance of the unlawful acts alleged in this Complaint.

23.    Defendant Ungerer & Company, Inc. ("Ungerer") is a Delaware corporation with its principal place of business located at 4 Ungerer Way, Lincoln, Park, New Jersey 07035.    Ungerer and its related companies are U.S.-based fragrance developers and suppliers that focus predominantly on natural ingredients for fragrance and flavor creation, as well as for end customers of such specialties.[8] Givaudan SA acquired Ungerer in 2020, and since then has operated it as wholly-owned subsidiary.[9]  Since the acquisition, Givaudan SA has controlled Ungerer both generally and with respect to the conduct of Ungerer in furtherance of the unlawful acts alleged in this Complaint.

24.    Defendant Custom Essence LLC ("Custom Essence") is a New Jersey corporation with its principal place of business located at 53 Veronica Ave., Somerset, New Jersey 00873.  Custom Essence specializes in the formulation of natural fragrance and creates perfumes for customers.  Givaudan SA acquired Custom Essence in 2021, and since then has operated it as a wholly-owned

---

[8]    *Givaudan completes acquisition of Ungerer*, GIVAUDAN (Feb. 20, 2020), https://www.givaudan.com/media/media-releases/2020/givaudan-completes-acquisition-ungerer.

[9]    *Id.*

subsidiary.  Since the acquisition, Givaudan SA has controlled Custom Essence both generally and with respect to the conduct of Custom Essence in furtherance of the unlawful acts alleged in this Complaint.  Givaudan SA, Givaudan Fragrances Corporation, Ungerer, and Custom Essence are collectively referred to as "Givaudan."

25.   **Firmenich Defendants**.  Defendant DSM-Firmenich AG is a Swiss corporation that manufactures and sells flavors and fragrances.  DSM-Firmenich AG is headquartered at Wurmisweg 576 Kaiseraugst, AG 4303 Switzerland and is listed on the Euronext Amsterdam stock exchange under the ticker symbol DSFIR.  DSM-Firmenich AG was created by the merger of DSM Group and Firmenich International SA, which was completed on May 8, 2023.  DSM-Firmenich AG has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates.  During the Class Period, DSM-Firmenich AG manufactured and/or sold Fragrance Products to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, or subsidiaries.

26.   Defendant Firmenich International SA is a Swiss corporation that manufactures and sells flavors and fragrances.  Firmenich is headquartered at Rue de la Bergère 7, 1242 Satigny, Switzerland.  Prior to its merger with DSM Group on May 8, 2023, Firmenich International SA had extensive operations throughout the

10

United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates.  During the Class Period, Firmenich International SA manufactured and/or sold Fragrance Products to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, or subsidiaries.

27.    Defendant Firmenich Inc. is a U.S. subsidiary of DSM-Firmenich AG incorporated under the laws of Delaware.  Firmenich Inc. maintains its principal place of business at 250 Plainsboro Road, Plainsboro, New Jersey 08536.  During the Class Period, Firmenich Inc. manufactured and/or sold Fragrance Products to purchasers in the United States, directly or through predecessors, affiliates, or subsidiaries.  During the relevant period, Firmenich International SA and/or DSM-Firmenich AG have controlled Firmenich Inc. both generally and with respect to the conduct of Firmenich Inc. in furtherance of the unlawful acts alleged in this Complaint.

28.    Defendant Agilex Flavors & Fragrances, Inc. ("Agilex") is a U.S. subsidiary of DSM-Firmenich AG incorporated under the laws of Delaware.  Agilex maintains its principal place of business at 140 Centennial Avenue, Piscataway, New Jersey 08854.  During the Class Period, Agilex manufactured and/or sold Fragrance Products to purchasers in the United States, directly or through predecessors, affiliates, or subsidiaries.  Firmenich International SA announced that it had completed the acquisition of Agilex on July 11, 2017.  On May 9, 2023, Agilex

11

announced that its new parent entity would be DSM-Firmenich AG.  Since the acquisition, Firmenich International SA and/or DSM-Firmenich AG have controlled Agilex both generally and with respect to the conduct of Agilex in furtherance of the unlawful acts alleged in this Complaint.   DSM-Firmenich AG, Firmenich International SA, Firmenich Inc., and Agilex are collectively referred to as "Firmenich."

29.   **Symrise Defendants**.  Defendant Symrise AG is a German company that manufactures and sells flavors and fragrances.  It was created in 2003 by the merger of Bayer subsidiary Haarmann & Reimer and Dragoco, both of which were based in Holzminden, Germany.  Symrise AG maintains a principal place of business at Mühlenfeldstraße 1, 37603 Holzminden, Germany.  Symrise AG states that "Our Corporate Center is located in Holzminden, Germany.  Key corporate functions such as governance and control, communications and administration are located here."[10] Symrise AG has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates.  During the Class Period, Symrise AG manufactured and/or sold Fragrance Products to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, or subsidiaries.

---

[10]    Symrise, Global Locations Page, https://www.symrise.com/our-company/global-locations/ (last visited Jan. 9, 2024).

30.     Defendant Symrise Inc. is a U.S. subsidiary of Symrise AG incorporated under the laws of New Jersey.  Symrise Inc. maintains its principal place of business at 300 North Street, Teterboro, New Jersey 07608.  During the Class Period, Symrise Inc. manufactured and/or sold Fragrance Products to purchasers in the United States, directly or through predecessors, affiliates, or subsidiaries.  Symrise AG controls Symrise Inc. both generally and with respect to the conduct of Symrise Inc. in furtherance of the unlawful acts alleged in this Complaint.

31.     Defendant Symrise US LLC is a subsidiary of Symrise AG, and is headquartered in Teterboro New Jersey, with offices located at 300 North Street, Teterboro, New Jersey 07608.  Symrise US LLC is a limited liability company organized and existing under the laws of the State of Delaware.  Symrise US LLC transacts or has transacted business in this District, and is engaged in the development, manufacture, and sale of flavors and fragrances.  Symrise AG controls Symrise US LLC both generally and with respect to the conduct of Symrise US LLC in furtherance of the unlawful acts alleged in this Complaint.  Symrise AG, Symrise Inc., and Symrise US LLC are collectively referred to as "Symrise."

32.     Each of the entities within a corporate family carried out the business of manufacturing, distributing, marketing, and/or selling Fragrance Products in coordination with their parents, subsidiaries, siblings, and related entities.

13

## C.    Agents and Co-Conspirators

33.    The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

34.    Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

35.    Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

## FACTUAL ALLEGATIONS

## A.    The Fragrance Industry

36.    A product's scent helps establish a positive and familiar olfactory response to the product.  Smells are also linked to a product's functional use.  For example, lemon or other citrus scents are often associated with cleanliness, and mint with freshness.  Scents can also convey status; the smell of leather may signify luxury or richness.  Research shows that most consumers "consider scent an essential

and necessary component of everyday household products."[11]   Indeed, the CEO of IFF's Scent division, Nicolas Mirzayantz, stated that "scent continues to be the #1 attribute driving purchase intent and even more importantly, the purchase repeat factor."[12]

37.   Consumer goods get their scents from fragrances.  Broadly speaking, a fragrance is a chemical mixture that has a smell or odor.[13]  Fragrances are derived from ingredients (natural or synthetic) and/or compounds.  The role of a fragrance is to impart a pleasant odor to the finished product and deliver a pleasant experience to the end user.  Fragrances are also used to disguise disfavored smells in the product, such that even products labelled as "unscented" may contain fragrances to mask the unpleasant smell of other ingredients, without giving the product a distinct scent.

38.   Manufacturers of consumer goods, like Plaintiffs and the Class, generally do not produce their own fragrances.  Instead, they purchase fragrance ingredients and fragrance compounds from fragrance manufacturers, principally

---

[11]   Rachel S. Herz et al., A Three-Factor Benefits Framework for Understanding Consumer Preference for Scented Household Products: Psychological Interactions and Implications for Future Development, Cogn. Research 7, 28 (April 1, 2022), https://cognitiveresearchjournal.springeropen.com/articles/10.1186/s41235-022-00378-6.

[12]   International Flavor & Fragrances Inc. Scent Learning Lab, Edited Transcript of conference call or presentation from April 5, 2021.

[13]   IFRA, What is a Fragrance?, https://ifrafragrance.org/fragrance-and-you/what-is-a-fragrance (last visited Jan. 9, 2024).

Defendants, for incorporation into various consumer products.  Defendants, in turn, source their raw materials further upstream.

### 1.   The Production of Fragrances

39.   The fragrance industry can be broken down into three segments.  First, there are the upstream suppliers of the raw materials used in the production of fragrances.  As described in greater detail below, these raw materials include both natural and synthetic materials.  Next, there are the manufacturers of fragrances, including Defendants, who use the raw materials to create fragrance ingredients and, as described in greater detail below, blend those fragrance ingredients into fragrance compounds.  Finally, the downstream part of the industry consists of the producers of various consumer products that embody the fragrance ingredients and compounds.  As discussed in greater detail below, these products generally fall into four distinct categories – fine fragrances (perfumes and colognes); fabric care (laundry detergents, fabric softeners, and specialty laundry products); home care (household cleaners, dishwashing detergents, and air fresheners); and body care (personal wash, hair care, and toiletries products).[14]

---

[14]   International Flavors & Fragrances Inc., 2021 Annual Report (Form 10-K), at 4 (Feb. 28, 2022).

40.     The following chart from a report by the industry trade association International Fragrance Association illustrates the three parts of the market: [15]



### a.     Upstream Suppliers

41.     Starting in the upstream part of the industry, companies produce the raw materials for fragrances.  These raw material derive from both natural and synthetic sources.  Natural raw materials are extracted from natural sources, such as plants, trees, or animals, by physical or biotechnological procedures.

42.     Synthetic raw materials are created in a lab and manufactured on an industrial scale.  More than 95% of the chemicals in synthetic fragrances are derived

---

[15]     The Value of Fragrance, A Socio-Economic Contribution Study for the Global Fragrance Industry, 11, IFRA (June 2019), https://ifrafragrance.org/docs/default-source/policy-documents/pwc-value-of-fragrance-report-2019.pdf?sfvrsn=b3d049c8_0#page=13.

from petrochemicals, such as phthalates, synthetic musks, parabens, and benzene derivatives.[16]

### b.    Fragrance Ingredient and Compound Production

43.    Defendants source natural and synthetic raw materials for their fragrance businesses.  Within their business, Defendants make and sell both "fragrance ingredients" and "fragrance compounds" (collectively, "Fragrance Products").  Defendants thus occupy a critical point of the supply chain, producing fragrances that are essential to many consumer products.

44.    A fragrance ingredient is any basic substance used for its odor properties or malodor coverage as a component of a fragrance mixture, which can be natural or synthetic.  Per Defendant IFF's 2021 Annual Report, "[f]ragrance ingredients are natural and synthetic, and active and functional ingredients that are used internally and sold to third parties, including competitors, for use in the preparation of compounds."[17]

45.    Using natural raw materials, fragrance manufacturers use various methods to extract the aromatics to create "natural" fragrance ingredients.  The name for a specific natural fragrance ingredient stems from a combination of the raw

---

[16]    *Synthetic Fragrances*, Up Front Cosmetics (May 14, 2020), https://upfrontcosmetics.ca/blogs/be-upfront/synthetic-fragrances.

[17]    IFF's 2021 Annual Report, *Supra* note 14 at 5.

18

material and the method of extraction.  Thus, the same raw material may result in an

essential oil, absolute, concrete, pomade, or tincture depending upon the extraction

method.[18]  For example, the oil obtained by steam distillation of lavender is called

essential oil of lavender or, simply, lavender oil.[19]

46.     Naturally-derived fragrance ingredients are temperamental.  Much like

grapes used to make wine, weather and other environmental impacts may affect the

strength or scent of the raw materials used in fragrance ingredients.  Additionally,

these raw materials may negatively interact with other ingredients in consumer

products.  Jasmine oil is known to cause discoloration in soaps.[20]

47.     Defendants also make synthetic ingredients, which can either be nature-

identical or artificial.

48.     Nature-identical synthetic fragrances are made with synthetically

derived ingredients to have the same key chemicals that define a fragrance found in

nature and will be judged to have a similar odor.  Some synthetic ingredients slightly

modify the structural features of the natural material to make them less susceptible

to degradation or interaction with other ingredients.  For instance, the synthesis of

---

[18]     Claire Guillemin, LAW & ODEUR: FRAGRANCE PROTECTION IN THE FIELDS OF
PERFUMERY AND COSMETICS 43-44 (1st ed. 2016) (citation omitted).

[19]     Charles S. Sell, "Perfumery Materials of Natural Origin," The Chemistry of
Fragrances: From Perfumer to Consumer 69 (2d ed. 2006).

[20]     *Id.* at 81.

jasmine is easier and more amendable to commercial products if slight modifications are made to the molecular chemistry.[21]  Artificial fragrances are made from synthetic ingredients and have a scent and/or chemical composition not known to be found in nature.

49.    Defendants sell fragrance ingredients to each other, to other fragrance compound makers, and also to consumer product manufacturers, including Class members.

50.    As set forth in Defendant IFF's 2021 Annual Report, fragrance compounds are "combinations of multiple fragrance ingredients that are ultimately used by our customers in their consumer goods."[22]  Compounding a fragrance generally means making a formulation of more than one ingredient.

51.    Numerous organizations have developed classifications of fragrances. In 1990, the French Society of Perfumers published its "Classification des Parfums" which included the following families: citrus, floral, fougere, chypre, woody, amber and leather.[23]

---

[21]    *Id.* at 82.

[22]    IFF's 2021 Annual Report, *Supra* note 14 at 4.

[23]    Mans Boelens & Ronald Boelens, "Classification of Perfumes and Fragrances," 26 Perfumer & Flavorist 28, 32 (Nov./Dec. 2001), https://img.perfumerflavorist.com/files/base/allured/all/document/2016/02/pf.PF_2 6_06_028_10.pdf.

52.     Likewise, Defendants categorized their fragrances in substantially similar manner.  For example, Defendant Givaudan's website categorizes fragrances as follows:[24]



53.     The other Defendants use substantially similar descriptions for the fragrances they offer to customers, including terms, such as, amber, citrus, floral, fresh, green musk, spicy, and woody.[25]

---

[24]     Shaping Tomorrow's Signature Fragrances with Science, Givaudan, https://www.givaudan.com/fragrance-beauty/ingredients/fragrance-molecules.

[25]     *See* International Flavors & Fragrance, Fragrance Ingredients Online Compendium, https://www.iff.com/portfolio/products/fragrance-ingredients/online-compendium (last accessed Feb. 5, 2024); Givaudan, Interactive fragrance index, https://www.givaudan.com/fragrance-beauty/ingredients/fragrance-molecules (last accessed Feb. 5, 2024); Firmenich, Ingredients Perfumery Catalogue, Main Olfactive Family, https://www.firmenich.com/ingredients/ingredient-perfumery-catalog (last accessed Feb 5, 2024); and Symrise, Scent and Care, Aroma Molecules, Ingredient Finder, https://www.symrise.com/scent-and-care/aroma-molecules/ingredient-finder/ (last accessed Feb. 5, 2024).

54.    The production of fragrance ingredients and fragrance compounds occurs at different facilities around the world, including in the United States.  Within the United States, New Jersey is a primary production site for the fragrance industry.  Givaudan manufactures fragrances in Mount Olive, New Jersey; IFF in Hazlet; Firmenich in Princeton; and Symrise in Teterboro.  Fragrance ingredients and compounds manufactured in New Jersey are sold throughout the United States.  Defendants also import fragrance ingredients and compounds manufactured from their foreign operations into the United States for sale to customers.

55.    Fragrances are a multi-billion dollar global industry.  Annual sales of fragrance ingredients were approximately $9.1 billion in 2022.[26]  Annual sales of fragrance compounds were valued at $35.08 billion in 2021.[27]  In the United States, revenues in the fragrance market are estimated to reach $8.71 billion in 2023.[28]

---

[26]    Ltd, R. and M., Fragrance Ingredients Market: Global Industry Trends, Share, Size, Growth, Opportunity and Forecast 2023-2028, Research and Markets (Jan. 2023),                https://www.researchandmarkets.com/reports/5732797/fragrance-ingredients-market-global-industry.

[27]    Research and Markets, *Global Fragrance Market Report to 2027 - Accelerating E-Commerce Channels and Increasing Demand for Hygiene Products are Driving Growth,* GLOBENEWSWIRE NEWS ROOM (Nov. 10, 2022), https://www.globenewswire.com/en/news-release/2022/11/10/2552774/28124/en/Global-Fragrance-Market-Report-to-2027-Accelerating-E-Commerce-Channels-and-Increasing-Demand-for-Hygiene-Products-are-Driving-Growth.html.

[28]    Stylumia, *2023 Beauty Trends: the Allure of Scents*, MEDIUM (Jan. 13, 2023), https://medium.com/@Stylumia/2023-beauty-trends-the-allure-of-scents-87ba629c145d.

Defendants collectively sell billions of dollars worth of fragrance ingredients and/or compounds in the United States each year.[29]

### c.    Downstream Customers

56.    Fragrance ingredients and fragrance compounds that Defendants produce are sold to Plaintiffs and the Class for use in consumer products.  Fragrances are most often shipped as oils, but on some occasions are shipped as powders.  As IFF notes, the industry separates the use of fragrances into several end-use categories, including fine fragrances (perfumes and colognes); fabric care (laundry detergents, fabric softeners, and specialty laundry products); home care (household cleaners, dishwashing detergents, and air fresheners); and body care (personal wash, hair care, and toiletries products).[30]   The following chart provides an illustrative example:[31]

---

[29]     IFF's 2021 Annual Report, *Supra* note 14; IAL Consultants, An Overview of the Global Flavours & Fragrances Market, 13th Edition (Sept. 2022).

[30]     IFF's 2021 Annual Report, *supra* note 14 at 4.

[31]     An Overview of the Global Flavours & Fragrances Market, *supra* note 29.



57.    How a product smells – or its fragrance in industry parlance – is a key driver of consumer preference both at the point of purchase and throughout its use. As a result of the critical importance of fragrances to customer purchases – *i.e.*, the ability of a product's smell to drive sales for that product – fragrances are indispensable to consumer goods manufacturers like Plaintiffs and the Class. Nevertheless, buyers generally remain sensitive to price.

## 2.    Defendants' Fragrance Products Are Interchangeable

58.    Fragrance ingredients are interchangeable commodity chemicals extracted from natural plants or created in a lab via synthesis processes.  Because fragrance ingredients are uniform chemicals, there is no meaningful difference between a fragrance ingredient (or combination of fragrance ingredients in the form of a fragrance compound) produced by one Defendant as compared to another.

59.    Symrise noted as much in its 2022 Corporate Report, stating, "Most of the fragrance ingredients we sell to our customers in our formulations are commodity products.  The components are no secret.  Anyone could use them and purchase the compounds on the market or even produce them themself [*sic*]."[32]

60.    Fragrance    compounds    produced    by    Defendants    are    also interchangeable.  Beginning in the late 20th century, Defendants gained the ability to reverse engineer each other's fragrances using technologies, such as gas chromatography and mass spectrometry.   The ability to reverse engineer a competitor's product means that a competitor can copy a proprietary blend and compete on price.  Defendants' technical ability to reverse engineer one another's products has only increased with time.  Larger companies, *e.g.*, the Defendants, have more capability to reverse engineer their competitor's products.

61.    Firmenich stated in a published study that mass chromatography and mass spectrometry "has threatened, if not eliminated, proprietary secrets" in the fragrance and flavor industry.[33]   This means fragrance manufactures, like the

---

[32]    Corporate   Report   2022,   Symrise   AG,   at   79   (March   8,   2023), https://symrise.com/corporatereport/2022/downloads/SYM_corporatereport_2022_EN.pdf.

[33]    Vincent Keller and Randy Burgess, ADEXA, Firmenich, Case Study, The flavor and fragrance of success (Oct. 2021), https://www.adexa.com/wp-content/uploads/2021/10/Case-Study_-Firmenich_Final.pdf (last accessed Feb. 5, 2024).

Defendants, could easily replicate each other's scents and create the same or similar fragrances.

62.    In fact, Defendants do manufacture and sell competing products.  That is, Defendants sell similar fragrance profiles even if they market them as something unique or different.  Thus, fragrance ingredients and compounds based on the same active ingredients are, to a large extent, interchangeable.

63.    IFF's 2021 annual report noted the substitutability of its products as a potential risk to its business.  Specifically, IFF noted that "increasing [its Fragrance] prices to our customers could result in long-term sales declines or loss of market share if our customers find alternative suppliers or choose to reformulate their consumer products to rely less on our products, which could have an adverse long-term impact on our results of operations."[34]

64.    Similarly, Givaudan has admitted:

> there is a very high degree of supply-side substitutability for fragrances and that this market, therefore, should not be further segmented in a narrower way such as distinguishing between different applications (consumer products such as soaps/detergents, cosmetics, toiletries and other applications such as fine fragrances).  It explains that any fragrance producer can and does produce any fragrance irrespective of its end-use and can switch production relatively easily from one

---

[34]    IFF's 2021 Annual Report, *supra* note 14 at 14.

fragrance to another once the production equipment has been cleaned."[35]

65.     The substitutability of Defendants' Fragrance Products should have led to price competition among Defendants and substantially restrained their abilities to increase prices unilaterally.

### 3.     Defendants Supply Each Other with Fragrance Ingredients

66.     Defendants primarily manufacture fragrance ingredients to support their own fragrance compound business.

67.     Defendants also buy and sell excess fragrance ingredients from one another.[36]  By transacting with one another, Defendants learn of capacity and price points for fragrance ingredients from one another.   The inter-Defendant sales increased their dependency on each other and provided a mechanism to enforce and monitor their conspiracy.

---

[35]     European Commission, Givaudan/Quest International Merger Case No. COMP/M.4507, at 3-4 (Feb. 21, 2007).

[36]     Claire Guillemin, LAW & ODEUR: FRAGRANCE PROTECTION IN THE FIELDS OF PERFUMERY AND COSMETICS 92, 423, 427 (1st ed. 2016) (citation omitted); Symrise, Financial Report 2018 (Mar. 13, 2019), at 10, https://www.symrise.com/investors/financial-results/index.php/?eID=tx_securedownloads&p=1&u=0&g=0&t=170700 4438&hash=2a99e982b89ed108946de6e550a8a3bf0464df7a&file=fileadmin/symr ise/Downloads_reports/reports/documents/2019/190313_SYM_Financial_Report_ 2018.pdf.

### B. The Structure and Characteristics of the Fragrance Market Support the Existence of a Conspiracy

68.     The structure and other characteristics of the market for fragrance ingredients and fragrance compounds make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

#### 1. The Market Is Highly Concentrated and the Defendants Are the Dominant Firms

69.     A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

70.     The Defendants are the "four largest providers" in the market, and "together have a market share of 64%" in the global fragrance market.[37]  Defendants' U.S. market shares are understood to be similar to their global market shares.



AFF market share 2022
in % (market size approx. € 39 billion)

12% Symrise
18% Givaudan
22% IFF (only Nourish & Scent)
11% Firmenich
37% Others

Source: Corporate data and internal estimates

---

[37]     Symrise AG, 2022 Financial Report 12-13 (Mar. 8, 2023), https://www.symrise.com/newsroom/downloads/index.php/?eID=tx_securedownloads&p=458&u=0&g=0&t=1707084408&hash=7cce282b6ebec8da38dd3fb258e46c54e915aeaf&file=fileadmin/symrise/Downloads_reports/reports/documents/2023/230308-Symrise-Financial-Report-2022.pdf.

71.     Defendants have further cemented their control of the fragrance market through the acquisition of rivals, which has resulted in significant industry consolidation.  As one industry analyst has noted, the Defendants' total share of the market:

> is higher than previous years due to acquisitions and mergers.  The opportunity to supply packages of products to their customers has become ever more attractive for the flavour and fragrance houses, reflected in various sideways and backwards integration moves in recent years.  This is exemplified by the merger of IFF and DuPont's Nutrition & Biosciences (N&B) business and the pending merger between Firmenich and DSM.[38]

72.     Since at least 2016, Defendants have "focused on so-called bolt-on acquisitions" to rapidly consolidate the market,[39] leading the industry to be "dominated by just a few companies."[40]  IFF, in its 2022 Annual Report, noted that "there has been increased consolidation among our competitors." [41]

---

[38]     An Overview of the Global Flavours & Fragrances Market, *supra* note 29.

[39]     Gillian Tan, *International Flavors & Fragrance: When Bland Is Good*, BLOOMBERG (May 10, 2016), https://www.bloomberg.com/opinion/articles/2016-05-10/international-flavors-fragrances-when-bland-is-good.

[40]     Andy Hoffman et al., *DSM Forms Flavor Giant with $21 Billion Deal for Firmenich*, BLOOMBERG (May 31, 2022), https://www.bloomberg.com/news/articles/2022-05-31/royal-dsm-agrees-to-merge-with-swiss-fragrance-maker-firmenich.

[41]     International Flavors & Fragrances Inc., 2022 Annual Report (Form 10-K), at 18 (Feb. 27, 2023).

73.     Recent examples of fragrance-industry consolidation include:

| Year | Acquisitions |
|------|--------------|
| **2014** | ▪  IFF acquired Aromor Flavors and Fragrances Ltd.[42] <br><br> ▪  Symrise acquired Diana Group in a transaction valued at €1.3 billion.[43] |
| **2015** | ▪  IFF acquired Ottens Flavors.[44] |
| **2016** | ▪  IFF acquired David Michael & Company, Inc.[45] |
| **2017** | ▪  Firmenich acquired Agilex Fragrances.[46] |
| **2018** | ▪  Firmenich acquired Flavourome.[47] |

---

[42]     Press Release, IFF Acquires Aromor to Strengthen Its Fragrance Ingredients and Fragrance Creation Capabilities (Jan. 16, 2014), https://ir.iff.com/news-releases/news-release-details/iff-acquires-aromor-strengthen-its-fragrance-ingredients-and.

[43]     *Symrise AG Successfully Closes Acquisition of Diana Group*, SYMRISE (July 29, 2014), https://www.symrise.com/newsroom/article/symrise-ag-successfully-closes-acquisition-of-diana-group/.

[44]     Press Release, IFF Completes Acquisition of Ottens Flavors (May 1, 2015), https://ir.iff.com/news-releases/news-release-details/iff-completes-acquisition-ottens-flavors.

[45]     Press Release, IFF Completes Acquisition of David Michael (Oct. 7, 2016), https://ir.iff.com/news-releases/news-release-details/iff-completes-acquisition-david-michael.

[46]     Press Release, Firmenich Completes Acquisition of Agilex Fragrances (July 11, 2017), https://www.firmenich.com/fragrance/press-release/firmenich-completes-acquisition-agilex-fragrances.

[47]     Press Release, Firmenich Completes Acquisition of "Flavourome", to Expand Presence in Africa (Feb. 5, 2018), https://www.firmenich.com/taste-and-

|  | ▪ Firmenich acquired Natural Flavors.[48] |
|---|---|
|  | ▪ Givaudan[49] acquired Expressions Parfumées.[50] |
|  | ▪ Agilex (Firmenich) acquired Fragrance West.[51] |
|  | ▪ Givaudan acquired Naturex.[52] |
|  | ▪ IFF acquired Frutarom.[53] |

---

beyond/press-release/firmenich-completes-acquisition-flavourome-expand-presence-africa.

[48]     Press Release, Firmenich Completes Acquisition of "Natural Flavors", Leader in Organic-Certified Flavors (Feb. 6, 2018), https://www.firmenich.com/taste-and-beyond/press-release/firmenich-completes-acquisition-natural-flavors-leader-organic.

[49]     Givaudan, Investor Presentation (Feb. 2023), https://www.givaudan.com/files/giv-2023-investor-presentation-feb.pdf.

[50]     Givaudan Completes the Acquisition of Expressions Parfumées (May 29, 2018), https://www.givaudan.com/media/media-releases/2018/givaudan-completes-acquisition-expressions-parfumees.

[51]     Press Release, Agilex Fragrances Acquires Fragrance West to Expand Presence on United States West Coast (June 25, 2018), https://www.firmenich.com/fragrance/press-release/agilex-fragrances-acquires-fragrance-west-expand-presence-united-states.

[52]     Givaudan Completes the Acquisition and Delisting of Naturex (Sept. 18, 2018), https://www.givaudan.com/media/media-releases/2018/givaudan-completes-acquisition-and-delisting-naturex.

[53]     Press Release, IFF Completes Combination with Frutarom, Establishing a Global Leader in Taste, Scent and Nutrition (Oct. 4, 2018), https://ir.iff.com/news-releases/news-release-details/iff-completes-combination-frutarom-establishing-global-leader.

| | | |
|---|---|---|
| | ▪ Firmenich acquired Senomyx.[54] | |
| **2019** | ▪ Givaudan acquired Golden Frog.[55] | |
| | ▪ Givaudan announced agreement to acquire AMSilk GmbH's cosmetics unit.[56] | |
| | ▪ Givaudan acquired Albert Vieille.[57] | |
| | ▪ Givaudan acquired Fragrance Oils.[58] | |
| | ▪ Givaudan acquired Drom.[59] | |
| **2020** | ▪ Symrise entered into agreement to purchase Sensient Technologies Corporations' fragrances and aroma chemicals business unit.[60] | |

[54]   Press Release, Firmenich Successfully Completes Tender Offer to Acquire Senomyx (Nov. 2, 2018), https://www.firmenich.com/taste-and-beyond/press-release/firmenich-successfully-completes-tender-offer-acquire-senomyx.

[55]   Givaudan Completes Acquisition of Vietnamese Flavour Company Golden Frog (Sept. 2, 2019), https://www.givaudan.com/media/media-releases/2019/acquisition-golden-frog-completed.

[56]   Givaudan to Acquire Cosmetics Business of AMSilk (Apr. 29, 2019), https://www.givaudan.com/media/media-releases/2019/givaudan-acquire-cosmetics-business-amsilk.

[57]   Givaudan Completes the Acquisition of Albert Vieille (May 6, 2019), https://www.givaudan.com/media/media-releases/2019/givaudan-completes-acquisition-albert-vieille.

[58]   Givaudan Acquires Fragrance Oils (Aug. 20, 2019), https://www.givaudan.com/media/media-releases/2019/givaudan-acquires-fragrance-oils.

[59]   Givaudan Completes the Acquisition of Drom (Sept. 6, 2019), https://www.givaudan.com/media/media-releases/2019/givaudan-completes-acquisition-drom.

[60]   *Symrise to Expand Scent & Care Activities Through Acquisition of Sensient's Fragrances Business Unit*, SYMRISE (Nov. 23, 2020), https://www.symrise.com/

| 2021 | ▪  IFF merged with DuPont's Nutrition & Biosciences business.[61] |
|------|---|
|      | ▪  Givaudan acquired Custom Essence.[62] |

74.     In May 2023, DSM and Firmenich completed a merger[63] that gives its new entity — DSM-Firmenich AG valued at roughly $21 billion — "comparable footing to IFF," after IFF's combination with DuPont.[64]

75.     In sum, in recent years, Defendants have acquired a number of rivals with operations focused on the United States, making the fragrance market in the United States exceptionally concentrated.

---

newsroom/article/symrise-to-expand-scent-care-activities-through-acquisition-of-sensients-fragrances-business-unit/.

[61]     Press Release, IFF to Complete Merger with DuPont's Nutrition & Biosciences Business (Feb. 1, 2021), https://ir.iff.com/news-releases/news-release-details/iff-complete-merger-duponts-nutrition-biosciences-business.

[62]     *Givaudan Completes the Acquisition of Custom Essence*, Givaudan (Dec. 3, 2021), https://www.givaudan.com/media/media-releases/2021/givaudan-completes-acquisition-custom-essence.

[63]     Press Release, Firmenich Completes Merger of Equals With DSM (May 9, 2023), https://www.firmenich.com/company/press-release/firmenich-completes-merger-equals-dsm.

[64]     Samantha Oller, *DSM, Firmenich to Merge into 'Powerhouse of Innovation and Creativity'*, FOODDRIVE (June 2, 2022), https://www.fooddive.com/news/dsm-firmenich-to-merge-into-powerhouse-of-innovation-and-creativity/624759/.

## 2. Defendants are Vertically Integrated

76. Defendants are vertically integrated to varying degrees. This means that Defendants control several stages of fragrance production, including the sourcing of raw materials, manufacturing, and distribution. Defendants describe their vertical integration as a strategic advantage. For example, in connection with an acquisition, Givaudan boasted that additional vertical integration would "enhance our industry leadership."[65] IFF boasted that its vertical integration in bioscience "will be a key driver of our innovation platform,"[66] and Firmenich described its "unmatched, vertically integrated portfolio" as a "unique value proposition."[67] Robust vertical integration, like Defendants' operations, creates and reflects significant market power by alleviating sourcing issues, driving greater efficiencies, reducing costs, and allowing for more control along the manufacturing or distribution process. As a result, vertical integration reinforces barriers to entry into

---

[65] *Givaudan Completes Acquisition of Ungerer*, Givaudan (Feb. 20, 2020), https://www.givaudan.com/file/207451/download.

[66] Transcript: International Flavor & Fragrance Inc. Presents at Barclays Global Consumer Staples Conference, Zonebourse (Sept. 09, 2021), https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Barclays-Global-Consumer-Staples-Co-37765129/.

[67] Press Release, Firmenich Appoints New Leadership for Integrated Perfumery & Ingredients Organization (Feb. 8, 2023), https://www.firmenich.com/fragrance/press-release/firmenich-appoints-new-leadership-integrated-perfumery-ingredients.

the fragrance market because prospective or smaller competitors cannot compete with the efficiencies and scale of Defendants.

### 3. Barriers to Entry Are High

77. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. The market for Fragrance Products has high barriers to entry.

78. Factors that deter new entry to the fragrance market include, but are not limited to:

> **Regulations**. Fragrance suppliers are subject to legal and regulatory frameworks (*e.g.*, environmental, health, and safety) that are geographically specific. Large suppliers with an international presence and more robust resources have an advantage in navigating such regulations because they will have already invested in a compliance infrastructure as well as in lobbyists to influence the legal and regulatory framework.

> **Scale**. Defendants benefit from economies of scale, which occur when increased output leads to lower average costs. Hopeful new entrants to the fragrance market find it difficult to compete because their average costs would be much higher than the larger incumbents, and because they lack similar promotion recourse. The mature and relatively saturated nature of the market also acts as a deterrent to new entrants.

> **Access to Raw Materials**. Raw materials are sourced from all over the globe with attendant supply chain complexity. Access to materials used as inputs is of critical importance to the ability of a firm to enter the market. Defendants, as the largest suppliers, maintain substantial control over access to key ingredients because they produce those ingredients themselves.

**High Capital Requirements**.  Only a few fragrance companies have the skills, capacity, and resources to manufacture Fragrance Products.  The amount of research and development, marketing, and capital expenditure required to enter this industry and gain market share has limited the number of industry operators.  To gain market share, companies spend large sums of money on marketing and to acquire competitors.  New entrants must overcome the need for substantial financing.

79.  Defendants IFF and Givaudan have repeatedly touted to their investors that the Fragrance market is protected by high barriers to entry.  Givaudan listed the industry's "high barrier to entry (complexity, R&D, consumer insight, regulations, etc.)" as a key investment highlight in a 2022 investor presentation.[68]  Givaudan's Chief Financial Officer, Alison Cornell, boasted during the Deutsche Bank Global Consumer Conference on June 14, 2016, "the barriers to entry favor the large players as they include an increasing global [indiscernible] regulatory environment, the need for capital investment in manufacturing facilities, the significant and ongoing investment in research and development, the complexity of managing global customers and ongoing investment in ingredients, people, intellectual property and processes."[69]  Symrise gave a similar presentation to its investors in 2019, stating

---

[68]  2022 General Investor Relations Presentation, Givaudan (Jan. 2022), at 32, https://www.givaudan.com/files/giv-2022-investor-presentation_jan.pdf.

[69]  Transcript : International Flavors &Fragrances Inc. Presents at DeutscheBank Global Consumer Conference, Zonebourse (June 14, 2016), https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Deutsche-Bank-Global-Consumer-Confe-38010620/.

high barriers to entry included "core list system and increasing regulatory pressure."[70]

80.  Givaudan reiterated these points again in a February 2023 investor presentation, stating that the company is protected by "**High barriers to entry** and high shifting costs for customers."[71]  Givaudan directly linked high barriers to entry with market share, stating in a February 2020 investor presentation that Defendants enjoyed "[l]eading market share . . . supported by substantial barriers to entry that continue to **protect incumbents**."[72]

81.  In a 2018 article, merger and acquisition advisory firm Grace Matthews, reiterated that barriers to entry in fragrances and flavors are high, as "technical expertise is highly valued, and regulatory compliance can be a significant issue as many products made by the F&F industry come into contact with the human body."[73]  Marifaith Hackett, Director of Specialty Chemicals with IHS Markit, explained, "'the business is fairly opaque to outsiders – by design, no doubt – and

---

[70]  Olaf Klinger (CFO), Symrise Investor Presentation, Symrise (June 2019), at 6, https://www.symrise.com/fileadmin/symrise/Corporate/Investors/Financial_calendar_and_presentations/190611_Symrise_Investor_Presentation_Paris.pdf.

[71]  Givaudan's Investor Presentation, *supra* note 49 (emphasis in original).

[72]  Givaudan, Investor Presentation (Feb. 2020), at 6, https://www.givaudan.com/files/giv-2020-investor-presentation-jan-oct.pdf (emphasis added).

[73]  Vincent Valk, *High Valuations Do Not Stop Flavors and Fragrances Deals*, GRACE MATTHEWS (Dec. 6, 2018), at 2, https://gracematthews.com/wp-content/uploads/2021/11/Highvaluationsdonotstopflavorsandfragrancesdeals.pdf.

any new entrant to the F&F industry would have to expect a fairly sharp learning curve'" and "'[n]ew entrants tend to start out small.'"[74]  The author of the article added, "[t]hese new entrants are often founded by individuals with pre-existing knowledge and contacts in the industry."[75]

### 4.    The Buy-Side of Market Is Not Concentrated

82.    The fact that the nature of the buy-side of the fragrance market is not concentrated is consistent with collusion.  With a large number of buyers, each of whom forms a small share of the total marketplace, there is less incentive for cartel members to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

83.    IFF, for example, "had no customers that accounted for greater than 10% of consolidated net sales in 2022, 2021 and 2020."[76]  In 2021, IFF's "25 largest customers, a majority of which were multi-national consumer products companies, collectively accounted for 29% of [its] sales in the aggregate."[77]

---

[74]    *Id.*

[75]    *Id.*

[76]    IFF's 2022 Annual Report, *supra* note 41 at 91.

[77]    IFF's 2021 Annual Report, *supra* note 14 at 18.

### 5.    Demand for Fragrances Is Inelastic

84.    Economic theory recognizes that industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices.   There are two primary characteristics that demonstrate the inelasticity of demand for the Fragrance Products market: a lack of substitute goods and the product being a small portion of the overall cost of the overall good.

85.    **Lack of Substitute Goods**: Substitute goods can serve to restrain price increases and temper the effects of a price-fixing conspiracy.   Even though the Fragrance Products with the same scent are fungible, Fragrance Products are the only products that can provide the scent in customer products.   There are no suitable substitute goods for fragrances that would work to restrain price increases of Fragrance Products.

86.    **Small Share of Overall Cost**: Fragrances typically constitute only a small share of the overall cost of the end products into which they are incorporated. As Givaudan stated in a recent investor presentation: "Scent and taste determine consumer purchase and repeat decisions whilst representing only a minor fraction of costs 0.5-2.0% in flavours and consumer fragrances to 4-6% in fine fragrances, i.e. a very minor portion of the end product costs."[78]

---

[78]    Givaudan's Investor Presentation, *supra* note 49.

### 6.    Fragrance Products Are Commodities

87.    As detailed above, Defendants' fragrance ingredients and fragrance compounds are commodities.  Coordination is easier with a commodity product because firms wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement where observed differences in prices, other than those arising because of differences in product grade, for example, are more likely to reflect cheating on the conspiracy than some kind of custom arrangement.

### 7.    Fragrances are Nondurable Products

88.    Additionally, fragrance ingredients and fragrance compounds are nondurable products with a limited shelf life, some with "best before" dates of only one year after manufacture.  The market for a nondurable good is easier to cartelize than a durable good market due to lower temptation for cartel members to cheat on sales of nondurable goods and less opportunity to price discriminate based on customers' different demand elasticities.

### 8.    Industry Associations Provided Defendants Forums to Collude and Assisted Defendants in Carrying out Their Conspiracy

89.    The European Commission announced that one of the entities that was raided on March 7, 2023, was an unnamed industry association, which has assisted the Defendants in carrying out their conspiracy.  The EC stated that it "has concerns

that companies and an association in the fragrance industry worldwide may have violated EU antitrust rules that prohibit cartels and restrictive business practices."[79]

90.    Courts have found industries in which main competitors participate in trade associations and frequently communicate with each other are susceptible to collusion.   Defendants control the most important trade associations and self-regulating bodies in the fragrance market.  This makes the fragrance market more susceptible to collusive behavior because the trade organizations provide forums for the Defendants to exchange sensitive information such as pricing and outputs. Defendants use their control of industry associations to facilitate their conspiracy.

91.    To start, Defendants coordinated and conspired through their control of International Fragrance Association ("IFRA").  IFRA is an official self-regulatory representative body of the worldwide fragrance industry with the stated goal of representing "the collective interests of the industry and promote the safe use and enjoyment of fragrances around the world."[80]  IFRA is currently limited to seven regular members: the Defendants, Robertet Group, Takasago International Corporation, and BASF.

---

[79]    Foo Yun Chee & Oliver Hirt, *EU, UK, Swiss Probe Suspected Fragrance Cartel, Givaudan Confirms Cooperation*, REUTERS (last updated Mar. 7, 2023), https://www.reuters.com/world/europe/eu-antitrust-regulators-raid-companies-association-fragrance-sector-2023-03-07/.

[80]    IFRA, Making the difference – in every sense, https://ifrafragrance.org/about-ifra/introduction (last visited Jan. 30, 2024).

92.     The Defendants control IFRA's board.  For example, Symrise's Chief Sustainability Officer, Hans Holger Gliewe, has been the chair of IFRA since April of 2020.  Prior to Mr. Gliewe, Michael Carlos, previously President of Givaudan's Fragrance Division and currently a board member of Givaudan, served as chair of IFRA from 2015 to 2020.  To this day, every Defendant maintains a representative on IFRA's board.

93.     IFRA has served as a mechanism to coordinate and facilitate Defendants' conspiracy.  Every year, IFRA hosts the Global Fragrance Summit, which is a multi-day event at which Defendants meet and intermingle.[81]  IFRA also holds other events throughout the year for its members (including Defendants).  Through such events, Defendants have ample opportunity to meet and coordinate. Indeed, the 2022 IFRA Global Fragrance Summit held from November 8, 2022 to November 10, 2022 in São Paulo, Brazil was attended by several representatives of Defendants, including Greg Adamson, the Senior Vice President of Global Regulatory Affairs at Givaudan; Jeremy Compton, Givaudan's Head of Science and Technology; Matteo Magnani, Firmenich's Chief Consumer and Innovation Officer, Ilaria Resta, Firmenich's Global President of Perfumery; Joris Theewis, IFF's Global Regulatory Strategic Lead; Gregory Ladics, IFF's Head of Product Safety

---

[81]     IFRA, Dialogue, https://ifrafragrance.org/priorities/dialogue (last visited April 20, 2023).

and Chemical Management; and Eder Ramos, Symrise's Global President of its Fragrance Division.[82]

94.    In addition to IFRA, Defendants also control several other trade associations that provide forums for their collusive communications.  After jointly deciding to leave the then-extant North American trade association, in March 2021, Defendants launched their own North American trade organization, Fragrance Science & Advisory Council ("FSAC").[83]  Reporting at the time explained that FSAC "unites the world's leading fragrance and flavor companies in an effort to drive science-based public policy in North America."  FSAC set out with the express goal to focus on "business-to-business audiences" in order to "defend[] fragrance ingredients" against, among other things, criticism from "consumer[s]."[84]  At the beginning, Defendants were the *only* members of FSAC.  To date, FSAC has added only one non-Defendant member – Bath and Body Works.

---

[82]    Global Fragrance Summit (Sao Paulo, Brazil 2022), available at https://www.mayerbrown.com/-/media/files/perspectives-events/events/2022/11/ifragfs2022_program.pdf?rev=dabc93abfbc74ddd82da63e6a7db58d0 (last accessed Feb. 5, 2024).

[83]    Lauren Nardella, *World's Biggest Fragrance and Flavor Firms Join Forces to Champion Science in Public Policy*, HBW INSIGHT (Mar. 31, 2021), https://hbw.pharmaintelligence.informa.com/RS151176/Worlds-Biggest-Fragrance-And-Flavor-Firms-Join-Forces-To-Champion-Science-In-Public-Policy.

[84]    *Id.*

95.     FSAC provides Defendants a unique opportunity to collude.   In addition to standard board and committee meetings, FSAC holds annual meetings. The inaugural annual meeting was held on December 9, 2021, and was attended by all Defendants.  According to a press release, FSAC's board and several committees, which are occupied by representatives of Defendants, "met to review progress and map goals and priorities for 2022."[85]

96.     As mentioned above, prior to founding FSAC, Defendants belonged to the North America-focused Fragrance Creators Association ("FCA").[86]  The timing of Defendants' departure from FCA and the founding of FSAC is highly suspicious – Defendants all announced they were leaving FCA on the same date – May 27, 2020.  In recent years, in direct conflict with Defendants' interests, FCA had been increasingly prioritizing consumer-focused fragrance safety transparency issues. Instead of cooperating with the FCA's evolving mission towards greater safety and transparency measures, Defendants created their own organization – FSAC – that they controlled to lobby for legislation that would benefit the Defendants at the expense of others (*i.e.*, smaller competitors and potential new entrants into the

---

[85]     Industry News, *The Fragrance Science & Advocacy Council Holds Inaugural Annual Meeting in December 2021*, FSAC (Feb. 7, 2022), https://fsac.org/ communications/fragrance-science-advocacy-council-holds-inaugural-annual-meeting-december-2021.

[86]     Nardella, *Supra* note 83.

markets, and their own customers).  However, after the investigation into Defendants began, IFF left FSAC and rejoined FCA.  In the announcement that IFF rejoined FCA, FCA made no mention of the fact that IFF once left the trade association and provides no reason for its rejoining.  It is reasonable to infer that IFF recognized that FSAC presented a unique opportunity to collude with its main competitors with only one other participant.  It is also reasonable to infer that IFF left FSAC in an attempt to shield itself from antitrust liability once it realized it was under scrutiny from antitrust authorities.

97.     Defendants also are all members of the Research Institute for Fragrance Materials ("RIFM").  RIFM holds itself out as a leading resource for the safe use of fragrance ingredients and serves as the industry regulator in conjunction with IFRA.  RIFM conducts and publishes safety assessments of all ingredients used for their aroma-producing properties.  RIFM's activities include conducting toxicity tests and allergy and photo toxicity testing of raw materials.  After testing, RIFM submits the results of the screening of the materials to IFRA, which then ensures Fragrance manufacturers' compliance with all relevant legislation and the standards of safety and conduct in the industry set by IFRA.  As Defendants have authority in both RIFM and IFRA, they are able to influence the testing process for fragrances and regulatory and safety standards for the fragrance market.

98.     Defendants all serve on RIFM's Advisory Committee and are the most prominent members of RIFM's Core Teams, which advise and consult on strategic issues related to RIFM's goals.   Thus, Defendants attend meetings of RIFM's Advisory Committee and Core Teams together, and they exert significant influence over RIFM's activities.

99.     While the FCA (the trade organization that Defendants left in order to form FSAC) has focused their efforts on greater transparency with customers, the Defendant-controlled FSAC has been using its power to "closely track[] fragrance-relevant developments at the US Food and Drug Administration and US Environmental Protection Agency and could be 'front and center' in discussions regarding fragrance ingredients."[87]

100.   Defendants have used their combined market share and chokehold on the FSAC to suppress innovation and customer choice, and delay safety and transparency initiatives advocated for by competitors.   Defendants will continue to wield trade organizations to maintain their dominant market share; as FSAC President and Chairman of the Board admitted, "'it will be one of these four [fragrance] houses that will own the majority of the science and safety assessment data.'"[88]   Nearly exclusive access to and control over this data will make it nearly

---

[87]     Nardella, *Supra* note 83.

[88]     *Id.*

impossible for small competitors to challenge industry standards coming out of the FSAC.

101.    Defendants' control of the FSAC in tandem with their influential positions in IFRA and RIFM cement Defendants' ability to dictate safety, health, and industry standards in the Fragrance market.

102.    Defendants also had significant opportunities to collude at other industry events, including those thrown by the American Society of Perfumers.  For instance, at the American Society of Perfumers' golf event, pictures show executives from Firmenich, Givaudan, and IFF paired in groups together.  And pictures from the American Society of Perfumers' Symposium similarly show Firmenich and IFF executives posing with their arms around each other.  These examples illustrate the coziness of executives from different fragrance companies as well as the many opportunities those executives had to collude and share competitively sensitive information with one another.

103.    Defendants also participate in the reoccurring World Perfumery Congress.  Givaudan, IFF, and Firmenich are Diamond Sponsors of the 2024 conference while Symrise is a Platinum Sponsor.[89]  The self-described "Sensory Event for Fragrance Leaders" is a multiday conference where industry insiders meet

---

[89]    World Perfumery Congress, https://worldperfumerycongress.com/ (last accessed Jan. 30, 2024).

to listen to presentations and attend networking receptions.  The presentations for the 2024 event include "The Current State of Fragrance According to Industry Insiders," and "Trend Forecasts & Innovations in Home Care Scents."[90]

104.   On information and belief, by controlling the trade associations in the fragrance market, Defendants used the trade association meetings as forums to exchange competitively sensitive pricing and volume information and organize their cartel.  As detailed above, these exchanges of information are confirmed by IFF's admission on February 10, 2022, that it knew how an "awful lot of [its] competitors" were pricing their products.  The reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[91]

### C.   Defendants Coordinated Parallel Price Increases During the Class Period

105.   Defendants acted in concert to fix, raise, maintain, and stabilize the price of Fragrance Products manufactured, sold, distributed, or imported into the United States.  This unlawful agreement in restraint of trade began at least as early

---

[90]   2024 World Perfumery Congress, The Sensory Event for Fragrance leaders, https://wpc2024.mapyourshow.com/8_0/explore/session-fulllist.cfm#/          (last accessed Jan. 30, 2024).

[91]   William E. Kovacic, Robert C. Marshall, Leslie M. Marx & Halbert L. White, Plus Factors and Agreement in Antitrust Law, 110 Mich. L. Rev. 393 (2011). Available at: https://repository.law.umich.edu/mlr/vol110/iss3/1.

as January 1, 2018, and continues into the present.  Defendants' conduct constitutes a horizontal price-fixing conspiracy and violates Sections 1 and 3 of the Sherman Act.

106.    During the period prior to the alleged conspiracy, fragrance prices in the United States were in a steady decline.  The beginning of the conspiracy marked a period of flat prices followed by a dramatic increase by over 37%.[92]

107.    Since at least 2018, Defendants have coordinated price increases to increase their profits.  The justifications offered by the Defendants — that their price increases were due primarily to increased input costs, chiefly stemming from the pandemic — were pretextual and do not fully account for the significant increases in prices over the Class Period.  These price increases are not adequately explained by market factors.  Moreover, Defendants publicly signaled their intent to raise prices throughout the Class Period, providing one another assurances that they would not compete for business on price.

108.    In a competitive market, increasing prices should result in customer churn, loss of sales volume, and loss of profits.  Contrary to these basic economic principles, Defendants have repeatedly touted their ability to raise Fragrance

---

[92]    United States Bureau of Labor Statistics, Producer Price Index by Commodity: Chemicals and Allied Products: Synthetic Organic Chemicals for Use as Flavor and Perfume Materials, retrieved from FRED, https://fred.stlouisfed.org/ series/WPU061403997 (Feb. 1, 2024).

Products prices during the Class Period without any negative impact on their fragrance businesses.  Such circumstances further confirm that Defendants have engaged in price fixing and that they were successful in doing so.

109.  Publicly available information shows that Defendants suspiciously reported increasing prices in parallel around the same time on several occasions throughout the Class Period.  For example, in January 2018, Givaudan announced that it was raising prices on all products by 6% effective in February 2018.

110.  In an April 9, 2018 report on its first-quarter sales, Givaudan reported that it "continues to implement price increases in collaboration with its customers to compensate for the increases in input costs."[93]  Likewise, Symrise reported in its first-quarter 2018 earnings call that "we continue to implement price increases in close dialogue with our customers to compensate for higher raw material cost."[94]

111.  In an August 7, 2018 SEC report, IFF disclosed that its "[n]et sales during the second quarter of 2018 increased 9%," due in part to "price increases" during the period.[95]

---

[93]    Press Release, Givaudan, First Quarter Sales (Apr. 9, 2018), https://www.givaudan.com/media/media-releases/2018/2018-first-quarter-sales.

[94]    Olaf Klinger, CFO & Member of Executive Board for Symrise AG, Remarks at Q1 2018 Symrise AG Earnings Call – Final (May 8, 2018) (Transcript available in Westlaw).

[95]    International Flavors & Fragrances, Inc., Quarterly Report (Form 10-Q), at 26 (Aug. 7, 2018).

112.   On August 14, 2018, Symrise reported price increases in its fragrance segment through a press release, announcing that "the company is in close dialogue with its customers to actively implement price increases."[96]

113.   Less than one month later, on September 6, 2018, IFF then-CEO Andreas Fibig also announced that their "teams are out there and *increasing prices as much as they can*."[97]

114.   Shortly after, on October 8, 2018, Givaudan confirmed that "the company continues to implement price increases in collaboration with its customers to compensate for the increases in input costs."[98]

115.   A few months later, during a January 25, 2019 investor call, Givaudan announced that the company was "working on price increases" for fragrances and that Givaudan was very "confident to pass on, let's say, the lion's share of the price

---

[96]    *Strong Organic Growth of 9.0% in the First Half of 2018*, Symrise (Aug. 14, 2018),     https://www.symrise.com/newsroom/article/strong-organic-growth-of-90-in-the-first-half-of-2018/.

[97]    Transcript: International Flavors &Fragrances Inc. Presents at Barclays Global Consumer Staples Conference, Zonebourse (Sept. 6, 2018) (emphasis added),           https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Barclays-Global-Consumer-Staples-Co-37949946/ Defendants at times refer to their Fragrance division as their scent business.

[98]    2018 Nine Month Sales, Givaudan (Oct. 8, 2018), https://www.givaudan.com/media/media-releases/2018/2018-nine-month-sales.

increase for the combined 5%, 6% for both divisions in 2019, and there will be a, let's say, a relatively small tail end in 2020."[99]

116.  Coming full circle, on February 19, 2019, IFF's VP of Global Communications and Investor Relations, Michael Deveau, announced that IFF was looking to achieve "about a 4% price increase related to the scent" business.[100]

117.  Defendants continued signaling their price increases throughout 2019.

118.  On July 18, 2019, Givaudan's CEO, Gilles Andrier, with respect to managing raw material cost increases, "we are fully compensated with price increase."[101]  In other words, Givaudan was able to recoup all costs in connection with increases in the costs of raw material through price increases.  On August 10, 2019, Symrise's CFO, Olaf Klinger, reported that Symrise was "successful in getting

---

[99]     Givaudan's (GVDBF) CEO Gilles Andrier on Q4 2018 Results, Seeking Alpha (Jan. 25, 2019), https://seekingalpha.com/article/4235672-givaudans-gvdbf-ceo-gilles-andrier-on-q4-2018-results-earnings-call-transcript.

[100]    International Flavor & Fragrances Inc. at Consumer Analyst Group of New York Conference Transcript, https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-         at-CAGNY-2019-Conference-Feb-19-2019-37937566/.

[101]    Givaudan SA (GVDBF) CEO Gilles Andrier on Q2 2019 Results - Earnings Call Transcript, https://seekingalpha.com/article/4275832-givaudan-sa-gvdbf-ceo-gilles-andrier-on-q2-2019-results-earnings-call-transcript.

through those price increases"[102] in the fragrance segment and, during a September 2019 CEO conference, IFF's then CEO Andreas Fibig touted that IFF had "seen in the last couple of quarters a mid-single-digit growth on the scent business, which was probably driven by – half of its volume growth, half of its price growth," which demonstrates that IFF has been increasing prices since at least sometime in 2019 without repercussions.[103]

119.    Touting Symrise's strong fourth quarter 2019 performance, CFO Olaf Klinger reported that "[i]n 2019, [Symrise's] profitability grew stronger than the top line, mainly due to under-proportional raw material price increases and good cost management."[104]  In the same call, CEO Heinz-Jürgen Bertam explained that "[r]aw material prices change and change all the time.  As we use 10,000 raw materials typically . . . most of this levels out . . . a lot of these effects level themselves out."[105]

---

[102]    Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on Q2 2019 Results - Earnings Call Transcript, https://seekingalpha.com/article/4284389-symrise-ag-syief-ceo-heinz-jurgen-bertram-on-q2-2019-results-earnings-call-transcript.

[103]    September 25, 2019 International Flavors & Fragrances Inc. at Sanford C Bernstein Strategic Decisions CEO Conference Transcript, https://www.marketscreener.com/quote/stock/INTERNATIONAL-FLAVORS-F-13047/news/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Bernstein-16th-Annual-Strategic-Dec-37916407/.

[104]    Symrise AG Q4 2019 Results: Earnings Call Transcript, Seeking Alpha (Mar. 10, 2020), https://seekingalpha.com/article/4331042-symrise-ag-syief-ceo-heinz-jurgen-bertram-on-q4-2019-results-earnings-call-transcript.

[105]    *Id*.

120.   Defendants increased prices again in 2020.  At Givaudan's July 21, 2020 earnings call, Givaudan SA CEO Gilles Andrier was asked how much of the company's 1% gross profit margin improvement was due to raw material costs. Andrier responded that raw material costs "had no material effect on the gross profit margin to explain the 1% improvement."[106]  Rather, the "improvement has lot to do with the price increase[s] that we have made."[107]  Mr. Andrier reported that despite COVID-related setbacks, "on a like-for-like basis, our fragrance division grew 4.5% and our Flavours [*sic*] division grew 3.6%."[108]

121.   Less than a month later, on August 11, 2020, during its 2020 earnings results call, Firmenich's CEO, Gilbert Ghostine, reported that "in consumer fragrance, we grew our revenue by 6%."[109]  CFO, Eric Nicolas, attributed the company's (overall) increase in profitability to "successful pricing, as well as the favourable impact of raw material costs."[110]

---

[106]   Givaudan SA (GVDBF) CEO Gilles Andrier on Q2 2020 Results - Earnings Call Transcript, Seeking Alpha (July 21, 2020), https://seekingalpha.com/article/4359705-givaudan-sa-gvdbf-ceo-gilles-andrier-on-q2-2020-results-earnings-call-transcript.

[107]   *Id.*

[108]   *Id.*

[109]   2020 Firmenich Earnings Results Call Transcript (Aug. 11, 2020).

[110]   *Id*.

122.    Similarly, in reporting its 2020 financial results on March 9, 2021, Mr. Klinger, Symrise's CFO, boasted that "[i]n Scent & Care, 40% of the organic growth and pricing and 60% was volume related."[111]

123.    And, consistent with 2019 and 2020, Defendants hiked prices again in 2021.  For example, on November 9, 2021, IFF's then-CEO Andreas Fibig reported that the company's fragrance division has had a "strong year" in part because of a "sales profitability expansion of 110 basis points" that had been "led by higher volume, favorable mix and higher productivity."[112]  Mr. Fibig then stated that "[o]ur team . . . did an exceptional job increasing prices to combat inflationary pressures, something that will continue to be critical as we move forward."[113]  On the same earnings call, CFO Glenn Richter confirmed that IFF implemented "broad-based pricing actions across all of our businesses."[114]

124.    During an earnings call, Firmenich's CEO Gilbert Ghostine announced that for the six months ended December 31, 2021, Firmenich's "revenue grew by

---

[111]    Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on 2020 Financial Results – Earnings Call Transcript, Seeking Alpha (Mar. 9, 2021), https://seekingalpha.com/article/4412605-symrise-ag-syief-ceo-heinz-jurgen-bertram-on-2020-financial-results-earnings-call-transcript.

[112]    Q3 2021 International Flavors & Fragrances Inc. Earning Call Transcript, The Motley Fool (Nov. 9, 2021), https://www.fool.com/earnings/call-transcripts/2021/11/09/international-flavors-fragrances-inc-iff-q3-2021-e/.

[113]    *Id.*

[114]    *Id.*

12%" and "we increased our adjusted EBITDA by 25%."[115]  Firmenich achieved this solid revenue and profitability growth by increasing prices.  As Mr. Ghostine stated, "we are taking all the action in order to make sure that we pass [the higher cost] to our customers."[116]

125.   Symrise also confirmed 2021 price increases during an earnings call held on March 1, 2022, in which Symrise's new CEO, Dr. Heinz-Jürgen Bertram, reported that "price increase initiatives were taken early on in the second half of last year" in its fragrance business.[117]

126.   After several years of steady price increases, on March 17, 2022, IFF again announced price increases that affected its fragrance business.[118]

---

[115]    Firmenich    Half    Year    2022    Results    Presentation    Transcript. https://img06.en25.com/Web/FirmenichCorporateCenter1/%7B0e7a45ec-10c3-4ec4-b4a9-4d85bdd25d97%7D_Firmenich_HY22_Presentation_Script.pdf?elq TrackId=7a99220d2dc9457dbc515805c644723b&elqaid=450&elqat=2.

[116]    *Id.*

[117]    Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on Q4 2021 Results - Earnings Call Transcript, Seeking Alpha (Mar. 4, 2022), https://seekingalpha.com/ article/4492962-symrise-ag-syief-ceo-dr-heinz-jurgen-bertram-on-q4-2021-results-earnings-call-transcript.

[118]    Press Release, IFF Announces Global Price Increases Across All Divisions (Mar. 17, 2022), https://ir.iff.com/news-releases/news-release-details/iff-announces -global-price-increases-across-all-divisions.

127.   Less than one month later, on April 12, 2022, Givaudan announced that it would keep raising prices in 2022, purportedly to offset higher input costs despite the fact that like-for-like sales rose 4.6% in the first quarter.[119]

128.   In a May 10, 2022 earnings call, IFF noted that it had raised prices by approximately 8% in the preceding quarter.[120]  When asked by an analyst whether the steep price increases were leading to push back from customers, Franklin Clyburn, IFF Chief Executive Officer stated:

> There are pushbacks.  I think some of the pushbacks are in some of the smaller customers, some of our emerging market customers where price is much more sensitive.  We are seeing pushback there.[121]

Glenn Robert Richter, Executive Vice President and Chief Financial Officer of IFF elaborated, stating that:

> I'd say, first of all, obviously, **we're not unique**.  Every industry is experiencing substantial increases in inflation and **all of our competitors are out there basically taking prices up as well**.[122]

---

[119]    *Givaudan to Keep Raising Prices After Q1 Sales Grew 4.6%*, REUTERS (Apr. 12, 2022), https://www.reuters.com/business/retail-consumer/givaudan-keep-raising-prices-after-q1-sales-grew-46-2022-04-12/.

[120]    International Flavors & Fragrances Inc. (IFF) Q-1 2022 Earnings Call Transcript (May 10, 2022), https://news.alphastreet.com/international-flavors-fragrances-inc-iff-q1-2022-earnings-call-transcript/.

[121]    *Id.*

[122]    *Id.* (emphasis added).

129.   Givaudan announced accelerated price increases again on July 21, 2022, despite the fact that like-for-like sales rose 7.9% year on year in the second quarter.[123]

130.   Shortly thereafter, on August 2, 2022, Symrise announced general price increases (including, apparently for fragrances) and its CEO, Dr. Bertram, boasted that the company managed to pass on the bulk of the higher costs to customers in the first half of the year.[124]

131.   A few days later, during the earnings call on August 5, 2022, Firmenich's CEO, Gilbert Ghostine, likewise announced parallel price increases despite a 32% increase in its fine fragrance sector.[125]   Firmenich's CFO Benoit Fouilland stated "If you look at the mix of our growth, you will see 11% growth that we delivered in financial year '22 . . . 30% of the growth was coming from price . . . . As you move towards the second part of the year the contribution of price to the

---

[123]    Silke Koltrowitz, *Givaudan to Accelerate Price Increases as Input Costs Hit Margins*, REUTERS (July 21, 2022), https://www.reuters.com/business/retail-consumer/givaudan-confirms-mid-term-targets-works-pass-higher-prices-2022-07-21/.

[124]    Jagoda Darlak & David Latona, *Symrise Hikes Forecast as Higher Prices, Demand Offset Soaring Costs*, REUTERS (Aug. 2, 2022), https://www.reuters.com/business/germanys-symrise-raises-sales-outlook-increased-demand-2022-08-02/.

[125]    Jennifer Weil, *Firmenich Posts Record Full-year Top- and Bottom-line Growth*, YAHOO NEWS (Aug. 5, 2022), https://www.yahoo.com/news/firmenich-posts-record-full-top-182010078.html.

overall growth has been increased."[126]  Ghostine publicly also signaled Firmenich's plan of launching additional price hikes in the coming fiscal year – "So far we have passed on the vast majority of the cost increase already this year," and would continue doing so next year.[127]  Firmenich confirmed those additional price hikes in a November 22, 2022 press release.[128]

132.  And, on November 8, 2022, IFF's CFO Glenn Richter boasted to investors that the "Scent division once again delivered a strong performance . . . due to volume growth, our price increases and productivity gains."[129]

133.  Defendants have continued to flaunt their ability to raise fragrance prices in the last few months.  On January 25, 2023, Tom Hallam, Givaudan's CFO,

---

[126]   Firmenich Full Year 2022 Results Transcript https://img06.en25.com/Web/FirmenichCorporateCenter1/%7B8d3b75af-a4c7-4e3a-ad0f-07828f370537%7D_Firmenich_Full_Year_2022_Results_transcript.pdf?elqTrackId=1137cb7ba0a1478d8368bff3787e7e5c&elqaid=450&elqat=2.

[127]   *Id.*

[128]   Firmenich Delivered Double-Digit Revenue Growth in the First Quarter of Financial Year 2023, Firmenich (Nov. 22, 2022), https://www.bloomberg.com/press-releases/2022-11-22/firmenich-delive230red-double-digit-revenue-growth-in-the-first-quarter-of-financial-year-2023.

[129]   International Flavors & Fragrances Inc. (IFF) Q3 2022 Earnings Call Transcript, Seeking Alpha (Nov. 8, 2022), https://seekingalpha.com/article/4554858-international-flavors-and-fragrances-inc-iff-q3-2022-earnings-call-transcript.

noted to its investors that "price increases" had "partially compensated" for higher fragrance input costs.[130]

134.   Similarly, on February 9, 2023, IFF's CFO Glenn Richter indicated that there were price increases in its Scent division.[131]   Further, despite volume issues in other parts of the business, IFF's new CEO, Frank Clyburn, noted that "in [IFF's] scent business, we feel as though our [sales] volumes are very comparable to peers and the competitors."[132]

135.   A week later, on February 16, 2023, Firmenich announced that "we continued to achieve strong momentum, with robust Revenue growth across the [fragrance ingredients] portfolio, supported by strong pricing measures and sustained customer demand" and the company is planning to take "further pricing actions."[133]   On the same day, during the earnings call, Mr. Ghostine, Firmenich's

---

[130]   Givaudan SA (GVDBF) Q4 2022 Earning Call Transcript, Seeking Alpha (Jan. 25, 2023), https://seekingalpha.com/article/4572304-givaudan-sa-gvdbf-q4-2022-earnings-call-transcript.

[131]   International Flavors & Fragrances Inc. (IFF) Q4 2022 Earnings Call Transcript, Seeking Alpha (Feb. 9, 2023), https://seekingalpha.com/article/4576967-international-flavors-and-fragrances-inc-iff-q4-2022-earnings-call-transcript.

[132]   *Id.*

[133]   *Firmenich Delivers Strong Results in First Half of Fiscal Year 2023*, FIRMENICH (Feb. 16, 2023), https://www.firmenich.com/company/press-release/firmenich-delivers-strong-results-first-half-fiscal-year-2023.

CEO affirmed the company's ability to increase prices without hurting sales – "we are [] able to combine price increases with sustained demand."[134]

136.   A month later, Olaf Klinger, the CFO at Symrise reported on the exception of 11.4% sales growth.  "Unlike normal years when target a sales split of one third pricing and two third volume, '22 was far from normal.  We needed to pass through high costs to our customers and were were [] – we were to a large extent successful.  We achieved around 75% pricing and around 25% volume growth in organic."[135]  Defendants' ability to reliably increase prices **and** volume at the same time provides strong circumstantial evidence of their conspiracy.

137.   As alleged above, Defendants signaled and implemented parallel price increases throughout the Class Period and were able to do so without losing sales volumes or hurting profitability.  Such price increases – with respect to magnitude and frequency – should not have been possible in a truly competitive commodities market because customers (*i.e.*, Plaintiffs and the Class) would have taken their business elsewhere in response to rising prices.   Yet, Defendants' conspiracy

---

[134]    Firmenich    Half    Year    2023    Earnings    Call    Transcript, https://img06.en25.com/Web/FirmenichCorporateCenter1/%7B6cd374b9-a455-4446-a591-fa12c5c02f69%7D_Firmenich-Half-Year-2023-Results-Transcript.pdf?elqTrackId=7d2e6da218764acc9dd16aa804ee992c&elqaid=450&elqat=2.

[135]    Symrise CFO Olaf Kinger on Q4 2022 results Earnings Call Transcript, Seeking Alpha (Mar. 8, 2023), https://seekingalpha.com/article/4585801-symrise-ag-syief-q4-2022-earnings-call-transcript.

prevented customers from switching to cheaper alternatives, therefore enabling Defendants to achieve price increases consistently – without loss of sales or profitability – over several years during the Class Period in the midst of difficult economic conditions attributable to the COVID-19 pandemic, supply chain disruptions, and inflation.

### D.    Defendants Monitored Their Conspiracy

138.    Price fixing cartels commonly monitor the conduct of the co-conspirators.  As noted by a Former Deputy Assistant Attorney General, in the Antitrust Division, Gary R. Spratling, who was responsible for investigating and prosecuting international cartels, cartels "have shared a number of common characteristics."[136]   On top of agreed-upon volumes, exchanges of otherwise competitively sensitive information, and prices charged to customers, a common characteristic among cartels includes "sophisticated mechanisms to monitor and police the agreements."[137]

139.    Through inter-Defendant sales and public statements, Defendants monitored their conspiracy.  IFF's public statements during the Class Period strongly suggest knowledge of each other's competitively sensitive pricing and sales

---

[136]    Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, ABA's Criminal Justice Section Presentation "Are the Recent Titanic Fines in Antitrust Case Just the Tip of the Iceberg?" (Mar. 6, 1998).

[137]    *Id.*

information, which is also consistent with the existence of Defendants' unlawful agreement to fix prices.  On the February 10, 2022 conference call with investors, Andreas Fibig, CEO of IFF, confirmed that IFF was tracking competitively sensitive information when he noted that "competitors" were also raising prices and that IFF's price increases were "neck to neck" with IFF's competitors "in the market."[138]  On the same call, Mr. Fibig also stated "we actually expect, and what we've seen from an awful lot of our competitors is everybody is basically implementing ***the same range of pricing*** in the market."[139]  Similarly, Givaudan in its 2022 Integrated Annual Report stated that "[m]onitoring of the competitive landscape" is "[h]ow we mitigate risks."[140]

### E.    Defendants' Pretextual Reasons for Their Prices Increases

140.   On information and belief, the justifications offered by the Defendants — that their price increases were due to increased input costs or increased demand — were pretextual and could not fully account for the significant increases in prices over the Class Period.

---

[138]    International Flavors & Fragrances Inc. (IFF) CEO Andreas Fibig on Q4 2021 results - Earnings Call Transcript, Seeking Alpha (Feb. 10, 2022), https://seekingalpha.com/article/4486003-international-flavors-and-fragrances-inc-iff-ceo-andreas-fibig-on-q4-2021-results-earnings.

[139]    *Id.* (emphasis added).

[140]    2022 Integrated Annual Report, Givaudan, at 24 (January 25, 2023), available at https://www.givaudan.com/files/giv-2022-integrated-annual-report.pdf.

141.   Defendants' conspiracy appears to have begun in response to increases in the cost of key fragrance inputs, such as petrochemicals, vanilla, and citrus.  In a normal market, when the cost to manufacture a good increases, it is common for some of those costs to be passed on to customers in the form of higher prices.  In a competitive market, a manufacturer typically cannot pass on to the customer all these costs because if prices increase too much, customers will turn to rival competitors or stop buying altogether.  Apparently, recognizing this fact, Defendants banded together to coordinate raising their prices.  Once Defendants entered into an illegal agreement to fix prices in or around 2018, Defendants continued the cartelized pricing conduct throughout the Class Period despite an easing in the costs of raw materials.

142.   Inflation surrounding the cost of various raw materials began easing in or around 2020.  Yet, Defendants continued to cite raw materials as a pretext for price increases and actually continued increasing prices.  This shows that Defendants had the collective power to increase prices without fear that a competitor (*i.e.*, one of the co-conspirators) would undercut them – a condition that is unnatural in a competitive market.  For example, among other instances, IFF disclosed on the November 8, 2022 earnings call, that "while we are clearly seeing signs of raw material inflation easing, we will continue taking appropriate targeted actions to

offset inflation to maintain profitability,"[141] suggesting continued price increases even after the prices of raw materials stabilized.  Indeed, on a February 9, 2023 call regarding 2022 Q4 earnings, IFF's CFO Glenn Richter confirmed that IFF had implemented price increases (a "catch up in pricing") during the fourth quarter of 2022 in the Scent division.[142]

143.   Similarly, on January 28, 2022, during a 2021 third quarter earnings call, Givaudan's CFO Tom Hallam observed that "the raw mat[erial]s were basically flat over 2021.  So there is no reasons or argument to increase prices during, during 2021."[143]  One year later, on January 25, 2023, despite continuous easing in the prices of raw materials, Mr. Hallam revealed that as a result of (and despite) "price increases," sales and profit measures increased, indicating that Givaudan continued to increase prices despite raw material inflation easing.[144]

144.   Likewise, demand factors do not justify Defendants' price increases. Regarding demand, U.S. macroeconomic indicators of demand show that hourly

---

[141]    Q3 2022 International Flavors & Fragrances Inc. Earning Call Transcript, *supra* note 129.

[142]    Q4 2022 International Flavors & Fragrances Inc. Earning Call Transcript, *supra* note 131.

[143]    Givaudan Q3 2021 Results – Earning Call Transcript, Seeking Alpha (Jan. 28, 2022),       https://seekingalpha.com/article/4482632-givaudans-gvdbf-ceo-gilles-andrier-on-q3-2021-results-earnings-call-transcript.

[144]    Givaudan SA, Q4 2022 Earning Call Transcript, *supra* note 130.

earnings, personal consumption, per capital real GDP, and unemployment all returned to the post-Great Recession trend after recovering from the economic shock of the COVID-19 pandemic as the following chart shows:



145.   None of these developments point to demand as a basis for steep price increases for Fragrance Products.

146.   Defendants achieved generally consistent price increases with their customers, including Plaintiffs and the Class, despite such increases being historically difficult to obtain and keep.  Defendants, as a result of collusive price-

fixing conduct, achieved these price increases even after the cost of raw materials – the purported reason for price increases – declined or stabilized.

**F.   Defendants' Coordinated Parallel Price Increases Substantially Improved Their Profitability**

147.   Despite the Defendants' claims that their price increases served only to "offset higher costs,"[145] publicly available data indicate that many of the Defendants' earnings before interest, taxes, depreciation, and amortization ("EBITDA") and gross profits actually increased during the Class Period, in some cases precipitously.

148.   For instance, as shown in the chart below, IFF's EBITDA surged from $160 million in Q4 2017 to $611 million in Q3 2022.[146]   Givaudan's EBITDA, meanwhile, increased rapidly from $496 million in H2 2017 to $810 million in H1 2022.[147]

---

[145]   Silke Koltrowitz, *Givaudan to Accelerate Price Increases as Input Costs Hit Margins*, REUTERS (July 21, 2022), https://www.reuters.com/business/retail-consumer/givaudan-confirms-mid-term-targets-works-pass-higher-prices-2022-07-21 (last updated July 21, 2022).

[146]   International Flavors and Fragrances – EBITDA, Trading Economics, https://tradingeconomics.com/iff:us:ebitda.

[147]   Givaudan – EBITDA, Trading Economics, https://tradingeconomics.com/givn:vx:ebitda.



149.    Gross profits at IFF and Givaudan also increased over the Class Period. For IFF, gross profits rose from $356 million in Q4 2017 to $1 billion in Q3 2022.[148] Givaudan's gross profits increased from $1.12 billion in H2 2017 to $1.46 billion in H1 2022.[149]

---

[148]    International Flavors and Fragrances – Gross Profit on Sales, Trading Economics, https://tradingeconomics.com/iff:us:gross-profit-on-sales.

[149]    Givaudan – Gross Profit on Sales, Trading Economics, https://tradingeconomics.com/givn:vx:gross-profit-on-sales.



Source: tradingeconomics.com

150.    Givaudan and IFF boasted their ability to record growth while IFF continuously raised prices.  In 2018, Givaudan highlighted the fact that "Fragrance Ingredients sales recorded growth, supported by price increases."[150]  The next year, they again emphasized that the Fragrance Division obtained "[e]xcellent growth driven by the strong performance of new wins and price increases to compensate for higher input costs."[151]

---

[150]    Givaudan  "2018  Full  Year  Results"  (January  25,  2019), https://www.givaudan.com/files/giv-2018-fyr-presentation.pdf.

[151]    Givaudan  "2019  Full  Year  Results"  (January  24,  2020), https://www.givaudan.com/files/giv-2019-fyr-presentation.pdf.

151.   In 2018, IFF had its "strongest improvement in Fragrance Ingredients, which grew high-single digits, led by price increases."[152]   In 2023, IFF claimed "profitability driven by favorable net pricing & productivity" and as a result "[d]elivered higher than expected sales and EBITDA in Q3 2023 driven by improved volume, favorable price to inflation & productivity benefits."  Even when IFF saw a momentary dip in sales volume it was able to keep "margin stable as price increases and the benefits of productivity initiatives offset higher raw material costs."[153]

152.   Symrise experienced a similar surge in earnings and profits during the Class Period despite its claims of rising costs, with EBITDA increasing nearly 50% from €631 million in FY 2018 to €922 million in FY 2022.[154]

---

[152]   IFF Q4 & FY 2019 Earnings Conference Call (February 13, 2020), https://ir.iff.com/static-files/815d3264-3440-4d35-87ed-7c66cdb88a75.

[153]   Third Quarter 2023 Earnings Conference Call, IFF (November 7, 2023), (emphasis added), https://ir.iff.com/static-files/e26b794e-c037-4a34-9381-e0361d 7bf414.

[154]   Financial Report 2022, Symrise (May 10, 2023), https://www.symrise.com/newsroom/downloads/index.php/?eID=tx_securedownlo ads&p=458&u=0&g=0&t=1707170084&hash=9ef55ac3f2dd93113a2be26ec47dde 7401a3b5c6&file=/fileadmin/symrise/Downloads_reports/agm/documents/2023/23 0329-Symrise-AGM-2023-Financial-Report-2022.pdf.

153.   Over the same period, Firmenich's adjusted EBITDA rose from 825.5 CHF to 904.5 CHF, while its unadjusted EBITDA remained flat at around 800 CHF.[155]

154.   These increases in volume, EBITDA, and profits during the relevant period are inconsistent with the Defendants' pretextual explanation that their price increases merely offset rising costs, and are more consistent with the existence of a conspiracy to fix prices.

### G.    Defendants Restrained and Allocated the Supply of Key Fragrance Ingredients

155.   During the Class Period, Defendants restrained the supply of fragrance ingredients.  Defendants agreed to each produce only a specific subset of Fragrance Products and not to produce other Fragrance Products produced by their competitors. By doing so, Defendants ensured that when customers wanted to make a fragrance requiring a specific ingredient, only one or a limited number of Defendants would be able to do so.  This greatly restrained competition in the fragrance industry and allowed Defendants to increase prices above the levels that would otherwise have been set by a competitive market.

---

[155]    Firmenich Annual Report 2022, 31, https://img06.en25.com/Web/Firmenich CorporateCenter1/%7B12ed0bb5-85e8-45e3-9d34-e4571c98cc26%7D_220805_ FIRMENICH_AR_FY22.pdf#page=31.

156.   By reaching this agreement, Defendants were able to nullify the competitive effects of Defendants' ability to reverse-engineer each other's fragrances.   So long as Defendants maintained a significant amount of non-overlapping fragrance ingredients, it would not matter if they could reverse-engineer each other's fragrances because they would not have the ingredients to make those fragrances.   By agreeing not to produce certain fragrance ingredients, Defendants restrained their ability to compete with each other by offering lower prices on specific fragrances.

157.   The plausibility of Defendants' conspiracy has been confirmed by scholars who have studied the fragrance industry.   As one scholar wrote in 2016, "Five multinational corporations, four of which originated in Western Europe, dominate the world fragrance market.   *For years this industrial concentration fostered a tacit agreement among the industry's largest players.   Under this informal understanding, the major fragrance houses would not cannibalize each other by manufacturing competing products based on formulas of a competitor acquired through reverse engineering*."[156]   This author went on to describe this understanding as a "*gentleman's agreement*," a term also used by Calice Becker —

---

[156]   Charles Cronin, *Lost and Found: Intellectual Property of the Fragrance Industry; From Trade Secret to Trade Dress*, JIPEL (Feb. 2, 2016) (emphasis added), https://jipel.law.nyu.edu/vol-5-no-1-6-cronin/.

head of the International Society of Perfumers-Creators (ISPC), whose members are predominantly affiliated with Defendants — who has described the industry as characterized by "a sort of gentleman's agreement and unspoken rules."[157]

158.   Similarly, two other scholars have remarked on how the leading fragrance manufacturers have reached a "***non-appropriation consensus***" when it comes to "olfactory creations" (with one of these scholars making this observation in an obscure, non-publicly available French-language source by no later than 2012), and have described the fragrance "industry" as "incestuous."[158]   At some point, this tacit agreement became express.   Indeed, Defendants' own employees and their co-conspirators have entered into public affirmations of this agreement not to compete. For example, the December 2022 "Perfumery Code of Ethics," authored by a former IFF employee and counting among its signatories current and former employees of Defendants and their co-conspirators, states as its first maxim the following: "We pledge to create or promote original olfactory forms.   Borrowed forms shall have their original creators and formula owners named and rewarded.   ***Plagiarism is not tolerated***."[159]   Adherents to the Perfumery Code of Conduct have thus mutually and expressly agreed not to compete with one another over their respective fragrance

---

[157]      *Id.*

[158]      Guillemin, *supra* note 18 at 25.

[159]      Perfumery   Code   of   Ethics,   v   23/2022-05   (emphasis   added),
https://perfumeryethics.org/the-code/.

formulas.  Likewise, the ISPC espouses a similar sentiment on its website: "We all copy and steal like artists – it's part of the creative process to understand how masterpieces are created, but what's crucial is to know what we do with the copies. ***Have them on the market the way they are - is plagiarism***."[160]

159.  By only producing a specific subset of fragrance ingredients, Defendants ensured that when customers wanted to make a fragrance requiring a specific ingredient, only one or a limited number of Defendants would be able to do so.  For example, Symrise touts itself as the "No. 1 supplier of fragrance raw materials," but it lists only 207 fragrance ingredients on its website.  IFF reports 255.  And Firmenich discloses only 206.  Finally Givaudan lists only 176 fragrance ingredients.  Each Defendant produces well fewer than the full universe of synthetic and natural fragrance ingredients that can be used to make fragrances.  This limited competition in the market for Fragrance Products and, as a result, increased prices.

160.  What is more, Defendants produce different fragrance ingredients among the subset of fragrance ingredients that they produce.  One could imagine an innocent explanation for Defendants producing only a subset of fragrance ingredients being that certain ingredients are more difficult to produce (or used less) and, therefore, all Defendants produce a similar subset of the overall fragrance

---

[160]    *ISPC Speaks at WPC 2022: Three Goals*, PERFUMEURS CREATEURS (Sept. 7, 2022) (emphasis added), https://www.perfumer-creators.com/en/news/ispc-speaks-at-wpc-2022-three-goals-71.

ingredients.  But that is not the case.  Firmenich, Givaudan, IFF, and Symrise all publish their fragrance ingredients online.  Excluding the fragrance ingredients that Defendants have trademarked, each Defendant produces a substantial number of fragrance ingredients that the other Defendants do not.  For instance, IFF produces lavonax, khusinil, meth cyclocitrone, and myrcenyl acetate, but neither Givaudan nor Symrise produce any of those ingredients.  Similarly, Givaudan produces methyl octyne carbonate, jasmacyclene, and isopropyl quinoline, but neither IFF nor Symrise produce them (even though they both produce isobutyl quinoline, which is chemically similar but distinct from isopropyl quinoline).  And Symrise produces formyrcenol, dimethyl myrcetone, and ethyl propionate, yet again neither Givaudan nor IFF produce those ingredients.  These are but a few illustrative examples.

161.   Defendants' failure to produce these fragrance ingredients is not a result of capacity limitations or capital restrictions.  Defendants are the largest fragrance ingredient manufacturers in the world and, as they themselves explain, use "cutting-edge chemistry and biotechnology" to develop their synthetic ingredients in order to launch "distinctive, high-performing products."  Indeed, Givaudan explains that its research centers "synthesise nearly 2,000 new molecules every year," even though "[o]nly a small number of th[em] end up in [Givaudan's] perfumers' palette."[161]

---

[161]   Givaudan, Shaping Tomorrow's Signature Fragrances with Science, *supra* note 24.

Thus, it is clear that Defendants have the ***capability*** to produce substantially all of the synthetic and natural fragrance ingredients that are used to make fragrances and would enable them to offer their customers the full array of fragrance options.

162.   This explanation also comports with COMCO's statement in the aftermath of the dawn raids that it had reason to believe Defendants had "limited the production of certain fragrances."  COMCO's announcement is further evidence that Defendants agreed to restrain the market to increase prices above competitive levels.

## H.   Government Authorities Conduct Dawn Raids on Defendants

163.   On March 7, 2023, the EC published the following announcement that it had carried out dawn raids at several suppliers and an industry association in the fragrances industry:

> On 7 March 2023, the European Commission carried out unannounced inspections at the premises of companies and an association active in the fragrance industry in various Member States.  In parallel, the Commission has sent out formal requests for information to several companies active in the same sector.
>
> The inspections and requests for information concern possible collusion in relation to the supply of Fragrance Products.  Fragrances are used in the manufacture of consumer products such as household and personal care products.
>
> The Commission has concerns that companies and an association in the fragrance industry worldwide may have violated EU antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union).
>
> The Commission has been in contact with the Antitrust Division of the US Department of Justice, the UK Competition and Markets Authority and the Swiss Competition Commission in relation to this matter and

the inspections were conducted in consultation with them. The Commission officials were accompanied by their counterparts from the national competition authorities of the Member States where the inspections were carried out.[162]

164.    Inspections by the EC are not undertaken casually. Inspections are typically done by an order of the EC, and the EC must have "reasonable grounds for suspecting an infringement of the competition rules;" "[i]t must be borne in mind that the inspections carried out by the Commission are intended to enable it to gather the necessary documentary evidence to check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information."[163]

165.    That same day, the CMA confirmed its participation in the investigation and named the Defendants as the subject of that investigation:

> The Competition and Markets Authority (CMA) has reason to suspect anti-competitive behaviour has taken place involving suppliers of fragrances and fragrance ingredients for use in the manufacture of consumer products such as household and personal care products.
>
> The businesses under investigation by the CMA are: Firmenich International SA, Givaudan SA, International Flavours & Fragrances Inc, and Symrise AG.
>
> The CMA has been in contact with the Antitrust Division of the US Department of Justice, the European Commission and the Swiss

---

[162]    European Commission Press Release IP/23/1532, *supra* note 1.

[163]    Case No. T-135/09, *Nexans France SAS v. Comm'n*, 2012 E.C.R. 43, http://curia.europa.eu/juris/document/document_print.jsf?doclang=EN&text=&pageIndex=0&part=1&mode=lst&docid=129701&occ=first&dir=&cid=663482.

Competition Commission in relation to this matter, and this investigation has been launched in consultation with them.[164]

166.   The next day, COMCO confirmed its involvement in the investigation and provided further details regarding the conduct for which the Defendants were under investigation:

> **The Swiss Competition Commission (COMCO) has opened an investigation in the fragrance sector.  There are suspicions that producers have colluded**.
>
> COMCO has indications that several undertakings active in the production of fragrances have violated cartel law.  There are suspicions that these undertakings have coordinated their pricing policy, prohibited their competitors from supplying certain customers and limited the production of certain fragrances.  Fragrances are used in the manufacture of many products, including in particular cosmetics, personal care products, detergents and cleaning products.  The undertakings involved in the investigation are Firmenich International SA (Geneva), Givaudan SA (Geneva), International Flavors & Fragrances Inc. (USA) et Symrise AG (Germany).
>
> Dawn raids were conducted at various locations.  These were carried out in consultation with other competition authorities, namely the European Commission, the US Department of Justice Antitrust Division and the UK Competition and Markets Authority.[165]

---

[164]   *CMA Launches Investigation into Fragrances and Fragrance Ingredients*, *supra* note 2.

[165]   The Swiss Competition Commission Press Release, *supra* note 3 (emphasis original).

167.   IFF, Symrise, Givaudan, and Firmenich have all confirmed that they are subjects of the investigation.[166]

168.   On March 7, 2023, Givaudan confirmed the investigation in a statement to Reuters:

> "I can confirm that we are part of an industry-wide investigation by European and Swiss authorities. As a good corporate citizen, Givaudan is fully cooperating with the authorities," a spokesperson said.[167]

169.   On March 8, 2023, Symrise released a press release on its website confirming the investigation:

> On March 7, 2023, EU cartel authorities have contacted Symrise at their headquarters in Holzminden. Together with Swiss, British and American authorities, they are investigating possible inadmissible agreements in the fragrance and fragrance ingredients sector. These investigations are taking place in parallel at all leading companies in the industry. Symrise is cooperating fully with the authorities. At present, precise details and concrete content on this investigation are still pending.[168]

170.   That same day, Firmenich posted a press release to its corporate website stating:

> Firmenich, the world's largest privately owned perfume and taste company confirms that on March 7th, 2023, certain competition

---

[166]   Patricia Nilsson & Javier Espinoza, *Top Four Fragrance Groups Raided in Co-Ordinated Antitrust Probe*, FINANCIAL TIMES (Mar. 8, 2023), https://www.ft.com/content/ebe2087e-198d-40dd-9615-e090facfb99f.

[167]   Chee & Hirt, *supra* note 79.

[168]   Press Release, Investigations by International Cartel Authorities (Mar. 08, 2023), https://www.symrise.com/newsroom/article/investigations-by-international-cartel-authorities/.

authorities commenced an industry wide investigation into the fragrances sector.  As part thereof, unannounced inspections were carried out at its offices in France, Switzerland and the UK.

Unannounced inspections are a preliminary step in anti-trust investigations into suspected infringements of competition rules.  This does not mean that the company has engaged in anti-competitive behavior nor does it prejudge the outcome of the investigation itself.

Firmenich is closely monitoring the situation and is fully cooperating with the investigators.  The Company is unable to comment further at this stage.[169]

171.   Firmenich also stated in its 2023 Financial Statements, "On March 7, 2023, certain competition authorities commenced an industry-wide investigation into the fragrances sector.  As part thereof, unannounced inspections were carried out at the Firmenich offices in France, Switzerland and the UK and Firmenich received a subpoena from the Antitrust Division of the United States Department of Justice."[170]

172.   In a May 10, 2023 SEC filing, IFF acknowledged the investigation and disclosed that it had received a subpoena from the U.S. Department of Justice:

On March 7, 2023, the European Commission ("EC") and the United Kingdom Competition and Markets Authority ("CMA") carried out unannounced inspections of certain of IFF's facilities.  On the same

---

[169]   Press Release, Firmenich Confirms Anti-Trust Probes into Fragrances Sector (Mar. 08, 2023), https://www.firmenich.com/company/press-release/firmenich-confirms-anti-trust-probes-fragrances-sector.

[170]   Financial statements 2023: for the year ended June 30, 2023, Firmenich, at 48 (July 31, 2023), https://www.dsm-firmenich.com/content/dam/dsm-firmenich/corporate/documents/firmenich-sa-annual-report-fy2023.pdf.

day, IFF was served with a grand jury subpoena by the Antitrust Division of the U.S. Department of Justice ("DOJ").  IFF understands the EC, CMA, DOJ and the Swiss Competition Commission to be investigating potential anticompetitive conduct as it relates to IFF's fragrance businesses.[171]

173.  In an article published March 8, 2023, a spokesperson for IFF told Bloomberg that "they were working closely with the relevant authorities."[172]

174.  The subpoena in question was issued by a criminal grand jury.  This indicates that the DOJ is considering a criminal prosecution against IFF and/or its co-conspirators, as reflected in Chapter 3 of the DOJ's Antitrust Division Manual.  Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed ***with a criminal prosecution***."[173]  The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division.  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the

---

[171]   International Flavors & Fragrances, Inc., Quarterly Report (Form 10-Q), at 25 (May 10, 2023).

[172]   Stephanie Bodoni & Lisa Pham, *Fragrance Firms Hit in Europe Suspected of Scent Supply Cartel*, BLOOMBERG (Mar. 8, 2023), https://www.bloomberg.com/news/articles/2023-03-08/fragrance-firms-hit-in-europe-suspected-of-scent-supply-cartel#xj4y7vzkg.

[173]   U.S. Dep't of Just., Antitrust Division Manual, Chapter III § F1, at 82, (5th ed., Last Updated April 2015), (emphasis added), https://www.justice.gov/sites/default/files/atr/legacy/2015/05/13/chapter3.pdf.

Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General.  If approved by the Assistant Attorney General, letters of authority are issued for all attorneys general who will participate in the grand jury investigation."[174]  Further, "[t]he investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which the price-fixed sales were made or where conspiratorial communications occurred."[175]

175.   On January 11, 2024, IFF announced that its Chief Executive Officer and Director, Franklin K. Clyburn, Jr., would cease to serve as CEO and a director of the Board, effective February 6, 2024.  Clyburn's Separation Agreement with IFF requires him to acknowledge that IFF is "involved in various proceedings launched in March 2023 by certain competition and enforcement authorities in the United States, United Kingdom, Switzerland and before the EU Commission . . . and . . . may be involved in other procedures conducted by other competition or enforcement authorities . . . in other jurisdictions for similar facts. (together, the 'Investigation')."[176]  Under his Separation Agreement, Clyburn has to "fully and promptly cooperate in good faith with the Company, the Group Companies and their

---

[174]    *Id.* at 83.

[175]    *Id.*

[176]    International Flavors & Fragrances Inc., Current Report (Form 8-K Filing), Exhibit 10.1, Separation Agreement and General Release (January 11, 2024).

legal counsel in any matter concerning the Investigation" and "in connection with any claim or court action brought against the Company or any Group Company in whole or in part for any alleged violation of the antitrust laws ('Derivative Actions'), including, but not limited to, providing testimony at trial or deposition, in compliance with applicable laws."[177]

176.   On top of having to cooperate with IFF, Clyburn's Separation Agreement prohibits him from cooperating with claimants against IFF related to its anticompetitive conduct.  Clyburn has held his post with IFF since January 18, 2022.

177.   Further demonstrating that Defendants commitment to coordination rather than competition, the CMA is investigating Defendants Firmenich, IFF, and Givaudan for entering into "No Poach" agreements concerning their employees. Specifically, the CMA revealed that it was investigating "unlawful coordination by Firmenich International SA, Givaudan SA and International Flavours & Fragrances Inc involving reciprocal arrangements relating to the hiring or recruitment of certain staff involved in the supply of fragrances and/or fragrance ingredients."[178]

---

[177]    *Id*.

[178]    *Suspected anti-competitive conduct in relation to fragrances and fragrance ingredients (51257)*, *Supra* note 7.

## DEFENDANTS' FRAUDULENTLY CONCEALED THEIR CONSPIRACY

178.   Plaintiffs and the Class had no knowledge of the Defendants' anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until, at the earliest, March 7, 2023, when the EC announced its investigation into the Defendants and that it was coordinating with the DOJ, COMCO, and CMA.  As a result, Plaintiffs and the Class did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before these revelations.  Prior to that time, there was insufficient information to suggest that the Defendants were involved in a conspiracy to fix prices, rig bids, or allocate the fragrance market.  Because Plaintiffs could not and did not discover the existence of their claims prior to March 7, 2023, Plaintiffs' claims did not accrue until that date at the earliest.

179.   Moreover, the statute of limitation on the claims asserted herein was tolled by fraudulent concealment until at least March 7, 2023.   Defendants affirmatively and wrongfully concealed their anticompetitive conduct since the beginning of the Class Period.

180.   Defendants' conspiracy was inherently self-concealing.  The success of the conspiracy depended on the Defendants and their co-conspirators keeping the price-fixing and bid-rigging conduct alleged herein secret from customers and

government authorities.   Accordingly, Plaintiffs reasonably believed they were making Fragrance Products purchases in a competitive industry.

181.   Defendants and their co-conspirators also took affirmative steps to conceal the conspiracy and carry it out in a manner that would evade detection. Throughout the Class Period, Defendants and their co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the Class.   Additionally, the Defendants provided pretextual reasons for their price increases that Plaintiffs and the Class reasonably relied upon.

182.   Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiffs and the Class did not learn or discover the operative facts giving rise to their claims until March 7, 2023.

183.   Plaintiffs exercised reasonable diligence.   Plaintiffs and the members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.   No information, actual or constructive, was ever made available to Plaintiffs and the Class that would have led a reasonably diligent person to investigate whether a conspiracy in the market for fragrances existed prior to March

7, 2023.[179]  Plaintiffs and the members of the Class did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint.

184.   By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

185.   Plaintiffs' claims are also timely under the continuing violations doctrine.   Each sale by the Defendants at prices affected by the conspiracy constituted a new overt act causing injury to Plaintiffs and members of the Class.

## CLASS ACTION ALLEGATIONS

186.   Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons and entities in the United States and its territories who purchased Fragrance Products directly from any of the Defendants or

---

[179]    Indeed, this is further bolstered by the fact that the CMA only announced on January 17, 2024 that it had extended its probe of Givaudan, Firmenich, and IFF to include allegations that they engaged in further anticompetitive behavior in the form of so-called no-poach agreements, *i.e.*, unlawful coordination involving reciprocal arrangements relating to the hiring or recruitment of certain staff involved in the supply of fragrances and/or fragrance ingredients.

their subsidiaries or affiliates during the period at least as early as January 1, 2018 until the effects of the conspiracy ceased.

187.   **Exclusions from the Class**: Specifically excluded from the Class are Defendants and their conspirators; the officers, directors, or employees of any Defendant or conspirator; any entity in which any Defendant or conspirator has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant or conspirator, and any person acting on their behalf.  Also excluded from the Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

188.   While Plaintiffs do not know the exact number of members of the Class, Plaintiffs believe the Class size is so numerous and geographically dispersed that joinder is impracticable given Defendants' substantial nationwide presence. Members of the Class are readily identifiable from information and records in Defendants' possession.

189.   Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making relief with respect to the Class as a whole appropriate.  Such questions of law and fact common to the Class include, but are not limited to:

(a)  Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Fragrance Products;

(b)  The identity of the participants of the alleged conspiracy;

(c)  The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)  Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

(e)  Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Class;

(f)  The effect of the alleged conspiracy on the price of Fragrance Products during the Class Period;

(g)  Whether the Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiffs and the members of the Class;

(h)  The appropriate injunctive and related equitable relief for Plaintiffs and the Class; and

(i)  The appropriate class-wide measure of damages.

190.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for Fragrance Products from Defendants and/or their co-conspirators.

191.    Plaintiffs and undersigned counsel will fairly and adequately protect the interests of the Class.  Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.  Plaintiffs are represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

192.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

193.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims

that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

194.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## INTERSTATE TRADE AND COMMERCE

195.    Billions of dollars of transactions in Fragrance Products are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

196.    Defendants' manipulation of the market had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

197.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for Fragrance Products.

198.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories.    Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of Fragrance Products, the prices of Fragrance Products would have been determined by a competitive, efficient market.

**ANTITRUST INJURY**

199.  Defendants' antitrust conspiracy had the following effects, among others:

200.  Price competition has been restrained or eliminated with respect to the pricing of Fragrance Products;

201.  The prices of Fragrance Products have been fixed, raised, maintained, or stabilized at artificially inflated levels;

202.  Purchasers of Fragrance Products have been deprived of the benefits of free and open competition; and

203.  Purchasers of Fragrance Products paid artificially inflated prices.

204.  The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and/or maintain the price of Fragrance Products.

205.  The precise amount of the overcharge impacting the prices of Fragrance Products paid by Plaintiffs and the Class can be measured and quantified using well-accepted models.

206.  By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Class have sustained injury to their businesses or property, having paid higher prices for Fragrance Products than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result,

have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CLAIM FOR RELIEF

**Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)
(Conspiracy in Restraint of Trade)**

207.  Plaintiffs repeat the allegations set forth in paragraphs 1-206 above.

208.  From at least January 1, 2018 until the effects of their unlawful conduct cease, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regards to Fragrance Products in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

209.  The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for Fragrance Products in the United States and elsewhere.

210.  In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

(a)    exchanging competitively sensitive information among themselves, with the aim to fix, increase, maintain, or stabilize prices of Fragrance Products in the United States and elsewhere;

(b)     participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of Fragrance Products in the United States and elsewhere; and

(c)     participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

211.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise, or stabilize prices of Fragrance Products.

212.   Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for Fragrance Products has been restrained, suppressed, and/or eliminated;

(b)     Prices for Fragrance Products provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States and elsewhere; and

(c)     Plaintiffs and members of the Class who purchased Fragrance Products from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

213.   Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by paying more for Fragrance Products

purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

214.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

215.   Plaintiffs and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs and the Class respectfully request the following relief:

A.   That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as representatives of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.   The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged

to have been a *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C.      The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      That judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.      That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the

combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F.      That the Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: February 05, 2024                        Respectfully submitted,

<u>/s/ James E. Cecchi</u>
James E. Cecchi
**CARELLA, BRYNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Tel.: (973) 994-1700
jcecchi@carellabyrne.com

*Liaison Counsel for Direct Purchaser*
*Class*

Hilary Scherrer
**HAUSFELD LLP**
888 16th Street NW, Suite 300
Washington, DC 20006
Tel.: (202) 540-7200
hscherrer@hausfeld.com

Christopher M. Burke
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA  92101

Tel.: (619) 6225-5620
cburke@koreintillery.com

Linda P. Nussbaum
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas
31st Floor
New York, NY 10036
Tel.: (917) 438-9189
lnussbaum@nussbaumpc.com

*Interim Co-Lead Class Counsel*

Scott Martin
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel.: (646) 357-1100
smartin@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel.: (215) 985-3270
kberan@hausfeld.com

Mike Roberts
**ROBERTS LAW FIRM US, PC**
20 Rahling Circle
Little Rock, AR 72223
Tel.: (501) 821-5575
mikeroberts@robertslawfirm.us

Susan R. Schwaiger
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas
31st Floor
New York, NY 10036
Tel.: (917) 438-9189
lnussbaum@nussbaumpc.com
schwaiger@nussbaumpc.com

Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA  92101
Tel.: (619) 6225-5620
wnoss@koreintillery.com
klv@koreintillery.com

Stephen Tillery
Rosemarie Fiorillo
Carol O'Keefe
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Tel.: (314) 241-4844
stillery@koreintillery.com
rfiorillo@koreintillery.com
cokeefe@koreintillery.com

Labeat Rrahmani
**KOREIN TILLERY LLC**
205 N Michigan Avenue, Suite 1950
Chicago, IL 60601
Tel.: (312)-899-5066
lrrahmani@koreintillery.com

Roberta D. Liebenberg
Gerard A. Dever
**FINE, KAPLAN AND BLACK,**
**R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
Tel.: (215) 567-6565
rliebenberg@finekaplan.com
gdever@finekaplan.com

Amelia F. Burroughs
**BURROUGHS LEGAL**
P.O. Box 1465
Ferndale, CA 95536
Tel.: (707) 845-9393
amelia@burroughslegal.com

Arthur N. Bailey
**RUPP PFALZGRAF, LLC**
111 West 2nd Street, Suite 1100
Jamestown, NY 14701
Tel.: (716) 664-2967
bailey@RuppPfalzgraf.com

Jason Lichtman
Emily N. Harwell
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
Tel.: (212) 355-9500
jlichtman@lchb.com
eharwell@lchb.com

Eric L. Cramer
Candice J. Enders
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
ccoslett@bm.net

Allan Steyer
D. Scott Macrae
Alexander Kullar
**STEYER LOWENTHAL**
**BOODROOKAS ALVAREZ &**
**SMITH LLP**
235 Pine Street, 15th Floor
San Francisco, CA  94104
Tel.: (415) 421-3400
asteyer@steyerlaw.com
smacrae@steyerlaw.com
akullar@steyerlaw.com

Brian D. Clark
Simeon A. Morbey
Arielle S. Wagner
**LOCKRIDGE GRINDAL**
**NAUEN P.L.L.P.**
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel.: (612) 339-6900
bdclark@locklaw.com
samorbey@locklaw.com
aswagner@locklaw.com

Lin Y. Chan
Katherine Lubin Benson
Jules A. Ross
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel.: (415) 956-1000
lchan@lchb.com
kbenson@lchb.com
jross@lchb.com

ecramer@bm.net
cenders@bm.net

Marc H. Edelson
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
Tel.: (215) 867-2399
medelson@edelson-law.com

Joshua H. Grabar
**GRABAR LAW OFFICE**
One Liberty Place 1650 Market Street
Suite 3600
Philadelphia, PA 19103
Tel.: 267-507-6085
jgrabar@grabarlaw.com

*Additional Plaintiffs' Counsel*