UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: FRAGRANCE DIRECT PURCHASER ANTITRUST LITIGATION | Civil Action No. 23-cv-02174 (WJM) (JSA) |
| IN RE: FRAGRANCE INDIRECT PURCHASER ANTITRUST LITIGATION | Civil Action No. 23-cv-3249 (WJM) (JSA) |
| IN RE: FRAGRANCE END-USER PLAINTIFF ANTITRUST LITIGATION | Civil Action No. 23-cv-16127 (WJM) (JSA) |
| | **DECLARATION OF Roberto Garavagno** |

I, Roberto Garavagno, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am Group Counsel at Givaudan International SA, and I have served the Givaudan group in that capacity since 1 September 2015. I make this declaration based upon my own personal knowledge and information obtained during the course of my employment at Givaudan International SA and in support of Givaudan SA's

Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaints for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2).

2.     The statements made in this declaration, to the best of my knowledge, are true both as of today, 8 April, 2024,  and as of April 18, 2023, the date the first Complaint in these actions was filed.  Capitalized terms not otherwise defined adopt the definitions used in Plaintiffs' Consolidated Amended Class Action Complaints.

3.     Givaudan SA is a *société anonyme* organized under the laws of Switzerland, with its principal place of business in Vernier, Switzerland.

4.     Givaudan SA is a legally separate and distinct company from Givaudan Fragrances Corporation, Ungerer & Company, Inc., and Custom Essence LLC, the three other Givaudan entities named as defendants in Plaintiffs' Consolidated Amended Class Action Complaints.   Givaudan SA is a holding company for, and has ownership interests in, various direct and indirect subsidiaries.

5.     For example, Givaudan SA holds an ownership interest in Givaudan United States, Inc., which in turn holds an ownership interest in Givaudan Flavors and Fragrances, Inc., which is the parent company of Givaudan Fragrances Corporation, an entity named as a defendant in these actions.  Givaudan Fragrances Corporation is, in turn, the corporate parent of Custom Essence LLC, an entity named as a defendant in these actions.

6.     Givaudan SA also holds an ownership interest in Ungerer Industries, Inc., which is the parent company of Ungerer & Company, Inc., an entity named as a defendant in these actions.

7.     Givaudan SA also holds ownership interests in various other subsidiaries, including Givaudan International SA and other entities organized under the laws of Switzerland and elsewhere.

8.     As a holding company, Givaudan SA's primary function is to manage its investments in its subsidiaries.  It has no operational activities.

9.     Givaudan SA has no employees, but it has 7 members of the board of directors and several authorized signatories, among which those of the group Executive Committee (7 members). None of them is domiciled in the USA.

10.    Givaudan SA neither directly owns nor leases property of any kind in the United States.  It does not maintain an office or any other facility in the United States.  It has no mailing address or telephone listing in the United States.  It does not maintain a bank account in the United States.

11.    Givaudan SA does not manufacture, distribute, or contract for the sale and supply of Fragrances or Fragrance Products in the United States.

12.     Givaudan SA is not directly involved in sales or marketing in the United States.

13.    Givaudan SA observes corporate formalities, and its subsidiaries, including the indirect subsidiaries in the United States, maintain separate books and records.

14.    Givaudan SA does not direct the day-to-day operations of its indirect subsidiaries in the United States, which have their own management and employees.

15.    Attached hereto as Exhibit A is a true and correct copy of the Givaudan 2020 Governance, Compensation, and Financial Report, *available at* https://www.givaudan.com/files/giv-2020-gcfr.pdf.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

s/ _____.
Roberto Garavagno

# Exhibit A





# Governance, Compensation and Financial Report

2020

Givaudan

engage your senses

# 2020 Governance, Compensation and Financial Report

As part of our reporting suite, this stand-alone document contains the full details of our governance and compensation policies as well as the details of our financial performance.

An overview can be found in the Integrated Annual Report.

**Table of contents**

| | |
|---|---|
| **3** | Governance report |
| **22** | Compensation report |
| **38** | Consolidated financial report |
| **102** | Statutory financial report |
| **114** | Appendix |

# Governance Report

**In this section**

| | |
|---|---|
| 4 | Group structure and shareholders |
| 5 | Capital structure |
| 7 | Board of Directors |
| 16 | Executive Committee |
| 19 | Compensation, shareholdings and loans |
| 19 | Shareholders' participation |
| 20 | Change of control and defence measures |
| 20 | Auditors |
| 21 | Information policy |



# Corporate governance
# Ensuring proper checks and balances

The Governance report is aligned with international standards and has been prepared in accordance with the 'Swiss Code of Obligations', the 'Directive on Information Relating to Corporate Governance' issued by the SIX Swiss Exchange and the 'Swiss Code of Best Practice for Corporate Governance' issued by economiesuisse.

The internal corporate governance framework is based on Givaudan SA's Articles of Incorporation. The 'Board Regulations of Givaudan SA', the Company's organisational regulation, further clarifies the duties, powers and regulations of the governing bodies of the Company.

Except when otherwise provided by law, the Articles of Incorporation and Givaudan's Board Regulations, all areas of management are fully delegated by the Board of Directors, with the power to sub-delegate to the Chief Executive Officer, the Executive Committee and its members. The Board Regulations of Givaudan also specifies the duties and the functioning of its four Board Committees.

> ⟳ **READ MORE**
> www.givaudan.com ▸ Our company ▸ Corporate governance ▸ Rules and policies ▸ **Articles of Incorporation, Board Regulations of Givaudan and other documentation regarding Givaudan's principles of corporate governance**

## 1. Group structure and shareholders
### 1.1 Group structure
#### 1.1.1 Description of the issuer's operational Group structure
Givaudan SA, the parent company of the Givaudan Group, with its registered corporate headquarters at 5 Chemin de la Parfumerie, 1214 Vernier, Switzerland ('the Company'), is a 'société anonyme', pursuant to art. 620 et seq. of the Swiss Code of Obligations. It is listed on the SIX Swiss Exchange under security number 1064593, ISIN CH0010645932.

The Company is a global leader in its industry. Givaudan operates around the world and has two principal businesses: Taste & Wellbeing and Fragrance & Beauty, providing customers with compounds, ingredients and integrated solutions. Taste & Wellbeing consists of four business units: Dairy, Sweet goods, Beverages and Savoury. Fragrance & Beauty also has four business units: Consumer products; Fine fragrances; Fragrance ingredients and Active Beauty.

Both divisions have a sales and marketing presence in all major countries and markets as well as Research and Development organisations. They share resources and knowledge in the areas of research and consumer understanding, where applicable. Corporate functions include Finance, Procurement, Science and Technology, Human Resources (HR), Legal, Ethics & Compliance, Enterprise Risk Management and Communications as well as Givaudan Business Solutions (GBS). GBS provides best-in-class internal processes and services in the areas of Finance, Controlling, HR, Procurement, Supply Chain, Environment, Health & Safety (EHS), Enterprise Data Management, Information Management and Technology (IM&T), Sustainability and Continuous Improvement.

#### 1.1.2 Listed companies within the scope of consolidation
The Company does not have any publicly listed subsidiaries.

#### 1.1.3 Unlisted companies within the scope of consolidation
The list of principal consolidated companies, their domiciles and the shareholding is presented on page 90, in note 32 to the 2020 consolidated financial statements. Note 1 to the consolidated financial statements as well as page 104 note 3 to the statutory financial statements offer more details regarding the structure of the Group. All unlisted subsidiaries are wholly-owned, unless otherwise indicated in notes 3 and 4 to the statutory financial

# Corporate governance

statements mentioned above. The 2020 Financial report is in English and can be downloaded on the Company website.

 **DOWNLOAD**
www.givaudan.com ▸ Investors ▸ Online annual report ▸ Download centre ▸ **2020 Governance, Compensation and Financial report**

## 1.2  Significant shareholders

To the knowledge of the Company, the following shareholders were the only shareholders holding more than 3% of the share capital of Givaudan SA as at 31 December 2020 (or as at the date of their last notification under article 20 of the Stock Exchange Act):

**Significant shareholders**

| 2020 | in % |
|---|---|
| **Beneficial owners** | |
| William H. Gates III and Melinda French Gates | 13.86 |
| BlackRock, Inc. | 5.06 |
| MFS Investment Management | 4.99 |
| **Nominees** | |
| Nortrust Nominees Limited[1] | 14.98 |
| Chase Nominees Limited[1] | 7.71 |
| Banque Pictet & Cie SA[2] | 4.49 |

1. Voting rights for the shares held by Nortrust Nominees Limited and Chase Nominees Limited need to be exercised in accordance with clients' instructions.
2. The shares held by Banque Pictet & Cie SA bear no voting rights.

 **READ THE NOTIFICATIONS**
www.ser-ag.com ▸ en ▸ Resources ▸ Notifications market participants ▸ **Significant shareholders**

The Company has not entered into any shareholder agreements with any of its significant shareholders.

## 1.3  Cross-shareholdings

The Company does not have any cross-shareholdings with any other company.

## 2.  Capital structure

### 2.1  Capital on the disclosure deadline

**Ordinary share capital**

As at 31 December 2020, the Company's ordinary share capital amounted to CHF 92,335,860 fully paid in and divided into 9,233,586 registered shares with a par value of CHF 10.00 each.

The market capitalisation of the Company at 31 December 2020 was CHF 34,441,275,780.

### 2.2  Authorised and conditional capital in particular

**Authorised share capital**

The Company does not have any authorised share capital.

**Conditional share capital**

As per article 3b of the Company's Articles of Incorporation, the Company's share capital can be increased by:

a.  issuing up to 463,215 shares (CHF 4,632,150) through the exercise of option or conversion rights granted in connection with bond issues of Givaudan SA or a Group company

b.  issuing up to 161,820 shares (CHF 1,618,200) through the exercise of option rights granted to employees and/or the members of the Board of Directors of the Group

c.  issuing up to 123,163 shares (CHF 1,231,630) through the exercise of warrants granted to the shareholders of Givaudan SA.

The conditional share capital amounts to a maximum of CHF 7,481,980, which equates to 8.1% of the existing share capital.

The subscription rights of the shareholders are excluded in cases a) and b) above. The Board of Directors is authorised to exclude the shareholders' preferential right to subscribe to bonds if the purpose is to finance acquisitions or to issue convertible bonds or warrants on the international capital market. In that case, the bonds or warrants must be offered to the public at market conditions, the deadline for exercising option rights must be not more than six years and the deadline for exercising conversion rights must be not more than 15 years from the issue of the bond or warrants and the exercise or conversion price for new shares must be at a level corresponding at least to the market conditions at the time of issue.

 **DOWNLOAD**
www.givaudan.com ▸ Our company ▸ Corporate governance ▸ Rules and policies ▸ **Articles of Incorporation**

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

## Corporate governance

The acquisition of shares through the exercise of option or conversion rights and the transfer of such shares are subject to restrictions as described in section 2.4.

### 2.3  Changes in capital
The information regarding the year 2018 is available in notes 8 and 9 to the statutory financial statements of the 2018 Financial report. Details of the changes in equity for the years 2019 and 2020 are given on page 107 in note 7 to the statutory financial statements included in the 2020 Financial report.

 DOWNLOAD
www.givaudan.com ‣ Investors ‣ Results centre ‣ **2020 Governance, Compensation and Financial report**

### 2.4  Shares and participation certificates
The Company has one class of shares only. All shares are registered shares with a par value of CHF 10.00 each. Subject to the limitations described below, all shares have the same rights in all respects. Every share gives the right to one vote and to an equal dividend.

### 2.5  Dividend-right certificates
Other than the registered shares, dividend-right certificates and participation certificates do not exist.

### 2.6  Limitations on transferability and nominee registrations
**2.6.1  Limitations on transferability for each share category; indication of statutory group clauses and rules for granting exceptions**
At the Annual General Meeting of shareholders on 20 March 2014, the previously existing registration and voting rights restrictions were abolished. Today, the Company no longer has limitations on transferability of shares.

**2.6.2  Reasons for granting exceptions in the year under review**
This is not applicable because the Company has no limitations on transferability of shares.

**2.6.3  Permissibility of nominee registrations; indication of any percent clauses and registration conditions**
Subject to the provisions mentioned in the next paragraph, registration with voting rights in the Company's share register is conditional on shareholders declaring that they have acquired the shares in their own name and for their own account.

Based on a regulation of the Board of Directors, nominee shareholders may be entered with voting rights in the share register of the Company for up to 2% of the share capital without further condition, and for more than 2% if they undertake to disclose to the Company the name, address, nationality and number of shares held by the beneficial owners.

**2.6.4  Procedure and conditions for cancelling statutory privileges and limitations on transferability**
Limitations on transferability and nominee registrations may be changed by a positive vote of the absolute majority of the share votes represented at a shareholders' meeting.

### 2.7  Convertible bonds and warrants/options
There are no bonds or warrants outstanding that are convertible into shares of Givaudan SA.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

## Corporate governance

### 3. Board of Directors

According to Givaudan's Articles of Incorporation, the Board of Directors may consist of between seven and nine members.

Membership of the Board is composed in such a way as to ensure it possesses all the competencies required to execute its strategic oversight and control over Givaudan. The Board's knowledge and diversity of experience are important assets in leading a company of Givaudan's size in a complex and fast-changing environment. Each of the current nine Board members has an in-depth knowledge of his or her relevant areas of expertise. Together, they ensure that the Company has all the competencies required.

Given the Company's business and its current 2020 strategy of 'Responsible growth. Shared success.', the most relevant and important required competencies include:
– in-depth industry knowledge
– international senior business leadership
– strategy setting and implementation and risk management
– financial expertise
– innovation and technology (including digital)
– sales and marketing
– regulatory affairs

The Board, with the help of external expert advisors, regularly reviews the list of competencies and has established a long-term skill matrix for the assessment of existing and required competencies. This matrix, which is used as a basis for Board succession planning, remains relevant for the new 2025 strategy. As in the past, knowledge of environmental, social and governance (ESG) matters and strong ethical values also remain key characteristics that Board members must possess.

In 2020, the Board added two new Board members in accordance with the new strategy, the long-term skill matrix and the succession plan to ensure a smooth transition of competencies upon retirement of current Board members over the next couple of years. Due to the COVID-19 pandemic, the onboarding of these two new Board members was conducted mainly virtually.

At the Annual General Meeting in March 2020, Calvin Grieder was re-elected as Chairman. Prof. Dr-Ing Werner Bauer was re-appointed Vice-Chairman by the Board.

### 3.1 Members of the Board of Directors

As of 31 December 2020, the following were members of the Board of Directors:



**Calvin Grieder** Chairman
▸ Engineer
▸ Swiss national, born in 1955 in the USA
▸ Non-executive
▸ First elected in 2014
▸ Chairman since 2017

In 1980, Calvin Grieder started his career as Marketing Manager with Georg Fischer Ltd in Switzerland and continued in various executive positions at Swiss and German companies including Swiss Industrial Company (SIG) Ltd and Swisscom Telecom Ltd, where he served as Head of the Mobile and Internet business and Member of the Executive Board. He was CEO of the international engineering group Bühler from 2001 to 2016.

Calvin Grieder holds the following mandate in a company quoted on an official stock exchange: Chairman of the Board of SGS SA.

He holds the following mandates in companies that are non-quoted: Chairman of the Board of Bühler Group, member of the Board of Trustees of Avenir Suisse, owner and member of the Board of Carivel7 AG, member of the Advisory Board of the ETH Zurich, Department of Mechanical and Process Engineering.

Calvin Grieder holds a Master of Science from the ETH Zurich and has completed an Advanced Management Program (AMP) at Harvard University.



**Prof. Dr-Ing. Werner Bauer** Vice-Chairman
▸ Businessman
▸ German & Swiss national, born in 1950
▸ Non-executive
▸ First elected 2014

Prof. Dr-Ing. Werner Bauer started his career as a university professor in chemical engineering at the Technical University in Hamburg, Germany. After serving as the Director of the Fraunhofer Institute for Food Technology & Packaging and as Professor in Food Bioprocessing Technology at the Technical University of Munich from 1985 to 1990, he joined Nestlé as Head of the Nestlé Research Centre in Lausanne in 1990. After heading commercially Nestlé South and East Africa he joined general management as Executive Vice-President in 2002,

## Corporate governance

responsible for technical, production, environment and R&D. In 2007 he became Chief Technology Officer and Head of Innovation, Technology, Research and Development, a position from which he retired in September 2013.

Prof. Bauer holds the following mandates in companies that are quoted on an official stock exchange: member of the Boards of Lonza Group AG and SIG Combibloc AG. He holds the following mandates in companies that are non-quoted: Chairman of the Board of Trustees of the Bertelsmann Foundation, vice-chairman of the Board of Bertelsmann SE & Co. KGaA.

Prof. Dr-Ing. Werner Bauer received a Diploma and a PhD in Chemical Engineering from the University Erlangen-Nürnberg in Germany.



**Victor Balli** Director
▸ Businessman
▸ Swiss national, born in 1957
▸ Non-executive
▸ First elected in 2016

Victor Balli started his professional career in 1985, working as a Financial Analyst & Business Development Manager with EniChem International SA in Zurich and Milan. From 1991 to 1995, he worked as a Principal with Adinvest AG, a corporate finance advisory company with offices in Zurich, San Francisco, New York, and London. Victor Balli held various positions at Minibar between 1996 and 2005, most recently as Chief Executive Officer EMEA as of 2005. From 2007 to 2018 Victor Balli was Chief Financial Officer and member of the Executive Committee of Barry Callebaut AG.

Victor Balli holds the following mandates in companies that are quoted on an official stock exchange: member of the Boards of KWS Saat SE & Co. KGaA, SIKA AG and Medacta International SA.

He holds the following mandates in companies that are non-quoted: Member of the Boards of the Federal Audit Oversight Authority, Hemro AG and the Supervisory Board of Louis Dreyfus Company Holding B.V.

Victor Balli has a Masters in Economics from the University of St. Gallen and a Masters in Chemical Engineering from the Swiss Federal Institute of Technology in Zurich.



**Lilian Biner** Director
▸ Businesswoman
▸ Swedish national, born in 1962
▸ Non-executive
▸ First elected 2011

Lilian Biner has senior management experience from retail and consumer goods companies. These posts have most recently included Chief Financial Officer and Executive Vice President with Axel Johnson AB in 2007 and Head of Strategic Pricing for Electrolux Major Appliances Europe, a company she joined in 2000 as head of HR and Organisational Development.

Lilian Biner holds the following mandates in companies that are quoted on an official stock exchange: member of the Boards of LE Lundbergföretagen and Carlsberg A/S.

She holds the following mandates in companies that are non-quoted: member of the Boards of a-connect (group) ag and Scania AB.

Lilian Biner is a graduate of the Stockholm School of Economics.



**Michael Carlos** Director
▸ Businessman
▸ French national, born in 1950
▸ Non-executive
▸ First elected 2015

Michael Carlos started his career with Givaudan in 1984 as General Manager in Hong Kong. He became Head of the European Creative Centre in Argenteuil in 1992 where he was in charge of integrating the creative resources from Givaudan and Roure. In 1999, he was appointed Global Head of Consumer Products and then President of the Fragrance Division in 2004, a position from which he retired in 2014.

Michael Carlos holds the following mandates in companies that are non-quoted: Member of the Boards of Manus Bio Inc. and Scent Design SA. He is the former Chairman of RIFM (The Research Institute of Fragrance Materials) and of IFRA (The International Fragrance Association)

Michael Carlos holds an MBA from the Indian Institute of Management and a degree in chemical engineering from the Indian Institute of Technology.

## Corporate governance

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix



**Ingrid Deltenre** Director
- Businesswoman
- Dutch & Swiss national, born in 1960
- Non-executive
- First elected 2015

Ingrid Deltenre has held several executive positions in the press and media including Director of Publisuisse from 1999 to 2004, and Director of the leading public TV broadcaster in German-speaking Switzerland, Schweizer Fernsehen, from 2004 to 2009. In 2010, she became Director General of the Geneva-based European Broadcasting Union (EBU), a position she held until June 2017.

She holds the following mandates in companies that are quoted on an official stock exchange: member of the Board of Banque Cantonale Vaudoise and member of the Supervisory Board of Deutsche Post/DHL.

She also is member of the board of Akara Funds, member of Agence France Presse, the President of the Executive Committee of the Executive MBA of the University of Zurich and member of the Foundation Board Schweizer Berghilfe.

Ingrid Deltenre holds a Master of Arts in Journalism, Educational Sciences and biological Anthropology from the University of Zurich.



**Olivier Filliol** Director
- Businessman
- Swiss national, born in 1967
- Non-executive
- First elected 2020

Olivier Filliol started his professional career as a strategy consultant with Bain & Company, working in the Geneva, Paris and Sydney offices. He joined Mettler-Toledo International Inc. in 1998 and since then served in various positions including General Manager of the company's North American checkweighing operations, Head of Process Analytics and Head of Global Sales, Service and Marketing. He will step down from his Executive role in April 2021, after which he will remain member of the Board of Directors of Mettler-Toledo.

In January 2008, he was appointed President and Chief Executive Officer of Mettler-Toledo and since January 2009, he is also member of its Board of Directors.

Olivier Filliol holds a Master (lic. oec.) and Ph.D. (Dr. oec.) in Business Administration from the University of St. Gallen, Switzerland. He also completed executive education at the Business School of Stanford University.



**Sophie Gasperment** Director
- Businesswoman
- French national, born in 1964
- Non-executive
- First elected 2020 (as of 1 September 2020)

Sophie Gasperment started her professional career in 1986 with L'Oréal, where she held several operational and development marketing responsibilities up until 2000, when she was appointed General Manager for L'Oréal in the U.K.

She served in the U.K. for 14 years, notably as Managing Director, L'Oréal UK & Ireland, as well as Chairman and Chief Executive Officer of The Body Shop International. She then led the L'Oréal Group's Strategic Prospective and Financial Communication until 2019, and has since focused on her activities as board director, senior advisor and angel investor.

Sophie Gasperment holds the following mandates in listed companies: Member of the Board of Accor, where she chairs the Nomination, Remuneration and CSR Committee, Lead Independent Director of Cimpress, Member of the Board of Kingfisher plc, where she chairs the Responsible Business Committee, and Member of the Supervisory Board of D'Ieteren. She also serves as Senior Advisor at Boston Consulting Group.

Sophie Gasperment is a graduate of ESSEC business school and of INSEAD. She is a French national, born in 1964.



**Thomas Rufer** Director
- Certified Public Accountant
- Swiss national, born in 1952
- Non-executive
- First elected 2009

Thomas Rufer joined Arthur Andersen in 1976, where he held several positions in audit and business consulting (accounting, organisation, internal control and risk management). He was Country Managing Partner for Arthur Andersen Switzerland from 1993 to 2001. Since 2002, he has been an independent consultant in accounting, corporate governance, risk management and internal control.

He holds the following mandate in a non-listed company: member of the Swiss Takeover Board.

Thomas Rufer has a degree in business administration (économiste d'entreprise HES) and is a Swiss Certified Public Accountant.

## Corporate governance

### 3.2  Other activities and vested interests

Please refer to the biographies of the Board members described in section 3.1 for their other activities and vested interests.

Except for those described in section 3.1, no Board member of Givaudan SA holds any material permanent management or consultancy functions for significant domestic or foreign interest groups nor any significant official functions or political posts. The Board of Directors assesses the independence of its members.

As at 31 December 2020, all members of the Board of Directors were non-executive and independent in accordance with article 14 of the Swiss Code of Best Practice for Corporate Governance. None of the Board members has important business connections with Givaudan SA or any of its affiliates.

### 3.3  Rules in the Articles of Incorporation on the number of permitted activities pursuant to Art. 12 para. 1 point 1 of the Ordinance against Excessive Compensation (OaEC)

Article 32 of the Articles of Incorporation of the Company permits the following external mandates for members of the Board of Directors:

– Members of the Board of Directors may not hold more than four additional mandates in companies that are quoted on an official stock exchange and seven additional mandates in non-quoted companies.

– The following mandates are not subject to these limitations:
  › mandates in companies which are controlled by the corporation
  › mandates held by order and on behalf of the corporation or any controlled company. No member of the Board of Directors or of the Executive Committee shall hold more than ten such mandates
  › mandates in associations, foundations, charitable organisations, trusts, employee welfare foundations and other comparable structures. No member of the Board of Directors or of the Executive Committee shall hold more than 15 such mandates.

'Mandates' mean mandates in the supreme governing body of a legal entity which is required to be registered in the Swiss commercial register or a corresponding foreign register. Mandates in different legal entities which are under joint control are deemed one mandate.

 **READ MORE**
www.givaudan.com › Our company › Corporate governance › Rules and policies › **Articles of incorporation**

### 3.4  Elections and terms of office

#### 3.4.1  Principles of the election procedure, rules differing from the statutory legal provisions with regard to the appointment of the Chairman, the members of the Compensation Committee and the independent proxy

The Company amended its Articles of Incorporation at the Annual General Meeting 2014 to align with the requirements of the OaEC. The rules regarding the appointment of the Chairman, the members of the Compensation Committee and the independent proxy do not deviate from the statutory legal provisions. All Board members, the Chairman, the members of the Compensation Committee and the independent proxy are elected annually and individually for one year, being the time from one ordinary Annual General Meeting to the next one.

#### 3.4.2  For each Board member: date of first election to Board and attendance of meetings

For the dates of first election to the Board and attendance of Board and committee meetings, please refer to the tables on pages 7-9 and table on page 13.

### 3.5  Internal organisational structure

#### 3.5.1  Allocation of tasks among the Board members

The Chairman is elected annually at the Annual General Meeting. He prepares the agenda and chairs meetings of the shareholders, convenes, prepares and chairs the meetings of the Board of Directors, coordinates the work of the Board committees, prepares and supervises the implementation of resolutions of the Board of Directors (to the extent not delegated to a committee), supervises the course of business and the activities of the Executive Committee, proposes succession candidates for appointment to the Board of Directors or to the Executive Committee and proposes the global remuneration of the Chief Executive Officer and other members of the Executive Committee to the Compensation Committee.

## Corporate governance

The Chairman receives all invitations and minutes of Committee meetings and is entitled to attend these meetings. The Chairman further decides in cases which fall under the tasks and powers of the Board of Directors, but in which a timely decision of the Board of Directors cannot be made because of urgency. In such cases, the Chairman informs the members of the Board of Directors as quickly as possible and the corresponding resolution is minuted at the next Board meeting.

If the Chairman is unable to act, the Vice-Chairman exercises his functions, assuming all his tasks and powers.

### BOARD COMMITTEES¹

**Audit Committee**

**Thomas Rufer (Chairman) / Lilian Biner / Victor Balli / Olivier Filliol**

▸ Assists the Board in its oversight responsibilities with respect to financial reporting
▸ Ensures effectiveness and efficiency of internal control, risk management and compliance systems
▸ Assesses and overviews the internal and external audit processes

**Nomination and Governance Committee**

**Calvin Grieder (Chairman) / Ingrid Deltenre / Michael Carlos / Sophie Gasperment**

▸ Assists the Board in applying principles of good corporate governance
▸ Prepares appointments to the Board and the Executive Committee

**Compensation Committee**

**Prof. Dr-Ing. Werner Bauer (Chairman) / Ingrid Deltenre / Victor Balli**

▸ Reviews and recommends the compensation policies to the Board
▸ Approves the remuneration for the Executive Committee
▸ Prepares the Compensation Report

**Innovation Committee**

**Michael Carlos (Chairman) / Calvin Grieder / Prof. Dr-Ing. Werner Bauer / Olivier Filliol**

▸ Assists the Board in scientific matters relating to the flavours, fragrances and cosmetics Industry
▸ Identifies opportunities, proposes and screens potential innovation partners

1. All committee members were part of their respective committee(s) for the entire year of 2020, except the new members: Olivier Filliol from 25 March 2020, and Sophie Gapermert from 1 September 2020.

### 3.5.2  For each committee of the Board of Directors: list of members – tasks – areas of responsibility

The Board of Directors has four established Committees: an Audit Committee, a Nomination and Governance Committee, a Compensation Committee and an Innovation Committee. Each committee is led by a Committee Chairman whose main responsibilities are to organise, lead and minute the meetings. For the participation of the Board members in the committees, please refer to the table on this page and on page 13.

**Audit Committee**

The primary function of the Audit Committee is to assist the Board in fulfilling its oversight responsibilities by reviewing the financial information, the systems of internal controls and the audit process. It carries out certain preparatory work for the Board of Directors as a whole. The Audit Committee currently consists of four members of the Board. All of them have the requisite financial experience.

The Audit Committee ensures that the Company's risk management systems are efficient and effective. It promotes effective communication among the Board, management, the internal audit function and external audit. It reviews and approves the compensation of the external auditors for the annual audit.

The Audit Committee held four regular meetings in 2020, each lasting approximately three to four hours. Due to the COVID-19 pandemic, three out of the four meetings were held by videoconference. The Head of Internal Audit, the Chief Financial Officer, the Corporate Ethics & Compliance Officer and the External Lead Audit Partner attended all meetings, apart from certain private sessions.

**Compensation Committee**

The Compensation Committee reviews and recommends the compensation policies to the Board of Directors. It approves the remuneration of the Chief Executive Officer and the other members of the Executive Committee as well as all performance-related remuneration instruments and pension fund policies. Since the Swiss Ordinance against Excessive Compensation came into force, the Committee prepares the Compensation Report to be established by the Board.

The Compensation Committee consists of three members of the Board who are elected annually by the Annual General Meeting of shareholders. The Committee takes advice from external independent compensation specialists and consults with the Chairman and the Chief

## Corporate governance

Executive Officer on specific matters where appropriate. Since the Annual General Meeting 2014, the members of the Compensation Committee are elected by the shareholders from the re-elected Board members.

In 2020, the Compensation Committee met five times. The average duration of each meeting was approximately 1.5 to 2 hours. Due to the COVID-19 pandemic, four of the five meetings were held by videoconference. During these meetings the Committee reviewed, among other things, the short-term and long-term incentive plan parameters as well as the alignment of Executive Committee and Board of Directors compensation with the Company's principles and policy. The Committee also reviewed the design of the long-term incentive plan to ensure alignment with the Givaudan 2025 strategy. The Chairman, the Chief Executive Officer, the Head of Global Human Resources and/or the Head of Compensation and Benefits attended relevant sections of the meetings.

 **READ MORE**
2020 Governance, Compensation and Financial report › page 23 › **Compensation committee**

### Nomination and Governance Committee
The Nomination and Governance Committee assists the Board in applying the principles of good corporate governance. It prepares appointments to the Board of Directors and the Executive Committee and advises on the succession planning process of the Company. It consists of four members of the Board.

The Nomination and Governance Committee met three times during 2020, to review the independence of Board members and to review the succession plans of critical leadership positions as well as the evolution of the board succession. Due to the COVID-19 pandemic, all meetings were held by videoconference. Each meeting lasted between one and one and a half hours. The CEO and the Head of Global Human Resources attended relevant sections of the meetings.

### Innovation Committee
The Innovation Committee advises the Board on scientific matters relevant to the flavour, natural ingredients and fragrance and cosmetics industry, or other additional fields the Board may request. It acts as a sounding board to the Board of Directors and research management, reviewing activities in different fields of research, looking at new opportunities and possible partnerships and reviewing projects on a detailed basis as required. It also serves as a platform for Board dialogue with the relevant members of the Executive Committee and the divisional Heads of Science and Technology.

The Innovation Committee met three times during 2020. Due to the COVID-19 pandemic, two of the three meetings were held by videoconference. On average each meeting lasted approximately four to six hours. The CEO, the Division Heads and the divisional Heads of Science and Technology were present. External speakers also attended the meetings. The Committee reviewed key areas of the Innovation programme, which included the 2025 innovation strategy, naturals, biotechnology and external innovation collaborations.

**READ MORE**
www.givaudan.com › Our company › Corporate governance › **Board of directors**

### 3.5.3  Work methods of the Board and its Committees
Board meetings are held periodically and also when matters require a meeting, or on the written request of one of the members of the Board. Ordinary Board meetings are held on average once a quarter plus one additional ordinary Board meeting to approve the Annual Report. The Chairman, after consultation with the Chief Executive Officer, sets the agenda for each Board meeting. Decisions may also be taken by circulation (in writing, including by PDF sent by e-mail) or by telecommunication (including telephone and videoconference), provided that none of the Board members requests a formal meeting.

Meetings of Board Committees are usually held in connection with Board meetings, with additional meetings scheduled as required. The Board of Directors receives regular reports from its Committees and the Chairman, as well as from the Executive Committee.

Minutes of Committee meetings are prepared by the secretary of the respective Committee and circulated to all Board members.

In preparation for Board and committee meetings, the Board members involved receive pertinent information for pre-reading via a secure electronic document sharing system.

In 2020 the Givaudan Board of Directors held six regular meetings including one constitutive meeting directly following the general meeting of shareholders. In addition, the Board held two extraordinary meetings. Due to the COVID-19 pandemic, four of the six regular meetings as well as the two extraordinary meetings were held by videoconference and one was held in a hybrid manner. To ensure the efficiency of the video meetings the Chairman held a number of one-on-one calls/meetings with individual Board members throughout the year. No meetings were held at Givaudan locations outside Switzerland. The ordinary meetings in person lasted for around one day each, the ordinary meetings by videoconference for four to six hours each and the two extraordinary meetings around one hour each.

# Corporate governance

Apart from the constitutive meeting directly following the general meeting of shareholders and the extraordinary meetings by telephone, the Company's operational and financial performance was presented by management and reviewed by the Board during each Board meeting. The Board was also informed about, and discussed all major business development and investment projects, management succession planning and compensation and other major business items as well as the findings of Internal Audit and risk management. In 2020, the Board discussed and approved the Company's new five-year strategy to 2025 and discussed the right structure for oversight of ESG matters. Apart from the first Board meeting, the Board was informed about and discussed the COVID-19 pandemic, its impact on the Company and management's measures to counter it at all Board meetings.

The Chief Executive Officer, the Chief Financial Officer and the presidents of the two divisions were present at all meetings, except for the constitutive meeting and certain closed sessions. The other members of the Executive Committee attended four ordinary meetings as well as the two extraordinary meetings. Selected senior managers were invited to address specific projects at ordinary Board meetings. The Head of Internal Audit and the Corporate Ethics & Compliance Officer each reported once to the Board of Directors.

In 2020 the Board conducted one annual self-assessment and had continuous discussions of its own succession planning, especially during times of increased uncertainty like the current COVID-19 pandemic.

The attendance of Board members at Board and Committee meetings in 2020 as well as the average duration of the meetings can be seen in the table below.

### 3.6  Definition of areas of responsibility

The Board of Directors is responsible for the ultimate direction, strategic supervision and control of the management of the Company, as well as other matters which, by law, are under its responsibility. This includes the establishment of medium- and long-term strategies and of directives defining Company policies and the giving of the necessary instructions in areas such as acquisitions, major investments and long-term financial commitments exceeding certain thresholds.

**Meetings: attendance 2020**

| Board member | Number of Board meetings / calls attended | | Number of Audit Committee meetings attended | Number of Compensation Committee meetings attended | Number of Nomination and Governance Committee meetings attended | Number of Innovation Committee meetings attended |
|---|---|---|---|---|---|---|
| | ordinary | extraordinary | | | | |
| Calvin Grieder | **6** | 2 | | | 3 | 3 |
| Victor Balli | **6** | 2 | **4** | 5 | | |
| Prof. Dr-Ing. Werner Bauer | **6** | 2 | | 5 | | 3 |
| Lilian Biner | **6** | 2 | **4** | | | |
| Michael Carlos | **6** | 2 | | | 3 | 3 |
| Ingrid Deltenne | **6** | 2 | | 5 | 3 | |
| Olivier Filliol (Board member from 25/03/2020) | **4** | 2 | **3** | | | 2 |
| Sophie Gaspermont (Board member from 01/09/2020) | **2** | | | | 1 | |
| Thomas Rufer | **6** | 1 | **4** | | | |
| **Meetings held in the year** | 8 | | 4 | 5 | 3 | 3 |
| **Average length of meetings** | 6-8 hours (ordinary) | | 3 to 4 hours | 1.5 to 2 hours | 1 to 1.5 hour | 4 – 6 hours |

Governance
report

Compensation
report

Consolidated
financial report

Statutory
financial report

Appendix

# Corporate governance

In accordance with Swiss law, the Articles of Incorporation and the Board Regulations of Givaudan, the duties of the Board of Directors include the following matters:

– the ultimate management of the Company and, in particular, the establishment of medium- and long-term strategies and of directives defining Company policies and the giving of the necessary instructions

– the establishment of the organisation

– the approval of the annual Group budget

– the structuring of the accounting system and of the financial controlling, as well as the financial planning

– the assessment of the Company's risk management

– the decision on investments in, or divestments of, fixed and tangible assets of a global amount exceeding the limit set by the corporate investment guidelines established by the Board of Directors

– the appointment and removal of the persons entrusted with the management and representation of the Company, in particular the Chief Executive Officer and the other members of the Executive Committee

– the ultimate supervision of the persons entrusted with the management, in particular with respect to compliance with the law, the Articles of Incorporation, regulations and instructions given in any areas relevant to the Company, such as working conditions, environmental protection, trade practices, competition rules, insider dealing and ad hoc publicity

– the preparation of the annual business report, as well as the preparation of the Annual General Meeting of shareholders and the implementation of its resolutions

– the notification of the court in case of insolvency

– the decisions regarding the subsequent performance of contributions on shares not fully paid in

– the ascertainment of share capital increases to the extent that these fall under the powers of the Board of Directors and resulting confirmations and modifications to the Articles of Incorporation

– the verification of the special professional qualifications of the auditors.

Except as otherwise provided by Swiss law, the Articles of Incorporation and the Board Regulations, all other areas of management are fully delegated by the Board of Directors to the Chief Executive Officer, the Executive Committee and its members.

 **READ MORE**
www.givaudan.com ▸ Our company ▸ Corporate governance ▸ Rules and policies ▸ **Board regulations of Givaudan**

## 3.7  Information and control instruments vis-à-vis senior management

The Board recognises that in order to be able to carry out its tasks of ultimate direction of the Company and supervision of the management, it needs to be fully informed about all matters that materially impact Givaudan. To ensure this, the Board has at its disposal an information and control system which comprises the following instruments:

**Management information system**
The Board ensures that it has sufficient information for appropriate decision-making through a management information system with wide-ranging information rights for the Board members:

– the Chairman of the Board receives invitations and minutes of Executive Committee meetings on a regular basis and the Chief Executive Officer and the Chief Financial Officer report regularly to the Chairman of the Board of Directors

– the Chief Executive Officer and the Chief Financial Officer are present and report at all regular Board meetings and answer all requests for information by the Board members about any matter concerning Givaudan that is transacted. Other members of the Executive Committee and selected senior managers are regularly invited to address specific projects at regular Board meetings. All members of the Executive Committee have a duty to provide information at meetings of the Board of Directors on request

# Corporate governance

– the Head of Internal Audit and the Corporate Ethics & Compliance Officer report to the Board once a year. The Board also receives annual reports on Environment, Health and Safety, Sustainability and Risk Management

– the Head of Internal Audit and the Corporate Ethics & Compliance Officer are present and report at each meeting of the Audit Committee. The Chief Financial Officer is also present at all meetings of the Audit Committee, as are the external auditors

– the Head of Global Human Resources, the Head of Compensation & Benefits and the Chief Executive Officer are present at each Compensation Committee meeting, except when questions of compensation for Executive Committee members are being deliberated. The Chairman also attends the meetings of the Compensation Committee regularly

– all Board members have access to the full minutes of all Committee meetings

– the Board of Directors receives summarised monthly reports from the Executive Committee, which include performance against key performance indicators. All Board members are immediately informed on extraordinary events. They also have direct access to the Givaudan intranet where all internal information on key events, presentations and organisational changes are posted. In addition, the Board members receive relevant information, including media releases and information to investors and financial analysts

– in preparation for each Board meeting, the Board members receive information and reports from the Executive Committee and other members of senior management via a secure electronic document sharing system and other means of communication

– the Board of Directors visits at least one Givaudan country operation per year, where Board members meet members of senior local management. Additionally, Board members are encouraged to visit country operations when travelling and to meet local and regional senior management to allow Board members the opportunity of getting first-hand information on local and regional developments and interacting directly with management across the globe

– the Board has regular access to the Chief Executive Officer, Chief Financial Officer and the other members of the Executive Committee. Any Board member may request from the Chief Executive Officer and other members of the Executive Committee information concerning the course of the business.

## Risk management

Givaudan has established an internal risk management process that is based on the Givaudan Enterprise Risk Management Charter. It focuses on identifying and managing/exploiting risks.

The Board of Directors defines the strategic risk management framework. This process is under the responsibility of the Executive Committee. The risk management process follows a structured assessment, review and reporting cycle that is coordinated by the Corporate Ethics & Compliance Officer to ensure a harmonised Group-wide approach.

For each identified strategic top-level Company risk a member of the Executive Committee is designated as the risk owner with the responsibility to manage the risk on a Group-wide basis. Once a year the Executive Committee reports to the Board on the risk management process, the strategic risks and the mitigation actions. Individual risks are also regularly discussed in Board meetings. Corporate Internal Audit provides assurance on the effectiveness of the risk management process.

 **READ MORE**
2020 Integrated Annual Report ▸ pages 21 – 23 ▸ **Managing risks**

## Internal audit

The Internal Audit function is established as an independent and objective function reporting directly to the Audit Committee.

The purpose of Internal Audit is to evaluate and contribute to the continuous improvement of the Company's risk management and control systems including the analysis and evaluation of the effectiveness of business processes and recommendations for adjustments where necessary.

Corporate Internal Audit uses a risk-based audit approach aimed at providing independent assurance on the effectiveness and efficiency of processes and controls that support Givaudan in achieving its objectives, identifying and managing its major risks, and ensuring compliance with applicable policies, laws and regulations. This approach follows a business process audit methodology that provides value to both, the local entities and the Group's management.

Givaudan corporate strategy, risk management findings, past audit results, management input, changes in the organisation and Internal Audit experience are the elements taken into account to build the annual internal audit plan. Effective reporting, accountability assignment, and thorough follow-up ensure the implementation of the audit recommendation as well as

## Corporate governance

the related risk reduction. For the individual audits, the internal audit function is supported by dedicated staff from the third party contractor Ernst & Young. The internal audit activity is reported to the full Board of Directors once a year.

### 4.  Executive Committee
The Executive Committee, under the leadership of the Chief Executive Officer, is responsible for all areas of operational management of the Company that are not specifically reserved to the Board of Directors.

The Chief Executive Officer is appointed by the Board of Directors upon recommendation of the Nomination Committee. Subject to the powers attributed to him, he has the task of achieving the strategic objectives of the Company and determining the operational priorities. In addition, he leads, supervises and coordinates the other members of the Executive Committee, including convening, preparing and chairing the meetings of the Executive Committee.

The members of the Executive Committee are appointed by the Board of Directors on recommendation of the Chief Executive Officer after evaluation by the Nomination Committee. The Executive Committee is responsible for developing the Company's strategic as well as long-term business and financial plans. Key areas of responsibility also include the management and supervision of all areas of the business development on an operational basis, and approving investment decisions.

The tasks and powers of the Executive Committee include the approval of investments, leasing agreements and divestments within the corporate investment guidelines. The Executive Committee approves important business projects, prepares the business plan of the Company and the budgets of the individual divisions and functions.

In addition, it plays a key role – together with the Human Resources organisation – in the periodic review of the talent management programme, including succession planning for key positions. Alliances and partnerships with outside institutions, such as universities, think tanks and other business partners, are also monitored by the Executive Committee.

The members of the Executive Committee are individually responsible for the business areas assigned to them.

**Sustainability**
The Head of Global Procurement and Sustainability, a member of the Executive Committee, heads the Company's sustainability programme. He is supported by a cross-functional corporate sustainability steering committee and a sustainability leadership team made up of internal specialists in corporate responsibility and sustainability to implement the programme. The Head of Global Procurement and Sustainability reports annually to the Board of Directors on sustainability matters. Individual aspects are discussed regularly at Board meetings.

The Executive Committee meets generally on a monthly basis to discuss general Company business and strategy. In 2020, the Committee held twelve regular meetings. Due to the COVID-19 pandemic, ten of the twelve meetings were held by videoconference and the other two at Company sites in Switzerland. The meetings lasted on average one to two days.

In addition, in 2020 the Executive Committee held eight two-hour meetings in between the regular monthly meetings to discuss the impact of the COVID-19 pandemic on the Company and decide on measures to ensure business continuity and employee health and safety.

## Corporate governance

Governance
report

Compensation
report

Consolidated
financial report

Statutory
financial report

Appendix

### 4.1 Members of the Executive Committee

At 31 December 2020, the following were members of the Executive Committee:



**Gilles Andrier** Chief Executive Officer
▸ French national
▸ Born in 1961
▸ Appointed in 2005

Gilles Andrier spent the first part of his career with Accenture in management consulting before joining Givaudan in 1993 as Fragrance Division Controller and Assistant to the Chief Executive Officer. He later held various positions including Head of Fragrance Operations in the USA and Head of Consumer Products in Europe. He was appointed Head of Fine Fragrances, Europe in 2001 before becoming Global Head of Fine Fragrances in 2003 and then CEO of Givaudan in 2005.

Other mandates held by Gilles Andrier are: independent non-executive Director of Albea SA.

Gilles Andrier graduated with two Masters in Engineering from ENSEEIH Toulouse.



**Tom Hallam** Chief Financial Officer
▸ British & Swiss national
▸ Born in 1966
▸ Appointed in 2017

Tom Hallam began his career in the UK working in various industries and positions. He moved to Switzerland in 1996 to join Serono in Geneva, where he held a number of positions of increasing responsibility including Financial Director for Manufacturing Operations, and in 2001 he was appointed Vice President, Corporate Finance. Tom Hallam joined Givaudan in 2008 as Group Controller, based in Vernier, Switzerland with responsibility for financial reporting and compliance, strategic planning and management of Givaudan's business development process. He was appointed Chief Financial Officer effective 1 January 2017.

Tom Hallam graduated from the University of Manchester, UK with a BA (Hons) in Accounting and Finance and subsequently qualified as a member of the Chartered Institute of Management Accountants.



**Louie D'Amico** President Taste & Wellbeing
▸ US national
▸ Born in 1961
▸ Appointed in 2018

Louie D'Amico began his career with Givaudan in sales as key account manager with Fries and Fries. On the merger with Givaudan Roure in 1997, he became the Head of the North America Sweet Goods business unit and later the North America Savoury business unit. In 2003, he relocated to Europe as Head of International Key Account Management and then Head of the Global Beverage business unit. In 2006, Louie D'Amico became Commercial Head of EAME. In 2010, he relocated back to the USA as Head of Flavours Americas. Effective 1 April 2018, he was appointed President of Taste & Wellbeing and a member of the Executive Committee.

Louie D'Amico has a BSc in chemistry from Michigan State University. He has over 30 years of experience in the flavour industry.



**Maurizio Volpi** President Fragrance & Beauty
▸ Italian national
▸ Born in 1969
▸ Appointed in 2015

Maurizio Volpi began his career in consumer goods with P&G and Reckitt Benckiser in Italy, working in various marketing roles. In 2000, he joined Givaudan Italy as Account Manager in Milan before moving to Argenteuil in 2003 as Head of Marketing Consumer Products Europe. Maurizio Volpi subsequently took on roles of increasing responsibility at the global level: Head of Global Marketing Consumer Products, Head of Global Marketing and Consumer Market Research for both Consumer Products and Fine Fragrances, and World Account Manager for Unilever. He was appointed Regional Head of Western and Eastern Europe (WEE) for the Consumer Products business in 2012 and in 2015 became President of Givaudan Fragrance & Beauty.

Other mandates held are: member of the Boards of Directors of International Fragrance Association and the Research Institute for Fragrance Materials.

Maurizio Volpi holds a degree in Economics from the Bocconi University in Milan, Italy.

## Corporate governance



**Simon Halle-Smith** Head of Global Human Resources and EHS
› British national
› Born in 1966
› Appointed in 2015

Simon Halle-Smith began his career in the pharmaceutical industry in 1991. He worked with Eli Lilly & Company in the UK in Clinical Trial Project Management, Sales and Human Resources. In 2004, he joined Quest as HR Director for the UK, before being appointed European HR Director in 2005. When Quest was acquired by Givaudan in 2007, he continued as European HR Director before being appointed Head of HR for the Fragrance Division in 2009. In 2015, Simon Halle-Smith became Head of Global Human Resources and a member of the Executive Committee. He took on the additional responsibility for Environment, Health and Safety (EHS) as of March 2017.

Simon Halle-Smith has a Bachelors in Biology and Chemistry and a PhD in Biochemistry from the University of East Anglia in the UK.



**Willem Mutsaerts** Head of Global Procurement and Sustainability
› Dutch national
› Born in 1962
› Appointed in 2015

Willem Mutsaerts joined Givaudan in 1989, initially with responsibility for sales in Benelux. He moved on to become Regional Account Manager for the APAC region in Singapore before being appointed Head of Global Purchasing for Fragrances. In 2001, he took commercial responsibility for Fragrance consumer products in the EAME region, and in 2007 was appointed Head of Global Operations Fragrances.

Willem Mutsaerts became Head of Global Procurement and a member of the Executive Committee in October 2015. As of March 2017, he took on the additional responsibility of head of Givaudan's Sustainability programme.

Willem Mutsaerts has a degree in international marketing and is the holder of an MBA obtained at Golden Gate University in Singapore.



**Anne Tayac** Head of Givaudan Business Solutions
› French national
› Born in 1968
› Appointed in 2016

Anne Tayac began her career as a Quality Assurance coordinator with Robertet in Grasse. She joined Givaudan France in 1996 as Head of Quality Management before being promoted to Global Head of Fragrance Quality Management in 1998. Anne Tayac relocated to Vernier in 2003 where she assumed roles of increasing responsibility in Quality Management, Customer Care, SAP deployment change management, Fragrance and Flavour Supply Chain Excellence and was most recently responsible for leading Global Fragrance Operations. She was appointed as Head of Givaudan Business Solutions in August 2016.

Anne Tayac has a Master in Flavours and Fragrances from Sciences University in Le Havre, France and in Analytical Control and Quality from Sciences University in Marseille, France.

### 4.2 Other activities and vested interests

Please refer to the biographies of the members of the Executive Committee described in section 4.1 for their other activities and vested interests.

Except for those described in section 4.1, no member of the Executive Committee of Givaudan SA holds any material permanent management or consultancy functions for significant domestic or foreign interest groups nor any significant official functions or political posts.

### 4.3 Rules in the Articles of Incorporation on the number of permitted activities pursuant to Art. 12 para. 1 point 1 OaEC

Article 32 of the Articles of Incorporation of the Company permits the following external mandates for members of the Executive Committee:

– members of the Executive Committee may, subject to approval by the Board of Directors, hold up to two mandates in quoted or non-quoted companies.

– the following mandates are not subject to these limitations:
  › mandates in companies which are controlled by the corporation
  › mandates held by order and on behalf of the corporation or any controlled company. No member of the Board of Directors or of the Executive Committee shall hold more than ten such mandates

## Corporate governance

Governance report

› mandates in associations, foundations, charitable organisations, trusts, employee welfare foundations and other comparable structures. No member of the Board of Directors or of the Executive Committee shall hold more than 15 such mandates.

'Mandates' mean mandates in the supreme governing body of a legal entity which is required to be registered in the Swiss commercial register or a corresponding foreign register. Mandates in different legal entities which are under joint control are deemed one mandate.

 **READ MORE**
www.givaudan.com › Our company › Corporate governance › Rules and policies › **Articles of incorporation**

### 4.4 Key elements of all management contracts between the issuer and companies (or natural persons) not belonging to the Group
The Company has not entered into any management contracts with third parties that fall within the scope of Subsection 4.4 of the SIX Directive on Information Relating to Corporate Governance.

### 5. Compensation, shareholdings and loans
In accordance with the Swiss Code of Obligations and the SIX Directive on Corporate Governance, Givaudan publishes the details of the remuneration of its Board of Directors and its Executive Committee in the Integrated Annual Report as well as the Compensation report and the Financial report.

### 6. Shareholders' participation
### 6.1 Voting rights and representation restrictions
### 6.1.1 All voting rights restrictions; indication of any statutory group clauses and rules on granting exceptions, particularly in the case of institutional voting rights representatives
At the Annual General Meeting of shareholders on 20 March 2014, the previously existing registration and voting rights restrictions were removed. Today, the Company has no limitations on voting rights for ordinary shareholders.

For restrictions on nominee shareholders, see section 2.6.3.

### 6.1.3 Reasons for granting exceptions in the year under review
Not applicable as the Company does not have any voting rights restrictions for ordinary shareholders.

### 6.1.4 Procedure and conditions for abolishing statutory voting rights restrictions
Any change in the above rules requires a positive vote of the absolute majority of the share votes represented at a shareholders' meeting, as prescribed by Swiss law.

### 6.1.5 Statutory rules on participation in the general meeting of shareholders if they differ from applicable legal provisions
There are no deviations from the Swiss legal provisions.

Any shareholder who, on the day determined by the Board of Directors, is registered as a shareholder with voting rights has the right to attend and to vote at the shareholders' meeting. Each shareholder may be represented at the shareholders' meeting by another shareholder who is authorised by a written proxy, by a legal representative or by the independent voting rights representative ('independent proxy') elected by the Annual General Meeting of shareholders.

### 6.1.6 Information on any rules which might be laid down in the Articles of Incorporation on the issue of instructions to the independent proxy, and any rules in the Articles of Incorporation on the electronic participation in the general meeting of shareholders
Article 10 of the Articles of Incorporation of the Company states that the Board of Directors establishes the rules on shareholder participation and representation in the shareholders' meeting, including the rules on proxies and voting instructions (by electronic means or otherwise).

### 6.2 Statutory quorums
The Articles of Incorporation of Givaudan SA follow the majority rules prescribed by Swiss law for decisions of general meetings of shareholders.

### 6.3 Convocation of the general meeting of shareholders
The convocation of shareholders registered with voting rights to general shareholders' meetings is made by publication in the Swiss official trade journal (SHAB/FOSC) at least 20 days prior to the day of the meeting. Shareholders representing at least 10% of the share capital may demand in writing that a shareholders' meeting be convened, setting forth the items to be included on the agenda and the proposals.

## Corporate governance

### 6.4 Agenda
Shareholders representing shares for a nominal value of at least CHF 1 million may demand in writing at least 45 days before the meeting that an item be included in the agenda, setting forth the item and the proposal.

### 6.5 Inscriptions into the share register
Shareholders will be registered with a right to vote in the share register of Givaudan SA until the record date set by the Board of Directors for each shareholders' meeting. The register date for the ordinary general meeting is specified in the invitation and is set approximately two weeks before the meeting. Only shareholders who hold shares registered in the share register with a right to vote at a certain date, or their representatives, are entitled to vote.

Givaudan SA has not granted any exceptions to this rule.

### 7. Change of control and defence measures
#### 7.1 Duty to make an offer
The Articles of Incorporation of Givaudan SA do not contain any rules on opting out or opting up under Swiss law.

General Swiss legal provisions apply, which provide that anyone who acquires more than 33.3% of the voting rights of a listed company is required to make a public offer to acquire all listed securities of the Company that are listed for trading on the SIX Swiss Exchange.

#### 7.2 Clauses on changes of control
In the event of a change of control, restricted share units (RSUs) and performance shares granted, as the case may be, by the Company to members of the Board of Directors and to a total of 509 senior management and employees may vest immediately. All other defence measures against change of control situations previously in effect were deleted by the Board of Directors in 2007.

### 8. Auditors
#### 8.1 Duration of the mandate and term of office of the lead auditor
At the Annual General Meeting of shareholders on 26 March 2009, Deloitte SA was first appointed as Group and statutory auditor of Givaudan SA and its affiliates and has held the audit mandate since that time. At the Annual General Meeting of shareholders on 25 March 2020, Deloitte SA was reappointed as statutory auditor for the business year 2020. The rotation of the lead auditor follows the legally required maximum duration of seven years in accordance with the art. 730a para. 2 of the Swiss Code of Obligations. Since March 2016, the responsible lead auditor for the Givaudan audit at Deloitte has been Ms Karine Szegedi Pingoud, Partner.

The Audit Committee and the Board reconsider on an annual basis whether the statutory auditors should be proposed for re-election to the shareholders' meeting.

#### 8.2 Auditing fees
The fees of Deloitte for professional services related to the audit of the Group's annual accounts for the year 2020 were CHF 3.6 million. This amount includes fees for the audit of Givaudan SA, its subsidiaries, and of the consolidated financial statements.

#### 8.3 Additional fees
In addition, for the year 2020, Deloitte rendered tax and compliance related services for a total of CHF 0.3 million.

#### 8.4 Informational instruments pertaining to the external audit
The external auditor presents the outcome of the audit directly to the Audit Committee after the end of each reporting year.

The Audit Committee conducts an assessment of the audit services provided by Deloitte during its regular meetings to evaluate the performance of Deloitte as external auditors.

The Audit Committee meets the external auditor at least four times per year, including private sessions without the presence of management. For each meeting the external auditors prepare a report in which they comment on their activities and are available for particular questions raised by the Audit Committee. In addition the Board of Directors meets with the external auditor as well at least once per year.

## Corporate governance

Furthermore, the Audit Committee reviews and approves the compensation and evaluates and approves other services provided by the external auditor.

The scope of the audit is defined in an engagement letter signed by the Chairman of the Audit Committee and the Chief Financial Officer.

During 2020 Deloitte attended all four of the Audit Committee meetings.

### 9. Information policy

Givaudan's Principles of Disclosure and Transparency are described in detail at:

www.givaudan.com › Our company › Corporate governance › **Rules and policies**

Givaudan's Articles of Incorporation can be found at:

www.givaudan.com › Our company › Corporate governance › **Rules and policies**

Hard copies of Company publications such as the Integrated Annual Report are available on request.

All Corporate publications such as the Integrated Annual Report, the Half Year Report and the GRI Sustainability report can also be downloaded from Givaudan's website at:

www.givaudan.com › Investors › Financial results › **Results centre**

Quarterly sales information and other media releases can be found at:

www.givaudan.com › Investors › Financial results › **Results centre**

All relevant information can also be found at:

www.six-swiss-exchange.com › Market data › Shares › **Share explorer**

The complete calendar of events is available at:

www.givaudan.com › Investors › Investor events › **Events calendar**

For further information please contact: Pierre Bénaich, Head of Givaudan Media and Investor Relations, Chemin de la Parfumerie 5, 1214 Vernier, Switzerland

**T** +41 22 780 9093
**E** givaudan.investors@givaudan.com

# Compensation Report



**In this section**

| | |
|---|---|
| **23** | Compensation governance |
| **25** | Compensation principles |
| **26** | Compensation of Givaudan executives |
| **31** | Compensation of the Executive Committee |
| **33** | Compensation of the Board of Directors |
| **34** | Share ownership guidelines |
| **35** | Ownership of Givaudan securities |
| **36** | Report of the statutory auditor |

# Reflecting business and individual performance

Governance report

**Compensation report**

Consolidated financial report

Statutory financial report

Appendix

Givaudan owes its success to a diverse pool of highly engaged and talented people. The Company's compensation policies are an essential component of our employee value proposition and a key driver of both individual and business performance.

Our compensation programmes reflect the performance of the business and of individuals and are aligned with our ambition of ensuring that Givaudan is a place where everyone feels welcome, valued and inspired. We have rigorous governance, policies and processes to ensure that our compensation practices are aligned with our principles of integrity, fairness and transparency.

This report on compensation, complementing our integrated report, has been prepared in compliance with the Ordinance against Excessive Compensation at Listed Stock Companies (OaEC) and with the Directive on Information relating to Corporate Governance, issued by the SIX Swiss Exchange. The report also comprises information required under the Swiss Code of Obligations and takes into account the recommendations set out in the Swiss Code of Best Practice for Corporate Governance of Economiesuisse.

## 1. Compensation governance
### 1.1 Compensation Committee
The Compensation Committee supports the Board of Directors (Board) in establishing and reviewing compensation policies. It regularly reviews Company-wide programmes in regard to base salary, pension and benefit plans. The Compensation Committee also annually reviews and approves the performance targets and related payouts  under  the annual incentives and share-based long-term incentives, while the applicable performance criteria are set by the Board.

The Compensation Committee is also responsible for reviewing and approving individual compensation and benefits of each Executive Committee member as well as recommending compensation for the Board.

The Compensation Committee consists of three independent members of the Board and is currently chaired by Prof. Dr-Ing. Werner Bauer. The Chief Executive Officer is regularly invited to Compensation Committee meetings. The Head of Global Human Resources acts as secretary of the Compensation Committee. The Chairman of the Compensation Committee may invite other executives as appropriate. However, executives do not participate in discussions regarding their own compensation.

The Compensation Committee meets four to five times a year and informs the Board of its deliberations, recommendations and resolutions after each meeting. The minutes of the meetings are available to the full Board. The Committee utilises independent external consultants to benchmark the compensation of senior management and the Board.

Table I, on the next page, summarises the Compensation Committee standing agenda items and approvals.

### 1.2 Specific activities in 2020
**Performance Share Plan (PSP)**
In 2019, Givaudan defined its purpose to articulate its sustained contribution to people, nature and communities, and set the foundation for all strategic choices and business decisions. To ensure alignment with the goals and ambitions derived from our purpose, the Compensation Committee reviewed the Company compensation plans during 2020. Accordingly, certain aspects of the Performance Share Plan (PSP) will change with effect from 1 January 2021. Details of these changes are explained in section 3.7.

**Response to COVID-19**
Having reviewed the impact of the pandemic on all aspects of the Givaudan business, the Compensation Committee determined that compensation decisions made at the beginning of 2020 would not be modified. In particular:

– the 2020 salary review for employees and executives took place according to the pre-established budgets and no reduction in salary took place; and

– no adjustments to pre-defined short or long term incentive targets or achievements were made for the performance year 2020.

# Reflecting business and individual performance

**I. Compensation Committee standing agenda items and approval**

| Timing | Agenda items | Proposed[1] | Consultation | Approved |
|---|---|---|---|---|
| Beginning of year | Compensation report | Compensation Committee | | Board of Directors[3] |
| | Prior year annual incentive achievement | CEO[2] | | Compensation Committee |
| | Set current year performance targets | CEO[2] | | Compensation Committee |
| | Long-term incentive award allocation | CEO[2] | | Compensation Committee |
| | Maximum amounts for shareholder voting on Executive Committee and Board compensation | Compensation Committee | | Board of Directors (preliminary)[3] |
| Mid-year / end of year | Long-term incentive achievement against targets | CEO[2] | | Compensation Committee |
| | Compensation of the Executive Committee | CEO[2] | | Compensation Committee |
| | Compensation of the Board of Directors | Compensation Committee | | Board of Directors |
| | Changes to compensation system (if any) | Compensation Committee | Chairman | Board of Directors |
| | Preview of key items for next year | CEO / Compensation Committee | | – |

1. CEO compensation proposed by Chairman of the Compensation Committee.
2. Individual concerned does not attend/abstains.
3. Subject to shareholders' vote (binding vote on maximum compensation amounts, consultative vote on Compensation report).

A special bonus was paid to employees who worked on site during the lockdown period in recognition of their outstanding commitment and efforts in ensuring the continuity of Givaudan's operations. An amount was defined for each country according to respective economic environments. The Company also implemented various measures and protocols to help employees balance work with home responsibilities and ensure their safety. There were no temporary or permanent layoffs resulting from the COVID-19 crisis.

## 1.3 Governance rules
The Articles of Incorporation of Givaudan include rules on the principles applicable to performance-related pay and to the allocation of equity securities, convertible rights and options (Arts. 23 – 25), additional amounts for payments to Executive Committee members appointed after the vote on pay at the shareholders' meeting (Art. 27), loans, credit facilities and post-employment benefits for the Executive Committee and Board (Arts. 30 and 31) and the vote on pay at the shareholders' meeting (Art. 26).

 **READ MORE**
www.givaudan.com ▸ Our company ▸ Corporate governance ▸ Rules and policies ▸ **Articles of incorporation**

In line with Givaudan's Articles of Incorporation, at the 2021 Annual General Meeting the Board will submit the following maximum aggregate amounts for shareholder approval:

– Compensation of the Board for the period until the 2022 ordinary shareholders' meeting

– Short-term variable compensation of the Executive Committee for the 2020 fiscal year (Executive Committee retrospective vote)

– Fixed and long-term variable compensation of the Executive Committee for the 2021 fiscal year (Executive Committee prospective vote)

The calculation approach to be applied for determining the amounts to be approved by shareholders is aligned with the Compensation report valuation methodologies. Full details of the amounts to be submitted for approval will be included in the shareholders' meeting invitation.

Givaudan will also submit the 2020 Compensation report to a consultative vote at the 2021 Annual General Meeting.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

Governance report

**Compensation report**

Consolidated financial report

Statutory financial report

Appendix

# Reflecting business and individual performance

## 2. Compensation principles

### 2.1 Board of Directors
In order to reinforce their independence in exercising their supervisory duties, members of the Board receive fixed compensation only. They are not eligible to any performance-based compensation and are not insured in the Company pension plans.

The Board compensation is paid in cash and in the form of Restricted Share Units (RSUs). RSUs are a right to receive shares of Givaudan after a three-year blocking period. They link the compensation with the share price evolution of the Company and strengthen the alignment with shareholders' interests.

### 2.2 Executives and employees
The ability to attract, motivate and retain the right talented employees globally is key to the continued success of Givaudan. Our competitive remuneration policy supports this ambition and is based on the following principles:

– Pay for performance: through our variable pay plans, employees participate in the Company's overall success and are rewarded for their contribution to business results.

– Alignment of interests: Givaudan seeks to align management and shareholders' interests by rewarding long-term value creation through share-based programmes.

– External competitiveness: overall compensation positioning should enable Givaudan to attract and retain highly talented individuals critical to its success.

– Internal consistency and fairness: internal pay scales reflect job level, function and geographic market.

Givaudan's total compensation in 2020 is composed of the following elements:

– Base salary: base salaries are regularly benchmarked in each location and pay scales are reviewed annually according to local market evolution. As a general rule, pay scales are built around market median.

– Profit Sharing Plan: non-management employees participate in the global Profit Sharing Plan. Payouts are based on yearly evolution of Group EBITDA.

– Annual Incentive Plan: this plan covers all managers and executives globally. It rewards participants for the achievement of financial targets and other organisational and individual objectives. Depending on the achievement of performance criteria, payouts can vary between 0% and 200% of target payout.

#### II. Givaudan compensation

| Compensation | Participants (number of participants) | Payout | Link to compensation principles | Alignment with the business strategy |
|---|---|---|---|---|
| Base salary | All employees (16,000) | Cash | Attract and retain highly talented individuals. Provides internal consistency and fairness | Nurture a pipeline of industry experts and future leaders to develop skills for sustained success |
| Profit Sharing Plan | Non-management employees (11,000) | Cash | Contribution to Group financial objectives | Reward our people to share in Group profit |
| Annual Incentive Plan[1] | Manager and executives (5,000) | Cash | Contribution to financial objectives | Achieve annual organic sales growth and EBITDA target and individual performance objectives |
| Performance Share Plan[1] (PSP) | Executives and selected managers (500) | Givaudan shares[2] | Alignment of management with long-term targets and shareholders' interests | Achieve long-term organic sales growth and free cash flow targets |
| Benefits | All employees (16,000) | Insurances, pension, fringe benefits | Protection against risk, attract and retain | Same as base salary |

1. The Annual Incentive Plan and PSP plan are described in more detail in the next sections.
2. Unless local laws prevent allocation of Givaudan shares, in which case payout is in cash.

# Reflecting business and individual performance

– Performance Share Plan (PSP): this plan links executives and selected manager compensation to the evolution of the Givaudan share price and long-term business objectives through the award of Performance Shares. Depending on the achievement of performance criteria, participants may receive between zero and two Givaudan shares per performance share at the end of the three-year vesting period.

– Benefits (indirect compensation): benefit plans seek to address current and future security needs of employees. These generally include retirement, health, death and disability benefits. Benefits-in-kind such as Company vehicles are offered to certain employees according to local market practice.

As illustrated in table II, every Givaudan employee's remuneration is linked to Company performance through cash-based and/or share-based variable pay plans and is aligned with Givaudan's compensation principles.

## 3. Compensation of Givaudan executives
### 3.1 Compensation benchmarking
The compensation of Givaudan executives, in terms of both structure and level, is regularly benchmarked against individuals in similar positions within selected listed Swiss companies (members of the Swiss Leader Index, or SLI) as well as European companies that are comparable in size and international presence. Comparable European companies included in our benchmarking may be selected from the following industries (Specific companies used for benchmarking of Executive Committee positions are disclosed in section 4.1 page 31):
– Flavour and fragrance
– Consumer products
– Food and beverage
– Speciality chemicals
– Biotechnology
– Ingredients

To the extent that the median size of the peer group of companies differs from Givaudan's size (taking into account revenue and market capitalisation), regression techniques are applied to adjust raw survey results for strict comparability.

## 3.2 Compensation mix
The total compensation of Givaudan executives consists of direct and indirect compensation components.

– Direct compensation consists of base salary, annual incentive and share-based components.

– Indirect compensation includes retirement coverage, health benefits, death and disability protection as well as certain benefits-in-kind according to local market practice.

Chart III illustrates the direct compensation mix at target for Givaudan executives in 2020.

**III. Direct compensation mix policy guidelines**



■ Fixed pay (incl. benefits)   ■ Annual incentive   ■ Performance shares

1.  Excluding CEO.

# Reflecting business and individual performance

Table IV below illustrates the structure and purpose of the two incentive schemes.

**IV. Variable compensation overview**

|  | Annual Incentive Plan | Performance Share Plan |
|---|---|---|
| **Participants** | Managers and executives | Key talent and executives |
| **Purpose** | To reward managers and executives for the achievement of annual organisational targets and overall individual performance | To link compensation to shareholder value creation and achievement of business objectives |
| **Grants** | Annual grant | Annual grant |
| **Vesting** | End of each year | 3 years |
| **Conditions for vesting** | Achievement of annual EBITDA and sales growth targets | Achievement relative sales growth and FCF/sales targets over 4 years |
| **Payout** | Cash | Shares[1] |

1. Unless local laws prevent allocation of Givaudan shares, in which case payout is in cash.

## 3.3  Clawback provisions

As part of the Givaudan compensation programme and ensuring appropriate risk management, all incentive-based compensation (Annual Incentive and PSP) is subject to clawback provisions. The respective plan rules provide the Compensation Committee with absolute discretion to cancel any payouts that would otherwise be due, including for reasons linked to an individual's performance or behaviour. With regard to the PSP, this means that any right to receive Givaudan shares at the end of the vesting period will lapse if such a determination is made by the Compensation Committee. In 2020, the Compensation Committee did not exercise clawback for any current or former Executive Committee members.

## 3.4  Base salary

Base salaries are established on the basis of the scope and responsibilities of the function, the external value of the role and the profile of the incumbent in terms of skills, experience and individual performance. To ensure market competitiveness, base salaries are reviewed annually. Base salary adjustments (if any) are based primarily on market evolution, taking into consideration the executive's performance and contribution to Company results.

## 3.5  Annual Incentive Plan

The Annual Incentive Plan is designed to reward managers' and executives' individual performance and contribution to Givaudan annual objectives.

**Performance criteria**

In 2020, the Annual Incentive Plan for Executive Committee members was based on the following performance criteria:
– Sales growth targets in local currencies: 50%
– EBITDA margin targets: 50%

For the purpose of the Annual Incentive Plan, EBITDA is expressed as a percentage of sales. Measurement at Group level is considered, except where divisional level is more appropriate having regard to the members' scope of responsibility.

Givaudan's compensation system has been designed for alignment with the Company's vision and strategy and enshrines the principles of pay for performance. To provide shareholders the ability to assess this performance link and in line with Givaudan's commitment to transparency, the Company discloses ex-post the overall payout factor under its variable pay plans. The disclosure approach protects the Company's commercially sensitive, forward-looking information. Provision of such information, such as relating to Annual Incentive Plan performance targets, could otherwise put the Company and its shareholders at a competitive disadvantage. Details of the Performance Share Plan threshold, targets and maximum are presented in the Compensation report.

Annual incentive payouts for managers and executives below the Executive Committee level are based on a mix of organisational performance objectives, cascaded from Givaudan Group objectives, and individual performance, taking into consideration achievement of personal objectives, day-to-day job responsibilities and the demonstration of behaviours in line with the Givaudan core values.

**Incentive targets, caps and payouts**

Expressed as a percentage of base salary, annual incentives at target were the following in 2020:
– Chief Executive Officer: 100%
– Chief Financial Officer and Division Presidents: 80%
– Other Executive Committee members: 60%
– Division Management Committee members: 35% – 50%
– Other executives and managers: 10% – 35%

Based on the performance achievements, incentive payouts may vary between 0% and a cap of 200% of target incentive. Minimum threshold achievement is required, otherwise no annual incentive is paid.

# Reflecting business and individual performance

In 2020, sales growth was on target and EBITDA was above target. This resulted in 135% of target payout for the Chief Executive Officer, and an average of 135% for the other members of the Executive Committee. Table V summarises historical annual incentive achievement against target since 2017.

**V. Historical annual incentive achievement**



Executive Committee excluding CEO
CEO

## 3.6 Performance Share Plan
Executives and selected management members are eligible to participate in the Performance Share Plan (PSP). The PSP is designed to reward executives and key talent who significantly influence the long-term success of the business.

PSP participants are granted Performance Shares annually. The total number of Performance Shares granted, and the plan parameters generally, are approved each year by the Compensation Committee. Givaudan applies a policy to cap the maximum value of PSP allocations. For Executive Committee members the annual total grant value per member is approximately two times annual base salary.

Performance Shares vest three years from grant date based on the achievement of performance criteria measured over the performance period. The operation of the PSP is summarised in the following diagram.

**VI. Operation of the 2020 PSP Performance criteria**



**March**
**Grant date**
Receive performance shares

**March**
**Vesting date**
Receive 0–2 Givaudan shares per performance share, based on the achievement of performance criteria

**Performance target setting**
Performance is measured on the vesting date based on the extent performance criteria have been met over the previous four years. Measuring performance over an extended four-year period is consistent with the long-term outlook of the business. The performance criteria that apply to grants have historically been a combination of:

– Relative average sales growth as compared to the sales growth of selected peer group companies; and

– Cumulative Free Cash Flow (FCF) margin, expressed as a percentage of cumulative sales.

The structure of performance criteria calculation has been specifically designed to be challenging.

As explained in section 3.7, these performance criteria will continue but from 1 January 2021 will be complemented by non-financial criteria linked to the Givaudan purpose.

For average sales growth, the peer group includes companies from the flavour and fragrance industry that publish sales in local currency. These companies represent in total approximately 75% of this market. The peer companies currently included in the group are Firmenich,

# Reflecting business and individual performance

Hasegawa, IFF, Robertet, Sensient, Symrise and Takasago. The performance range for relative sales growth extends from −1.5% to 2.5% annualised sales growth versus peer group over the four-year performance period (2017 and prior: −2% to 2%).

In the case of FCF margin, final achievement is calculated as the average of the reported FCF margin for each of the four performance years. This means that Givaudan's FCF for each year of the performance period is summed, and this cumulative result is divided by the sum of Givaudan's sales in each year of the performance period. The assessment over four years ensures that the performance targets are stringent and reward sustained Company performance. The performance range extends from 9% to 17%.

Target setting and testing against targets follows adherence to strict governance policies. Careful consideration is given to Givaudan's performance and its projections. In addition, a reference test against historical achievements is conducted.

Targets set for the 2020 PSP remain aligned with our 2020 guidance, and within the overall objectives. In addition to the factors already mentioned, the assessment and target setting take into consideration the impact of significant investments (in particular, recent acquisitions) and ensuring targets are appropriately challenging.

### VII.  Historical FCF margin vs set target



1.  Cumulative FCF margin of the related previous performance period.
2.  Four-year target for corresponding PSP.

## Share payout caps

Based on the extent that performance criteria are met, the actual number of shares vesting at the end of the performance period may vary between 0% and 200% of the Performance Shares initially granted. The level of vesting is dependent on the combination of performance achievement against both criteria.

A payout of 200% would require an achievement level above the maximum threshold for both criteria.

An achievement level below the minimum threshold on either measure results in a 0% payout.

Different combinations of relative sales growth and FCF achievements within the above ranges lead to payouts between 0% and 200%, ranked according to their long-term economic value generation for the Company. The outcome of the matrix payout approach is that outperformance on one performance criteria can be counterbalanced in the event of underperformance on the other. Accordingly, the weighting of impact for each performance criteria differs depending on the positioning within the matrix shown in table VIII.

### VIII.  Performance Share Plan payout matrix



Darker region indicative of target achievement zone for 100% payout.
Note that a cap at 100% applies in the event relative sales growth is below zero.

A 100% payout can be obtained where a target combination of the performance criteria is met, such as when relative average sales growth is in line with the peer group and cumulative FCF margin is 12%. An additional payout cap applies, so that the extent to which outperformance on FCF may counterbalance lower sales growth achievement is restricted. Accordingly, in the

## Reflecting business and individual performance

Governance
report

**Compensation
report**

Consolidated
financial report

Statutory financial
report

Appendix

event relative sales growth is below the peer group and FCF margin targets are achieved or exceeded, a cap of at 100% applies.

Participants do not receive any dividends or have any voting rights in respect of Performance Shares during the vesting period.

In general, Performance Shares lapse on cessation of employment. In specific circumstances such as death, disability or retirement, Performance Shares may vest subject to satisfaction of the performance criteria. In case of a change of control, Performance Shares may vest immediately.

**Vesting in 2020**
The 2017 PSP vested on 15 April 2020 with a 95% payout. This reflects below target achievement on FCF and above target achievement on relative sales growth.

For reference, Givaudan tests performance against other benchmark metrics, including relative total shareholder return (TSR), and we continue to outperform the market in many regards. For instance, Givaudan's TSR measured over recent  four year periods has generally been at or above third quartile compared to local Swiss indices, global chemical indices and our benchmark peer group.

**IX.  2017 PSP achievement**

| Criteria | Performance | Payout |
|---|---|---|
| Average sales growth compared to peer group | +0.5% | ➔ **95%** of performance shares granted |
| Cumulative FCF / sales[1] | 12.5% | |

1. Formula = Σ (Free cash flow margin reporting year x sales in reporting currency in year / Σ Sales in reporting currency in year).

### 3.7  Changes to Performance Share Plan (PSP)
From 1 January 2021, a new PSP aligned with the Givaudan purpose will operate. This purpose – Creating for happier, healthier lives with love for nature. Let's imagine together – includes four focus areas: creations, nature, people and communities. The financial metrics traditionally used to calculate the PSP and detailed in 1.2 will be retained but will be complemented by non-financial criteria linked to the focus areas of the Givaudan purpose.

Within the focus areas, calculation criteria in the new PSP are:
– Creations – sales and free cash flow (FCF)
– Nature – net greenhouse gas (GHG) emissions reduction in scope 1, 2 and 3
– People – gender diversity, nationality mix and employee safety

Stretched targets to be set in the focus areas in the new PSP will pave the way for the achievement of our purpose aspirations, and a clear methodology and sufficient data will ensure that these targets are appropriate. All the non-financial metrics used in the new PSP will be rigorously measurable and audited.

The following chart reflects the proportion of contribution from the three focus areas of the Givaudan purpose.



| | | |
|---|---|---|
| 80% | **Creations** | Relative sales / Free cash flow |
| 10% | **Nature** | Net GHG emissions reduction (scope 1+2+3) |
| 10% | **People** | Gender diversity / Nationality mix / Employee safety |

During 2020, as part of the review of the Company compensation plans, the Compensation Committee considered the appropriateness of the existing flavour and fragrance industry peer group used in PSP calculations to benchmark organic sales growth. The nature of the Company's business has evolved in recent years with the acquisition of other businesses, and it is expected that a new and broadened peer group will be used in future calculations to reflect this change.

Reflecting business and individual performance

## 3.8 Benefits

Executive Committee members participate in the benefit plans of the Company, consisting mainly of retirement, insurance and health care plans that are designed to provide a reasonable level of protection for the employees and their dependents in respect of the risks of retirement, ill-health, disability and death.

Executive Committee members are also provided with certain executive perquisites and benefits in kind according to competitive market practice. The aggregate monetary value of these benefits is evaluated at fair value and disclosed in the compensation tables.

## 4. Compensation of the Executive Committee

### 4.1 Benchmarking of Executive Committee positions

All benchmarking activity related to Executive Committee positions is performed by independent consultants. Givaudan's executive compensation targets base pay at the market median. Executive Committee members have the opportunity to be rewarded with above-median pay for sustained outstanding performance from a number of variable compensation components. These variable elements reflect achievements against quantitative targets established by the Board. Variable compensation, particularly long-term components, represents a significant portion of an executive's total compensation. In general, the weight of variable compensation increases with executive's level of responsibility and the impact of their position on Company results.

In 2020, Executive Committee compensation was reviewed against a peer group of other Swiss multinational companies. This peer group consisted of Swiss Leader Index (SLI) companies of comparable market cap (approximately 0.5x to 2x), excluding financial services institutions. The benchmark included 12 companies: ABB, Alcon, Geberit, Kuehne + Nagel, LafargeHolcim, Lonza, Richemont, Schindler, SGS, Sika, Swatch and Swisscom. Consistent with prior external benchmarks, the review confirmed the positioning against the market remains appropriate. The findings have been cross-validated against a listed European company comparator group with the finding that Givaudan compensation positioning appears similar versus the European peer group than the SLI companies. The European benchmark included 10 companies: Akzo Nobel, Beiersdorf, Carlsberg, Coca-Cola European Partners, DSM, Kerry Group, Pernod Ricard, Smith & Nephew, Solvay and Symrise. The European peer group consists of companies of a similar size (approximately 0.5x to 2x market cap and turnover of Givaudan). In addition, the peer group chosen is a competitor group of Givaudan considering talent acquisition and retention.

**X.  Executive compensation benchmark**

| | Below median | Median | Above median |
|---|---|---|---|
| Base pay | ■ | | |
| Short-term incentive[1] | ■ | | |
| Long-term incentive[2] | | | ■ |
| **Total compensation** | | ■ | |

1.  Annual Incentive Plan (please refer to section 3.5).
2.  Performance Share Plan (please refer to section 3.6).

The results confirm that total compensation of the Executive Committee is overall aligned with the market. The long-term incentive compensation is positioned above median, which is in line with Givaudan policy and reflects our continued strong focus on rewarding outstanding performance over the long term.

In 2020, independent consulting services were contracted with EY regarding Executive Committee compensation topics, including benchmarking. EY has additionally provided other tax and advisory services to the Company.

### 4.2 Compensation levels in 2020

Total Executive Committee compensation reported in 2020 remained stable compared to 2019, representing full year compensation for seven members (including the CEO).

Total Executive Committee compensation for the reporting period increased by 4%, reflecting:
– the full year impact on base salaries of the compensation mix rebalancing implemented in 2019
– the higher achievement rates of annual incentive targets in 2020 versus 2019.
  Further details are available in section 3.5.

Executive Committee member compensation has been set in accordance with our compensation principles, including consideration of roles and responsibilities and with reference to our compensation benchmarks.

### 4.2.1 Highest total compensation

The Chief Executive Officer, Gilles Andrier, received the highest total compensation in 2020. For compensation details, please refer to table XI.

## Reflecting business and individual performance

### XI. Executive Committee compensation summary

| in Swiss francs | Gilles Andrier CEO 2020 | Gilles Andrier CEO 2019 | Executive Committee members (excluding CEO)[1] 2020 | Executive Committee members (excluding CEO)[1] 2019 | Total 2020 | Total 2019 |
|---|---|---|---|---|---|---|
| - Base salary | 1,211,084 | 1,167,910 | 3,336,973 | 3,191,433 | 4,548,057 | 4,359,343 |
| - Pension benefits[2] | 574,237 | 577,527 | 1,036,769 | 1,005,412 | 1,611,006 | 1,582,939 |
| - Other benefits[3] | 145,344 | 141,730 | 433,184 | 562,795 | 578,528 | 704,525 |
| **Total fixed compensation** | **1,930,665** | **1,887,167** | **4,806,926** | **4,759,640** | **6,737,591** | **6,646,807** |
| - Annual incentive[4] | 1,636,536 | 1,438,925 | 3,176,247 | 2,830,707 | 4,812,783 | 4,269,632 |
| - Number of performance shares granted[5] | 895 | 1,092 | 2,077 | 2,448 | 2,972 | 3,540 |
| - Value at grant[6] | 2,501,078 | 2,500,243 | 5,804,177 | 5,604,941 | 8,305,255 | 8,105,184 |
| **Total variable compensation** | **4,137,614** | **3,939,168** | **8,980,424** | **8,435,648** | **13,118,038** | **12,374,816** |
| **Total compensation** | **6,068,279** | **5,826,335** | **13,787,350** | **13,195,288** | **19,855,629** | **19,021,623** |
| Employer social security[7] | 504,728 | 471,214 | 1,029,178 | 989,482 | 1,533,906 | 1,460,696 |

1. Represents full year compensation of six Executive Committee members.
2. Company contributions to broad-based pension and retirement savings plans and annualised expenses accrued for supplementary executive retirement benefit.
3. Represents annual value of health and welfare plans, international assignment benefits and other benefits in kind.
4. Annual incentive accrued in reporting period based on performance in the reporting period.
5. 2020 Performance shares vest on 15 April 2023, 2019 Performance Shares vest on 15 April 2022.
6. Value at grant calculated according to IFRS methodology and based on 100% achievement of performance targets.
7. 2020 estimated social security charges based on 2020 compensation; 2019 estimated social security charges based on 2019 compensation.

#### 4.2.2  Other compensation, fees and loans to members or former members of the Executive Committee
No other compensation or fees were accrued for or paid to any member or former member of the Executive Committee during the reporting period. No member or former member of the Executive Committee or related parties had any loan outstanding as of 31 December 2020.

#### 4.2.3  Special compensation of Executive Committee members who left the Company during the reporting period
No such compensation was incurred during the reporting period.

#### 4.2.4  Employment contract termination clauses of Executive Committee members
Employment contracts of Executive Committee members comply with the OaEC and our Articles of Incorporation. Accordingly, contractual entitlements are within the specified thresholds, in particular the maximum contractual notice period is six months and any non-compete clause does not exceed 12 months. No additional compensation or benefits are provided in the case of change in control, except for long-term incentive awards that may vest immediately.

All contractual arrangements of Executive Committee members are approved by the Compensation Committee of the Board.

#### 4.2.5  Compensation voting for Executive Committee members
The compensation paid is within the amounts approved by shareholders in the respective Annual General Meeting.

The fixed and long term variable compensation approved for 2020 was CHF 15,300,000 (2019: CHF 15,000,000).

# Reflecting business and individual performance

The annual incentive, short term variable compensation amount for 2020 was CHF 4,812,783 and will be submitted for approval at the 2020 Annual General Meeting (2019: CHF 4,269,632).

## 5.  Compensation of the Board of Directors

Compensation of Board members consists of Director fees, Committee fees and Restricted Share Units (RSUs). Fees are paid at the end of each year in office completed. RSUs give participants the right to receive Givaudan shares (or a cash equivalent in countries where securities laws prevent the offering of Givaudan securities) at the end of a three-year blocking period. During this period Board members must hold RSUs (accordingly are restricted from trading RSUs or the underlying Givaudan shares), thereby aligning with shareholder interests over the longer term. Board members are entitled to receive Givaudan shares regardless of membership status so that, for example, if re-election does not occur during the restriction period, awarded RSUs are retained by the respective Board member. Such practice has been implemented in line with best practice in support of Givaudan's commitment to ensuring Board independence.

The annual fees for Board membership and additional functions are summarised in the table XII. The fee structure remained unchanged versus prior year levels.

### XII.  Board of Directors fees – Summary

|  | Annual fees (CHF) | Restricted Shares Compensation (CHF)[3] |
| --- | --- | --- |
| Chairman of the Board[1] | 400,000 | 580,000 |
| Vice-Chairman of the Board[1] | 100,000 | 145,000 |
| Board membership | 100,000 | 145,000 |
| Chairman – Audit Committee[2] | 55,000 | |
| Chairman – Other Committees[2] | 40,000 | |
| Membership – All Committees | 25,000 | |

1.  Incl. Board membership fees.
2.  Incl. Committee membership fees.
3.  Number of RSUs granted represents the closest match to the values displayed.

The Chairman of the Board does not receive any additional board membership fees. Similarly, a Committee Chairman does not receive any additional Committee Membership fees.

Each Board member receives an additional amount of CHF 10,000 to cover out-of-pocket expenses. This amount is paid for the coming year in office. The RSUs are also granted for the same period.

Board fees are aligned with the total Board compensation approved by shareholders at the 2020 Annual General Meeting and with market practice. Board member compensation was benchmarked against a peer group of other Swiss multinational companies. This peer group consisted of Swiss Leader Index (SLI) companies with comparable market cap (approximately 0.5x to 2x), excluding financial services institutions. The benchmark included 12 companies: ABB, Alcon, Geberit, Kuehne + Nagel, LafargeHolcim, Lonza, Richemont, Schindler, SGS, Sika, Swatch and Swisscom. Consistent with prior external benchmarks, the review confirmed the positioning against the market remains appropriate.

The compensation paid to the Board members for the reporting period is shown in table XIII.

### 5.1  Compensation of the Board member with the highest compensation

The Board member with the highest compensation in 2020 was Calvin Grieder, Chairman of the Board since 23 March 2017. For compensation details please refer to table XIII.

### 5.2  Other compensation, fees and loans to members or former members of the Board

No additional compensation or fees were paid to any member of the Board. No Board member or related parties had any loan outstanding as of 31 December 2020.

### 5.3  Special compensation of members of the Board who left the Company during the reporting period

No such compensation was incurred during the reporting period.

### 5.4  Compensation voting for members of the Board

The compensation paid to the Board members for the period between the 2019 and 2020 Annual General Meetings (CHF 2,817,450) is again within the amount approved by shareholders at the 2019 Annual General Meeting (CHF 2,950,000). Amounts approved at the 2020 Annual General Meeting (CHF 3,400,000) will be paid by the end of the year in office and validated in the 2021 Compensation report. Such approved and paid amounts may differ from those shown in the Board compensation summary table which, according to the OaEC, must include compensation paid in the reporting year.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

## Reflecting business and individual performance

### XIII.  Board of Directors compensation summary

| 2020<br>in Swiss francs | Calvin Grieder<br>Chairman[5] | Victor Balli[5] | Prof. Dr-Ing.<br>Werner Bauer[5] | Lilian Biner[5] | Michael Carlos[5] | Ingrid Deltenre[5] | Thomas Rufer[5] | Olivier Filliol[5,6] | Sophie Gasperment[5,7] | Total 2020[1] |
|---|---|---|---|---|---|---|---|---|---|---|
| Director fees[2] | 400,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 75,000 | 33,333 | 1,108,333 |
| Committee fees[2] | 65,000 | 50,000 | 65,000 | 25,000 | 65,000 | 50,000 | 55,000 | 37,500 | 8,333 | 420,833 |
| Total fixed (cash) | 465,000 | 150,000 | 165,000 | 125,000 | 165,000 | 150,000 | 155,000 | 112,500 | 41,666 | 1,529,166 |
| Number of RSUs granted[3] | 208 | 52 | 52 | 52 | 52 | 52 | 52 | 39 | 17 | 576 |
| Value at grant[4] | 581,256 | 145,314 | 145,314 | 145,314 | 145,314 | 145,314 | 145,314 | 108,986 | 47,507 | 1,609,633 |
| **Total compensation** | **1,046,256** | **295,314** | **310,314** | **270,314** | **310,314** | **295,314** | **300,314** | **221,486** | **89,173** | **3,138,799** |

1. Represents total compensation for the Board of Director paid in respect of the reporting year, reported in accordance with the accrual principle.
2. Represents Director and Committee fees paid in respect of the reporting year, reported in accordance with the accrual principle.
3. RSUs blocking period ends on 15 April 2023.
4. Economic value at grant according to IFRS methodology, with no discount applied for the blocking period.
5. The function of each member of the Board of Directors is indicated on pages 7–9 in the 2020 Governance report.
6. Represents compensation from April to December 2020.
7. Represents compensation from September to December 2020.

| 2019<br>in Swiss francs | Calvin Grieder<br>Chairman[5] | Victor Balli[5] | Prof. Dr-Ing.<br>Werner Bauer[5] | Lilian Biner[5] | Michael Carlos[5] | Ingrid Deltenre[5] | Thomas Rufer[5] | Total 2019[1] |
|---|---|---|---|---|---|---|---|---|
| Director fees[2] | 400,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,000,000 |
| Committee fees[2] | 65,000 | 50,000 | 65,000 | 25,000 | 65,000 | 50,000 | 55,000 | 375,000 |
| Total fixed (cash) | 465,000 | 150,000 | 165,000 | 125,000 | 165,000 | 150,000 | 155,000 | 1,375,000 |
| Number of RSUs granted[3] | 252 | 63 | 63 | 63 | 63 | 63 | 63 | 630 |
| Value at grant[4] | 576,980 | 144,245 | 144,245 | 144,245 | 144,245 | 144,245 | 144,245 | 1,442,450 |
| **Total compensation** | **1,041,980** | **294,245** | **309,245** | **269,245** | **309,245** | **294,245** | **299,245** | **2,817,450** |

1. Represents total compensation for the Board of Director paid in respect of the reporting year, reported in accordance with the accrual principle.
2. Represents Director and Committee fees paid in respect of the reporting year, reported in accordance with the accrual principle.
3. RSUs blocking period ends on 15 April 2022.
4. Economic value at grant according to IFRS methodology, with no discount applied for the blocking period.
5. The function of each member of the Board of Directors is indicated on pages 5–6 in the 2019 Governance report.

Estimated social security charges based on 2020 compensation amounted to CHF 259,320 (2019: CHF 233,000).

### 6.  Share ownership guidelines

Under the share ownership guidelines (Guidelines), Executive Committee members must hold approximately two times annual base salary in Givaudan shares. In general, the Guidelines should be met within five years from the beginning of the calendar year after joining the Executive Committee.

As the current Guidelines were implemented in September 2017, transitional arrangements to the Guidelines are in place for Executive Committee members appointed before 2016, such that all such members should reach the new Guideline holding requirement latest 2020.

Ownership of Givaudan shares by Executive Committee members as per 31 December 2020 is shown in table XIV.

Governance
report

Compensation
report

Consolidated
financial report

Statutory financial
report

Appendix

Reflecting business and individual performance

## 7. Ownership of Givaudan securities

### 7.1 Executive Committee

The Chief Executive Officer and other members of the Executive Committee, including persons closely connected to them, held 6,312 Givaudan shares. For further details, please refer to table XIV showing:

– The shares held individually by each member of the Executive Committee as per 31 December 2020.

– The unvested Performance Shares that were granted in 2018–2020 and were still owned by members of the Executive Committee as per 31 December 2020.

No member of the Executive Committee held any share options or option rights as at 31 December 2020 (31 December 2019: no member of the Executive Committee held any share options or option rights).

One person closely connected to a member of the Executive Committee owned 217 unvested Performance Shares as at 31 December 2020.

The Company is not aware of any other ownership of shares, share options/option rights, RSUs or Performance Shares as per 31 December 2020 by persons closely connected to members of the Executive Committee.

**XIV. Executive Committee: ownership of Givaudan securities**

| 2020<br>in numbers | Shares | Unvested<br>Performance Shares |
|---|---|---|
| Gilles Andrier, CEO | 3,900 | 3,433 |
| Tom Hallam | 584 | 1,362 |
| Louie D'Amico | 431 | 1,358 |
| Maurizio Volpi | 350 | 1,715 |
| Simon Halle-Smith | 452 | 1,023 |
| Willem Mutsaerts | 269 | 1,023 |
| Anne Tayac | 326 | 1,023 |
| **Total 2020** | **6,312** | **10,937** |
| Total 2019 | 5,265 | 13,073 |

### 7.2 Board of Directors

As per 31 December 2020, the Chairman and other Board members, including persons closely connected to them held 6,501 Givaudan shares in total. For further details, please refer to table XV showing:

– The shares held individually by each Board member as per 31 December 2020.

– The RSUs that were granted in 2018–2020 and were still owned by members of the Board as per 31 December 2020.

The Company is not aware of any other ownership of shares, share options/option rights, RSUs or Performance Shares as per 31 December 2020 by persons closely connected to members of the Board.

**XV. Board of Directors: ownership of Givaudan securities**

| 2020<br>in numbers | Shares | Blocked RSUs |
|---|---|---|
| Calvin Grieder, Chairman | 655 | 752 |
| Victor Balli | 175 | 188 |
| Prof. Dr-Ing. Werner Bauer | 1,355 | 188 |
| Lilian Biner | 662 | 188 |
| Michael Carlos | 1,187 | 188 |
| Ingrid Deltenre | 292 | 188 |
| Thomas Rufer | 975 | 188 |
| Olivier Filliol | 1,200 | 52 |
| Sophie Gasperment | | 30 |
| **Total 2020** | **6,501** | **1,962** |
| Total 2019 | 4,501 | 2,260 |

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

# Deloitte.

Deloitte SA
Rue du Pré-de-la-Bichette 1
1202 Geneva
Switzerland

Phone: +41 (0)58 279 8000
Fax: +41 (0)58 279 8800
www.deloitte.ch

## Report of the statutory auditor

## To the General Meeting of GIVAUDAN SA, Vernier

## Report of the Statutory Auditor in relation to sections 4 and 5 of the compensation report in accordance with the Ordinance against Excessive compensation in Stock Exchange Listed Companies (Ordinance)

We have audited the accompanying compensation report of Givaudan SA for the year ended 31 December 2020. Our audit is limited to the information provided in sections 4 and 5 on page 31 to 34 in accordance with the articles 14 – 16 of the Ordinance against Excessive compensation in Stock Exchange Listed Companies (Ordinance).

### Responsibility of the Board of Directors

The Board of Directors is responsible for the preparation and overall fair presentation of the compensation report in accordance with Swiss law and the Ordinance against Excessive compensation in Stock Exchange Listed Companies (Ordinance). The Board of Directors is also responsible for designing the remuneration system and defining individual remuneration packages.

### Auditor's Responsibility

Our responsibility is to express an opinion on the compensation report. We conducted our audit in accordance with Swiss Auditing Standards. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the compensation report complies with Swiss law and articles 14 – 16 of the Ordinance.

An audit involves performing procedures to obtain audit evidence on the disclosures made in the compensation report with regard to compensation, loans and credits in accordance with articles 14 – 16 of the Ordinance. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatements in the compensation report, whether due to fraud or error. This audit also includes evaluating the reasonableness of the methods applied to value components of remuneration, as well as assessing the overall presentation of the compensation report.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

Governance
report

Compensation
report

Consolidated
financial report

Statutory financial
report

Appendix

# Deloitte.

**Opinion**

In our opinion, sections 4 and 5 of the compensation report of Givaudan SA for the year ended 31 December 2020 comply with Swiss law and articles 14 – 16 of the Ordinance.

**Deloitte SA**

Karine Szegedi Pingoud
Licensed Audit Expert
Auditor in Charge

Laetitia Cejudo Petit
Licensed Audit Expert

Geneva, 28 January 2021

# Consolidated Financial Report



**In this section**

**39   Consolidated financial statements**
39   Consolidated Income Statement
39   Consolidated Statement of Comprehensive Income
40   Consolidated Statement of Financial Position
41   Consolidated Statement of Changes in Equity
42   Consolidated Statement of Cash Flows
**43   Notes to the consolidated financial statements**
43   1. Group Organisation
43   2. Summary of Significant Accounting Policies
53   3. Critical Accounting Estimates and Judgments
54   4. Foreign Exchange Rates
54   5. Financial Risk Management
63   6. Acquisitions
65   7. Segment Information
68   8. Employee Benefits
73   9. Share-Based Payments
73   10. Investments in Joint Ventures and Associates
74   11. Other Operating Income
74   12. Other Operating Expense
74   13. Expenses by Nature
74   14. Financing Costs
74   15. Other Financial (Income) Expense, Net

75   16. Income Taxes
76   17. Earnings per Share
77   18. Cash and Cash Equivalents
77   19. Accounts Receivable – Trade
77   20. Inventories
78   21. Property, Plant and Equipment
79   22. Intangible Assets
81   23. Debt
83   24. Changes in Liabilities Arising from Financing Activities
84   25. Provisions
85   26. Own Equity Instruments
85   27. Equity
85   28. Commitments
86   29. Contingent Liabilities
86   30. Related Parties
87   31. Board of Directors and Executive Committee Compensation
90   32. List of Principal Group Companies
92   33. Disclosure of the Process of Risk Assessment
**93   Report of the Statutory Auditor**
93   Statutory Auditor's Report on the Consolidated Financial Statements

# Consolidated financial statements

## Consolidated Income Statement
For the year ended 31 December

| in millions of Swiss francs, except for earnings per share data | Note | 2020 | 2019 |
|---|---|---|---|
| Sales | 7 | 6,322 | 6,203 |
| Cost of sales | | (3,663) | (3,673) |
| **Gross profit** | | **2,659** | **2,530** |
| as % of sales | | 42.1% | 40.8% |
| Selling, marketing and distribution expenses | | (848) | (791) |
| Research and product development expenses | | (536) | (528) |
| Administration expenses | | (218) | (221) |
| Share of results of joint ventures and associates | 10 | 3 | 4 |
| Other operating income | 11 | 45 | 41 |
| Other operating expense | 12 | (109) | (115) |
| **Operating income** | | **996** | **920** |
| as % of sales | | 15.8% | 14.8% |
| Financing costs | 14 | (86) | (79) |
| Other financial income (expense), net | 15 | (34) | (33) |
| **Income before taxes** | | **876** | **808** |
| Income taxes | 16 | (133) | (106) |
| **Income for the period** | | **743** | **702** |
| **Attribution** | | | |
| Income attributable to non-controlling interests | | – | – |
| Income attributable to equity holders of the parent | | 743 | 702 |
| as % of sales | | 11.8% | 11.3% |
| **Earnings per share – basic (CHF)** | 17 | **80.59** | **76.17** |
| **Earnings per share – diluted (CHF)** | 17 | **79.96** | **75.59** |

The notes on pages 43 to 92 form an integral part of these financial statements.

## Consolidated Statement of Comprehensive Income
For the year ended 31 December

| in millions of Swiss francs | Note | 2020 | 2019 |
|---|---|---|---|
| **Income for the period** | | **743** | **702** |
| **Items that may be reclassified to the income statement** | | | |
| **Cash flow hedges** | | | |
| Movement in fair value, net | | (51) | (56) |
| Gains (losses) removed from equity and recognised in the consolidated income statement | | 6 | 6 |
| Movement on income tax | 16 | 4 | 4 |
| **Exchange differences arising on translation of foreign operations** | | | |
| Movement in fair value arising on hedging instruments of the net assets in foreign operations | | 58 | 51 |
| Currency translation differences | | (385) | (99) |
| Movement on income tax | 16 | 5 | (6) |
| **Items that will not be reclassified to the income statement** | | | |
| **Defined benefit pension plans** | | | |
| Remeasurement gains (losses) of post-employment benefit obligations | 8 | 46 | (91) |
| Movement on income tax | 16 | (5) | (3) |
| **Other comprehensive income for the period** | | **(322)** | **(194)** |
| **Total comprehensive income for the period** | | **421** | **508** |
| **Attribution** | | | |
| Total comprehensive income attributable to non-controlling interests | | – | – |
| Total comprehensive income attributable to equity holders of the parent | | 421 | 508 |

The notes on pages 43 to 92 form an integral part of these financial statements.

# Consolidated financial statements

**Consolidated Statement of Financial Position**

| in millions of Swiss francs | Note | 31 December 2020 | 31 December 2019 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | 5, 18 | 411 | 452 |
| Derivative financial instruments | 5 | 54 | 24 |
| Financial assets at fair value through income statement | 5 | 4 | 4 |
| Accounts receivable - trade | 5, 19 | 1,359 | 1,365 |
| Inventories | 20 | 1,201 | 1,149 |
| Current tax assets | 16 | 66 | 50 |
| Prepayments | | 50 | 35 |
| Other current assets | 5 | 154 | 163 |
| **Current assets** | | **3,299** | **3,242** |
| Derivative financial instruments | 5 | 65 | 1 |
| Property, plant and equipment | 21 | 2,222 | 2,326 |
| Intangible assets | 22 | 4,543 | 4,286 |
| Deferred tax assets | 16 | 218 | 211 |
| Post-employment benefit plan assets | 8 | 20 | 32 |
| Financial assets at fair value through income statement | 5 | 180 | 177 |
| Interests in joint ventures and investments in associates | 10 | 35 | 34 |
| Other long-term assets | | 76 | 87 |
| **Non-current assets** | | **7,359** | **7,154** |
| **Total assets** | | **10,658** | **10,396** |

| in millions of Swiss francs | Note | 31 December 2020 | 31 December 2019 |
|---|---|---|---|
| **Liabilities and equity** | | | |
| Short-term debt | 5, 23 | 206 | 335 |
| Derivative financial instruments | 5 | 49 | 29 |
| Accounts payable - trade and others | 5 | 809 | 833 |
| Accrued payroll and payroll taxes | | 211 | 189 |
| Current tax liabilities | 16 | 157 | 111 |
| Financial liability - own equity instruments | 26 | 108 | 108 |
| Provisions | 25 | 23 | 18 |
| Other current liabilities | | 233 | 207 |
| **Current liabilities** | | **1,796** | **1,830** |
| Derivative financial instruments | 5 | 103 | 79 |
| Long-term debt | 5, 23 | 4,245 | 3,796 |
| Provisions | 25 | 71 | 69 |
| Post-employment benefit plan liabilities | 8 | 545 | 601 |
| Deferred tax liabilities | 16 | 310 | 280 |
| Other non-current liabilities | | 80 | 82 |
| **Non-current liabilities** | | **5,354** | **4,907** |
| **Total liabilities** | | **7,150** | **6,737** |
| Share capital | 27 | 92 | 92 |
| Retained earnings and reserves | 27 | 6,133 | 5,961 |
| Own equity instruments | 26, 27 | (168) | (168) |
| Other components of equity | | (2,567) | (2,245) |
| **Equity attributable to equity holders of the parent** | | **3,490** | **3,640** |
| Non-controlling interests | | 18 | 19 |
| **Total equity** | | **3,508** | **3,659** |
| **Total liabilities and equity** | | **10,658** | **10,396** |

The notes on pages 43 to 92 form an integral part of these financial statements.

## Consolidated financial statements

**Consolidated Statement of Changes in Equity**
For the year ended 31 December

| 2020<br>in millions of Swiss francs | Share Capital | Retained earnings and reserves | Own equity instruments | Cash flow hedges | Currency translation differences | Remeasurement of post employment benefit obligations | Equity attributable to equity holders of the parents | Non-controlling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|
| Note | 27 | 27 | 26, 27 | | | 8 | | | |
| **Balance as at 1 January** | **92** | **5,961** | **(168)** | **(107)** | **(1,613)** | **(525)** | **3,640** | **19** | **3,659** |
| Income for the period | | 743 | | | | | 743 | – | 743 |
| Other comprehensive income for the period | | | | (41) | (322) | 41 | (322) | | (322) |
| **Total comprehensive income for the period** | | **743** | | **(41)** | **(322)** | **41** | **421** | **–** | **421** |
| Dividends paid | | (571) | | | | | (571) | | (571) |
| Movement on own equity instruments, net | | | – | | | | | | |
| Non-controlling interests | | | | | | | | (1) | (1) |
| **Net change in other equity items** | | **(571)** | | | | | **(571)** | **(1)** | **(572)** |
| **Balance as at 31 December** | **92** | **6,133** | **(168)** | **(148)** | **(1,935)** | **(484)** | **3,490** | **18** | **3,508** |

| 2019<br>in millions of Swiss francs | Share Capital | Retained earnings and reserves | Own equity instruments | Cash flow hedges | Currency translation differences | Remeasurement of post employment benefit obligations | Equity attributable to equity holders of the parents | Non-controlling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|
| Note | 27 | 27 | 26, 27 | | | 8 | | | |
| **Balance as at 1 January** | **92** | **5,811** | **(142)** | **(61)** | **(1,559)** | **(431)** | **3,710** | **22** | **3,732** |
| Income for the period | | 702 | | | | | 702 | – | 702 |
| Other comprehensive income for the period | | | | (46) | (54) | (94) | (194) | | (194) |
| **Total comprehensive income for the period** | | **702** | | **(46)** | **(54)** | **(94)** | **508** | **–** | **508** |
| Dividends paid | | (552) | | | | | (552) | | (552) |
| Movement on own equity instruments, net | | | (26) | | | | (26) | | (26) |
| Non-controlling interests | | | | | | | | (3) | (3) |
| **Net change in other equity items** | | **(552)** | **(26)** | | | | **(578)** | **(3)** | **(581)** |
| **Balance as at 31 December** | **92** | **5,961** | **(168)** | **(107)** | **(1,613)** | **(525)** | **3,640** | **19** | **3,659** |

The notes on pages 43 to 92 form an integral part of these financial statements.

## Consolidated financial statements

**Consolidated Statement of Cash Flows**
For the year ended 31 December

| in millions of Swiss francs | Note | 2020 | 2019 |
|---|---|---|---|
| Income for the period | | 743 | 702 |
| Income tax expense | 16 | 133 | 106 |
| Interest expense | 14 | 80 | 68 |
| Non-operating income and expense | 14, 15 | 40 | 44 |
| **Operating income** | | **996** | **920** |
| Depreciation of property, plant and equipment | 21 | 201 | 193 |
| Amortisation of intangible assets | 22 | 187 | 161 |
| Impairment of long-lived assets | 21, 22 | 13 | 1 |
| **Other non-cash items** | | | |
| - share-based payments | | 56 | 41 |
| - pension expense | 8 | 49 | 38 |
| - additional and unused provisions, net | 25 | 20 | 12 |
| - other non-cash items | | (18) | – |
| **Adjustments for non-cash items** | | **508** | **446** |
| (Increase) decrease in inventories | | (68) | (28) |
| (Increase) decrease in accounts receivable | | (76) | (101) |
| (Increase) decrease in other current assets | | (19) | 25 |
| Increase (decrease) in accounts payable | | 27 | 108 |
| Increase (decrease) in other current liabilities | | 2 | (19) |
| **(Increase) decrease in working capital** | | **(134)** | **(15)** |
| **Income taxes paid** | | **(125)** | **(106)** |
| Pension contributions paid | 8 | (40) | (37) |
| Provisions used | 25 | (16) | (21) |
| Purchase and sale of own equity instruments, net | | (56) | (51) |
| **Cash flows from (for) operating activities** | | **1,133** | **1,136** |

| in millions of Swiss francs | Note | 2020 | 2019 |
|---|---|---|---|
| Increase in long-term debt | 24 | 1,405 | 660 |
| (Decrease) in long-term debt | 24 | (784) | (184) |
| Increase in short-term debt | 24 | 3,044 | 2,904 |
| (Decrease) in short-term debt | 24 | (3,300) | (2,919) |
| **Cash flows from debt, net** | | **365** | **461** |
| Interest paid | 24 | (53) | (51) |
| Purchase and sale of derivative financial instruments, net | 24 | (19) | – |
| Lease payments | 24 | (52) | (52) |
| Transactions of non-controlling interest | | (7) | (3) |
| Other, net | 24 | (9) | (7) |
| **Cash flows from financial liabilities** | | **225** | **348** |
| Distribution to the shareholders paid | 27 | (571) | (552) |
| **Cash flows from (for) financing activities** | | **(346)** | **(204)** |
| Acquisition of property, plant and equipment | 21 | (188) | (275) |
| Acquisition of intangible assets | 22 | (39) | (45) |
| Acquisition of subsidiaries, net of cash acquired | 6 | (629) | (478) |
| Proceeds from the disposal of property, plant and equipment | 21 | 8 | 74 |
| Proceeds from sales of intangible assets | 22 | 2 | – |
| Proceeds from disposal of investment property | | | 2 |
| Interest received | | 3 | 6 |
| Dividend received from joint ventures and associates | | 1 | 2 |
| Purchase and sale of financial assets at fair value through income statement, net | | (3) | (105) |
| Impact of financial transactions on investing, net | | 25 | (29) |
| Other, net | | 1 | (43) |
| **Cash flows from (for) investing activities** | | **(819)** | **(891)** |
| **Net increase (decrease) in cash and cash equivalents** | | **(32)** | **41** |
| Net effect of currency translation on cash and cash equivalents | | (9) | (12) |
| Cash and cash equivalents at the beginning of the period | 18 | 452 | 423 |
| **Cash and cash equivalents at the end of the period** | 18 | **411** | **452** |

The notes on pages 43 to 92 form an integral part of these financial statements.

# Notes to the consolidated financial statements

Governance
report

Compensation
report

**Consolidated
financial report**

Statutory financial
report

Appendix

## 1. Group Organisation

Givaudan SA and its subsidiaries (hereafter 'the Group') operate under the name Givaudan. Givaudan SA is a limited liability company incorporated and domiciled in Switzerland. The Group is headquartered in Vernier, near Geneva, Switzerland. Givaudan is a leading supplier of creative fragrance, beauty, flavour and wellbeing products to the consumer goods industry. It operates in over 100 countries and has subsidiaries and branches in more than 40 countries. Worldwide, it employs 15,852 people. A list of the principal Group companies is shown in Note 32 to the consolidated financial statements.

The Group is listed on the SIX Swiss Exchange (GIVN).

## 2. Summary of Significant Accounting Policies

The significant accounting policies applied in the preparation of these consolidated financial statements are set out below. These policies have been consistently applied to all years presented, unless otherwise stated.

### 2.1 Basis of Preparation

The consolidated financial statements have been prepared in accordance with International Financial Reporting Standards (IFRS) as issued by the IASB and Swiss law.

They are prepared under the historical cost convention as modified by the revaluation of financial assets and financial liabilities at fair value through the income statement, and of own equity instruments classified as derivatives. Historical cost is generally based on the fair value of the consideration given in exchange for goods and services. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, regardless of whether that price is directly observable or estimated using another valuation technique.

The preparation of the consolidated financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent liabilities at the date of the financial statements, and reported amounts of revenues and expenses during the reporting period. It also requires management to exercise its judgment in the process of applying the Group's accounting policies. Critical accounting estimates and judgments are disclosed in Note 3.

The COVID-19 pandemic has not materially affected the business activities of the Group; thus the operating results as well as the consolidated financial statements for the year ended 31 December 2020 have not been materially impacted.

Givaudan SA's Board of Directors approved these consolidated financial statements on 28 January 2021.

### 2.1.1 Changes in Accounting Policies and Disclosures Standards, amendments and interpretations effective in 2020

The accounting policies adopted are consistent with those of the annual financial statements for the year ended 31 December 2019, as described in the 2019 consolidated financial statements, with the exception of the adoption as of 1 January 2020 of the standards and interpretations described below:

**Amendments to IFRS 10 and IAS 28: Sales or Contribution of Assets between an Investor and its Associate or Joint Venture** clarify that in a transaction involving an associate or joint venture the extent of gain or loss recognition depends on whether the assets sold or contributed constitute a business. The adoption of these amendments has no impact on the accounting of the joint arrangements currently held by the Group.

**Definition of Material: Amendments to IAS 1 and IAS 8** align the definition used in the Conceptual Framework and the standards themselves. The clarification does not impact the current practice of the Group.

**Definition of a Business: Amendments to IFRS 3** narrow and clarify the definition of a business. They also permit a simplified assessment of whether an acquired set of activities and assets are a group of assets rather than a business. The amendments do not impact the current practice of the Group.

**Amendments to IFRS 9, IAS 39 and IFRS 7: Interest Rate Benchmark Reform** provide certain reliefs in connection with interest rate benchmark reform. The reliefs relate to hedge accounting and have the effect that IBOR reform should not generally cause hedge accounting to terminate. The amendments do not impact the current practice of the Group, as the practical expedient has been applied.

## Notes to the consolidated financial statements

### 2.1.2 IFRSs and IFRICs issued but not yet effective
New and revised standards and interpretations, issued but not yet effective, have been reviewed to identify the nature of the future changes in accounting policy and to estimate the effect of any necessary changes in the consolidated financial statements and supporting notes upon their adoption.

#### a) Issued and effective for 2021.

**Amendments to IFRS 16: Covid-19-related rent concessions** provide lessees with an exemption from assessing whether a COVID-19-related rent concession is a lease modification. The Group is not exposed to lessee relief for which the exemption election impacts the consolidated financial statements significantly.

**Amendments to IFRS 9, IAS 39, IFRS 7, IFRS 4 and IFRS 16: Interest Rate Benchmark Reform – Phase 2** address issues that might affect financial reporting when an existing interest rate benchmark is replaced with an alternative benchmark interest rate. The amendments relate to the modification of financial assets, financial liabilities and lease liabilities, specific hedge accounting requirements and disclosure requirements applying IFRS 7 to accompany the amendments regarding modifications and hedge accounting. The amendments permit continuation of hedge accounting, therefore the Group will retain the cumulative gain or loss in the cash flow hedge reserve for designated cash flow hedges that are subject to interest rate benchmark reforms even though there is uncertainty arising from the reform with respect to the timing and amount of the cash flows of the hedged items.

#### b) Issued and effective for 2022 and after.

**Annual Improvements to IFRS® Standards 2018–2020** provides a streamlined process for dealing efficiently with a collection of amendments to IFRS 1 First-time Adoption of International Financial Reporting Standards, IFRS 9 Financial Instruments, IFRS 16 Leases and IAS 41 Agriculture. The amendments do not impact the current practice of the Group.

**Amendments to IAS 16: Property, Plant and Equipment: Proceeds before Intended Use** prohibit the deduction of proceeds from selling items produced before an item of property, plant and equipment (PP&E) is available for use from the cost of that PP&E. The amendments do not impact the current practice of the Group.

**Amendments to IAS 37: Onerous Contracts – Cost of Fulfilling a Contract** specify that the 'cost of fulfilling' a contract comprises the 'costs that relate directly to the contract'. Costs that relate directly to a contract can either be incremental costs of fulfilling that contract or an allocation of other costs that relate directly to fulfilling contracts. The amendments do not impact the current practice of the Group.

**Amendments to IAS 1: Classification of Liabilities as Current or Non-current** affect only the presentation of liabilities in the statement of financial position by clarifying that the classification (a) should be based on rights that are in existence at the end of the reporting period, and (b) is unaffected by expectations about whether an entity will exercise its right to defer settlement of a liability. The amendments do not impact the current practice of the Group.

**IFRS 17 Insurance Contracts** establishes the principles for the recognition, measurement, presentation and disclosure of insurance contracts. The standard has no impact for the Group.

### 2.2 Consolidation
The subsidiaries that are consolidated are those companies controlled, directly or indirectly, by Givaudan SA. The Group controls an entity when the Group is exposed to, or has rights to, variable returns from its involvement with the entity and has the ability to affect those returns through its power over the entity. The Group reassesses whether or not it controls an investee if there are indications of a change in facts and circumstances.

Companies acquired during the year are consolidated from the date on which operating control is transferred to the Group, and subsidiaries to be divested are included up to the date on which control passes to the acquirer.

The acquisition method of accounting is used to account for the acquisition of subsidiaries. The cost of an acquisition is measured as the fair value of the assets acquired, shares issued and liabilities undertaken or assumed at the date of acquisition. Identifiable assets acquired and liabilities and contingent liabilities assumed are measured initially at their fair values at the acquisition date. Acquisition related costs are expensed as incurred. The excess of the cost of acquisition over the fair value of the Group's share of net assets of the subsidiary acquired is recognised as goodwill.

Where necessary, changes are made to the accounting policies of subsidiaries to bring and ensure consistency with the policies adopted by the Group.

## Notes to the consolidated financial statements

Assets and liabilities, equity, income, expenses and cash flows resulting from inter-company transactions are eliminated in full on consolidation.

### 2.3  Investments in Joint Ventures and Associates
A joint venture is a joint arrangement whereby the Group and other parties that have joint control of the arrangement have rights to the net assets of the joint arrangement. Joint control is the contractually agreed sharing of control of an arrangement, which exists when the strategic, financial and operating decisions relating to the activities of the joint venture require the unanimous consent of the parties sharing control.

An associate is an entity over which the Group has significant influence and that is neither a subsidiary nor an interest in a joint venture. Significant influence is the power to participate in the financial and operating policy decisions of the investee but is not control or joint control over those policies.

The results and assets and liabilities of joint ventures and associates are incorporated in the consolidated financial statements using the equity method of accounting. Under the equity method, an investment in a joint venture or an associate is initially recognised at cost and adjusted thereafter to recognise the Group's share of the income statement and the other comprehensive income of the joint venture or associate. Adjustments are made where necessary to bring the accounting policies in line with those adopted by the Group. Unrealised gains and losses on transactions between the Group and a jointly controlled entity or an associate are eliminated to the extent of the Group's interest in the joint arrangement or associate.

### 2.4  Foreign Currency Valuation
#### 2.4.1  Functional and presentation currency
Items included in the financial statements of each entity in the Group are measured using the functional currency of that entity. The functional currency is normally the one in which the entity primarily generates and expends cash. The consolidated financial statements are presented in millions of Swiss francs (CHF), the Swiss franc being the Group's presentation currency.

#### 2.4.2  Transactions and balances
Foreign currency transactions are translated into the functional currency using the exchange rates prevailing on the dates of the transactions, or using a rate that approximates the exchange rates on the dates of the transactions. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translation at the reporting period-end rates of monetary assets and liabilities denominated in foreign currencies are recognised in other financial income (expense), net, except for:

– Exchange differences deferred in equity as qualifying cash flow hedges on certain foreign currency risks and qualifying net investment hedges;

– Exchange differences on monetary items to a foreign operation for which settlement is neither planned nor likely to occur, therefore forming part of the net investment in the foreign operation, which are recognised initially in other comprehensive income and reclassified from equity to the income statement on disposal of the net investment or on partial disposal when there is a loss of control of subsidiary or a loss of joint control over a jointly controlled entity; and

– Exchange differences on foreign currency borrowings relating to assets under construction which are included in the cost of those assets when they are regarded as an adjustment to interest costs on those foreign currency borrowings.

Non-monetary items that are measured in terms of historical cost in foreign currencies are not retranslated.

#### 2.4.3  Translation of the financial statements of foreign subsidiaries
For the purpose of presenting consolidated financial statements, the assets and liabilities of Group companies reporting in currencies other than Swiss francs (foreign operations) are translated into Swiss francs using exchange rates prevailing at the end of the reporting period. Cash flows, income and expenses items of Group companies are translated each month independently at the average exchange rates for the period when it is considered a reasonable approximation of the underlying transaction rate. All resulting exchange differences are recognised in other comprehensive income and accumulated in equity.

#### 2.4.4  Hyperinflationary economies
Restatement of financial statements is required for subsidiaries whose functional currencies have experienced a cumulative inflation rate of more than 100% over the past three years. The gain or loss on the net monetary position as well as the gain or loss incurred upon adjusting the carrying amounts of non-monetary assets and liabilities for inflation are recognised in the consolidated income statement and then translated into Swiss francs. Restatement to current units of currency is made using the change in a general price index.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

## Notes to the consolidated financial statements

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

### 2.5  Segment Reporting

The operating segments are identified on the basis of internal reports that are regularly reviewed by the Executive Committee, the members of the Executive Committee being the chief operating decision makers, in order to allocate resources to the segments and to assess their performance. The internal financial reporting is consistently prepared along the lines of the two operating divisions: Fragrance & Beauty and Taste & Wellbeing.

The business units of each division, respectively Fine Fragrances, Consumer Products, Fragrance Ingredients and Active Beauty for the Fragrance & Beauty Division and Beverages, Dairy, Savoury, Sweet Goods and Natural Ingredients for the Taste & Wellbeing Division, are not considered as separately reportable operating segments as decision making about the allocation of resources and the assessment of performance are not made at this level.

Inter-segment transfers or transactions are set on an arm's length basis.

Information about geographical areas is determined based on the Group's operations; Switzerland, Europe, Africa and Middle East; North America; Latin America and Asia Pacific. Revenues from external customers are shown by destination and by segment.

### 2.6  Revenue from Contracts with Customers

The Group manufactures and sells manufactured fragrance, beauty, flavour and wellbeing products, specialty ingredients and molecules of fragrance and flavour to the agreed upon specifications and may contain additional performance obligations for certain clients such as the assignment of specific application technologies, joint market research and particular stock conditions. Most of these additional performance obligations are not distinct because they are highly dependent on the delivery of manufactured products and molecules.

Sales are recognised when control of the goods has transferred, being when the goods are delivered to the customer, the customer has full discretion over the channel and price to sell the goods, and there is no unfulfilled obligation that could affect the customer's acceptance of the goods. Delivery occurs when the customer has accepted the goods in accordance with the sales contract, the acceptance provisions have lapsed, or the Group has objective evidence that all criteria for acceptance have been satisfied.

The goods are often sold with volume discounts based on aggregate sales over a 12 months period. Revenue from these sales is recognised based on the price specified in the contract, net of the estimated volume discounts provided that it is highly probable that a significant

reversal will not occur. No element of financing is deemed present as the sales are made with credit terms that are consistent with market practice.

A receivable is recognised when the goods are delivered as this is the point in time that the consideration is unconditional because only the passage of time is required before the payment is due.

### 2.7  Research and Product Development

The Group is active in research and in formulas, technologies and product developments. In addition to its internal scientific efforts, the Group collaborates with outside partners.

Expenditure on research activities is recognised as an expense in the period in which it is incurred.

Internal developments or developments obtained through agreements on formula, technology and product costs are capitalised as intangible assets when there is an identifiable asset that will generate probable economic benefits and when the cost can be measured reliably. When the conditions for recognition of an intangible asset are not met, development expenditure is recognised in the income statement in the period in which it is incurred.

### 2.8  Employee Benefit Costs

Wages, salaries, social security contributions, annual leave and paid sick leave, bonuses and non-monetary benefits are expensed in the year in which the associated services are rendered by the Group's employees.

### 2.8.1 Pension obligations

A defined benefit plan is a pension plan that defines an amount of pension benefit that an employee will receive on retirement, principally dependent on an employee's years of service and remuneration at retirement. Plans are usually funded by payments from the Group and employees to financially independent trusts. The liability recognised in the statement of financial position is the aggregate of the present value of the defined benefit obligation at the statement of financial position date less the fair value of plan assets. Where a plan is unfunded, only a liability representing the present value of the defined benefit obligation is recognised in the statement of financial position. The present value of the defined benefit obligation is calculated by independent actuaries using the projected unit credit method twice a year, at interim and annual publication. This reflects the discounted expected future payment required to settle the obligation resulting from employee service in the current and prior periods. The future cash outflows incorporate actuarial assumptions primarily regarding the projected

# Notes to the consolidated financial statements

Governance
report

Compensation
report

**Consolidated
financial report**

Statutory financial
report

Appendix

rates of remuneration growth, and long-term indexation rates. Discount rates, used to determine the present value of the defined benefit obligation, are based on the market yields of high quality corporate bonds in the country concerned. Actuarial gains and losses arising from experience adjustments and changes in actuarial assumptions are charged or credited to equity in other comprehensive income in the period in which they arise. Past service costs are recognised immediately in the income statement. Pension assets and liabilities in different defined benefit schemes are not offset unless the Group has a legally enforceable right to use the surplus in one plan to settle obligations in another plan.

A defined contribution plan is a pension plan under which the Group pays fixed contributions into publicly or privately administrated funds. The Group has no further payment obligations once the contributions have been made. The contributions are charged to the income statement in the year to which they relate.

### 2.8.2  Other post-retirement obligations
Some Group companies provide certain post-retirement healthcare and life insurance benefits to their retirees, the entitlement to which is usually based on the employee remaining in service up to retirement age and completing a minimum service period. The expected costs of these benefits are accrued over the periods in which employees render service to the Group.

## 2.9  Share-Based Payments
The Group has established a performance share plan to align the long-term interests of key executives and members of the Board of Directors with the interests of the shareholders.

Key executives are awarded a portion of their performance-related compensation in equity-settled share-based payment transactions. The costs are recorded in each relevant functions part of the employees' remuneration as personnel expenses with a corresponding entry in equity in own equity instruments for equity-settled share-based payment transactions. The different share-based payments are described below:

### 2.9.1  Performance Share Plan
Key executives are awarded a portion of their performance-related compensation in equity-settled share-based payment transactions in the form of a performance share plan.

The performance share plan is established with Givaudan registered shares and a vesting period of three years. The Group has at its disposal either treasury shares or conditional share capital.

The cost of equity-settled instruments is expensed as employee remuneration over the vesting period, together with a corresponding increase in equity in own equity instruments. The cost is determined by reference to the fair value of the shares expected to be delivered at the date of vesting. Performance conditions are included in the assumptions in which the number of shares varies. No market conditions are involved.

The fair value is determined as the market price at grant date reduced by the present value of dividends expected or any other expected distribution to the shareholders to be paid during the vesting period, as participants are not entitled to receive dividends or any other distribution to the shareholders during the vesting period.

At each statement of financial position date the Group revises its estimates of the number of shares that are expected to be delivered. Where an equity-settled award is cancelled, it is treated as if it had vested on the date of cancellation.

### 2.9.2  Restricted Share Plan
The members of the Board of Directors receive a portion of their compensation in equity-settled share-based payment transactions in the form of restricted share units.

Restricted shares are set generally with a vesting period of three years, during which the restricted shares cannot be settled or transferred. The Group has at its disposal treasury shares for the delivery of the restricted shares.

The cost of these equity-settled instruments to be expensed, together with a corresponding increase in equity, over the vesting period, is determined by reference to the fair value of the restricted shares granted at the date of the grant. Service conditions are included in the assumptions about the number of restricted shares that are expected to become deliverable. No performance conditions are included.

The fair value is determined as the market price at grant date reduced by the present value of dividends expected or any other expected distribution to the shareholders to be paid during the vesting period, as participants are not entitled to receive dividends or any other distribution to the shareholders during the vesting period.

At each statement of financial position date the Group revises its estimates of the number of restricted shares that are expected to be delivered. Where an equity-settled award is cancelled, it is treated as if it had vested on the date of cancellation.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

## Notes to the consolidated financial statements

### 2.10 Taxation

Income taxes include all taxes based upon the taxable profits of the Group, including withholding taxes payable on the distribution of retained earnings within the Group. Other taxes not based on income, such as property and capital taxes, are included either in operating expenses or in financial expenses according to their nature. The Group's liability for current income tax is calculated using tax rates that have been enacted or substantively enacted by the end of the reporting period.

Deferred income taxes are provided based on the full liability method, under which deferred tax consequences are recognised for temporary differences between the tax bases of assets and liabilities and their carrying values. Deferred tax liabilities are generally recognised for all taxable temporary differences. Deferred tax assets are generally recognised for all deductible temporary differences, unused tax losses and unused tax credits to the extent that it is probable that taxable profit will be available against which those items can be utilised. Management considers that these tax benefits are probable on the basis of business projections on the relevant entities.

Such deferred tax assets and liabilities are not recognised if the temporary difference arises from initial recognition of an asset or liability in a transaction other than a business combination that at the time of the transaction affects neither the accounting nor the taxable income.

Deferred income tax assets and liabilities are measured at the tax rates that are expected to apply to the year when the asset is realised or the liability is settled, based on tax rates that have been enacted or substantively enacted at the balance sheet date.

Deferred income tax is provided on temporary differences arising on investments in subsidiaries and interests in jointly controlled entities, except where the timing of the reversal of the temporary difference is controlled by the Group and it is probable that the temporary difference will not reverse in the foreseeable future. Current tax assets and liabilities are offset and deferred income tax assets and liabilities are offset when the income taxes are levied by the same taxation authority and when there is a legally enforceable right to offset them.

Current and deferred tax are recognised as an expense or income in the income statement, except when they relate to items that are recognised outside the income statement, in which case the tax is also recognised outside the income statement.

### 2.11 Cash and Cash Equivalents

Cash and cash equivalents comprise cash on hand and demand deposits with banks and similar institutions. Cash equivalents are held for the purpose of meeting short-term cash commitments (maturity of three months or less from the date of acquisition) and are subject to an insignificant risk of changes in value.

### 2.12 Financial Assets

Financial assets are classified as financial assets at fair value through the income statement except for trade receivables which are classified at amortised cost. The classification depends on the nature and purpose of the financial assets and is determined at the time of initial recognition.

Regular way purchases or sales of financial assets require delivery of assets within the time frame established by regulation or convention in the marketplace. All regular way purchases or sales of financial assets are recognised and derecognised at the settlement date (i.e. the date that the asset is delivered to or by the Group). Financial assets are classified as current assets, unless they are expected to be realised beyond twelve months of the statement of financial position date.

The Group derecognises a financial asset when the contractual rights to the cash flows from the asset expire, or when it transfers the financial asset and substantially all the risks and rewards of ownership of the asset to another party. On derecognition of a financial asset in its entirety, the following amounts are recognised in the income statement: (i) the difference between the asset's carrying amount and the sum of the consideration received and receivable; (ii) the cumulative gain or loss that had been recognised in other comprehensive income and accumulated in equity.

Dividend income from investments is recognised in other financial income (expense), net when the right to receive payment has been established. Interest income is accrued on a time basis and included in other financial income (expense), net.

### 2.12.1 Financial assets at fair value through the income statement

Financial assets such as debt instruments, equity securities, investment funds and derivatives not designated as effective hedging instruments are classified in this category.

Debt instruments are held with the objective to manage cash flows by both collecting their contractual cash flows and selling them at market price when needed. The main purpose of such instruments is to fund obligations related to employees. They are designated as financial

# Notes to the consolidated financial statements

assets measured at fair value through the income statement to avoid recognition inconsistency resulting from changes in fair values of the financial assets and the obligations.

Other financial assets which are not debt instruments are held with the main objectives to participate in long-term partnerships, to hedge certain financial risks, and to fund obligations related to employees. Their designation as financial assets measured at fair value through the income statement is in line with management intentions to hold such assets.

These financial assets are initially measured at fair value whereas directly attributable transaction costs are expensed in the income statement. At the end of each period, the carrying value is adjusted to the fair value with a corresponding entry in the income statement until the investment is derecognised.

The subsidiaries in the United States of America entered over the years into various life insurance contracts called corporate owned life insurance (COLI) to fund long-term obligations related to employees. For both the COLI contracts and the associated long-term obligations, adjustments to the fair value, gains and losses, are recognised in the income statement.

For quoted equity instruments, the fair value is the market value, being calculated by reference to share exchange quoted selling prices at close of business on the statement of financial position date. Non-quoted financial assets are valued at fair value based on observable market transactions or if not available based on prices given by reputable financial institutions or on the price of the latest transaction.

## 2.12.2 Financial assets at amortised cost
Trade receivables are the only financial assets that are recognised at fair value and subsequently measured at amortised cost. They reach the objective of collecting contractual cash flows over their life. Trade receivables are carried at amortised cost less allowances for loss. They generally do not contain a significant financing component. The allowance loss measurement is then determined by applying a simplified approach equalling the lifetime expected credit losses. Under this approach the tracking of changes in credit risk is not required but instead the base lifetime expected credit loss at all times is applied. An allowance for loss is estimated using a provision matrix that takes into account both the outstanding amounts and the risk category of the debtor, which is based on past default experience, specific factors to debtors and reasonable and supportable information about future economic conditions. Losses are recorded within selling, marketing and distribution expenses in the income statement. Trade receivables are deemed as impaired when there is an indication of significant financial difficulties

of the debtor (delinquency in or default on payments occurs, probability of bankruptcy or need for financial reorganisation).

Trade receivables are non-derivative financial assets with fixed or determinable payments that are not quoted in an active market.

## 2.13 Derivative Financial Instruments and Hedging Activities
Most derivative instruments are entered into to provide economic hedges. They are initially recognised at fair value on the date a derivative contract is entered into and are subsequently measured at their fair value. The method to recognise the resulting gain or loss depends on whether the derivative is designated as a hedging instrument and, if so, the nature of the item being hedged.

The Group documents, at the inception of the transaction, the relationship between hedging instruments and hedged items, as well as its risk management objectives and strategy for undertaking various hedging transactions. The Group also documents its assessment, both at hedge inception and on an ongoing basis, as to whether the derivatives that are used in hedging transactions are highly effective in offsetting changes in fair values or cash flows of hedged items.

Movements on the hedging reserve in shareholders' equity are shown in the statement of changes in equity. These derivatives are presented as current or non-current on the basis of their settlement dates.

## 2.13.1 Cash flow hedge
The effective portion of changes in the fair value of derivatives that are designated and qualify as cash flow hedges is recognised in the cash flow hedge reserve within other comprehensive income, limited to the cumulative change in fair value of the hedged item on a present value basis from the inception of the hedge. The gain or loss relating to the ineffective portion is immediately recognised in financing costs in the income statement.

Amounts accumulated in equity are reclassified to the income statement in the periods when the hedged transaction affects the income statement, in the same line as the recognised hedged item. However, when the hedged forecast transaction results in the recognition of a non-financial asset or liability, the amounts are transferred from equity and included in the initial measurement of the cost of the non-financial asset or liability.

## Notes to the consolidated financial statements

When forward contracts are used to hedge forecast transactions such as future debt issuance, management assumes that the sources of hedge effectiveness in regards of the characteristics of the hedging relationship is sufficiently immaterial to exclusively perform a qualitative assessment.

When the hedging instrument expires or is sold, terminated or exercised, or the hedge no longer meets the criteria for hedge accounting, any cumulative gain or loss existing in equity at that time remains in equity and is recognised when the ultimate forecast transaction occurs. If the forecast transaction is no longer expected to occur, any cumulative gain or loss existing in equity is immediately taken to the income statement.

### 2.13.2  Hedges of net investments in foreign operations

Hedges of net investments in foreign operations are accounted for similarly to cash flow hedges. Any gain or loss on the foreign currency forward contracts relating to the effective portion of the hedge is recognised in other comprehensive income and accumulated in the foreign currency translation reserve. The gain or loss relating to the ineffective portion is recognised immediately in other financial income and expense in the income statement.

### 2.13.3  Derivatives at fair value through the income statement

Certain derivative instruments do not qualify for hedge accounting and are accounted for at fair value through the income statement. At each statement of financial position date these derivative instruments are valued at fair value based on quoted market prices, with the unrealised gain or loss recognised in the income statement. They are derecognised when the Group has lost control of the contractual rights of the derivatives, at which time a realised gain or loss is recognised in the income statement.

### 2.14  Inventories

Inventories are stated at the lower of cost and net realisable value. Cost is determined using a weighted average cost formula. The cost of finished goods and work in process comprises raw materials, direct labour, other direct costs and related production overheads but excludes borrowing costs. Cost of sales includes the corresponding direct production costs of goods manufactured and services rendered as well as related production overheads. Net realisable value is the estimated selling price in the ordinary course of business, less estimated costs necessary to make the sale.

### 2.15  Property, Plant and Equipment

Property, plant and equipment are initially recognised at cost of purchase or construction and subsequently at cost less accumulated depreciation and accumulated impairment losses. The cost of an item of property, plant and equipment includes expenditure that is attributable to the purchase or construction. It includes, for qualifying assets, borrowing costs in accordance with the Group's accounting policy (Note 2.19), and cost of its dismantlement, removal or restoration, related to the obligation for which an entity incurs as a consequence of installing the asset.

The assets are depreciated on a straight-line basis, except for land, which is not depreciated. Estimated useful lives of major classes of depreciable assets are as follows:
– Buildings and land improvements   40 years
– Machinery and equipment            5 – 15 years
– Office equipment                   3 years
– Motor vehicles                     5 years

The assets' residual values and useful lives are reviewed, and adjusted if appropriate, at each statement of financial position date.

The carrying values of plant and equipment are written down to their recoverable amount when the carrying value is greater than their estimated recoverable amount (Note 2.18).

Gains and losses on disposals are determined by comparing the proceeds with the carrying amount with gains being recognised within other operating income and losses being recognised within other operating expense within the income statement.

Subsequent costs are included in the asset's carrying amount or recognised as a separate asset, as appropriate, only when it is probable that future economic benefits associated with the item will flow to the Group and the cost of the item can be measured reliably. Subsequent costs such as repairs and maintenance are recognised as expenses as incurred.

### 2.16  Leases

For all agreements containing a lease, a right-of-use asset and a corresponding lease liability are recognised, except for low-value assets and short-term leases, defined as leases with a lease term of 12 months or less. Those are recognised as an expense on a straight-line basis in the consolidated income statement. The Group accounts for contracts containing both lease and non-lease components as a single lease component.

The lease liability is initially measured at the present value of the future lease payments, as from commencement date of the lease until the expected termination date. In determining the lease term, management considers all facts and circumstances that create an economic

# Notes to the consolidated financial statements

incentive to exercise an extension option, or not exercise a termination option. Extension options are only included in the lease term if the lease is reasonably certain to be extended. The lease term is reassessed if an option is, or not, actually exercised or the Group becomes obliged, or not, to exercise it. The assessment of reasonable certainty is only revised if a significant event or a significant change in circumstances occurs, which affects this assessment, and that is within the control of the lessee. The lease payments are discounted by using the interest rate implicit in the contract or, if not available, the incremental borrowing rate, which is defined as the interest rate that the Group would have to pay to borrow, over a similar term and with a similar security, the funds necessary to obtain an asset of a similar value to the right-of-use asset in a similar economic environment. The lease liability is subsequently measured to reflect interest, lease payments and any lease modifications. The lease liability is presented under the lines short-term debt and long-term debt in the consolidated statement of financial position. The interest expense is presented in the line financing costs in the consolidated income statement.

The right-of-use assets comprise the initial measurement of the corresponding lease liability, lease payments made at or before the commencement date, initial direct costs and estimates of cost to put the underlying asset in the appropriate condition. Right-of-use assets are subsequently measured at cost less accumulated depreciation and impairment losses, adjusted for any remeasurement of the lease liability. They are depreciated over the shorter period of the lease term and the useful life of the underlying asset. Right-of-use-assets are presented in the consolidated statement of financial position under the line property, plant and equipment.

All lease payments on leases are presented as part of cash flows from financing activities, except for the short-term and low-value leases cash flows which are booked under operating activities.

## 2.17  Intangible Assets

Goodwill represents the excess of the cost of an acquisition over the fair value of the Group's share of the net assets of the acquired subsidiary at the date of acquisition. Goodwill on acquisitions is recognised in the statement of financial position as an intangible asset. Goodwill is tested annually for impairment or more frequently when there are indications of impairment, and carried at cost less accumulated impairment losses. Impairment charges on goodwill are not reversed. Any goodwill or fair value adjustments to the carrying amounts of assets and liabilities arising on the acquisition of a foreign operation are recognised in the local currency at the effective date of the transaction and translated at year-end exchange rates. For the purpose of impairment testing, goodwill is allocated to the cash-generating units being the Group's reportable operating segments: Taste & Wellbeing Division and Fragrance & Beauty Division,

which itself includes two lower levels of cash-generating units related to Expressions Parfumées and Fragrance Oils.

Intangible assets acquired in a business combination are identified and recognised separately from goodwill when they satisfy the definition of an intangible asset and their fair values can be measured reliably.

Internal developments are capitalised as intangible assets when there is an identifiable asset that will generate probable economic benefits and when the cost can be measured reliably. Costs include all costs directly attributable to preparing the asset for use. Development costs previously recognised as an expense are not recognised as an asset in subsequent periods.

Separately acquired intangible assets are capitalised when the identifiable asset will generate probable economic benefits and when its cost can be measured reliably.

Intangible assets are carried at cost less accumulated amortisation and accumulated impairment losses. Amortisation is on a straight-line basis over the estimated economic useful life of the asset. Useful life is determined based on the character of the asset and may be indefinite. In that case, the asset is not amortised but annually tested for impairment. Estimated definite useful life of major classes of amortisable assets are as follows:
– Name and product brands          2 – 10 years
– Software/ERP system                 3 – 7 years
– Process-oriented technology      5 – 20 years
– Client relationships                    15 – 23 years
– Supplier relationships                 3 years

Gains or losses arising on the disposal of intangible assets are measured as the difference between the net disposal proceeds and the carrying amount with gains being recognised within other operating income and losses being recognised in other operating expense within the income statement.

## 2.18  Impairment of Long-Lived Assets

Non-financial assets that are subject to depreciation or amortisation are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. When the recoverable amount of a non-financial asset, being the higher of its fair value less cost to sell and its value in use, is less than its carrying amount, then the carrying amount is reduced to the asset's recoverable value. This reduction is recognised

Governance
report

Compensation
report

**Consolidated
financial report**

Statutory financial
report

Appendix

# Notes to the consolidated financial statements

as an impairment loss within other operating expense within the income statement. Value in use is determined by using pre-tax cash-flow projections over a five-year period and a terminal value. These are discounted using a pre-tax discount rate that reflects current market conditions of the time value of money and the risks specific to the asset.

Intangible assets with indefinite useful life are tested for impairment annually, and whenever there is an indication that the asset may be impaired.

An impairment loss is reversed if there has been a change in the circumstances used to determine the recoverable amount. A previously recognised impairment loss is reversed only to the extent that the asset's carrying amount does not exceed the carrying amount that would have been determined, net of depreciation or amortisation, if no impairment loss had been recognised.

## 2.19  Borrowing Costs
Borrowing costs directly attributable to the acquisition, construction or production of qualifying assets, which are assets that necessarily take a substantial period of time to prepare for their intended use, are added to the cost of those assets, until such time as the assets are substantially ready for their intended use.

Investment income earned on the temporary investment of specific borrowings pending their expenditure on qualifying assets is deducted from the borrowing costs eligible for capitalisation. All other borrowing costs are recognised in the income statement in the period in which they are incurred.

## 2.20  Accounts Payable – Trade and Others
Trade payables are obligations to pay for goods or services that have been acquired in the ordinary course of business from suppliers and are carried at amortised cost.

## 2.21  Debt
The proceeds of straight bonds, of private placements and of debt issued are recognised as the proceeds received, net of transaction costs incurred. Any discount arising from the coupon rate, represented by the difference between the net proceeds and the redemption value, is amortised using the effective interest rate method and charged to interest expense over the life of the bonds or the private placements. Debt is derecognised at redemption date.

Debt is classified within current liabilities unless the Group has an unconditional right to defer settlement of the liability for at least twelve months after the statement of financial position date.

## 2.22  Provisions
Provisions are recognised when the Group has a present legal or constructive obligation as a result of past events, for which it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation, and for which a reliable estimate of the amount of the obligation can be made. Provisions are reviewed regularly and are adjusted where necessary to reflect the current best estimates of the obligation.

## 2.23  Own Equity Instruments
Own equity instruments are own shares and derivatives on own shares. Purchases and sales are accounted for at the settlement date.

Purchases of own shares are recognised at acquisition cost including transaction costs as a deduction from equity. The original cost of acquisition, results from resale and other movements are recognised as changes in equity, net. Treasury shares acquired by the execution of own equity derivatives are recognised at the execution date market price.

The settlement and the contract for derivatives on own shares determine the categorisation of each instrument. When the contract assumes the settlement is made by exchanging a fixed amount of cash for a fixed number of treasury shares, the contract is recognised in equity except for a forward contract to buy and write put options which is recognised as a financial liability. When the contract assumes the settlement either net in cash or net in treasury shares or in the case of option of settlement, the contract is recognised as a derivative. Instruments recognised in equity are recognised at acquisition cost including transaction costs. Instruments recognised as financial liabilities are recognised at the net present value of the strike price of the derivative on own shares with the interest charge recognised over the life of the derivative in the line Financing costs of the income statement. They are derecognised when the Group has lost control of the contractual rights of the derivative, with the realised gain or loss recognised in equity.

At each statement of financial position date instruments recognised as derivatives are valued at fair value based on quoted market prices, with any unrealised gain or loss recognised in the line Other financial income (expense), net in the income statement. They are derecognised when the Group has lost control of the contractual rights of the derivatives, with any realised gain or loss recognised.

## Notes to the consolidated financial statements

### 2.24  Share Capital
Ordinary shares are classified as equity. Incremental costs directly attributable to the issue of new shares or options are shown in equity as a deduction, net of tax, from the proceeds.

### 2.25  Statement of Cash Flows
Cash flows from operating activities arise from the principal activities of the Group in the Fragrance & Beauty and Taste & Wellbeing businesses. The indirect method is used whereby the operating income is adjusted for the transactions of a non-cash nature in order to derive the cash generated from operations. It includes income tax paid on all activities.

Cash flows from financing activities are primarily the proceeds from the issue and repayment of the debt instruments, the dividend payment to shareholders and interest paid. Cash flows from long-term and short-term borrowings are reported separately of gross cash receipts and gross cash payments.

Cash flows from investing activities arise principally from the investments in property, plant and equipment and intangible assets, from the acquisition of subsidiaries, and from the transactions with jointly controlled entities.

### 2.26  Distribution to the Shareholders
Dividend distributions or distributions out of statutory capital reserves from 'capital contributions – additional paid-in capital' are recognised in the period in which they are approved by the Group's shareholders.

### 3.  Critical Accounting Estimates and Judgments
The estimates and underlying assumptions are reviewed on an ongoing basis and are based on historical experience and other factors, including expectation of future events that are believed to be reasonable under the circumstances. During 2020 management included in it's assessment the potential impact of the coronavirus pandemic on the carrying value of the Group's carrying amounts of assets and liabilities.

### 3.1  Critical Accounting Estimates and Assumptions
The key assumptions concerning the future, and other key sources of estimation uncertainty at the statement of financial position date that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year, are for the most part related to:

– In a business combination, the determination of the fair value of the identifiable assets acquired, particularly intangibles, and the liability requiring estimations which are based on all available information and in some cases on assumptions with respect to the timing and amount of future revenues and expenses associated with an asset. The purchase price is allocated to the underlying acquired assets and liabilities based on their estimated fair value at the time of acquisition. The excess is reported as goodwill. As a result, the purchase price allocation impacts reported assets and liabilities, future net earnings due to the impact on future depreciation and amortisation expense and impairment charges (Note 6);

– The impairment of goodwill requiring estimates of the value in use of the cash-generating units to which goodwill is allocated (Note 22);

– The impairment of long-lived assets requiring estimates to measure the recoverable amount of an asset or group of assets (Note 21 and 22);

– The calculation of the present value of defined benefit obligations requiring financial and demographic assumptions (Note 8);

– The determination and provision for income taxes requiring estimated calculations for which the ultimate tax determination is uncertain (Note 16);

– The provisions requiring assumptions to determine reliable best estimates (Note 25); and

– The contingent liabilities assessment (Note 29).

If, in the future, estimates and assumptions, which are based on management's best judgment at the date of the financial statements, deviate from the actual circumstances, the original estimates and assumptions will be modified as appropriate in the year in which the circumstances change.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

## Notes to the consolidated financial statements

### 3.2 Critical Judgments in Applying the Entity's Accounting Policies

In the process of applying the Group's accounting policies, management has made the following judgments, apart from those involving estimates, which have the most significant effect on the amounts recognised in the consolidated financial statements:

– Computer software and Enterprise Resource Planning: Computer software is internally developed programmes or modifications that result in new or in substantial improvements of existing IT systems and applications. Enterprise Resource Planning relates to the implementation of an ERP system that is changing the way the business is done in the areas of Finance, Supply Chain and Compliance. The Group has determined that the development phase of internally developed software and the ERP business transformations will provide future economic benefits to the Group and meet the criterion of intangible assets (Note 22); and

– Internal developments on formulas, technologies and products: The outcome of these developments depends on their final assemblage and application, which varies to meet customer needs, and consequently the future economic benefits of these developments are not certain. Thus the criteria for the recognition as an asset of the internal developments on formulas, technologies and products are generally not met. The expenditures on these activities are recognised as expense in the period in which they are incurred.

### 4. Foreign Exchange Rates

| Foreign currency to Swiss francs exchange rates | ISO code | Units | **31 Dec 2020** | **Average 2020** | 31 Dec 2019 | Average 2019 | 31 Dec 2018 | Average 2018 |
|---|---|---|---|---|---|---|---|---|
| Dollar | USD | 1 | 0.88 | 0.94 | 0.97 | 0.99 | 0.98 | 0.98 |
| Euro | EUR | 1 | 1.08 | 1.07 | 1.09 | 1.11 | 1.13 | 1.15 |
| Pound | GBP | 1 | 1.21 | 1.21 | 1.28 | 1.27 | 1.25 | 1.30 |
| Yen | JPY | 100 | 0.86 | 0.88 | 0.89 | 0.91 | 0.90 | 0.88 |
| Singapore dollar | SGD | 1 | 0.67 | 0.68 | 0.72 | 0.73 | 0.72 | 0.72 |
| Real | BRL | 1 | 0.17 | 0.18 | 0.24 | 0.25 | 0.25 | 0.27 |
| Renminbi | CNY | 1 | 0.14 | 0.14 | 0.14 | 0.14 | 0.14 | 0.15 |
| Mexican peso | MXN | 100 | 4.44 | 4.37 | 5.13 | 5.13 | 5.01 | 5.08 |
| Rupiah | IDR | 10,000 | 0.63 | 0.64 | 0.70 | 0.70 | 0.68 | 0.69 |

### 5. Financial Risk Management
### 5.1 Capital Management

The objective of the Group when managing capital is to maintain the ability to continue as a going concern whilst maximising shareholder value through an optimal balance of debt and equity.

In order to maintain or adjust the capital structure, management may issue or reimburse debt, propose to adjust the amounts distributed to the shareholders, return capital to shareholders, issue new shares and cancel shares through share buyback programmes.

The Group monitors its capital structure using a number of classic measures, mainly Leverage and Net Debt to EBITDA. The Group is committed to maintaining an investment grade credit profile, as defined by external ratings agencies.

The Leverage ratio is defined as net debt divided by the sum of net debt and equity (as defined for leverage ratio in the table below).

| in millions of Swiss francs | Note | **2020** | 2019 |
|---|---|---|---|
| Short-term debt | 23 | 206 | 335 |
| Long-term debt | 23 | 4,245 | 3,796 |
| Less: cash and cash equivalents | 18 | (411) | (452) |
| **Net debt** | | **4,040** | **3,679** |
| Total equity attributable to equity holders of the parent | | 3,490 | 3,640 |
| Remeasurement of post-employment benefit obligations | 8 | 484 | 525 |
| **Equity** | | **3,974** | **4,165** |
| **Net debt and equity** | | **8,014** | **7,844** |
| **Leverage ratio** | | **50%** | **47%** |

The Net Debt to EBITDA ratio is defined as follows:

– Net debt is calculated as the total of the consolidated short-term and long-term debt, less cash and cash equivalents.

– EBITDA is defined as Earnings Before Interest (and other financial income (expense), net), Tax, Depreciation and Amortisation, corresponds to operating income before depreciation, amortisation and impairment of long-lived assets.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

# Notes to the consolidated financial statements

The Group has entered into several private placements which contain various covenants with externally imposed capital requirements. The Group was in compliance with these requirements as at 31 December 2020 and 2019.

## 5.2  Financial Risk Management
The Group's activities expose it to a variety of financial risks: market risk (including currency risk, interest rate risk and price risk), credit risk and liquidity risk. The Group's overall risk management programme focuses on the unpredictability of financial markets and seeks to minimise potential adverse effects on the Group's financial performance. The Group generally enters into financial derivative transactions to hedge underlying business related exposures.

Risk management is carried out by a team within the central treasury department (hereafter 'Group Treasury') under the risk management policies approved by the Board of Directors. The Board of Directors provides written principles for overall risk management, as well as written policies covering specific areas, such as foreign exchange risk, interest rate risk and credit risk, use of derivative financial instruments and non-derivative financial instruments, and investment of excess liquidity. Group Treasury monitors and manages financial risks relating to the operations of the Group through internal risk reports which analyse exposures by degree and magnitude of risk. To manage the interest rate and currency risk arising from the Group's operations and its sources of finance, the Group enters into derivative transactions, primarily interest rate swaps, forward currency contracts and options. Compliance with policies and exposure limits is reviewed by the treasury controlling on a continuous basis. Group Treasury issues monthly reports for the Chief Financial Officer and quarterly reports for the Audit Committee.

## Categories of financial instruments
The accounting policies for financial instruments have been applied to the items in the table:

| 2020<br>in millions of Swiss francs | Note | At amortised cost | At fair value through the income statement | Derivatives used for hedge accounting | Other financial liabilities | Total |
|---|---|---|---|---|---|---|
| **Current financial assets** | | | | | | |
| Cash and cash equivalents | 18 | 411 | | | | 411 |
| Derivative financial instruments | 5.3 | | 54 | | | 54 |
| Financial assets at fair value through income statement | 5.3 | | 4 | | | 4 |
| Accounts receivable – trade | 19 | 1,359 | | | | 1,359 |
| Other current assets [a] | | 154 | | | | 154 |
| **Non-current financial assets** | | | | | | |
| Derivative financial instruments | 5.3 | | | 65 | | 65 |
| Financial assets at fair value through income statement | 5.3 | | 180 | | | 180 |
| **Total financial assets as at 31 December** | | **1,924** | **238** | **65** | | **2,227** |
| **Current financial liabilities** | | | | | | |
| Short-term debt | 23 | 45 [b] | | | 161 | 206 |
| Derivative financial instruments | 5.3 | | 19 | 30 | | 49 |
| Accounts payable | | | | | 809 | 809 |
| **Non-current financial liabilities** | | | | | | |
| Derivative financial instruments | 5.3 | | | 103 | | 103 |
| Long-term debt | 23 | 369 [b] | | | 3,876 | 4,245 |
| **Total financial liabilities as at 31 December** | | **414** | **19** | **133** | **4,846** | **5,412** |

a) Other current assets consist of other receivables non trade.
b) Lease liabilities.

## Notes to the consolidated financial statements

| 2019 in millions of Swiss francs | Note | At amortised cost | At fair value through the income statement | Derivatives used for hedge accounting | Other financial liabilities | Total |
|---|---|---|---|---|---|---|
| **Current financial assets** | | | | | | |
| Cash and cash equivalents | 18 | 452 | | | | 452 |
| Derivative financial instruments | 5.3 | | 24 | | | 24 |
| Financial assets at fair value through income statement | 5.3 | | 4 | | | 4 |
| Accounts receivable – trade | 19 | 1,365 | | | | 1,365 |
| Other current assets [a] | | 163 | | | | 163 |
| **Non-current financial assets** | | | | | | |
| Derivative financial instruments | 5.3 | | | 1 | | 1 |
| Financial assets at fair value through income statement | 5.3 | | 177 | | | 177 |
| **Total financial assets as at 31 December** | | **1,980** | **205** | **1** | | **2,186** |
| **Current financial liabilities** | | | | | | |
| Short-term debt | 23 | 42 [b] | | | 293 | 335 |
| Derivative financial instruments | 5.3 | | 10 | 19 | | 29 |
| Accounts payable | | | | | 833 | 833 |
| **Non-current financial liabilities** | | | | | | |
| Derivative financial instruments | 5.3 | | | 79 | | 79 |
| Long-term debt | 23 | 399 [b] | | | 3,397 | 3,796 |
| **Total financial liabilities as at 31 December** | | **441** | **10** | **98** | **4,523** | **5,072** |

a) Other current assets consist of other receivables non trade.
b) Lease liabilities.

The carrying amount of each class of financial assets and liabilities disclosed in the previous tables approximates the fair value. The fair value of each class of financial assets and liabilities, except financial assets and liabilities at amortised cost, is determined by reference to published price quotations and is estimated based on valuation techniques using the quoted market prices. Given the nature of the Group's accounts receivable trade items, the carrying value is considered as equivalent to the fair value.

### 5.2.1  Market Risk
The Group's activities primarily expose it to the financial risks of changes in foreign currency exchange rates, interest rates and commodity prices. The Group enters into a number of derivative financial instruments to manage its exposure to foreign currency risk and interest rate risk, including:

− Currency derivatives, mainly forward foreign exchange contracts, to hedge the exchange rate risk arising from recorded transactions; and

− Interest rate swaps and other instruments to mitigate the risk of interest rate increases and/or to optimally manage interest rate costs depending on the prevailing interest rate environment.

Market risk exposures are measured using sensitivity analysis. There has been no change during the year in the structure of the Group's exposure to market risks or the manner in which these risks are managed.

### 5.2.1.1  Foreign Exchange Risk
The Group operates across the world and is exposed to movements in foreign currencies affecting its net income and financial position. Foreign exchange risk arises from future commercial transactions, recognised assets and liabilities, and net investments in foreign operations.

It is the Group's policy to enter into derivative transactions to hedge current, forecasted foreign currency transactions, and translation risk arising from certain investments in foreign operations with a functional currency different from the Group's presentation currency.

In 2018 the Group applied hedge accounting on the net investment in foreign currency in Naturex SA with the aim of being protected from the foreign currency risk on the translation of the investment in Naturex (i.e. EUR) into the Group's presentation currency (i.e. CHF). In total EUR 1,292 million of Euro straight bonds were designated as hedging instruments, corresponding to the net investment in Naturex. This resulted in a gain of CHF 7 million (2019: CHF 51 million), recognised in currency translation differences in equity in 2020.

In 2019 and 2020 the Group applied hedge accounting on the foreign currency risk related to the Euro straight bonds coupons, and to the acquisitions of Albert Vieille SAS, drom, and the cosmetic business of Indena.

# Notes to the consolidated financial statements

In 2020 the Group also applied hedge accounting on the net investment in foreign currency in Ungerer with the aim of being protected from the foreign currency risk on the translation of the investment in Ungerer (i.e. USD) into the Group's presentation currency (i.e. CHF). The combination of a Eurobond and several cross-currency swaps as one single item are designated as hedging instrument for an amount of USD 544 million corresponding to the foreign currency principal cash flow of the cross-currency swap. In 2020, it resulted in a gain of CHF 51 million recognised in currency translation differences in equity.

The cross-currency swaps designated in the above mentioned hedging relationship have the following characteristics:

| Entity | Issue date | Type of instrument | Notional amount in millions of EUR | Notional amount in millions of USD | Annual USD fixed interest rate (payment) | Annual EUR fixed interest rate (receipt) | Starting date | Maturity date |
|---|---|---|---|---|---|---|---|---|
| **Givaudan SA** | 2020 | Cross-currency swaps | 80 | 87.3 | 2.218% | 1% | 22 Apr 2020 | 22 Apr 2027 |
| | | | 100 | 108.8 | 2.166% | | | |
| | | | 80 | 86.9 | 2.167% | | | |
| | | | 80 | 87.0 | 2.166% | | | |
| | | | 90 | 97.9 | 2.133% | | | |
| | | | 70 | 76.2 | 2.126% | | | |

Furthermore Group Treasury centrally manages foreign exchange risk management activities against the functional currency of each subsidiary, and is required to hedge, whenever cost-effective, their largest exposures.

The measurement of the foreign currency risk expresses the total exposure by currency, which is in the opinion of Group Treasury a representative manner to monitor the risk. It measures the cumulative foreign exchange risk of all subsidiaries of recognised assets and liabilities that are denominated in a currency (e.g. USD) that is not the subsidiary's functional currency (e.g. other than USD).

The following table summarises the significant exposures to the foreign currency risk at the date of the consolidated statement of financial position:

| **Currency exposure 2020** in millions of Swiss francs | USD | EUR | CHF | GBP | SGD |
|---|---|---|---|---|---|
| Currency exposure without hedge [a] | 424 | (774) | 113 | (200) | 109 |
| Hedged amount | (440) | 754 | (108) | 195 | (111) |
| Currency exposure including hedge | (16)[b] | (20) | 5 | (5) | (2) |

| Currency exposure 2019 in millions of Swiss francs | USD | EUR | CHF | GBP | SGD |
|---|---|---|---|---|---|
| Currency exposure without hedge [a] | 477 | (159) | 43 | (149) | 148 |
| Hedged amount | (468) | 83 | (38) | 156 | (162) |
| Currency exposure including hedge | 9[b] | (76) | 5 | 7 | (14) |

a) + long position; - short position.
b) Mainly due to unhedged positions in countries where hedging is not cost-effective.

In the exposure calculations the intra-Group positions, except those related to net investments in foreign operations in Naturex and Ungerer, are included. The Euro straight bonds for the amounts of EUR 1,292 million and USD 544 million, which are both designated as hedging instruments have been excluded respectively from the EUR and USD exposures to align the foreign exchange risk through natural hedging.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

# Notes to the consolidated financial statements

The following table summarises the sensitivity to transactional currency exposures of the main currencies as at 31 December:

| Currency risks 2020<br>in millions of Swiss francs | USD | EUR | CHF | GBP | SGD |
|---|---|---|---|---|---|
| Reasonable shift | 9% | 5% | 6% | 12% | 6% |
| Impact on income statement if the currency strengthens against all other currencies | (1) | (1) | – | (1) | – |
| Impact on income statement if the currency weakens against all other currencies | 1 | 1 | – | 1 | – |

| Currency risks 2019<br>in millions of Swiss francs | USD | EUR | CHF | GBP | SGD |
|---|---|---|---|---|---|
| Reasonable shift | 13% | 6% | 6% | 8% | 6% |
| Impact on income statement if the currency strengthens against all other currencies | 1 | (4) | 1 | 1 | (1) |
| Impact on income statement if the currency weakens against all other currencies | (1) | 4 | (1) | (1) | 1 |

The sensitivity is based on the exposure at the date of the consolidated statement of financial position and based on assumptions deemed reasonable by management, showing the impact on income before tax. Management uses historical volatilities of the significant currencies contributing to the exposure to determine the reasonable change.

Argentina became hyperinflationary effective 1 July 2018, requiring retroactive implementation of hyperinflation accounting as of 1 January 2018. The impact of the restatement of the non-monetary assets and liabilities of the subsidiaries in Argentina with the general price index at the beginning of the period is recorded in the opening equity. In the current year the subsequent loss resulting from the restatement of non-monetary assets of CHF 2 million (2019: CHF 8 million loss) is recorded in other financial income (expense), net.

### 5.2.1.2 Interest Rate Risk
The Group is exposed to interest rate risk because entities in the Group borrow funds at both fixed and floating interest rates, and invest in debt financial instruments. Borrowings issued at variable rates expose the Group to cash flow interest rate risk which is partially counterbalanced by cash held at variable rates. Borrowings issued at fixed rates expose the Group to fair value interest rate risk.

Group Treasury manages interest rate risk centrally by simulating various scenarios on liabilities taking into consideration refinancing, renewal of existing positions and hedging. Hedging strategies are applied by either positioning the liabilities or protecting interest expense through different interest cycles. Hedging activities are regularly evaluated to align interest rate views and define risk limits. Group Treasury manages interest rate risk mainly by the use of interest rate swap contracts.

In response to the announcements made by LIBOR regulators in regard of the transition to new benchmark interest rates to replace LIBOR, the Group has set up an IBOR transition project comprising the following work streams: risk management, tax, treasury, legal, accounting and systems. The aim of the programme is to understand where the business could be impacted by IBOR exposures and prepare and deliver on an action plan to enable a smooth transition to alternative benchmark rates. The Group aims to have its transition and fall back plans in place in 2021.

The following table shows the sensitivity to interest rate changes:

| As at 31 December 2020<br>in millions of Swiss francs | 150 basis points increase | 25 basis points decrease |
|---|---|---|
| Impact on income statement | – | – |
| Impact on equity | 152 | (31) |

| As at 31 December 2019<br>in millions of Swiss francs | 150 basis points increase | 25 basis points decrease |
|---|---|---|
| Impact on income statement | – | – |
| Impact on equity | 126 | (25) |

The sensitivity is based on exposure on net liabilities at the date of the consolidated statement of financial position using assumptions which have been deemed reasonable by management showing the impact on the income before tax.

## Notes to the consolidated financial statements

**Cash flow hedges**

The Group entered into several forward starting interest rate swaps, in order to protect against future increases in interest rates, while also fixing the interest rate on future debt issuance. The transactions have the following characteristics:

| Entity | Issue date | Hedge instrument | Currency of instrument | Notional amount in millions | Annual fixed interest rate (payment) | Floating rate (receipt) | Starting date | Maturity date | Hedge item |
|---|---|---|---|---|---|---|---|---|---|
| Givaudan SA | 2014 | Forward starting interest rate swaps | CHF | 125 | 2.052% | The 3 months CHF Libor rate | 07 Dec 2021 | 07 Dec 2031 | Highly probable debt issuance in 2021 replacing the public bond of CHF 150 million, issued in Dec 2011 with a 10 year maturity |
| | 2015 | | | 100 | 2.345% | | 15 Feb 2024 | 15 Feb 2034 | Highly probable debt issuance in 2024 replacing the public bond of CHF 150 million, issued in Mar 2014 with a 10 year maturity |
| | 2016 | | | 100 | 0.921% | The 6 months CHF Libor rate | 19 Mar 2024 | 19 Mar 2034 | Highly probable debt issuance in 2031 replacing the public bond of CHF 200 million, issued in Dec 2016 with a 15 year maturity |
| | 2017 | | | | | | 05 Dec 2031 | 05 Dec 2041 | |
| | 2018 | | | 25 | 1.275% | | 09 Apr 2025 | 09 Apr 2030 | Highly probable debt issuance in 2025 replacing the public bond of CHF 200 million, issued in Apr 2018 with a 7 year maturity |
| | | | EUR | 100 | 0.967% | | 20 Dec 2024 | 22 Dec 2031 | Highly probable debt issuance in 2024 replacing the private placement of EUR 200 million, issued in Dec 2017 with a 7 year maturity |
| | 2019 | | | 250 | 1.302% | The 6 months EUR Libor rate | 17 Sep 2025 | 17 Sep 2032 | Highly probable debt issuance in 2025 replacing the public bond of EUR 500 million, issued in Sep 2018 with a 7 year maturity |
| | 2020 | | | 350 | 1.200% | | 17 Sep 2030 | 17 Sep 2040 | Highly probable debt issuance in 2030 replacing the public bond of EUR 800 million, issued in Sep 2018 with a 12 year maturity |
| | 2020 | | | 50 | 0.282% | | 22 Apr 2032 | 22 Apr 2042 | Highly probable debt issuance in 2032 replacing the public bond of EUR 500 million, issued in Apr 2020 with a 12 year maturity |

The carrying amount of the total cash flow hedges at 31 December 2020 is CHF 133 million (2019: CHF 97 million). The amount of fair value recognised in other comprehensive income is CHF 58 million (2019: CHF 56 million).

**Hedge positions closed**

The Group closed several financial instruments which had been entered to protect against future increases in interest rate, while also fixing the interest rate on future debt issuance. The corresponding losses which have been recorded in equity will be recycled in the income

# Notes to the consolidated financial statements

statement (Financing costs) over the period of the cash flow initially hedged, although the period of cash flows of the new debts is sometimes different. The transactions have the following characteristics:

| Entity | Inception date | Type of Instrument | Currency of Instrument | Notional amount in millions | Average rate | Fair value of financial instrument at the date of settlement in millions of Swiss francs | Amount recycled in the income statement over the period in millions of Swiss francs | Starting date of recycling through income statement | Maturity Date | Tranche | Assigned to debt |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2012 | Treasury locks | USD | 100 | 1.80% | (1) | - | Feb 2013 | Feb 2023 | 10Y | Private Placements for a total of USD 250 million, respectively USD 40 million redeemable in February 2020 with an annual interest rate of 2.74%, USD 150 million redeemable in February 2023 with an annual interest rate of 3.30% and USD 60 million redeemable in February 2025 with an annual interest rate of 3.45%. |
| | 2012 | | CHF | 75 | 1.63% | (8) | (2) | Dec 2016 | Dec 2021 | 5Y | Public bond for a total of CHF 300 million, respectively CHF 100 million at a rate of 0.000% with 6 year maturity and CHF 200 million at a rate of 0.625% with 15 year maturity. |
| Givaudan SA | 2012 2014 | Forward starting interest rate swaps | CHF | 150 | 1.90% | (15) | (3) | Apr 2018 | Apr 2023 | 5Y | Public bond for a total of CHF 350 million, respectively CHF 150 million at a floating rate with 2 year maturity and CHF 200 million at a rate of 0.375% with 7 year maturity. |
| | June 2018 | | EUR | 400 | 1.05% | (1) (5) | - (1) | Sep 2018 | Sep 2025 Sep 2028 | 7Y 10Y | Dual tranche placement of Euro bond totalling EUR 1,300 million, respectively EUR 500 million at a rate of 1.125% for 7 years and EUR 800 million at a rate of 2.000% for 12 years. |
| | 2014 2015 2018 2019 | | CHF | 125 | 1.40% | (2) (20) | - - | Nov 2020 | Nov 2025 Nov 2028 | 5Y 8Y | Public bond of CHF 150 million at a rate of 0.150% with 8 year maturity. |
| **Total for the year ended 31 December 2020** | | | | | | **(6)** | | | | | |

### 5.2.1.3 Price Risk
The Group is exposed to equity price risk arising from equity investments held classified at fair value through income statement. The Group manages its price risk through a diversification of portfolios within the limits approved by the Board of Directors.

The Group holds its own shares to meet future expected obligations under the various share-based payment schemes.

## Notes to the consolidated financial statements

**Sensitivity analysis**
The Group's equity portfolio is composed of US and EUR shares. The benchmark for the reasonable change is an average of historical volatility of US indexes (16% for the last three years) and of CAC PME index (24% for the last three years).

The sensitivity analysis has been determined based on the exposure to equity price risks at the end of the reporting period:

| **2020**<br>in millions of Swiss francs | Equity price increase | Equity price decrease |
|---|---|---|
| Impact on income statement | 32 | (32) |

| 2019 - 16% USD & 18% EUR<br>in millions of Swiss francs | Equity price increase | Equity price decrease |
|---|---|---|
| Impact on income statement | 26 | (26) |

### 5.2.2  Credit Risk

Credit risk refers to the risk that a counterparty will default on its contractual obligations resulting in a financial loss to the Group. Commercial credit risk is managed by the Group's subsidiaries and monitored on a Group basis whilst counterparty risk related to financial institutions is centrally managed within the Group Treasury function.

Trade receivables are subject to a policy of active risk management which focuses on the assessment of country risk, credit limits, ongoing credit evaluation and account monitoring procedures. Generally, there is no significant concentration of trade receivables or commercial counterparty credit risk, due to the large number of customers that the Group deals with and their wide geographical spread with the exception of one single external customer that generates revenues, mainly attributable to the Fragrance & Beauty Division, of approximately CHF 566 million (2019: CHF 581 million). Countries, credit limits and exposures are continuously monitored.

The credit risk on liquid funds, derivatives and other monetary financial assets is limited because the counterparties are financial institutions with investment grade ratings.

The following table presents the credit risk exposure to individual financial institutions:

| | **2020** | | | 2019 | | |
|---|---|---|---|---|---|---|
| | Total<br>in Mio CHF | Max. with any individual bank<br>in Mio CHF | Number of banks | Total<br>in Mio CHF | Max. with any individual bank<br>in Mio CHF | Number of banks |
| AAA – range | 30 | 30 | 1 | 6 | 6 | 1 |
| AA – range | 16 | 14 | 4 | 6 | 4 | 4 |
| A – range | 104 | 50 | 12 | 136 | 95 | 10 |
| BBB – range | 275 | 155 | 7 | 271 | 132 | 7 |

The carrying amount of financial assets recognised in the consolidated financial statements, which is net of impairment losses, represents the Group's maximum exposure to credit risk.

### 5.2.3  Liquidity Risk

The Group manages liquidity risk by maintaining sufficient cash, marketable securities, availability of funds through an adequate amount of committed credit facilities and the ability to close out market positions. Due to the dynamic nature of the underlying businesses, Group Treasury maintains flexibility in funding by maintaining availability under committed and uncommitted credit lines.

Group Treasury monitors and manages cash at the Group level and defines the maximum cash level at subsidiary level. Cash surpluses held by subsidiaries over and above amounts required for working capital management are transferred to the central treasury centre. The surplus of cash is generally invested in interest bearing current accounts, time deposits, money market deposits and funds. When necessary, intercompany loans are granted by the Group to subsidiaries to meet their non-recurrent payment obligations.

The following table analyses the Group's remaining contractual maturity for financial liabilities and derivative financial instruments. The table has been drawn up based on the undiscounted

## Notes to the consolidated financial statements

cash flows of financial liabilities based on the earliest date on which the Group is obliged to pay. The table includes both interest and principal cash flows:

| 2020<br>in millions of Swiss francs | Up to 6<br>months | 6 – 12<br>months | 1 – 5<br>years | Over 5<br>years | Total |
|---|---|---|---|---|---|
| Short-term debt (excluding bank overdrafts) | (5) | (164) | | | (169) |
| Accounts payable | (809) | | | | (809) |
| Net settled derivative financial instruments | | | (18) | (113) | (131) |
| Gross settled derivative financial instruments – outflows | (1,860) | (700) | | | (2,560) |
| Gross settled derivative financial instruments – inflows | 1,889 | 706 | | | 2,595 |
| Long-term debt | (24) | (28) | (1,787) | (2,477) | (4,316) |
| **Balance as at 31 December** | **(809)** | **(186)** | **(1,805)** | **(2,590)** | **(5,390)** |

| 2019<br>in millions of Swiss francs | Up to 6<br>months | 6 – 12<br>months | 1 – 5<br>years | Over 5<br>years | Total |
|---|---|---|---|---|---|
| Short-term debt (excluding bank overdrafts) | (192) | (101) | | | (293) |
| Accounts payable | (833) | | | | (833) |
| Net settled derivative financial instruments | – | (1) | (19) | (79) | (99) |
| Gross settled derivative financial instruments – outflows | (2,143) | (429) | | | (2,572) |
| Gross settled derivative financial instruments – inflows | 2,155 | 431 | | | 2,586 |
| Long-term debt | (15) | (33) | (1,709) | (1,993) | (3,750) |
| **Balance as at 31 December** | **(1,028)** | **(133)** | **(1,728)** | **(2,072)** | **(4,961)** |

The undiscounted cash flows related to lease liabilities are CHF 52 million (2019: CHF 47 million) within 1 year, CHF 146 million (2019: CHF 92 million) within 1 to 5 years and CHF 261 million (2019: CHF 357 million) thereafter.

### 5.3 Fair Value Measurements

The following tables present the Group's assets and liabilities that are measured subsequent to initial recognition at fair value, grouped into levels 1 to 3 based on the degree to which the fair value is measured:

– **Level 1** inputs to measure fair value are those derived from quoted prices (unadjusted) in active markets for identical assets or liabilities;

– **Level 2** inputs to measure fair value are those derived from inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly (i.e. as prices) or indirectly (i.e. derived from prices); and

– **Level 3** inputs to measure fair value are those derived from valuation techniques that include inputs for the asset or liability that are not based on observable market data (unobservable inputs).

| 2020<br>in millions of Swiss francs | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Financial assets at fair value through income statement** | | | | |
| Forward foreign exchange contracts | | 54 | | 54 |
| Swaps (hedge accounting) | | 65 | | 65 |
| Corporate owned life insurance | | 37 | | 37 |
| Equity securities | 109 | 17 | 4 | 130 |
| Debt securities | | 17 | | 17 |
| **Total assets** | **109** | **190** | **4** | **303** |
| **Financial liabilities at fair value through income statement** | | | | |
| Forward foreign exchange contracts | | 19 | | 19 |
| Swaps (hedge accounting) | | 133 | | 133 |
| **Total liabilities** | | **152** | | **152** |

| 2019<br>in millions of Swiss francs | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Financial assets at fair value through income statement** | | | | |
| Forward foreign exchange contracts | | 24 | | 24 |
| Swaps (hedge accounting) | | 1 | | 1 |
| Corporate owned life insurance | | 36 | | 36 |
| Equity securities | 112 | 16 | | 128 |
| Debt securities | | 17 | | 17 |
| **Total assets** | **112** | **94** | | **206** |
| **Financial liabilities at fair value through income statement** | | | | |
| Forward foreign exchange contracts | | 10 | | 10 |
| Swaps (hedge accounting) | | 98 | | 98 |
| Swaps (no hedge accounting) | | – | | – |
| **Total liabilities** | | **108** | | **108** |

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

# Notes to the consolidated financial statements

Governance
report

Compensation
report

Consolidated
financial report

Statutory financial
report

Appendix

Financial assets and liabilities at fair value through income statement are measured with Level 1, Level 2 and Level 3 inputs. Level 1 financial assets consist of marketable securities quoted on financial market. Level 2 financial assets and liabilities consist of cross-currency swaps and forward foreign exchange contracts that are measured using quoted forward exchange rates and yield curves derived from quoted interest rates matching maturities of the contracts, of interest swaps that are measured using quoted interest rates and yield curves derived from quoted interest rates matching maturities of the contracts, and of corporate owned life insurance (COLI) that are measured on quoted instruments with similar credit ratings and terms in a mix of money market, fixed income and equity funds managed by unrelated fund managers. Level 3 financial assets consist of investment funds in venture capital that are measured quarterly by an independent third parties using proprietary valuation models which are audited by qualified authorities.

The carrying amount of each class of financial assets and liabilities disclosed above approximates their fair value. There was no transfer between the level categories in the period.

## 6. Acquisitions
### Acquisitions 2020
During the year 2020 Givaudan made three acquisitions, Ungerer, the cosmetics business of Indena and Alderys.

### Ungerer
On 20 February 2020 Givaudan acquired 100% of the share capital of Ungerer and its affiliates for a purchase price of CHF 676 million (USD 688 million). Headquartered in New Jersey, USA, Ungerer is a leading independent company in the flavour and fragrance specialty ingredients business, most notably in essential oils, which provides a rich palette of predominantly natural ingredients for flavour and fragrance creation, as well as for end customers of such specialties. Ungerer also has an impressive local and regional customer presence for both flavours and fragrances in North America. Founded more than 125 years ago, Ungerer has developed a strong market position in all segments and a high quality reputation with its customer base. With a presence in more than 60 countries, a total of eight manufacturing facilities and six R&D centres, Ungerer's capabilities and its 650 employees will further extend Givaudan's market leadership in its core flavour and fragrance activities. As from 1 February 2020 the acquisition contributed CHF 190 million of sales and a net profit of CHF 10 million to the Group's consolidated results.

The identifiable assets and liabilities of Ungerer acquired are recorded at fair value at the date of acquisition and are as follows:

| in millions of Swiss francs | | Fair value |
|---|---|---|
| Cash and Cash equivalents | | 94 |
| Accounts receivable | | 36 |
| Inventories | | 78 |
| Other current assets | | 10 |
| Property, plant and equipment | | 36 |
| - Client relationships | 213 | |
| - Process-oriented technology and other | 73 | |
| - Name and product brands | 10 | |
| - Software / ERP system | 1 | |
| Total identified intangible assets | | 297 |
| Accounts payable | | (4) |
| Other payables | | (67) |
| Provisions | | (7) |
| Debt | | (7) |
| Deferred tax liabilities | | (63) |
| **Net assets acquired** | | **403** |
| Cash consideration | | 676 |
| **Goodwill** | | **273** |

The goodwill of CHF 273 million arising on the acquisition relates mainly to the value of the qualified workforce and expected synergies that do not meet the criteria for recognition as separable intangible assets. The goodwill is allocated partly to the Taste & Wellbeing division and partly to the Fragrance & Beauty division for the amounts of CHF 191 million and CHF 82 million respectively. The total amount of goodwill that is expected to be deductible for tax purposes is nil.

The acquired receivables are fair valued at CHF 36 million. The gross contractual amounts of the receivables acquired are CHF 37 million. The best estimation at the acquisition date of the contractual cash flows not to be collected amounts to CHF 1 million.

## Notes to the consolidated financial statements

In compliance with IFRS 3, the fair values determined are provisional and the Group has twelve months from the date of acquisition to finalise the allocation of the acquisition price.

### Indena

On 29 May 2020 Givaudan acquired the cosmetics business of Indena for a purchase price of CHF 32 million (EUR 30 million). Headquartered in Milan, Italy, Indena is a world leading company dedicated to the identification, development and production of high quality active ingredients derived from plants, for use in the pharmaceutical, health-food and personal care industries. With almost a century of botanical experience, Indena has developed an extensive breadth of expertise in this field, while ensuring bio-diversity and protecting the ecosystem from uncontrolled harvesting. From 29 May 2020, the acquisition has contributed CHF 3 million of sales to the Group's consolidated results.

The identifiable assets and liabilities of the cosmetics business of Indena acquired are recorded at fair value at the date of acquisition and CHF 21 million goodwill has been recognised. The goodwill arising on the acquisition relates mainly to the value of the qualified workforce and expected synergies that do not meet the criteria for recognition as separable intangible assets. In compliance with IFRS 3, these values determined are provisional and the Group has twelve months from the date of acquisition to finalise the allocation of the acquisition price.

### Alderys

On 3 August 2020 Givaudan acquired 80% of the share capital of Alderys SAS for a purchase price of CHF 23 million (EUR 21 million). Founded in 2009, Alderys is an innovative French biotechnology company headquartered in Orsay, France, employing 30 employees. Alderys develops innovative approaches to the biological engineering of valuable compounds from renewable feedstock. The projects developed by Alderys are aimed at the chemical and cosmetic industry sectors as well as nutrition. They are recognised for offering innovative technological industrial solutions with high sustainability standards. From 3 August 2020, the acquisition has generated CHF 0.8 million other operating income to the Group's consolidated results.

The identifiable assets and liabilities of the cosmetics business of Alderys acquired are recorded at fair value at the date of acquisition and CHF 10 million goodwill has been recognised. The goodwill arising on the acquisition relates mainly to the value of the qualified workforce and expected synergies that do not meet the criteria for recognition as separable intangible assets. In compliance with IFRS 3, these values determined are provisional and the Group has twelve months from the date of acquisition to finalise the allocation of the acquisition price.

### Acquisitions 2019

During the year 2019 Givaudan made five acquisitions, AMSilk, Albert Vieille, Fragrance Oils, Golden Frog and drom.

### AMSilk

On 25 April 2019 Givaudan acquired the cosmetics business of AMSilk GmbH for a purchase price of CHF 7 million. AMSilk is the world's first industrial supplier of vegan silk biopolymers and has its headquarters near Munich, Germany. AMSilk offers a range of high-performance biosourced polypeptides with unique functional properties in the field of cosmetics. These vegan biopolymers offer a broad range of applications across categories such as hair care and skin care with benefits like silk touch, anti-pollution or colour protection of the hair. Over the last 9 years, they have filed 10 patents for the use of biopolymers in cosmetic applications.

The identifiable assets and liabilities of the cosmetics business of AMSilk acquired are recorded at fair value at the date of acquisition and no goodwill has been recognised. The allocation of the acquisition price has been finalised and no adjustments were made to the acquisition values.

### Albert Vieille

On 3 May 2019 Givaudan acquired 100% of the share capital of Albert Vieille SAS and its affiliates for a purchase price of CHF 54 million. Albert Vieille has unique know-how in the realm of aromatic plants and specialises in 100% pure essential oils and speciality natural ingredients. The natural ingredients are used for the formulation of perfumes and aromatherapy products. With its origins dating back to 1920, and with more than 60 employees, Albert Vieille is based close to Grasse, in France, and has a manufacturing facility in Spain, with its products sold globally through a network of distributors. They source their raw materials across the world, where fragrant crops are harvested and have developed over many years strong capabilities in natural ingredients sourcing and processing.

The goodwill of CHF 27 million arising on the acquisition relates mainly to the value of the qualified workforce and expected synergies that do not meet the criteria for recognition as separable intangible assets. The identifiable assets and liabilities of Albert Vieille acquired are recorded at fair value at the date of acquisition. The allocation of the acquisition price has been finalised and no adjustments were made to the acquisition values.

# Notes to the consolidated financial statements

**Fragrance Oils**

On 21 August 2019 Givaudan acquired 100% of the share capital of Fragrance Oils Limited and its affiliates for a purchase price of CHF 244 million. Founded in 1967, Fragrance Oils is a leading British-based manufacturer and marketer of innovative speciality fragrances for fine fragrances, personal and home care applications. Their state-of-the-art manufacturing facility in Radcliffe, UK, employs over 250 employees and sells its products in more than 90 countries, in particular in high growth markets.

The identifiable assets and liabilities of Fragrance Oils acquired are recorded at fair value at the date of acquisition. Total net assets acquired of CHF 139 million consist of cash (CHF 25 million), working capital (CHF 21 million), fixed assets (CHF 24 million), intangible assets which are comprised of process knowledge, client relationships and brand name (CHF 91 million), deferred tax liabilities (CHF 17 million) and other liabilities (CHF 5 million). The total purchase price of CHF 244 million was settled in cash, resulting in goodwill of CHF 105 million which relates mainly to the value of the qualified workforce and expected synergies that do not meet the criteria for recognition as separable intangible assets.

The allocation of the acquisition price has been finalised and no adjustments were made to the acquisition values.

**Golden Frog**

On 30 August 2019 Givaudan acquired 100% of the share capital of Golden Frog Flavor-Fragrance Manufacture Corporation, a Vietnamese flavour company, for a purchase price of CHF 30 million. Golden Frog manufactures natural flavours, extracts and essential oils for the food and beverage industry. It offers a wide range of natural ingredients including herbs, spices, fruit and vegetable extracts and essential oils from the great biodiversity of Vietnam. With headquarters and manufacturing facilities in the Ho Chi Minh area, Golden Frog employs 156 people and caters to the needs of the South East Asian markets.

The goodwill of CHF 11 million arising on the acquisition relates mainly to the value of the qualified workforce and expected synergies that do not meet the criteria for recognition as separable intangible assets. The identifiable assets and liabilities of Golden Frog acquired are recorded at fair value at the date of acquisition. The allocation of the acquisition price has been finalised and no adjustments were made to the acquisition values.

**drom**

On 6 September 2019 Givaudan acquired 100% of the share capital of drom fragrances GmbH & Co. KG and its affiliates for a purchase price of CHF 180 million. Founded in 1911, drom is a global perfume house creating fragrances for consumer products  and fine fragrance customers across the world. Headquartered near Munich, in Germany, drom has manufacturing facilities in Germany, China, the USA and Brazil. The company employs 489 people globally.

The identifiable assets and liabilities of drom acquired are recorded at fair value at the date of acquisition. Total net assets acquired of CHF 98 million consist of cash (CHF 11 million), working capital (CHF 40 million), fixed assets (CHF 28 million), intangible assets which are comprised of process knowledge, client relationships and brand name (CHF 98 million), deferred tax liabilities (CHF 27 million), short-term loans (CHF 25 million) and other liabilities (CHF 27 million). The total purchase price of CHF 180 million was settled in cash, resulting in goodwill of CHF 82 million which relates mainly to the value of the qualified workforce and expected synergies that do not meet the criteria for recognition as separable intangible assets.

The allocation of the acquisition price has been finalised and no adjustments were made to the acquisition values.

## 7.  Segment Information

Management has determined the operating segments based on the reports reviewed by the Executive Committee that are used to allocate resources to the segments and to assess their performance. The Executive Committee considers the business from a divisional perspective:

**Fragrance & Beauty**     Manufacture and sale of fragrance and beauty products into three global business units: Fine Fragrances, Consumer Products and, Fragrance Ingredients and Active Beauty. Expressions Parfumées and Fragrance Oils are both included in Fine Fragrances and Consumer Products; and

**Taste & Wellbeing**     Manufacture and sale of flavour and wellbeing products into five business units: Beverages, Dairy, Savoury, Sweet Goods and Natural Ingredients. The information of these business units are reviewed by the Executive Committee primarily by region.

## Notes to the consolidated financial statements

The performance of the operating segments is based on EBITDA as a percentage of sales.

### Business segments

| in millions of Swiss francs | Note | Fragrance & Beauty 2020 | Fragrance & Beauty 2019 | Taste & Wellbeing 2020 | Taste & Wellbeing 2019 | Group 2020 | Group 2019 |
|---|---|---|---|---|---|---|---|
| Segment sales | | 2,924 | 2,799 | 3,398 | 3,410 | 6,322 | 6,209 |
| Less inter segment sales [a] | | – | – | – | (6) | – | (6) |
| **Segment sales to third parties** | | **2,924** | **2,799** | **3,398** | **3,404** | **6,322** | **6,203** |
| **EBITDA** | | **677** | **555** | **720** | **720** | **1,397** | **1,275** |
| as % of sales | | 23.2% | 19.8% | 21.2% | 21.1% | 22.1% | 20.6% |
| Depreciation | 21 | (77) | (73) | (124) | (120) | (201) | (193) |
| Amortisation | 22 | (64) | (49) | (123) | (112) | (187) | (161) |
| Impairment of long-lived assets | 21, 22 | | – | (13) | (1) | (13) | (1) |
| Additions to Property, plant and equipment | 21 | 89 | 160 | 104 | 330 | 193 | 490 |
| Acquisitions of Property, plant and equipment | 6, 21 | 16 | 59 | 24 | 5 | 40 | 64 |
| Additions to Intangible assets | 22 | 22 | 27 | 23 | 26 | 45 | 53 |
| Acquisitions of Intangible assets (excluding goodwill) | 6, 22 | 50 | 210 | 272 | 13 | 322 | 223 |
| **Total gross investments** | | **177** | **456** | **423** | **374** | **600** | **830** |

a) Transfer prices for inter-divisional sales are set on an arm's length basis.

The amounts by division provided to the Executive Committee are measured in a consistent manner in terms of accounting policies with the consolidated financial statements.

### Reconciliation table to Group's operating income

| in millions of Swiss francs | Fragrance & Beauty 2020 | Fragrance & Beauty 2019 | Taste & Wellbeing 2020 | Taste & Wellbeing 2019 | Group 2020 | Group 2019 |
|---|---|---|---|---|---|---|
| **EBITDA** | **677** | 555 | **720** | 720 | **1,397** | 1,275 |
| Depreciation | (77) | (73) | (124) | (120) | (201) | (193) |
| Amortisation | (64) | (49) | (123) | (112) | (187) | (161) |
| Impairment of long-lived assets | – | – | (13) | (1) | (13) | (1) |
| **Operating income** | **536** | **433** | **460** | **487** | **996** | **920** |
| as % of sales | 18.4% | 15.5% | 13.5% | 14.3% | 15.8% | 14.8% |
| Financing costs | | | | | (86) | (79) |
| Other financial income (expense), net | | | | | (34) | (33) |
| **Income before taxes** | | | | | **876** | **808** |
| as % of sales | | | | | 13.9% | 13.0% |

### Entity-wide disclosures
The breakdown of sales from the major group of similar products is as follows:

| in millions of Swiss francs | 2020 | 2019 |
|---|---|---|
| **Fragrance & Beauty** | | |
| Compounds | 2,529 | 2,427 |
| Ingredients and Active Beauty | 395 | 372 |
| **Taste & Wellbeing** | | |
| Compounds | 3,398 | 3,404 |
| **Total sales** | **6,322** | **6,203** |

# Notes to the consolidated financial statements

The Group operates in a number of geographical areas: Switzerland (country of domicile); Europe, Africa and Middle-East; North America; Latin America; and Asia Pacific.

| in millions of Swiss francs | Fragrance & Beauty Segment sales [a] | | Taste & Wellbeing Segment sales [a] | | Group Segment sales [a] | | Group Non-current assets [b] | |
|---|---|---|---|---|---|---|---|---|
| | **2020** | 2019 | **2020** | 2019 | **2020** | 2019 | **2020** | 2019 |
| Switzerland | 35 | 34 | 33 | 26 | 68 | 60 | 1,496 | 1,546 |
| Europe | 882 | 859 | 833 | 841 | 1,715 | 1,700 | 2,453 | 2,470 |
| Africa and Middle-East | 255 | 226 | 240 | 247 | 495 | 473 | 81 | 92 |
| North America | 618 | 559 | 1,150 | 1,082 | 1,768 | 1,641 | 1,720 | 1,409 |
| Latin America | 359 | 346 | 315 | 353 | 674 | 699 | 211 | 251 |
| Asia Pacific | 775 | 775 | 827 | 855 | 1,602 | 1,630 | 839 | 878 |
| **Total geographical segments** | **2,924** | **2,799** | **3,398** | **3,404** | **6,322** | **6,203** | **6,800** | **6,646** |

a) Segment sales are revenues from external customers and are shown by destination.
b) Non-current assets other than financial instruments, deferred tax assets, post-employment benefit assets.
   They consist of property, plant and equipment, intangible assets and investments in jointly controlled entities.

Revenues of approximately CHF 566 million (2019: CHF 581 million) are derived from a single external customer. These revenues are mainly attributable to the Fragrance & Beauty Division.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

## Notes to the consolidated financial statements

### 8. Employee Benefits

The following amounts related to employee remuneration and benefits are included in determining operating income:

| in millions of Swiss francs | 2020 | 2019 |
|---|---|---|
| Wages and salaries | 1,085 | 1,019 |
| Social security costs | 164 | 156 |
| Post-employment benefits: defined benefit plans | 49 | 38 |
| Post-employment benefits: defined contribution plans | 37 | 37 |
| Equity-settled instruments | 54 | 41 |
| Change in fair value on own equity instruments | | 2 |
| Other employee benefits | 104 | 112 |
| **Total employees' remuneration** | **1,493** | **1,405** |

### Retirement Benefit Plans

The Group operates a number of defined benefit and defined contribution plans throughout the world, the assets of which are generally held in separate trustee-administered funds. The pension plans are generally funded by payments from employees and by the relevant Group companies, taking account of the recommendations of independent qualified actuaries. The most significant plans are held in Switzerland, United States of America and United Kingdom (further information by country is disclosed at the end of this note).

Non-pension plans consist primarily of post-retirement healthcare and life insurance schemes, principally in the United States of America.

The amounts recognised in the consolidated income statement are as follows:

| | 2020 | | | 2019 | | |
|---|---|---|---|---|---|---|
| in millions of Swiss francs | Pension Plans | Non-pension Plans | Total | Pension Plans | Non-pension Plans | Total |
| Current service cost | 45 | 1 | 46 | 37 | 1 | 38 |
| Loss (gain) arising from settlement | 3 | | 3 | | | |
| **Total included in employees' remuneration** | **48** | **1** | **49** | **37** | **1** | **38** |
| Net interest cost included in financing costs | 4 | 2 | 6 | 7 | 2 | 9 |
| **Total components of defined benefit cost** | **52** | **3** | **55** | **44** | **3** | **47** |
| **Of which arising from:** | | | | | | |
| Funded obligations | 48 | 3 | 51 | 40 | 3 | 43 |
| Unfunded obligations | 4 | – | 4 | 4 | – | 4 |

The amounts recognised in other comprehensive income are as follows:

| | 2020 | | | 2019 | | |
|---|---|---|---|---|---|---|
| in millions of Swiss francs | Pension Plans | Non-pension Plans | Total | Pension Plans | Non-pension Plans | Total |
| (Gains) losses from change in demographic assumptions | (11) | | (11) | (7) | 3 | (4) |
| (Gains) losses from change in financial assumptions | 128 | 5 | 133 | 262 | 5 | 267 |
| Experience (gains) losses | 23 | (2) | 21 | – | (5) | (5) |
| Return on plan assets less interest on plan assets | (189) | | (189) | (167) | | (167) |
| **Remeasurement (gains) losses of post-employment benefit obligations** | **(49)** | **3** | **(46)** | **88** | **3** | **91** |
| **Of which arising from:** | | | | | | |
| Funded obligations | (54) | 3 | (51) | 78 | 2 | 80 |
| Unfunded obligations | 5 | | 5 | 10 | 1 | 11 |

## Notes to the consolidated financial statements

The amounts recognised in the statement of financial position are as follows:

| | 2020 | | | 2019 | | |
|---|---|---|---|---|---|---|
| in millions of Swiss francs | Pension Plans | Non-pension Plans | Total | Pension Plans | Non-pension Plans | Total |
| **Funded obligations** | | | | | | |
| Present value of funded obligations | (2,301) | (63) | (2,364) | (2,206) | (61) | (2,267) |
| Fair value of plan assets | 1,917 | | 1,917 | 1,783 | – | 1,783 |
| **Recognised asset (liability) for funded obligations, net** | **(384)** | **(63)** | **(447)** | **(423)** | **(61)** | **(484)** |
| **Unfunded obligations** | | | | | | |
| Present value of unfunded obligations | (80) | (3) | (83) | (84) | (8) | (92) |
| **Recognised asset (liability) for unfunded obligations** | **(80)** | **(3)** | **(83)** | **(84)** | **(8)** | **(92)** |
| **Total defined benefit asset (liability)** | **(464)** | **(66)** | **(530)** | **(507)** | **(69)** | **(576)** |
| Deficit recognised as liabilities for post-employment benefits | (484) | (66) | (550) | (539) | (69) | (608) |
| Surplus recognised as assets for post-employment benefits | 20 | | 20 | 32 | | 32 |
| **Total net asset (liability) recognised** | **(464)** | **(66)** | **(530)** | **(507)** | **(69)** | **(576)** |

Amounts recognised in the statement of financial position for post-employment defined benefit plans are predominantly non-current. The non-current portion is reported as non-current assets and non-current liabilities. The current portion is reported as current liabilities within other current liabilities.

Changes in the present value of the defined benefit obligations are as follows:

| | 2020 | | | 2019 | | |
|---|---|---|---|---|---|---|
| in millions of Swiss francs | Pension Plans | Non-pension Plans | Total | Pension Plans | Non-pension Plans | Total |
| **Balance as at 1 January** | **2,290** | **69** | **2,359** | **2,029** | **64** | **2,093** |
| **Amounts recognised in the income statement** | | | | | | |
| Current service cost | 45 | 1 | 46 | 37 | 1 | 38 |
| Interest cost | 25 | 2 | 27 | 39 | 2 | 41 |
| **Amounts recognised in the other comprehensive income** | | | | | | |
| (Gains) losses from change in demographic assumptions | (11) | | (11) | (7) | 3 | (4) |
| (Gains) losses from change in financial assumptions | 128 | 5 | 133 | 262 | 5 | 267 |
| Experience (gains) losses | 23 | (2) | 21 | | (5) | (5) |
| Employee contributions | 14 | | 14 | 14 | – | 14 |
| Benefit payments | (77) | (3) | (80) | (82) | (3) | (85) |
| Settlements | (9) | | (9) | | | |
| Acquisitions | 3 | | 3 | 8 | | 8 |
| Currency translation effects | (50) | (6) | (56) | (10) | 2 | (8) |
| **Balance as at 31 December** | **2,381** | **66** | **2,447** | **2,290** | **69** | **2,359** |

## Notes to the consolidated financial statements

Changes in the fair value of the plan assets are as follows:

| in millions of Swiss francs | 2020 | | | 2019 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Pension Plans | Non-pension Plans | Total | Pension Plans | Non-pension Plans | Total |
| **Balance as at 1 January** | **1,783** | | **1,783** | **1,618** | | **1,618** |
| **Amounts recognised in the income statement** | | | | | | |
| Interest income | 21 | | 21 | 32 | | 32 |
| **Amounts recognised in the other comprehensive income** | | | | | | |
| Return on plan assets less interest on plan assets | 189 | | 189 | 167 | | 167 |
| Employer contributions | 37 | 3 | 40 | 34 | 3 | 37 |
| Employee contributions | 14 | | 14 | 14 | – | 14 |
| Benefit payments | (77) | (3) | (80) | (82) | (3) | (85) |
| Settlements | (12) | | (12) | | | |
| Acquisitions | 2 | | 2 | 1 | | 1 |
| Currency translation effects | (40) | – | (40) | (1) | – | (1) |
| **Balance as at 31 December** | **1,917** | **–** | **1,917** | **1,783** | | **1,783** |

Plan assets are comprised as follows:

| in millions of Swiss francs | | 2020 | | 2019 |
| --- | --- | --- | --- | --- |
| Debt | 568 | 30% | 560 | 31% |
| Equity | 326 | 17% | 309 | 17% |
| Property | 335 | 17% | 245 | 14% |
| Insurances policies and other | 688 | 36% | 669 | 38% |
| **Total** | **1,917** | **100%** | **1,783** | **100%** |

The investment strategies are diversified within the respective statutory requirements of each country providing long-term returns with an acceptable level of risk. The plan assets are primarily quoted in an active market with exception of the property and insurance policies.

The plan assets do not include Givaudan registered shares. They do not include any property occupied by, or other assets used by, the Group.

The Group operates defined benefit plans in many countries for which the actuarial assumptions vary based on local economic and social conditions. The assumptions used in the actuarial valuations of the most significant defined benefit plans, in countries with stable currencies and interest rates, are as follows:

| Weighted percentage | 2020 | 2019 |
| --- | --- | --- |
| Discount rates | 0.9% | 1.2% |
| Projected rates of remuneration growth | 1.1% | 1.2% |
| Future pension increases | 0.5% | 0.5% |
| Healthcare cost trend rate | 0.1% | 1.1% |

The overall discount rate and the overall projected rates of remuneration growth are calculated by weighting the individual rates in accordance with the defined benefit obligation of the plans.

### Sensitivity analysis
The defined benefit obligations are calculated on the basis of various financial and demographic assumptions. The below information quantifies the consequences of a change in some key assumptions.

The effects ((gain)/loss) of the change in assumptions are as follows:

| in millions of Swiss francs | Change in assumption | Effects of the change | Increase in assumption | Decrease in assumption |
| --- | --- | --- | --- | --- |
| Discount rate [a] | 0.5% | on the current service cost | (6) | 8 |
| | | on the defined benefit obligation | (196) | 219 |
| Salary increases | 0.5% | on the current service cost | 2 | (2) |
| | | on the defined benefit obligation | 13 | (13) |
| Pension increases | 0.5% | on the current service cost | 5 | – |
| | | on the defined benefit obligation | 156 | (41) |
| Medical cost trend | 1.0% | on the current service cost | – | – |
| | | on the defined benefit obligation | 3 | (3) |
| Life expectancy | 1 year | on the current service cost | 1 | (1) |
| | | on the defined benefit obligation | 79 | (80) |

a) The pension plan fiduciaries or trustees, as each situation dictates, may use various strategies which employ financial instruments to mitigate the impact of changes in the discount rate assumptions on the actual pension plan liabilities through corresponding changes in the plan assets. For the year end 2020, and considering the illustrative impact of changes in discount rates on the defined benefit obligation shown above, the use of these strategies is estimated to result in offsetting changes in the value of the assets between minus CHF 84 million and plus CHF 91 million for a plus and minus 50 basis point change in interest rates respectively.

## Notes to the consolidated financial statements

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

### Information by country
#### Switzerland
According to the Swiss Federal Law on Occupational Retirement, Survivors and Disability (LPP/BVG), the pension plan is managed by an independent, legally autonomous entity which has the legal structure of a foundation. The plan was amended during the second half of 2017 principally by reducing the conversion rate used to convert the retirement savings capital into a pension and by increasing savings contributions from both the employee and employer.

The Board of Trustees of the foundation is composed of equal numbers of employee and employer representatives. Each year the Board of Trustees decides the level of interest, if any, to apply to the retirement accounts in accordance with the pension policy. It is also responsible for the investment of the assets defining the investment strategy for long-term returns with an acceptable level of risk. The foundation provides benefits on a defined contribution basis.

The majority of the employees are participants to the plan and are insured against the financial consequences of old age, disability and death. The employer and employees pay contributions to the pension plan at rates set out in the foundation rules based on a percentage of salary. The amount of the retirement account can be taken by the employee at retirement in the form of pension or capital.

Under IAS 19 employee benefits, the pension plan is classified as defined benefit plan due to the promises and underlying benefits guarantees. Consequently the pension obligation is calculated by using the projected unit credit method.

The Group expects to contribute CHF 27 million to these plans during 2021.

#### United States of America
The main US pension plan is qualified under and is managed in accordance with the requirements of US federal law. In accordance with federal law the assets of the plan are legally separate from the employer and are held in a pension trust. The plan was frozen in 2016 and consequently no further accrual of benefits will continue as at the date of enforcement of the plan change.

The law requires minimum and maximum amounts that can be contributed to the trust, together with limitations on the amount of benefits that may be provided under the plan. There are named fiduciaries that are responsible for ensuring the plan is managed in accordance with the law. The fiduciaries are responsible for the investment of the assets

defining the investment strategy for long-term returns with an acceptable level of risk. The plan provides benefits on a defined benefit basis.

The accrued benefits based on service to the plan freeze are payable at retirement and on death in service. With exceptions for optional lump sum amounts for certain sections of the plan, the benefits are paid out as annuities.

Under IAS 19 employee benefits, the pension obligations are calculated by using the projected unit credit method.

The Group expects to contribute CHF 5 million to these plans during 2021.

#### United Kingdom
The two occupational pension schemes (Quest UK Pension Scheme and Givaudan UK Pension Plan) are arranged under the applicable UK Pension Schemes and Pensions Acts and managed as legally autonomous pension trusts by the Boards of Trustees. The plans were frozen during 2016 and consequently no further accrual benefits will continue as at the date of enforcement of the plan change.

The Boards of Trustees are composed of two employee representatives and four employer representatives, for the Quest UK Pension Scheme, and three employee representatives, three employer representatives plus two pensioner representatives for the Givaudan UK Pension Plan. The Boards of Trustees are responsible for the investment of the assets defining the investment strategy for long-term returns with an acceptable level of risk. In their respective sections, both trusts provide benefits on a defined benefit basis and are now frozen to future accruals and members.

The accrued benefits based on service to the plan freeze are payable at retirement and on death in service. With exceptions for trivial amounts, transfer values, lump sum death benefits and tax free lump sums, the benefits are paid out as annuities.

Under IAS 19 employee benefits, the pension obligations in the defined benefit sections of both the Quest UK Pension Scheme and the Givaudan UK Pension Plan are calculated by using the projected unit credit method.

The Group expects to contribute CHF 8 million to these plans during 2021.

## Notes to the consolidated financial statements

### Rest of the world

The Group operates other retirement plans classified either as defined benefit or defined contribution plans in some other countries. No individual plan other than those described above is considered material to the Group.

The Group expects to contribute CHF 3 million to these plans in 2021.

The funding position of the funded defined benefit plans are as follows:

| As at 31 December 2020 in millions of Swiss francs | Switzerland | United States of America | United Kingdom | Other countries | Total |
|---|---|---|---|---|---|
| Present value of defined benefit obligation | 1,376 | 458 | 369 | 98 | 2,301 |
| Fair value of plan asset | 1,089 | 398 | 388 | 42 | 1,917 |
| **Deficit / (surplus)** | **287** | **60** | **(19)** | **56** | **384** |
| Funding ratio | 79.1% | 86.9% | 105.1% | 42.9% | 83.3% |

| As at 31 December 2019 in millions of Swiss francs | Switzerland | United States of America | United Kingdom | Other countries | Total |
|---|---|---|---|---|---|
| Present value of defined benefit obligation | 1,306 | 450 | 361 | 89 | 2,206 |
| Fair value of plan asset | 957 | 393 | 392 | 41 | 1,783 |
| **Deficit / (surplus)** | **349** | **57** | **(31)** | **48** | **423** |
| Funding ratio | 73.3% | 87.3% | 108.6% | 46.1% | 80.8% |

### Key assumptions

| 2020 in percentage | Switzerland | United States of America | United Kingdom |
|---|---|---|---|
| Discount rate | 0.00 | 2.55 | 1.40 |
| Future salary increases | 1.75 | n/a | n/a |
| Future pension increases | 0.00 | 0.00 | 2.83 |
| Future average life expectancy for a pensioner retiring at age 65 | 22.9 | 21.9 | 22.7 |

| 2019 in percentage | Switzerland | United States of America | United Kingdom |
|---|---|---|---|
| Discount rate | 0.15 | 3.22 | 2.00 |
| Future salary increases | 1.99 | n/a | n/a |
| Future pension increases | 0.00 | 0.00 | 2.74 |
| Future average life expectancy for a pensioner retiring at age 65 | 22.8 | 21.2 | 23.3 |

Assumptions regarding future mortality experience are set based on actuarial advice in accordance with published statistics and experience in each territory. Mortality assumptions for the most important countries at year-end 2020 are based on the following tables:
– Switzerland: BVG2015
– United States of America: Pri-2012
– United Kingdom: S3PA

Allowance for future improvements in mortality have been allowed for as appropriate in each country. In Switzerland the generational rates have been used adopting the CMI (2016) approach and a 1.50% long term rate of improvement. In the United States of America the published rates have been adjusted and projected in accordance with the MP2020 scale. In the United Kingdom the rates reflect the latest (2019) CMI projections with a 1.25% long term rate of improvement.

## Notes to the consolidated financial statements

### 9.  Share-Based Payments
#### Performance share plan
Performance shares are granted on a yearly basis. The performance shares are converted into tradable and transferable shares of Givaudan SA after the vesting period, subject to performance conditions. The performance metric is a combination of the average sales growth of selected peer companies and the cumulative free cash flow margin. There is no market vesting condition involved and participation in this plan is mandatory.

| Year of grant | Commencing date | Vesting date | Number of shares expected to be delivered at vesting date | Fair value at grant date (CHF) |
|---|---|---|---|---|
| 2018 | 31 Mar 2018 | 15 Apr 2021 | 25,325 | 1,993.3 |
| 2019 | 31 Mar 2019 | 15 Apr 2022 | 19,823 | 2,289.6 |
| 2020 | 31 Mar 2020 | 15 Apr 2023 | 15,054 | 2,794.5 |

The cost of the equity-settled instruments of CHF 52 million (2019: CHF 40 million) has been expensed in the consolidated income statement. A marginal portion of the number of shares expected to be delivered can be settled in cash in the jurisdictions where a physical delivery is not permitted.

#### Equity-settled instruments related to restricted shares
Restricted shares shown in the table below have been granted on a yearly basis. These shares are tradable and transferable after the vesting period. Participation in these plans is mandatory.

Restricted shares outstanding at the end of the year have the following terms:

| Year of grant | Commencing date | Blocking period of restricted shares ends on | Restricted share at grant date (CHF) | **Number of restricted shares 2020** | Number of restricted shares 2019 |
|---|---|---|---|---|---|
| 2017 | 31 Mar 2017 | 15 Apr 2020 | 1,621.6 | | 900 |
| 2018 | 31 Mar 2018 | 15 Apr 2021 | 1,993.3 | 730 | 730 |
| 2019 | 31 Mar 2019 | 15 Apr 2022 | 2,289.6 | 630 | 630 |
| 2020 | 31 Mar 2020 | 15 Apr 2023 | 2,794.5 | 602 | |

Of the 1,962 outstanding restricted shares (2019: 2,260), no share (2019: none) was deliverable. The cost of these equity-settled instruments of CHF 2 million (2019: CHF 1 million) has been expensed in the consolidated income statement.

Movements in the number of restricted shares outstanding are as follows:

| Number of restricted shares | **2020** | 2019 |
|---|---|---|
| **As at 1 January** | **2,260** | **2,565** |
| Granted | 602 | 630 |
| Delivered/sold | (900) | (935) |
| **As at 31 December** | **1,962** | **2,260** |

For these plans, the Group has at its disposal treasury shares.

### 10.  Investments in Joint Ventures and Associates

| Year of incorporation | Name of Joint ventures | Principal activity | Country of incorporation | Ownership interest |
|---|---|---|---|---|
| 2014 | BGN Tech LLC | Innovative natural ingredients | USA | 49% |
| 2015 | Natural Extracts International Ltd | Natural ingredient derivatives production | Mauritius | 49% |
| 2016 | Vanilla International Ltd | Natural ingredient collection and extract | Mauritius | 49% |

Summarised financial information in respect of the Group's joint ventures is set out below. The following net assets represent 100% of the jointly controlled entities:

| **As at 31 December** in millions of Swiss francs | **2020** | 2019 |
|---|---|---|
| Current assets | 35 | 70 |
| Non-current assets | 28 | 31 |
| Current liabilities | (7) | (37) |
| Non-current liabilities | (7) | (12) |
| **Total net assets of joint ventures** | **49** | **52** |

| **As at 31 December** in millions of Swiss francs | **2020** | 2019 |
|---|---|---|
| Income | 11 | 17 |
| Expenses | (10) | (16) |

## Notes to the consolidated financial statements

Jiangsu Xinrui Aromatics Ltd, manufacturing fragrance ingredients in China, became an associate in 2019 in accordance with the new terms and conditions set in the arrangement. The Group's ownership interest is 49%. As at 31 December 2020, the total assets were CHF 60 million (2019: CHF 55 million) with a total liabilities of CHF 36 million (2019: CHF 36 million) resulting in a total net assets of CHF 24 million (2019: CHF 19 million).

### 11.  Other Operating Income

| in millions of Swiss francs | 2020 | 2019 |
|---|---|---|
| Gains on disposal of fixed assets | 4 | 1 |
| Other income | 41 | 40 |
| **Total other operating income** | **45** | **41** |

The other income in 2019 includes CHF 10 million of insurance income recoverable in relation to the provision that the Group has recorded for the Passaic river environmental matter (Note 25).

### 12.  Other Operating Expense

| in millions of Swiss francs | 2020 | 2019 |
|---|---|---|
| Project related expenses | 15 | 34 |
| Amortisation of intangible assets | 16 | 12 |
| Impairment of long-lived assets | 13 | 1 |
| Loss on divestment | 8 | |
| Losses on disposal of fixed assets | 2 | 5 |
| Environmental provisions | 1 | – |
| Business taxes | 20 | 20 |
| Acquisition and integration related expenses | 25 | 29 |
| Other expenses | 9 | 14 |
| **Total other operating expense** | **109** | **115** |

During 2020 the Group continued to review its business portfolio and divested a small part of its business, which resulted in a loss on divestment of CHF 8 million.

Furthermore, as part of the manufacturing footprint optimisation program, the Group restructured some of its operations and as a consequence recorded impairment charges of CHF 13 million.

### 13.  Expenses by Nature

| in millions of Swiss francs | Note | 2020 | 2019 |
|---|---|---|---|
| Raw materials and consumables used | | 2,668 | 2,714 |
| Total employee remuneration | 8 | 1,493 | 1,405 |
| Depreciation, amortisation and impairment charges | 21, 22 | 401 | 355 |
| Transportation expenses | | 17 | 61 |
| Freight expenses | | 153 | 131 |
| Consulting and service expenses | | 126 | 146 |
| Energies | | 73 | 78 |
| IT related costs | | 71 | 63 |
| Other expenses | | 324 | 330 |
| **Total operating expenses by nature** | | **5,326** | **5,283** |

### 14.  Financing Costs

| in millions of Swiss francs | Note | 2020 | 2019 |
|---|---|---|---|
| Interest expense[a] | | 80 | 68 |
| Net interest related to defined benefit pension plans | 8 | 6 | 9 |
| Derivative interest (gains) losses | | (2) | 1 |
| Amortisation of debt discounts | | 2 | 1 |
| **Total financing costs** | | **86** | **79** |

a)  Out of which CHF 8 million (2019: CHF 9 million) are interest expense on lease liabilities.

### 15.  Other Financial (Income) Expense, Net

| in millions of Swiss francs | 2020 | 2019 |
|---|---|---|
| Fair value and realised (gains) losses from derivatives instruments, net (at fair value through income statement) | (37) | 20 |
| Exchange (gains) losses, net | 52 | 5 |
| Unrealised (gains) losses from financial instruments measured at fair value through income statement | (4) | (12) |
| Interest (income) | (3) | (5) |
| Capital taxes and other non-business taxes | 10 | 11 |
| Other (income) expense, net | 16 | 14 |
| **Total other financial (income) expense, net** | **34** | **33** |

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

## Notes to the consolidated financial statements

### 16. Income Taxes

Amounts charged to (credited in) the consolidated statement of comprehensive income are as follows:

| in millions of Swiss francs | | 2020 | | | | 2019 | | |
|---|---|---|---|---|---|---|---|---|
| | Income statement | Other comprehensive income | Own equity instruments | Total | Income statement | Other comprehensive income | Own equity instruments | Total |
| **Current taxes** | | | | | | | | |
| - in respect of current year | 176 | (3) | | 173 | 140 | (5) | | 135 |
| - in respect of prior years | (6) | | | (6) | (9) | | | (9) |
| **Deferred taxes** | | | | | | | | |
| - in respect of current year | (36) | (1) | | (37) | (21) | (11) | | (32) |
| - reclassified from equity to income statement | | | | | | | | |
| - in respect of prior years | (1) | | | (1) | (4) | 21 | | 17 |
| **Total income tax expense** | **133** | **(4)** | | **129** | **106** | **5** | | **111** |

Since the Group operates globally, it is subject to income taxes in many different tax jurisdictions. As such, in determining the provision for income taxes, judgment is required as there are transactions for which the ultimate tax determination is uncertain at the time of preparing the financial statements. As a result, any differences between the final tax outcome and the amounts that were initially recorded impact the current and deferred taxes in the period in which such final determinations are made.

The Group calculates on the basis of the income statement its average applicable tax rate as a weighted average of the tax rates in the tax jurisdictions in which the Group operates, including research tax credits and withholding tax on dividends, interest and royalties.

The Group's average applicable tax rate differs from the Group's effective tax rate as follows:

| | 2020 | 2019 |
|---|---|---|
| **Group's average applicable tax rate** | **16%** | **14%** |
| **Tax effect of** | | |
| Income not taxable | (3%) | (4%) |
| Expenses not deductible | 2% | 4% |
| Change in tax rate | 1% | – |
| Other adjustments of income taxes of prior years | (1%) | (2%) |
| Other differences | – | 1% |
| **Group's effective tax rate** | **15%** | **13%** |

The variation in the Group's average applicable tax rate arises due to changes in the composition of the Group's profitability within the Group's subsidiaries, in accordance with the Group's business profile in terms of geographical presence, product mix and customer portfolio, as well as external factors related to changes in local statutory tax rates.

In the prior year the Group assessed the impact of the Swiss Tax Reform that is effective as from 1 January 2020 and revalued the deferred tax balances applicable in Switzerland.

### Income tax assets and liabilities

Amounts recognised in the statement of financial position related to income taxes are as follows:

| As at 31 December in millions of Swiss francs | 2020 | 2019 |
|---|---|---|
| Current income tax assets | 66 | 50 |
| Current income tax liabilities | (157) | (111) |
| **Total net current income tax asset (liability)** | **(91)** | **(61)** |

# Notes to the consolidated financial statements

| 2020 in millions of Swiss francs | Property, plant & equipment | Intangible assets | Pension plans | Tax loss carry forward | Other differences | Total |
|---|---|---|---|---|---|---|
| **Net deferred tax asset (liability) as at 1 January** | **(128)** | **(207)** | **113** | **29** | **124** | **(69)** |
| Acquisition | (2) | (68) | | 1 | 5 | (64) |
| (Credited) debited to consolidated income statement | 19 | 18 | 1 | (5) | 4 | 37 |
| (Credited) debited to other comprehensive income | | | (5) | | 6 | 1 |
| (Credited) debited to own equity instruments | | | | | | |
| Currency translation effects | 6 | 8 | (4) | (1) | (6) | 3 |
| **Net deferred tax asset (liability) as at 31 December** | **(105)** | **(249)** | **105** | **24** | **133** | **(92)** |
| Deferred tax assets | | | | | | 218 |
| Deferred tax liabilities | | | | | | (310) |
| **Net deferred tax asset (liability) as at 31 December** | | | | | | **(92)** |

| 2019 in millions of Swiss francs | Property, plant & equipment | Intangible assets | Pension plans | Tax loss carry forward | Other differences | Total |
|---|---|---|---|---|---|---|
| **Net deferred tax asset (liability) as at 1 January** | **(140)** | **(178)** | **112** | **17** | **159** | **(52)** |
| Acquisition | (7) | (47) | 1 | – | 1 | (52) |
| (Credited) debited to consolidated income statement | 18 | 15 | 5 | 12 | (25) | 25 |
| (Credited) debited to other comprehensive income | | | (3) | | (7) | (10) |
| (Credited) debited to own equity instruments | | | | | – | – |
| Currency translation effects | 1 | 3 | (2) | – | (4) | (2) |
| **Net deferred tax asset (liability) as at 31 December** | **(128)** | **(207)** | **113** | **29** | **124** | **(69)** |
| Deferred tax assets | | | | | | 211 |
| Deferred tax liabilities | | | | | | (280) |
| **Net deferred tax asset (liability) as at 31 December** | | | | | | **(69)** |

Amounts recognised in the statement of financial position for deferred taxes are reported as non-current assets and non-current liabilities. The current portion will be charged or credited to the consolidated income statement during 2021.

Deferred tax assets on loss carry forwards of CHF 24 million (2019: CHF 29 million) have been recognised principally in the subsidiaries in France and China, the majority of which expires after 2022. The management considers that there will be future taxable profit available against which these tax losses can be recovered. Deferred tax assets on unused tax losses of CHF 16 million (2019: CHF 17 million) which have not been recognised are mainly located in subsidiaries in Spain.

Deferred tax assets on tax credits of CHF 92 million (2019: CHF 71 million) have been recognised.

A deferred tax liability of CHF 24 million has been recognised in 2020 (2019: CHF 26 million) for certain foreign subsidiaries which have undistributed earnings subject to withholding tax when paid out as dividend as the parent entity is in a position to forecast the timing of distributions expected in the foreseeable future, whereas no deferred tax liability could be recognised for undistributed earnings of CHF 627 million (2019: CHF 534 million).

## 17. Earnings per Share
### Basic earnings per share
Basic earnings per share is calculated by dividing the income for the period attributable to shareholders by the weighted average number of shares outstanding:

| | **2020** | 2019 |
|---|---|---|
| **Income attributable to equity holder of the parent (in millions of Swiss francs)** | **743** | **702** |
| **Weighted average number of shares outstanding** | | |
| Ordinary shares | 9,233,586 | 9,233,586 |
| Treasury shares | (14,369) | (17,354) |
| **Net weighted average number of shares outstanding** | **9,219,217** | **9,216,232** |
| **Basic earnings per share (CHF)** | **80.59** | **76.17** |

## Notes to the consolidated financial statements

### Diluted earnings per share

For the calculation of diluted earnings per share, the weighted average number of shares outstanding is adjusted to assume conversion of all potentially dilutive shares:

| | 2020 | 2019 |
|---|---|---|
| Income attributable to equity holder of the parent (in millions of Swiss francs) | 743 | 702 |
| Weighted average number of shares outstanding for diluted earnings per share of 72,588 (2019: 70,619) | 9,291,805 | 9,286,851 |
| Diluted earnings per share (CHF) | 79.96 | 75.59 |

### 18. Cash and Cash Equivalents

| in millions of Swiss francs | 2020 | 2019 |
|---|---|---|
| Cash on hand and balances with banks | 339 | 379 |
| Short-term investments | 72 | 73 |
| Balance as at 31 December | 411 | 452 |

### 19. Accounts Receivable – Trade

| in millions of Swiss francs | 2020 | 2019 |
|---|---|---|
| Accounts receivable | 1,377 | 1,384 |
| Notes receivable | 1 | 1 |
| Less: allowance for doubtful accounts | (19) | (20) |
| Balance as at 31 December | 1,359 | 1,365 |

Ageing list:

| in millions of Swiss francs | 2020 | 2019 |
|---|---|---|
| Neither past due nor impaired | 1,280 | 1,269 |
| Less than 30 days | 59 | 78 |
| 30 – 60 days | 16 | 17 |
| 60 – 90 days | 5 | 7 |
| Above 90 days | 18 | 14 |
| Less: allowance for doubtful accounts | (19) | (20) |
| Balance as at 31 December | 1,359 | 1,365 |

Movement in the allowance for doubtful accounts:

| in millions of Swiss francs | 2020 | 2019 |
|---|---|---|
| Balance as at 1 January | (20) | (21) |
| Increase in allowance for doubtful accounts recognised in consolidated income statement | (5) | (4) |
| Amounts written off as uncollectible | 2 | 1 |
| Reversal of allowance for doubtful accounts | 2 | 3 |
| Currency translation effects | 2 | 1 |
| Balance as at 31 December | (19) | (20) |

No significant impairment charge has been recognised in the consolidated income statement in 2020 or in 2019. Past due and impaired receivables are still considered recoverable. The carrying amount of accounts receivable – trade is considered to correspond to the fair value.

### 20. Inventories

| in millions of Swiss francs | 2020 | 2019 |
|---|---|---|
| Raw materials and supplies | 460 | 438 |
| Work in process | 28 | 26 |
| Intermediate and finished goods | 787 | 747 |
| Less: allowance for slow moving and obsolete inventories | (74) | (62) |
| Balance as at 31 December | 1,201 | 1,149 |

In 2020 the amount of write-down of inventories was CHF 45 million (2019: CHF 40 million). At 31 December 2020 and 2019 no significant inventory was valued at net realisable value.

## Notes to the consolidated financial statements

### 21. Property, Plant and Equipment

| 2020<br>in millions of Swiss francs | Land | Buildings and land improvements | Machinery, equipment and vehicles | Construction in progress | Total Acquired PP&E | Buildings, land and improvements | Machinery, equipment and vehicles | Total Right-of-Use Assets | Total Property, Plant & Equipment |
|---|---|---|---|---|---|---|---|---|---|
| **Net book value** | | | | | | | | | |
| **Balance as at 1 January** | **131** | **901** | **631** | **222** | **1,885** | **419** | **22** | **441** | **2,326** |
| Additions | | 1 | 4 | 151 | 156 | 28 | 9 | 37 | 193 |
| Acquisitions | 9 | 16 | 11 | – | 36 | 3 | 1 | 4 | 40 |
| Disposals | (1) | (2) | (7) | | (10) | (4) | – | (4) | (14) |
| Transfers | | 133 | 118 | (251) | | – | – | | |
| Impairment | | – | – | | – | | | | – |
| Depreciation | | (50) | (100) | | (150) | (41) | (10) | (51) | (201) |
| Reclassified as assets held for sale | (5) | – | | | (5) | | | | (5) |
| Currency translation effects | (5) | (50) | (34) | (10) | (99) | (17) | (1) | (18) | (117) |
| **Balance as at 31 December** | **129** | **949** | **623** | **112** | **1,813** | **388** | **21** | **409** | **2,222** |
| Cost | 129 | 1,523 | 1,888 | 112 | 3,652 | 463 | 37 | 500 | 4,152 |
| Accumulated depreciation | | (561) | (1,257) | | (1,818) | (75) | (16) | (91) | (1,909) |
| Accumulated impairment | | (13) | (8) | | (21) | | | | (21) |
| **Balance as at 31 December** | **129** | **949** | **623** | **112** | **1,813** | **388** | **21** | **409** | **2,222** |

| 2019<br>in millions of Swiss francs | Land | Buildings and land improvements | Machinery, equipment and vehicles | Construction in progress | Total Acquired PP&E | Buildings, land and improvements | Machinery, equipment and vehicles | Total Right-of-Use Assets | Total Property, Plant & Equipment |
|---|---|---|---|---|---|---|---|---|---|
| **Net book value** | | | | | | | | | |
| **Balance as at 1 January** | **131** | **821** | **592** | **205** | **1,749** | **246** | **17** | **263** | **2,012** |
| Additions | | 1 | 7 | 270 | 278 | 198 | 14 | 212 | 490 |
| Acquisitions | 3 | 29 | 10 | 2 | 44 | 19 | 1 | 20 | 64 |
| Disposals | | (3) | (3) | | (6) | | (3) | (3) | (9) |
| Transfers | | 116 | 134 | (250) | | | | | |
| Impairment | | (1) | – | | (1) | | | | (1) |
| Depreciation | | (46) | (101) | | (147) | (39) | (7) | (46) | (193) |
| Reclassified as assets held for sale | (1) | (2) | | | (3) | | | | (3) |
| Currency translation effects | (2) | (14) | (8) | (5) | (29) | (5) | – | (5) | (34) |
| **Balance as at 31 December** | **131** | **901** | **631** | **222** | **1,885** | **419** | **22** | **441** | **2,326** |
| Cost | 131 | 1,449 | 1,855 | 222 | 3,657 | 457 | 29 | 486 | 4,143 |
| Accumulated depreciation | | (535) | (1,214) | | (1,749) | (38) | (7) | (45) | (1,794) |
| Accumulated impairment | | (13) | (10) | | (23) | | | | (23) |
| **Balance as at 31 December** | **131** | **901** | **631** | **222** | **1,885** | **419** | **22** | **441** | **2,326** |

The expense related to the low-value and short-term leases amounts to CHF 2 million (2019: CHF 1 million) and CHF 2 million (2019: CHF 6 million) respectively.

The Group leases various offices, warehouses, machinery and equipment. Rental contracts are typically made for fixed periods of 1 to 30 years, but may have extension and termination options, used to maximise operational flexibility in terms of managing the assets used in the Group's operations. The majority of extension and termination options held are exercisable only by the Group and not by the respective lessor. During the current financial year, no significant financial effect was triggered by revision of lease terms (2019: nil).

# Notes to the consolidated financial statements

Lease terms are negotiated on an individual basis and contain a wide range of different terms and conditions. The lease agreements do not impose any covenants other than the security interests in the leased assets that are held by the lessor. Leased assets may not be used as security for borrowing purposes.

At 31 December 2020 and 2019 no significant capitalised borrowing costs were accounted for.

## 22. Intangible Assets

| 2020 in millions of Swiss francs | Goodwill | Process-oriented technology and other | Client relation-ships | Supplier relation-ships | Name and product brands | Software/ ERP system | Total |
|---|---|---|---|---|---|---|---|
| **Net book value** | | | | | | | |
| **Balance as at 1 January** | **3,146** | **290** | **604** | **25** | **57** | **164** | **4,286** |
| Additions | | | | | | 45 | 45 |
| Acquisitions | 304 | 86 | 224 | | 12 | – | 626 |
| Disposals | | (2) | (7) | | – | | (9) |
| Impairment | | – | (4) | | | | (4) |
| Amortisation | | (61) | (64) | (13) | (12) | (37) | (187) |
| Currency translation effects | (156) | (10) | (47) | – | (1) | – | (214) |
| **Balance as at 31 December** | **3,294** | **303** | **706** | **12** | **56** | **172** | **4,543** |
| Cost | 3,294 | 1,129 | 1,095 | 44 | 80 | 819 | 6,461 |
| Accumulated amortisation | | (820) | (385) | (32) | (24) | (647) | (1,908) |
| Accumulated impairment | | (6) | (4) | | | | (10) |
| **Balance as at 31 December** | **3,294** | **303** | **706** | **12** | **56** | **172** | **4,543** |

| 2019 in millions of Swiss francs | Goodwill | Process-oriented technology and other | Client relation-ships | Supplier relation-ships | Name and product brands | Software/ ERP system | Total |
|---|---|---|---|---|---|---|---|
| **Net book value** | | | | | | | |
| **Balance as at 1 January** | **2,968** | **287** | **511** | **37** | **57** | **148** | **4,008** |
| Additions | | | | | | 53 | 53 |
| Acquisitions | 225 | 61 | 152 | 2 | 7 | 1 | 448 |
| Amortisation | | (52) | (52) | (14) | (5) | (38) | (161) |
| Currency translation effects | (47) | (6) | (7) | – | (2) | – | (62) |
| **Balance as at 31 December** | **3,146** | **290** | **604** | **25** | **57** | **164** | **4,286** |
| Cost | 3,146 | 1,059 | 931 | 44 | 69 | 774 | 6,023 |
| Accumulated amortisation | | (763) | (327) | (19) | (12) | (610) | (1,731) |
| Accumulated impairment | | (6) | | | | | (6) |
| **Balance as at 31 December** | **3,146** | **290** | **604** | **25** | **57** | **164** | **4,286** |

Classification of amortisation expenses is as follows:

| | 2020 | | | 2019 | | |
|---|---|---|---|---|---|---|
| in millions of Swiss francs | Fragrance & Beauty | Taste & Wellbeing | Total | Fragrance & Beauty | Taste & Wellbeing | Total |
| Cost of sales | 10 | 14 | 24 | 8 | 10 | 18 |
| Selling, marketing and distribution expenses | 33 | 37 | 70 | 21 | 24 | 45 |
| Research and product development expenses | 10 | 52 | 62 | 11 | 58 | 69 |
| Administration expenses | 3 | 12 | 15 | 4 | 13 | 17 |
| Other operating expenses | 8 | 8 | 16 | 5 | 7 | 12 |
| **Total** | **64** | **123** | **187** | **49** | **112** | **161** |

### Impairment test for goodwill

Goodwill is allocated to the Group's cash-generating units (CGUs), which are defined as the Taste & Wellbeing Division and the Fragrance & Beauty Division, which itself includes two lower levels of cash-generating units related to Expressions Parfumées and Fragrance Oils. Goodwill allocated to these CGUs was CHF 2,298 million (2019: CHF 2,214 million) to the Taste & Wellbeing Division, CHF 756 million (2019: CHF 685 million) to the Fragrance & Beauty Division, CHF 135 million (2019: CHF 135 million) to Expressions Parfumées, and CHF 105 million (2019: CHF 112 million) to Fragrance Oils.

The recoverable amount of each CGU has been determined based on value in use calculations. These calculations use pre-tax cash flow projections based on financial business plans and budgets approved by management covering a five year period, as well as a terminal value. The basis of the key assumptions is market growth adjusted for estimated market share gains. The terminal value assumes the long-term inflation rate for growth beyond the five year period. The discount rate used to discount the estimated future cash flows has a number of components which are derived from capital market information where the cost of equity corresponds to the return expected by the shareholders by benchmarking with comparable companies in the fragrance and flavour industry, and where the cost of debt is based on the conditions on which companies with similar credit rating can obtain financing.

A discount rate of 9.1% (2019: 8.9%) was applied to cash flow projections of the Fragrance & Beauty Division, 9.2% (2019: 8.9%) was applied to cash flow projections of the Taste & Wellbeing Division, 9.1% (2019: 8.5%) was applied to cash flow projections of Expressions Parfumées and 10.6% (2019: 10.8%) was applied to cash flow projections of Fragrance Oils. These discount rates are pre-tax.

## Notes to the consolidated financial statements

Governance
report

Compensation
report

Consolidated
financial report

Statutory
financial report

Appendix

No impairment loss in any of the CGUs resulted from the impairment tests for goodwill. The Group has conducted an analysis of the sensitivity of the impairment test to changes in the cash flows and in the discount rate in the periods presented. Management believes that any reasonable change in the assumptions would not cause the carrying amount to exceed the recoverable amount of each CGU.

### Process-oriented technology and other

This consists mainly of process-oriented technology, formulas, molecules, delivery systems as well as process knowledge and research expertise in innovative cosmetic solutions, acquired when the Group purchased Food Ingredients Specialties (FIS), International Bioflavors (IBF), Quest International, Soliance, Induchem, Spicetec, Activ International, Vika, Centroflora Nutra, Expressions Parfumées, Naturex, Albert Vieille, AMSilk, Golden Frog, drom, Fragrance Oils, Ungerer, Indena and Alderys.

### Client relationships

As part of the acquisition of Quest International, Induchem, Spicetec, Activ International, Vika, Centroflora Nutra, Expressions Parfumées, Naturex, Albert Vieille, Golden Frog, drom, Fragrance Oils, Ungerer and Indena the Group acquired client relationships in the Taste & Wellbeing and Fragrance & Beauty Divisions, mainly consisting of client relationships with key customers.

### Supplier relationships

As part of the acquisition of Naturex and Albert Vieille, the Group acquired supplier relationships in the Taste & Wellbeing and Fragrance & Beauty Divisions, mainly consisting of relationships with key suppliers.

### Name and product brands

In connection with the acquisition of Induchem, Spicetec, Activ International, Vika, Centroflora Nutra, Expressions Parfumées, Naturex, Albert Vieille, Golden Frog, drom, Fragrance Oils, Ungerer and Indena, the Group acquired name and product brands in active beauty and in natural flavour businesses.

### Software/ERP system

This consists of internally generated intangible assets associated with the development of identifiable software products and ERP systems.

The residual useful lives of the acquired intangible assets carried at cost, being their fair value at acquisition date, are determined in accordance with the principles set out in Note 2.17. Remaining useful lives of major classes of amortisable intangible assets are as follows:
– Software                                          2.7 years
– Name and product brands                           12.7 years
– Process-oriented technology and other             6.8 years
– Client relationships                              15.3 years
– Supplier relationships                             0.7 years

## Notes to the consolidated financial statements

### 23. Debt

| 2020<br>in millions of Swiss francs | Bank borrowings | Bank facility | Bank overdrafts | Public bonds | Private placements | Total short-term and long-term debt | Total lease liabilities | Total debt |
|---|---|---|---|---|---|---|---|---|
| **Balance as at 1 January** | **68** | **600** | **2** | **2,453** | **567** | **3,690** | **441** | **4,131** |
| Cash flows | 60 | (600) | (1) | 945 | (39) | 365 | (52) | 313 |
| Non-cash changes | | | | | | | | |
| - Amortisation of debt discount | | | | 2 | | 2 | 8 | 10 |
| - Acquisition / Divestment | 3 | | | | 1 | 4 | 1 | 5 |
| - Currency effects | (28) | | | 24 | (20) | (24) | (21) | (45) |
| - Lease liabilities | | | | | | | 37 | 37 |
| **Balance as at 31 December** | **103** | | **1** | **3,424** | **509** | **4,037** | **414** | **4,451** |
| Within 1 year | 10 | | 1 | 150 | | 161 | 45 | 206 |
| Within 1 to 3 years | 36 | | | 100 | 240 | 376 | 74 | 450 |
| Within 3 to 5 years | 44 | | | 888 | 269 | 1,201 | 53 | 1,254 |
| Thereafter | 13 | | | 2,286 | | 2,299 | 242 | 2,541 |
| **Balance as at 31 December** | **103** | | **1** | **3,424** | **509** | **4,037** | **414** | **4,451** |

| 2019<br>in millions of Swiss francs | Bank borrowings | Bank facility | Bank overdrafts | Public bonds | Private placements | Total short-term and long-term debt | Total lease liabilities | Total debt |
|---|---|---|---|---|---|---|---|---|
| **Balance as at 1 January** | **11** | **169** | **3** | **2,505** | **582** | **3,270** | **260** | **3,530** |
| Cash flows | 31 | 431 | (1) | | | 461 | (52) | 409 |
| Non-cash changes | | | | | | | | |
| - Amortisation of debt discount | | | | 1 | | 1 | 9 | 10 |
| - Acquisition / Divestment | 31 | | 1 | | | 32 | 20 | 52 |
| - Currency effects | (5) | | (1) | (53) | (15) | (74) | (2) | (76) |
| - Lease liabilities | | | | | | | 206 | 206 |
| **Balance as at 31 December** | **68** | **600** | **2** | **2,453** | **567** | **3,690** | **441** | **4,131** |
| Within 1 year | 2 | | 2 | 250 | 39 | 293 | 42 | 335 |
| Within 1 to 3 years | 18 | | | 249 | 108 | 375 | 49 | 424 |
| Within 3 to 5 years | 40 | 600 | | 150 | 362 | 1,152 | 35 | 1,187 |
| Thereafter | 8 | | | 1,804 | 58 | 1,870 | 315 | 2,185 |
| **Balance as at 31 December** | **68** | **600** | **2** | **2,453** | **567** | **3,690** | **441** | **4,131** |

Governance report

Compensation report

**Consolidated financial report**

Statutory financial report

Appendix

# Notes to the consolidated financial statements

The Group entered into the following debt transactions:

| Issuer | Issue date | Type of debt | Currency of principal | Principal amount in millions | Redeemable | Interest rate | Type of interest | **2020** in millions of Swiss francs | 2019 |
|---|---|---|---|---|---|---|---|---|---|
| **Givaudan SA** | 2011 | Public bonds | CHF | 150 | 07 Dec 2021 | 2.125% | | 150 | 149 |
| **Givaudan United States, Inc.** | 2012 | Private placements[a] | USD | 40 | 06 Feb 2020 | 2.740% | | Reimbursed | 39 |
| | | | USD | 150 | 06 Feb 2023 | 3.300% | | 132 | 145 |
| | | | USD | 60 | 06 Feb 2025 | 3.450% | Fixed | 53 | 58 |
| **Givaudan SA** | 2014 | Public bonds | CHF | 100 | 18 Sep 2020 | 1.000% | | Reimbursed | 100 |
| | | | CHF | 150 | 19 Mar 2024 | 1.750% | | 150 | 150 |
| | 2016 | | CHF | 100 | 07 Dec 2022 | 0.000% | | 100 | 100 |
| | | | CHF | 200 | 05 Dec 2031 | 0.625% | | 200 | 200 |
| | 2017 | Private placements | EUR | 100 | 20 Dec 2022 | | Floating[c] | 108 | 108 |
| | | | EUR | 200 | 20 Dec 2024 | 1.331% | Fixed | 216 | 217 |
| | 2018 | Public bonds | CHF | 150 | 09 Apr 2020 | | Floating | Reimbursed | 150 |
| | | | CHF | 200 | 09 Apr 2025 | 0.375% | Fixed | 200 | 200 |
| | | | EUR | 500 | 17 Sep 2025 | 1.125% | | 538 | 540 |
| | | | EUR | 800 | 17 Sep 2030 | 2.000% | | 861 | 864 |
| | 2019 | Group bank credit facility | CHF | 600 | 26 Jun 2023 | | Floating[c] | Reimbursed | 600 |
| | 2020 | Public bonds | | 180 | | | | | |
| | | | | 150 | 10 Nov 2028 | 0.150% | Fixed | 150 | |
| **Givaudan Finance Europe BV** | 2020 | Public bonds | EUR | 500 | 22 Avr 2027 | 1.000% | Fixed | 537 | |
| | | | | 500 | 22 Avr 2032 | 1.625% | | 538 | |
| **Other entities** | 2019 | Other local borrowings | EUR | 7 | Various maturities | 1.180% | Fixed | 6 | 8 |
| | 2020 | | | 6 | | | | | |
| | 2019 | | CNY | 426 | | | Floating | 97 | 59 |
| | 2020 | | | 714 | | | | | |
| | | | other | | | | | 1 | 3 |
| **Total short-term and long-term debt as at 31 December[b]** | | | | | | | | **4,037** | **3,690** |

a) There are various covenants contained in these transactions covering conditions on net worth, indebtedness and EBITDA ratio to net interest expense of Givaudan United States, Inc. The company is and has been in full compliance with the covenants set.
b) The fair value of the short-term and long-term debt exceeds its carrying value by approximately 9% as at 31 December 2020.
c) The floating interest rate is based on a Libor rate.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

## Notes to the consolidated financial statements

The weighted average effective interest rates at the statement of financial position date were as follows:

|  | **2020** | 2019 |
|---|---|---|
| Private placements (USD) | 3.3% | 3.2% |
| Private placements (EUR) | 1.1% | 1.1% |
| Straight bond (EUR) | 1.5% | 1.7% |
| Straight bond (CHF) | 0.8% | 0.8% |
| Bank facility | 5.0% | 0.9% |
| **Weighted average effective interest rate on gross debt** | **1.5%** | **1.3%** |

### 24. Changes in Liabilities Arising from Financing Activities

| **2020**<br>in millions of Swiss francs | **Balance as at 1 January** | Cash impact | | Non-cash changes | | | | **Balance as at 31 December** |
|---|---|---|---|---|---|---|---|---|
| | | Cash flows Inflow (Outflow) | Amortisation of debt discount / premium and interest expense | Acquisition / Divestment | Fair values changes and Others | | Currency effects | |
| Total short-term and long-term debt | 3,690 | 365 | 2 | 4 | | | (24) | 4,037 |
| Interest on liabilities | 13 | (53) | | | 62 | | – | 22 |
| Derivative financial instruments | 98 | (19) | | | 54 | | – | 133 |
| Lease liabilities | 441 | (52) | 8 | 1 | 37 | | (21) | 414 |
| Others, net | 19 | (9) | | | 9 | | – | 19 |
| **Total liabilities from financing activities** | **4,261** | **232** | **10** | **5** | **162** | | **(45)** | **4,625** |

| **2019**<br>in millions of Swiss francs | **Balance as at 1 January** | Cash impact | | Non-cash changes | | | | **Balance as at 31 December** |
|---|---|---|---|---|---|---|---|---|
| | | Cash flows Inflow (Outflow) | Amortisation of debt discount / premium and interest expense | Acquisition / Divestment | Fair values changes and Others | | Currency effects | |
| Total short-term and long-term debt | 3,270 | 461 | 1 | 32 | | | (74) | 3,690 |
| Interest on liabilities | 13 | (51) | | | 51 | | – | 13 |
| Derivative financial instruments | 43 | | | | 55 | | – | 98 |
| Lease liabilities | 260 | (52) | 9 | 20 | 206 | | (2) | 441 |
| Others, net | 17 | (7) | | | 9 | | – | 19 |
| **Total liabilities from financing activities** | **3,603** | **351** | **10** | **52** | **321** | | **(76)** | **4,261** |

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

## Notes to the consolidated financial statements

### 25. Provisions

| 2020<br>in millions of Swiss francs | Restruc-<br>turing | Claims and<br>litigation | Environ-<br>mental | Others | Total |
|---|---|---|---|---|---|
| **Balance as at 1 January** | **14** | **10** | **27** | **36** | **87** |
| Acquisitions | | | | 7 | 7 |
| Additional provisions | 16 | 2 | 3 | 6 | 27 |
| Unused amounts reversed | (2) | – | (3) | (2) | (7) |
| Utilised during the year | (8) | (1) | (4) | (3) | (16) |
| Currency translation effects | – | – | (2) | (2) | (4) |
| **Balance as at 31 December** | **20** | **11** | **21** | **42** | **94** |
| Current liabilities | 13 | 3 | 1 | 6 | 23 |
| Non-current liabilities | 7 | 8 | 20 | 36 | 71 |
| **Balance as at 31 December** | **20** | **11** | **21** | **42** | **94** |

| 2019<br>in millions of Swiss francs | Restruc-<br>turing | Claims and<br>litigation | Environ-<br>mental | Others | Total |
|---|---|---|---|---|---|
| **Balance as at 1 January** | **25** | **12** | **26** | **34** | **97** |
| Additional provisions | | 3 | 3 | 9 | 15 |
| Unused amounts reversed | (2) | – | – | (1) | (3) |
| Utilised during the year | (9) | (5) | (2) | (5) | (21) |
| Currency translation effects | – | – | – | (1) | (1) |
| **Balance as at 31 December** | **14** | **10** | **27** | **36** | **87** |
| Current liabilities | 10 | 2 | 3 | 3 | 18 |
| Non-current liabilities | 4 | 8 | 24 | 33 | 69 |
| **Balance as at 31 December** | **14** | **10** | **27** | **36** | **87** |

Significant judgment is required in determining the various provisions. A range of possible outcomes is determined to make reliable estimates of the obligation that is sufficient for the recognition of a provision. Differences between the final obligations and the amounts that were initially recognised impact the income statement in the period in which such determination is made.

### Restructuring provisions

Restructuring provisions arise from reorganisations of the Group's operations and management structure primarily related to integration of acquired businesses and from reorganisations in the Taste & Wellbeing Division.

### Claims and litigation

These provisions are made in respect of legal claims brought against the Group and potential litigations. Related estimated legal fees are also included in these provisions.

### Environmental

Givaudan's affiliate, Givaudan Fragrances Corporation, is one of approximately 100 companies identified by the US Environmental Protection Agency ('EPA') as 'Potentially Responsible Parties' ('PRP') for alleged contamination of the Lower Passaic River. The EPA released a Focused Feasibility Study ('FFS') covering only the lower 8 miles of the River in 2014. In March 2016, the EPA issued its Record of Decision ('ROD') to confirm the remediation solution related to the FFS. The chosen solution entails a bank-to-bank dredge of the lower 8 miles of the River ('Operable Unit 2'), and the installation of an engineered cap, with an estimated cost of CHF 1.3 billion. One PRP agreed in 2016 to conduct the detailed remediation design for Operable Unit 2, which is underway and expected to be completed in 2021. The EPA has also selected an allocator to work with the PRP's on an allocation of the remediation costs for Operable Unit 2, the first phase of which was concluded at the end of 2020. The EPA anticipates the implementation of the ROD remediation for Operable Unit 2 will take at least 6 years and may begin in 2022 and continue through at least 2028.

The Cooperating Parties Group ('CPG'), of which Givaudan had been a member, completed its Remedial Investigation ('RI') in 2019 and submitted its final Feasibility Study ('FS') in September 2020, which proposed an Interim Remedial Measure ('IRM') for certain areas of sediment in the upper 9 miles of the Lower Passaic River. The CPG is waiting for final approval of the FS and IRM, which remains under review by the EPA and the New Jersey Department of Environmental Protection.

At this time, there are many uncertainties associated with the final remediation plans for the River and the Company's share of the costs, if any. However, in accordance with accounting guidance, the Group has recorded a reserve which it believes can reasonably be expected to cover the Company's obligation, if any, given the information currently available.

The other material components of the environmental provisions consist of costs to sufficiently clean and refurbish contaminated sites and to treat where necessary.

## Notes to the consolidated financial statements

### Other provisions

These consist largely of provisions related to long-term deferred compensation plan and to restoring expenses related to leased facilities.

### 26. Own Equity Instruments

Details of own equity instruments are as follows:

| As at 31 December 2020 | Settlement | Category | Maturity | Strike price (CHF) | in equivalent shares | Fair value in millions of Swiss francs |
|---|---|---|---|---|---|---|
| Registered shares | | Equity | | | 16,570 | 62 |
| Purchased calls | Gross shares | Equity | 2021 - 2022 | 1,680.0 - 3,475.3 | 42,000 | 46 |
| Written puts | Gross shares | Financial liability | 2021 - 2022 | 1,680.0 - 3,369.3 | 42,000 | 1 |

| As at 31 December 2019 | Settlement | Category | Maturity | Strike price (CHF) | in equivalent shares | Fair value in millions of Swiss francs |
|---|---|---|---|---|---|---|
| Registered shares | | Equity | | | 15,541 | 47 |
| Purchased calls | Gross shares | Equity | 2020 - 2021 | 1,704.0 - 2,884.0 | 49,000 | 37 |
| Written puts | Gross shares | Financial liability | 2020 - 2021 | 1,704.0 - 2,794.0 | 49,000 | 1 |

### 27. Equity
### Share capital

As at 31 December 2020 the share capital amounts to CHF 92,335,860, divided into 9,233,586 fully paid-up registered shares, with a nominal value of CHF 10.00 each. Every share gives the right to one vote.

The Board of Directors has at its disposal conditional capital of a maximum aggregate amount of CHF 7,481,980 that may be issued through a maximum of 748,198 registered shares, of which a maximum of CHF 1,618,200 can be used for executive share option plans.

At the Annual General Meeting held on 25 March 2020 the distribution of an ordinary dividend of CHF 62.00 per share (2019: CHF 60.00 per share) was approved. The dividend payment has been paid out of available retained earnings.

Movements in own equity instruments are as follows:

| | | Price in Swiss francs | | | Total in millions of Swiss francs |
|---|---|---|---|---|---|
| 2020 | Number | High | Average | Low | |
| **Balance as at 1 January** | **15,541** | | | | **168** |
| Purchases at cost | 25,000 | 2,595.0 | 2,250.0 | 1,799.0 | 56 |
| Sales and transfers | (23,971) | 3,634.8 | 2,180.6 | 2,141.6 | (52) |
| (Gains) losses, net recognised in equity | | | | | – |
| **Movement on registered shares, net** | | | | | **4** |
| **Movement on derivatives on own shares, net** | | | | | **(4)** |
| **Income taxes** | | | | | |
| **Balance as 31 December** | **16,570** | | | | **168** |

| | | Price in Swiss francs | | | Total in millions of Swiss francs |
|---|---|---|---|---|---|
| 2019 | Number | High | Average | Low | |
| **Balance as at 1 January** | **11,906** | | | | **142** |
| Purchases at cost | 26,000 | 2,154.0 | 1,968.3 | 1,800.0 | 51 |
| Sales and transfers | (22,365) | 1,858.0 | 1,858.0 | 1,858.0 | (42) |
| (Gains) losses, net recognised in equity | | | | | – |
| **Movement on registered shares, net** | | | | | **9** |
| **Movement on derivatives on own shares, net** | | | | | **17** |
| **Income taxes** | | | | | |
| **Balance as 31 December** | **15,541** | | | | **168** |

### 28. Commitments

From 1 January 2019, as in accordance with IFRS 16, the Group has recognised right-of-use assets and lease liabilities for lease commitments in the scope of IFRS 16, except for short-term and low-value leases (Note 2.1.1). The charge in the consolidated income statement for all operating leases was CHF 17 million (2019: CHF 14 million).

The Group has capital commitments for the purchase or construction of property, plant and equipment totalling CHF 13 million (2019: CHF 28 million).

# Notes to the consolidated financial statements

Governance
report

Compensation
report

Consolidated
financial report

Statutory
financial report

Appendix

## 29. Contingent Liabilities

From time to time and in varying degrees, Group operations and earnings continue to be affected by political, legislative, fiscal and regulatory developments, including those relating to environmental protection, in the countries in which it operates.

The activities in which the Group is engaged are also subject to physical risks of various kinds. The nature and frequency of these developments and events, not all of which are covered by insurance, as well as their effect on the future operations and earnings are not predictable.

Givaudan Group companies are involved in various legal and regulatory proceedings of a nature considered typical of its business, including contractual disputes and employment litigation.

Two of the Group's US affiliates, Givaudan Flavors Corporation and Ungerer & Company have been named as defendants in numerous lawsuits brought against them and other flavour and raw chemical supply companies. The plaintiffs allege that they sustained pulmonary injuries due to flavours that contain diacetyl, 2,3 pentanedione and other flavouring chemicals. To date, many of the cases filed against the Group's affiliates have been settled or dismissed; however, numerous new cases have been filed. The Group has already recovered a portion of the prior defence and settlement costs from its insurance policies, and will continue to recover a portion of any such future costs.

## 30. Related Parties

Transactions between Givaudan SA and its subsidiaries, which are related parties of Givaudan SA, have been eliminated on consolidation and are not disclosed in this note.

### Compensation of key management personnel

The compensation of the Board of Directors and the Executive Committee during the year was as follows:

| in millions of Swiss francs | 2020 | 2019 |
|---|---|---|
| Salaries and other short-term benefits | 14 | 12 |
| Post-employment benefits | 1 | 1 |
| Share-based payments | 12 | 11 |
| **Total compensation** | **27** | **24** |

No other related party transactions have taken place during 2020 (2019: nil) between the Group and the key management personnel.

### Reconciliation table to the Swiss code of obligations

| | IFRS | | Adjustments [a] | | Swiss CO (Art. 663bis) | |
|---|---|---|---|---|---|---|
| in millions of Swiss francs | **2020** | 2019 | **2020** | 2019 | **2020** | 2019 |
| Salaries and other short-term benefits | 14 | 12 | (6) | (4) | 8 | 8 |
| Post-employment benefits | 1 | 1 | 1 | 1 | 2 | 2 |
| Share-based payments | 12 | 11 | (2) | (1) | 10 | 10 |
| **Total compensation** | **27** | **24** | **(7)** | **(4)** | **20** | **20** |

a) IFRS information is adjusted mainly to the recognition of the share-based payments, IFRS 2 versus economic value at grant date. IFRS information also includes security costs.

There are no other significant related party transactions including in the jointly controlled entities.

## Notes to the consolidated financial statements

### 31. Board of Directors and Executive Committee Compensation
**Compensation of members of the Board of Directors**

Compensation of Board members consists of Director fees, Committee fees and Restricted Share Units (RSUs). Fees are paid at the end of each year in office completed. RSUs give participants the right to receive Givaudan shares (or a cash equivalent in countries where securities laws prevent the offering of Givaudan securities) at the end of a three-year blocking period.

The Chairman of the Board does not receive any additional Board Membership fees. Similarly, a Committee Chairman does not receive any additional Committee Membership fees. Each Board member receives an additional amount of CHF 10,000 to cover out-of-pocket expenses. This amount is paid for the coming year in office. The RSUs are also granted for the same period. The compensation paid to the Board members for the reporting period is shown in the table below:

| 2020<br>in Swiss francs | Calvin Grieder<br>Chairman[e] | Victor Balli[e] | Prof. Dr-Ing.<br>Werner Bauer[e] | Lilian Biner[e] | Michael Carlos[e] | Ingrid Deltenre[e] | Thomas Rufer[e] | Olivier Filliol[e,f] | Sophie<br>Gasperment[e,g] | Total<br>2020[a] |
|---|---|---|---|---|---|---|---|---|---|---|
| Director fees[b] | 400,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 75,000 | 33,333 | 1,108,333 |
| Committee fees[b] | 65,000 | 50,000 | 65,000 | 25,000 | 65,000 | 50,000 | 55,000 | 37,500 | 8,333 | 420,833 |
| Total fixed (cash) | 465,000 | 150,000 | 165,000 | 125,000 | 165,000 | 150,000 | 155,000 | 112,500 | 41,666 | 1,529,166 |
| Number of RSUs granted[c] | 208 | 52 | 52 | 52 | 52 | 52 | 52 | 39 | 17 | 576 |
| Value at grant[d] | 581,256 | 145,314 | 145,314 | 145,314 | 145,314 | 145,314 | 145,314 | 108,986 | 47,507 | 1,609,633 |
| **Total compensation** | **1,046,256** | **295,314** | **310,314** | **270,314** | **310,314** | **295,314** | **300,314** | **221,486** | **89,173** | **3,138,799** |

a) Represents total compensation for the Board of Director paid in respect of the reporting year,
   reported in accordance with the accrual principle.
b) Represents Director and Committee fees paid in respect of the reporting year, reported in accordance with the accrual principle.
c) RSUs blocking period ends on 15 April 2023.
d) Economic value at grant according to IFRS methodolgy, with no discount applied for the blocking period.
e) The function of each member of the Board of Directors is indicated on pages 7-9 in the 2020 Governance report.
f) Represents compensation from April to December 2020.
g) Represents compensation from September to December 2020.

| 2019<br>in Swiss francs | Calvin Grieder<br>Chairman[e] | Victor Balli[e] | Prof. Dr-Ing.<br>Werner Bauer[e] | Lilian Biner[e] | Michael Carlos[e] | Ingrid Deltenre[e] | Thomas Rufer[e] | Total<br>2019[a] |
|---|---|---|---|---|---|---|---|---|
| Director fees[b] | 400,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,000,000 |
| Committee fees[b] | 65,000 | 50,000 | 65,000 | 25,000 | 65,000 | 50,000 | 55,000 | 375,000 |
| Total fixed (cash) | 465,000 | 150,000 | 165,000 | 125,000 | 165,000 | 150,000 | 155,000 | 1,375,000 |
| Number of RSUs granted[c] | 252 | 63 | 63 | 63 | 63 | 63 | 63 | 630 |
| Value at grant[d] | 576,980 | 144,245 | 144,245 | 144,245 | 144,245 | 144,245 | 144,245 | 1,442,450 |
| **Total compensation** | **1,041,980** | **294,245** | **309,245** | **269,245** | **309,245** | **294,245** | **299,245** | **2,817,450** |

a) Represents total compensation for the Board of Director paid in respect of the reporting year, reported
   in accordance with the accrual principle.
b) Represents Director and Committee fees paid in respect of the reporting year, reported in accordance with the accrual principle.
c) RSUs blocking period ends on 15 April 2022.
d) Economic value at grant according to IFRS methodolgy, with no discount applied for the blocking period.
e) The function of each member of the Board of Directors is indicated on pages 5-6 in the 2019 Governance report.

Estimated social security charges based on 2020 compensation amounted to CHF 259,320 (2019: CHF 233,000).

Governance
report

Compensation
report

Consolidated
financial report

Statutory
financial report

Appendix

## Notes to the consolidated financial statements

**Other compensation, fees and loans to members or former members of the Board**
No additional compensation or fees were paid to any member of the Board. No Board member or related parties had any loan outstanding as of 31 December 2020.

**Special compensation of members of the Board who left the company during the reporting period**
No such compensation was incurred during the reporting period.

**Compensation of members of the Executive Committee**
The compensation of the Executive Committee during the year was as follows:

| in Swiss francs | Gilles Andrier CEO 2020 | Gilles Andrier CEO 2019 | Executive Committee members (excluding CEO)[a] 2020 | Executive Committee members (excluding CEO)[a] 2019 | Total 2020 | Total 2019 |
|---|---|---|---|---|---|---|
| - Base salary | 1,211,084 | 1,167,910 | 3,336,973 | 3,191,433 | 4,548,057 | 4,359,343 |
| - Pension benefits[b] | 574,237 | 577,527 | 1,036,769 | 1,005,412 | 1,611,006 | 1,582,939 |
| - Other benefits[c] | 145,344 | 141,730 | 433,184 | 562,795 | 578,528 | 704,525 |
| **Total fixed compensation** | **1,930,665** | **1,887,167** | **4,806,926** | **4,759,640** | **6,737,591** | **6,646,807** |
| - Annual incentive[d] | 1,636,536 | 1,438,925 | 3,176,247 | 2,830,707 | 4,812,783 | 4,269,632 |
| - Number of performance shares granted[e] | 895 | 1,092 | 2,077 | 2,448 | 2,972 | 3,540 |
| - Value at grant[f] | 2,501,078 | 2,500,243 | 5,804,177 | 5,604,941 | 8,305,255 | 8,105,184 |
| **Total variable compensation** | **4,137,614** | **3,939,168** | **8,980,424** | **8,435,648** | **13,118,038** | **12,374,816** |
| **Total compensation** | **6,068,279** | **5,826,335** | **13,787,350** | **13,195,288** | **19,855,629** | **19,021,623** |
| Employer social security[g] | 504,728 | 471,214 | 1,029,178 | 989,482 | 1,533,906 | 1,460,696 |

a)  Represents full year compensation of six Executive Committee members.
b)  Company contributions to broad-based pension and retirement savings plans and annualised expenses accrued for supplementary executive retirement benefit.
c)  Represents annual value of health and welfare plans, international assignment benefits and other benefits in kind.
d)  Annual incentive accrued in reporting period based on performance in the reporting period.
e)  2020 Performance shares vest on 15 April 2023, 2019 Performance Shares vest on 15 April 2022.
f)  Value at grant calculated according to IFRS methodology and based on 100% achievement of performance targets.
g)  2020 estimated social security charges based on 2020 compensation; 2019 estimated social security charges based on 2019 compensation.

## Notes to the consolidated financial statements

### Other compensation, fees and loans to members or former members of the Executive Committee

No other compensation or fees were accrued for or paid to any member or former member of the Executive Committee during the reporting period. No member or former member of the Executive Committee or related parties had any loan outstanding as of 31 December 2020.

### Special compensation of Executive Committee members who left the company during the reporting period

Members of the Executive Committee that stepped down during 2020 did not receive any special compensation as a result of their departure from the Company.

### Ownership of shares and unvested share rights

Details on the Givaudan share based payment plans are described in Note 9.

As per 31 December 2020, the Chairman and other Board members including persons closely connected to them held 6,501 Givaudan shares in total. For further details, please refer to the following table showing:

– The shares held individually by each Board member as per 31 December 2020.

– The RSUs that were granted in 2018 – 2020 and were still owned by members of the Board as per 31 December 2020.

| 2020<br>in numbers | Shares | Blocked RSUs |
|---|---|---|
| Calvin Grieder, Chairman | 655 | 752 |
| Victor Balli | 175 | 188 |
| Prof. Dr-Ing. Werner Bauer | 1,355 | 188 |
| Lilian Biner | 662 | 188 |
| Michael Carlos | 1,187 | 188 |
| Ingrid Deltenre | 292 | 188 |
| Thomas Rufer | 975 | 188 |
| Olivier Filliol | 1,200 | 52 |
| Sophie Gasperment | – | 30 |
| **Total 2020** | **6,501** | **1,962** |
| Total 2019 | 4,501 | 2,260 |

The company is not aware of any other ownership of shares, share options/option rights, RSUs or performance shares as per 31 December 2020 by persons closely connected to members of the Board.

As per 31 December 2020, the Chief Executive Officer and other members of the Executive Committee, including persons closely connected to them, held 6,312 Givaudan shares in total. For further details, please refer to the below table showing:

– The shares held individually by each member of the Executive Committee as per 31 December 2020.

– The unvested performance shares that were granted in 2018 – 2020 and were still owned by members of the Executive Committee as per 31 December 2020.

| 2020<br>in numbers | Shares | Unvested<br>Performance<br>Shares |
|---|---|---|
| Gilles Andrier, CEO | 3,900 | 3,433 |
| Tom Hallam | 584 | 1,362 |
| Louie D'Amico | 431 | 1,358 |
| Maurizio Volpi | 350 | 1,715 |
| Simon Halle-Smith | 452 | 1,023 |
| Willem Mutsaerts | 269 | 1,023 |
| Anne Tayac | 326 | 1,023 |
| **Total 2020** | **6,312** | **10,937** |
| Total 2019 | 5,265 | 13,073 |

No member of the Executive Committee held any share options or option rights as at 31 December 2020 (2019: none).

One person closely connected to a member of the Executive Committee owned 217 unvested Performance Shares as at 31 December 2020.

The company is not aware of any other ownership of shares, share options/option rights, RSUs or performance shares as per 31 December 2020 by persons closely connected to members of the Executive Committee.

## Notes to the consolidated financial statements

### 32.  List of Principal Group Companies

The following are the principal companies fully owned by the Group. Share capital is shown in thousands of currency units:

| | | | |
|---|---|---|---|
| **Switzerland** | Givaudan SA | CHF | 92,336 |
| | Givaudan Suisse SA | CHF | 4,000 |
| | Givaudan Finance SA | CHF | 100,000 |
| | Givaudan International SA | CHF | 100 |
| | Vamara Holding SA | CHF | 100 |
| | Givaudan Treasury International SA | CHF | 1,000 |
| | Naturex AG | CHF | 15,288 |
| | Agthemis RE AG | CHF | 3,300 |
| | Fondation Givaudan | - | - |
| **Argentina** | Givaudan Argentina SA | ARS | 30,000 |
| | Givaudan Argentina Servicios SA | ARS | 8,000 |
| **Australia** | Givaudan Australia Pty Ltd | AUD | 93,703 |
| | Naturex Australia Pty Ltd | AUD | 0.003 |
| | drom International Pty Ltd | AUD | 50 |
| | Ungerer Australia Pty Ltd | AUD | 1,311 |
| **Austria** | Givaudan Austria GmbH | EUR | 40 |
| **Belgium** | Naturex SPRL | EUR | 1,000 |
| **Bermuda** | FF Holdings (Bermuda) Ltd | USD | 12 |
| | Givaudan International Ltd | USD | 12 |
| | FF Insurance Ltd | CHF | 170 |
| **Brazil** | Givaudan do Brasil Ltda | BRL | 345,381 |
| | G Nutra Ind Com Prod Alim e Nutricionais Ltda | BRL | 31,219 |
| | Naturex Ingredientes Naturais Ltda | BRL | 7,035 |
| | drom Internacional Fragrâncias Indústria e Comércio Ltda. | BRL | 14,388 |
| **Canada** | Givaudan Canada Co | CAD | 12,901 |
| | Naturex Inc (Canada) | CAD | 500 |
| **Chile** | Givaudan Chile Ltda | CLP | 5,000 |
| | Chile Botanics SA | CLP | 1,837,205 |
| | Naturex Chile SA | CLP | 1,731,600 |

| | | | |
|---|---|---|---|
| **China** | Givaudan Fragrances (Shanghai) Ltd | USD | 7,750 |
| | Givaudan Flavors (Shanghai) Ltd | USD | 10,783 |
| | Givaudan Specialty Products (Shanghai) Ltd | USD | 12,000 |
| | Givaudan Hong Kong Ltd | HKD | 7,374 |
| | Givaudan Flavors (Nantong) Ltd | USD | 39,000 |
| | Naturex Trading Shanghai Co Ltd | CNY | 5,608 |
| | drom Fragrances International (Guangzhou) Co Ltd | CNY | 14,058 |
| | Ungerer Fragrance & Flavor (Shanghai) Co Ltd | CNY | 7,677 |
| **Colombia** | Givaudan Colombia SA | COP | 6,965,925 |
| | Ungerer de Colombia SAS | COP | 39,600 |
| **Czech Republic** | Givaudan CR, s.r.o. | CZK | 200 |
| **Egypt** | Givaudan Egypt SAE | USD | 21,360 |
| | Givaudan Egypt Fragrances LLC | EGP | 50 |
| **France** | Givaudan France SAS | EUR | 5,006 |
| | Expressions Parfumées SAS | EUR | 3,548 |
| | Naturex SA | EUR | 14,551 |
| | SCI Les Broquetons | EUR | 495 |
| | Albert Vieille SAS | EUR | 908 |
| | drom International SARL | EUR | 1,011 |
| | Alderys SAS (ownership of 80%) | EUR | 13 |
| **Germany** | Givaudan Deutschland GmbH | EUR | 164,402 |
| | Naturex GmbH | EUR | 150 |
| | drom fragrances GmbH & Co. KG | EUR | 48,063 |
| | drom Holding GmbH | EUR | 4,747 |
| | drom Verwaltungsgesellschaft mbH | EUR | 25 |
| | Dr.rer.nat.Storp Vermögensverwaltungs-GmbH | EUR | 2,773 |
| | drom Perfume Trade GmbH | EUR | 44,276 |
| **Hong Kong** | drom Asia Pacific Ltd. | HKD | 10 |
| **Hungary** | Givaudan Hungary Kft | EUR | 15 |
| | Givaudan Business Solutions Kft | EUR | 12 |
| **India** | Givaudan (India) Private Ltd | INR | 87,330 |
| | Naturex India Private Ltd | INR | 64,416 |
| | Valentine Foods Private Ltd | INR | 100 |
| | Ungerer Flavours India PVT Ltd | INR | 100 |

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

## Notes to the consolidated financial statements

| | | | |
|---|---|---|---|
| **Indonesia** | P.T. Givaudan Indonesia | IDR | 2,608,000 |
| | P.T. drom Fragrances Indonesia | IDR | 3,462,600 |
| | P.T. Fragrance Oils Indonesia | USD | 30 |
| **Italy** | Givaudan Italia SpA | EUR | 521 |
| | Expressions Parfumées SRLA | EUR | 10 |
| | Naturex SpA | EUR | 1,200 |
| | drom International Italia S.r.l. | EUR | 26 |
| **Ivory Coast** | Naturex Ivory Coast Abidjan Purchasing | XOF | 6,000 |
| **Japan** | Givaudan Japan K.K. | JPY | 1,000,000 |
| | Naturex K.K. | JPY | 5,000 |
| **Korea** | Givaudan Korea Ltd | KRW | 550,020 |
| | Naturex Korea Seoul sales office | KRW | 284,000 |
| **Malaysia** | Givaudan Business Solutions Asia Pacific Sdn.Bhd | MYR | 2,000 |
| | Givaudan Flavours & Fragrances Malaysia Sdn.Bhd | MYR | 3,981 |
| | Fragrance Oils (Malaysia) Sdn.Bhd | MYR | - |
| **Morocco** | Naturex Morocco Casablanca | MAD | 24,640 |
| **Mexico** | Givaudan de Mexico SA de CV | MXN | 53,611 |
| | Naturex Ingredientes Naturales SA de CV | MXN | 62,768 |
| | Oxiquimica S.A.P.I de CV | MXN | 500 |
| | Ungerer Servicios AS de CV | MXN | 50 |
| | Ungerer Mexico S. de R.L. de CV | MXN | 92,556 |
| **Netherlands** | Givaudan Nederland B.V. | EUR | 402 |
| | Vika B.V. | EUR | 20 |
| | Virgula B.V. | EUR | 20 |
| | Naturex Coöperatief UA | EUR | 1 |
| | Givaudan Finance Europe BV | EUR | 5,000 |
| **New Zealand** | Givaudan NZ Ltd | NZD | 71 |
| **Nigeria** | Givaudan (Nigeria) Ltd | NGN | 10,000 |
| | Fragrance Oils (West Africa) Ltd | NGN | 15,000 |
| **Peru** | Givaudan Peru SAC | PEN | 1,303 |
| | Activ International SAC | PEN | 14,043 |
| **Poland** | Givaudan Polska Sp. Z.o.o. | PLN | 50 |
| **Russia** | Givaudan Rus LLC | RUB | 9,000 |
| | Naturex LLC | RUB | 1,500 |
| **Singapore** | Givaudan Singapore Pte Ltd | SGD | 24,000 |
| | Naturex Holdings Singapore Private Ltd | SGD | 500 |
| | Fragrance Oils (Far East) Pte Ltd | GBP | 5 |
| | Ungerer Singapore Pte Ltd | USD | 100 |

| | | | |
|---|---|---|---|
| **South Africa** | Givaudan South Africa (Pty) Ltd | ZAR | 360,002 |
| **Spain** | Givaudan Iberica, SA | EUR | 8,020 |
| | Naturex Iberian Partners, SL | EUR | 13,497 |
| | Aromasur S.L.U. | EUR | 1,320 |
| | Tierra Aromatical del Sur SL | EUR | 3 |
| | drom Spain SL | EUR | 10 |
| **Sweden** | Givaudan North Europe AB | SEK | 120 |
| | Swedish Oat Fiber AB | SEK | 1,000 |
| **Thailand** | Givaudan (Thailand) Ltd | THB | 100,000 |
| **Turkey** | Givaudan Aroma Ve Esans Sanayi Ve Ticaret Limited Sirketi | TRY | 34 |
| **United Kingdom** | Givaudan UK Ltd | GBP | 70 |
| | Major International Ltd | GBP | 50 |
| | Givaudan Holdings UK Ltd | GBP | 317,348 |
| | Naturex Ltd | GBP | 1,006 |
| | drom International UK Limited | GBP | 30 |
| | Fragrance Oils Limited | GBP | 80 |
| | Fragrance Oils (International) Limited | GBP | 16 |
| | Fragrance Oils (Purchasing) Limited | GBP | 1 |
| | Ungerer Limited | GBP | 5 |
| **United Arab Emirates** | Givaudan Middle East & Africa FZE | AED | 1,000 |
| | Expression Parfumees LLC | AED | 300 |
| **United States of America** | Givaudan United States, Inc. | USD | 0.05 |
| | Givaudan Flavors Corporation | USD | 0.1 |
| | Givaudan Fragrances Corporation | USD | 0.1 |
| | Givaudan Flavors and Fragrances, Inc. | USD | 0.1 |
| | Naturex Holdings, Inc. | USD | 0.1 |
| | Naturex, Inc. | USD | 1 |
| | Vegetable Juices, Inc. | USD | - |
| | drom International, Inc. | USD | 20 |
| | Ungerer Industries, Inc | USD | 1,807 |
| | Ungerer and Company, Inc. | USD | 650 |
| **Uruguay** | Ungerer Uruguay SA | UYU | 360 |
| **Venezuela** | Givaudan Venezuela SA | VES | 4.5 |
| **Vietnam** | Golden Frog Flavor-Fragrance Manufacture Corporation | USD | 3,279 |

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

# Notes to the consolidated financial statements

### 33. Disclosure of the Process of Risk Assessment

Risk management in Givaudan is an integral part of the business. It is a structured and continuous process of identifying, assessing and deciding on responses to risks. The reporting of the opportunities and threats that these risks create and how they might hinder the business in achieving its objectives is also part of managing risks.

Risk management is the responsibility of the Board of Directors, which delegates to the Executive Committee the management of the overall company risk management process. The Group actively promotes the continuous monitoring and management of risks at the operational management level.

The Givaudan Enterprise Risk Management Charter describes the principles, framework and process of the Givaudan Enterprise Risk Management, which ensure that material risks are identified, managed and reported. It defines the associated roles and responsibilities which are reflected in the delegated authorities. Enterprise Risk Management encompasses both the Fragrance and Flavour businesses, as well as Givaudan Group functions. It includes all types of risks in terms of their nature, their source or their consequences.

The process aims to be comprehensive, organised and documented in order to improve compliance with corporate governance regulations, guidelines and good practices; better understand the risk profile of the business; and provide additional risk-based management information for decision making.

The objectives of the Risk Management process are to continuously ensure and improve compliance with good corporate governance guidelines and practices as well as laws and regulations, where applicable; facilitate disclosure to key stakeholders of potential risks and the company's philosophy for dealing with them. At the same time, the process creates the awareness of all key executives of the magnitude of risks; provides risk-based management information for effective decision-making; and safeguard the values of the company and its assets, and protect the interests of shareholders.

Givaudan's management, at all levels, is accountable for ensuring the appropriateness, timeliness and adequacy of the risk analysis. Mitigation decisions are taken at individual and combined levels. This management is also responsible for implementing, tracking and reporting the risk mitigation directives of the Executive Committee, including periodic reporting to the Board. The assessment is performed in collaboration between the Executive Committee, divisional and functional management teams and the Corporate Compliance Officer.

The Board of Directors' Audit Committee also promotes the effective communication between the Board, Givaudan's Executive Committee, other senior corporate functions and Corporate Internal Audit in order to foster openness and accountability.

Givaudan has carried out its annual review of internal controls over accounting and financial reporting. A risk assessment is performed throughout the Internal Control System for those identified risks which may arise from the accounting and financial reporting. Then, relevant financial reporting controls are defined for each risk.

**Deloitte.**

Deloitte SA
Rue du Pré-de-la-Bichette 1
1202 Geneva
Switzerland

Phone: +41 (0)58 279 8000
Fax: +41 (0)58 279 8800
www.deloitte.ch

**Statutory Auditor's Report**

**To the General Meeting of GIVAUDAN SA, Vernier**

**Report on the Audit of the Consolidated Financial Statements**

### Opinion

We have audited the consolidated financial statements of Givaudan SA and its subsidiaries (the Group), which comprise the consolidated income statement, consolidated statement of comprehensive income, consolidated statement of financial position, consolidated statement of changes in equity, consolidated statement of cash flows for the year ended 31 December 2020, and notes to the consolidated financial statements, including a summary of significant accounting policies.

In our opinion the consolidated financial statements, presented on pages 39 to 92, give a true and fair view of the consolidated financial position of the Group as at 31 December 2020, its consolidated financial performance and its consolidated cash flows for the year then ended in accordance with International Financial Reporting Standards (IFRS) and comply with Swiss law.

### Basis for Opinion

We conducted our audit in accordance with Swiss law, International Standards on Auditing (ISAs) and Swiss Auditing Standards. Our responsibilities under those provisions and standards are further described in the Auditor's Responsibilities for the audit of the consolidated financial statements section of our report. We are independent of the Group in accordance with the provisions of Swiss law and the requirements of the Swiss audit profession, as well as the International Code of Ethics for Professional Accountants, (including International Independence Standards) of the International Ethics Standards Board for Accountants (IESBA Code) and we have fulfilled our other ethical responsibilities in accordance with these requirements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

Governance
report

Compensation
report

Consolidated
financial report

Statutory
financial report

Appendix

# Deloitte.

## Our Audit Approach

### Summary

| | |
|---|---|
| **Key audit matters** | Based on our audit scoping, we identified the following key audit matters:<br>– Acquisition accounting related to Ungerer and its affiliates;<br>– Carrying value of intangible assets; and<br>– Taxation. |
| **Materiality** | Based on our professional judgment we determined materiality for the Group as a whole to be CHF 60 million. |
| **Scoping** | Based on our understanding of Givaudan's operations, we have defined 17 component operations in 11 countries that are in scope for group reporting purposes. We have requested from the auditors in these countries to perform audit procedures to address the risks identified in our risk assessment phase. Coverage ratio on group sales, group operating income and group total assets are disclosed below. |

## Key Audit Matters

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements of the current period. These matters were addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters.

# Deloitte.

**Acquisition accounting related to Ungerer and its affiliates**

| Key audit matter | How the scope of our audit responded to the key audit matter |
|---|---|
| As described in the Critical Accounting Estimates and Judgments in Note 3, significant judgment is required in determining the fair value of the identifiable assets acquired, particularly intangibles, and the liabilities assumed. Such judgments require estimates that are not only based on available information but as well on assumptions with respect to the timing and amount of future revenues and expenses associated with an asset and a liability. In addition, judgment is required to allocate the purchase price to the underlying acquired assets and liabilities based on their estimated fair value. | We have tested the design & implementation of Givaudan internal controls in relation to acquisition accounting. |
| | We obtained legal documents such as the sale and purchase agreement and its relevant appendices to evaluate the key terms and conditions. We confirmed our understanding of the transaction by conducting inquiries with management. |
| As described in Note 6 to the consolidated financial statements, the Group completed the acquisition of Ungerer on 20 February 2020 for a total consideration of CHF 676 million. | We obtained various reports from management's advisors that supported our understanding of the rationale of the acquisition as well as the completeness of the assets acquired and liabilities assumed. We also obtained report from management's external valuation experts providing the valuation of intangible and tangible assets in the acquisition accounting. |
| This transaction is considered as a business combination as defined by IFRS 3 Business Combinations which requires management to perform a purchase price allocation. The purchase price allocation apportions the consideration paid against the net assets acquired and fair valued and against goodwill. | We assessed whether the transaction constitutes a business combination in accordance with IFRS 3 "Business Combinations". We also appraised the acquisition date selected by management. |
| For the acquisition of Ungerer and its affiliates, the consideration paid was allocated against the fair value of identified intangible assets for CHF 297 million, the fair value of other identifiable assets for CHF 254 million, the fair value of liabilities assumed of CHF 148 million and goodwill of CHF 273 million. | We tested the payments of consideration by tracing them to the bank statements evidencing the payments of the funds. |
| The accounting for the acquisition of assets and liabilities of Ungerer and its affiliates, including the valuation of intangible assets identified, requires a number of complex accounting judgments sensitive to key assumptions such as discount rate, growth rate and other assumptions used in the business plan, internal rate of return, attrition rate and royalty rate. | We challenged management on the identification and valuation of intangible assets and valuation of tangible assets acquired and liabilities assumed in the acquisition accounting against the terms of the sale and purchase agreement, management's experts reports and comparable transactions. |
| In addition, the amortisation period retained for intangibles acquired also requires judgment and constitutes a significant estimate that affects current and future financial periods. | We reviewed and assessed the work performed by management's external valuation experts including the valuation methodology for each category of intangible assets, along with the key judgments made in determining the fair values including any fair value adjustments to tangible assets. We have involved our own valuation specialists to test the reasonableness of the methodology and assumptions used as well as the computation of tangible and intangible assets value. |
| We focused on this transaction because of the complexity of applying acquisition accounting, the level of judgment relating to the identification and valuation of intangible assets, valuation of tangible assets acquired and the liabilities assumed and the significance of consideration paid on that particular transaction in 2020. | We evaluated the reasonableness of the business plan used in the valuation model. In particular, we challenged sales forecasts with historical data from the business acquired and market trends from Givaudan. Using previous acquisitions and available market data, we benchmarked the assumptions used in determining the attrition and royalty rate as well as the contributory asset charges ('CAC') used in the valuation. |
| | We also challenged the duration estimated by management for the amortisation of the intangible assets acquired, comparing them to current Group accounting policies and other recent acquisitions. |
| | We validated the appropriateness and completeness of the related disclosures in Note 3 and Note 6 to the consolidated financial statements. |
| | Based on the procedures performed above, we obtained sufficient audit evidences to corroborate management's judgments and assumptions regarding the acquisition accounting of Ungerer and its affiliates. |

# Deloitte.

## Carrying value of intangible assets

| Key audit matter | How the scope of our audit responded to the key audit matter |
|---|---|
| As of 31 December 2020, Givaudan carries intangible assets of CHF 4,543 million of which goodwill of CHF 3,294 million and other intangible assets of CHF 1,249 million.<br><br>The goodwill has been allocated to the following four Cash Generating Units ("CGUs"):<br>– Taste & Wellbeing: CHF 2,298 million,<br>– Fragrance & Beauty: CHF 756 million,<br>– Expressions Parfumées: CHF 135 million,<br>– Fragrance Oils: CHF 105 million.<br><br>Furthermore, Givaudan holds intangible assets that were recognised from previous business combinations amounting to CHF 1,077 million. These assets are mainly technology-related assets, customer and suppliers' relationships and brand names. These assets have been recognised during the initial purchase price allocations in accordance with IFRS 3 "Business Combination". The valuation of software is not part of our Key Audit Matter consideration as Software and ERP system assets (carrying value 172 million as of 31 December 2020) have not been recognised from acquisition accounting.<br><br>As stated in Note 2.17 to the consolidated financial statements, the carrying value of goodwill and intangible assets with infinite useful economic life is tested for impairment annually or more frequently if impairment indicators are present. Management has not identified any indicators of impairment in the period. For Goodwill, Management has proceeded to an evaluation of the recoverable amount of the CGUs by comparing the recoverable value of the assets with their carrying values. Management performed its annual impairment test of goodwill in the fourth quarter of 2020 and has calculated the value-in-use in order to estimate the recoverable value of the assets. In order to derive the value in use of the assets attributable to the CGUs, Management has prepared discounted cash flows models.<br><br>The key inputs that require judgment are:<br>– The identification of the relevant CGUs;<br>– The estimate of the future cash flows the entity expects to derive from each of the CGUs;<br>– The discount rates; and<br>– The long-term growth rate used to derive the terminal value.<br><br>Management concluded that in all cases, value-in-use formed the basis of the impairment conclusions and that no impairment should be recognised on that basis. A sensitivity analysis considering changes in assumptions in the cash flows and in the discount rates does not give rise to any material impairment.<br><br>Further details in relation to management impairment considerations have been provided in Note 22, with details regarding the discount rates used for each of the CGUs. | We assessed internal controls in relation to the identification of impairment indicators and challenged independently the results.<br><br>We assessed the design and implementation of the internal controls relating to the projected financial information process and approval, the preparation and review of the weighted average cost of capital and preparation and review of the asset impairment models for Goodwill and intangible assets with indefinite useful life.<br><br>We have inquired with management about the presence of impairment indicators for the intangible assets that have been recognized from current and past business combinations. We have corroborated the results of our inquiries with a review of the financial performance of the underlying markets and legal entities as well as inquiries with personnel outside the finance function.<br><br>We evaluated and challenged the key assumptions and inputs to the impairment models by independently estimating a range of acceptable outcome and performing sensitivity analyses in order to evaluate the impact of selecting alternative assumptions.<br><br>In challenging the assumptions, we have:<br>– Considered the appropriateness of the judgment that Expressions Parfumées and Fragrance Oils constitute separate CGUs and that the 2020 acquisitions are integrated to the Fragrance & Beauty and Taste & Wellbeing CGUs;<br>– Assessed the discount rates used. In doing so, we involved our internal valuation specialists to assess the appropriateness of management's key inputs and methodology used in deriving the discount rates. This included benchmarking these inputs against available market data;<br>– Evaluated the appropriateness of the long term growth rates applied to derive the terminal value by tracing them back to a prominent source of macroeconomic projections;<br>– Tested the extent to which projected financial information can be reliably prepared by management by performing retrospective review to compare prior period forecasts with actual results and reviewed any budget revision;<br>– Confirmed that forecasted cash flows were consistent with Board approved forecasts and analysed reasonably possible downside sensitivities;<br>– Evaluated the reasonableness of cash flow projections by considering the potential effects related to the COVID-19 pandemic;<br>– Evaluated the sensitivity in the valuation resulting from changes to the key assumptions applied.<br><br>We audited the integrity of the impairment models and cash flow forecasts. We considered the compliance of management's impairment models with the requirements of IAS 36 "Impairment of Assets".<br><br>We have compared management estimates of economic useful life with the actual usage of the assets.<br><br>We also reviewed the appropriateness of the amortisation method and related charges for intangible assets with a definite useful economic life. |

# Deloitte.

## Carrying value of intangible assets

| Key audit matter | How the scope of our audit responded to the key audit matter |
|---|---|
| Intangible assets with a definite useful economic life are carried at cost less accumulated amortisation and accumulated impairment losses. In addition to the amortisation booked on a straight-line basis over the estimated economic useful life of the asset, management assessed impairment indicators on a regular basis.<br><br>Due to the significance of the carrying value for goodwill and acquisition-related intangible assets and the judgments involved in performing the impairment test, this matter was considered as a key audit matter. | We have validated the appropriateness and completeness of the related disclosures in Note 22 to the consolidated financial statements.<br><br>Based on the procedures performed, we obtained sufficient appropriate audit evidence to corroborate management's judgments and estimates regarding the carrying value for intangibles assets. |

## Taxation

| Key audit matter | How the scope of our audit responded to the key audit matter |
|---|---|
| The Group operates in a large number of different jurisdictions and is therefore subject to many tax regimes with differing rules and regulations. As described in the Summary of Significant Accounting Policies in Note 2 and in Note 3 on Critical Accounting Estimates and Judgments, significant judgment is required in determining provision for income taxes, both current and deferred, as well as the assessment of provisions for uncertain tax positions including estimates of interest and penalties where appropriate.<br><br>The effective tax rate of the group increased from 13% in 2019 to 15% in 2020. The consolidated statement of financial position includes current tax assets of CHF 66 million, current tax liabilities of CHF 157 million, together with deferred tax assets of CHF 218 million and deferred tax liabilities of CHF 310 million. The tax expense recognised in the consolidated income statement amounts to CHF 133 million. Details of all current and deferred tax balances are disclosed in Note 16 to the consolidated financial statements.<br><br>Due to their significance to the financial statements as a whole, combined with the level of judgment and estimation required to determine their values and the geographical spread with different jurisdictions, the evaluation of current and deferred tax balances including the assessment of provisions for uncertain tax positions is considered a key audit matter. | We assessed the design and implementation of internal controls in respect to provisions for current tax and the recognition and recoverability of deferred tax assets.<br><br>We evaluated management's implementation of Group policies and controls regarding current and deferred tax, as well as the reporting of uncertain tax positions.<br><br>We examined the procedures in place for the current and deferred tax calculations for completeness and valuation and audited the related tax computations and estimates in the light of our knowledge of the tax circumstances. Our work was conducted with the support of our internal tax specialists.<br><br>We performed an assessment of the material components affecting the Group's tax expense, balances and exposures. With the support of tax specialists, we reviewed and challenged the information reported by the main contributing subsidiaries including the information related to deferred tax assets on loss carry forwards and we verified the consolidation and analysis of tax balances.<br><br>We considered management's assessment of the validity and adequacy of provisions for uncertain tax positions, evaluating the basis of assessment and reviewing relevant correspondence and legal advice where available including any information regarding similar cases with the relevant tax authorities.<br><br>For the deferred tax assets and liabilities, we assessed the appropriateness of management's assumptions and estimates such as the expected future tax rate, expected dividend distribution from subsidiaries and timing of the temporary differences.<br><br>We validated the appropriateness and completeness of the related disclosures in Note 16 to the consolidated financial statements.<br><br>Based on the procedures performed, we obtained sufficient appropriate audit evidence to corroborate management's judgments and estimates regarding current and deferred tax balances including provisions for uncertain tax positions. |

**Deloitte.**

Governance report

Compensation report

**Consolidated financial report**

Statutory financial report

Appendix

### Our application of materiality

We define materiality as the magnitude of misstatement in the financial statements that makes it probable that the economic decisions of a reasonably knowledgeable person would be changed or influenced. We use materiality both in planning the scope of our audit work and in evaluating the results of our work.

Based on our professional judgment we determined materiality for the Group as a whole to be CHF 60 million, based on a calculation of 7% of normalised Group income before taxes, adjusted for non-recurring transactions. We selected Group income before taxes as the basis for determining our materiality because, in our view, this measure represents the performance of the Group and is one of the indicators against which Givaudan is commonly assessed and is a generally accepted benchmark.

The materiality applied by the component auditors ranged from CHF 45 million to CHF 18 million depending on the scale of the component's operations, the component's contribution to Group sales, Group income before taxes, Group total assets and our assessment of risks specific to each location.

We agreed with the Audit Committee that we would report to the Committee all audit differences in excess of CHF 3 million, as well as differences below that threshold that, in our view, warranted reporting on qualitative grounds. We also reported to the Audit Committee on disclosure matters that we identified when assessing the overall presentation of the financial statements.

### An overview of the scope of our audit

Our group audit was scoped by obtaining an understanding of the group and its environment, including group-wide controls, and assessing the risks of material misstatement at the group level. Based on that assessment, we focused our group audit scope primarily on the audit work at 17 component operations in 11 countries. 11 of these were subject to a full audit, whilst the remaining six were subject to specified audit procedures where the extent of our testing was based on our assessment of the risks of material misstatement and of the materiality of the group's operations at those locations.

# Deloitte.

These locations are geographically spread across all regions, reflecting Givaudan's global operations. We obtain assurance over these countries through a combination of audit procedures performed locally, within the Givaudan shared service centres and centrally at the Head office.

In aggregate, these components represented scope coverage of:



**Revenue**   **Profit before tax**   **Total assets**

73%  27%   96%  4%   75%  25%

● Audits for group reporting purposes   ● Review at group level

All other wholly owned and joint venture businesses were subject to analytical review procedures for the purpose of the Group audit. Annual statutory audits are conducted by Deloitte at the majority of the Group's affiliates, although these are predominantly completed subsequent to our audit report on the consolidated financial statements.

At the parent entity level we also tested the consolidation controls and carried out analytical procedures to confirm our conclusion that there were no significant risks of material misstatement of the aggregated financial information of the remaining components not subject to audit or audit of specified account balances.

The group audit team virtually visited some key locations as defined at planning stage. We are defining our visits based on significance of the affiliates and main events occurred during the year. All component audit partners were included in planning briefings, we discussed their risk assessment and we reviewed the documentation of the results from their procedures.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

# Deloitte.

## Other Information in the Annual Report

The Board of Directors is responsible for the other information in the annual report. The other information comprises all information included in the annual report, but does not include the consolidated financial statements, the stand-alone financial statements of the Company and our auditor's reports thereon.

Our opinion on the consolidated financial statements does not cover the other information in the annual report and we do not express any form of assurance conclusion thereon.

In connection with our audit of the consolidated financial statements, our responsibility is to read the other information in the annual report and, in doing so, consider whether the other information is materially inconsistent with the consolidated financial statements or our knowledge obtained in the audit, or otherwise appears to be materially misstated. If, based on the work we have performed, we conclude that there is a material misstatement of this other information, we are required to report that fact. We have nothing to report in this regard.

## Responsibility of the Board of Directors for the Consolidated Financial Statements

The Board of Directors is responsible for the preparation of the consolidated financial statements that give a true and fair view in accordance with IFRS and the provisions of Swiss law, and for such internal control as the Board of Directors determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, the Board of Directors is responsible for assessing the Group's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the Board of Directors either intends to liquidate the Group or to cease operations, or has no realistic alternative but to do so.

## Auditor's Responsibilities for the Audit of the Consolidated Financial Statements

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with Swiss law, ISAs and Swiss Auditing Standards will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements.

# Deloitte.

A further description of our responsibilities for the audit of the financial statements is located at the website of EXPERTsuisse: http://expertsuisse.ch/en/audit-report-for-public-companies. This description forms part of our auditor's report.

## Report on Other Legal and Regulatory Requirements

In accordance with article 728a paragraph 1 item 3 CO and Swiss Auditing Standard 890, we confirm that an internal control system exists, which has been designed for the preparation of consolidated financial statements according to the instructions of the Board of Directors.

We recommend that the consolidated financial statements submitted to you be approved.

**Deloitte SA**

Karine Szegedi Pingoud
Licensed Audit Expert
Auditor in Charge

Laetitia Cejudo Petit
Licensed Audit Expert

Geneva, 28 January 2021

# Statutory Financial Report



**In this section**

**103  Statutory financial statements of Givaudan SA (Group Holding Company)**

**103**  Income Statement

**103**  Statement of Financial Position

**104  Notes to the statutory financial statements**

**104**  1. General Information

**104**  2. Summary of Accounting Principles Adopted

**104**  3. Subsidiaries

**105**  4. Investments in Joint Ventures and Associates

**106**  5. Debt

**106**  6. Indirect Taxes

**106**  7. Equity

**108**  8. Own Shares

**108**  9. Board of Directors and Executive Committee Compensation

**109  Appropriation of available earnings**

**109**  Proposal of the Board of Directors to the General Meeting of Shareholders

**110  Report of the Statutory Auditor**

**110**  Statutory Auditor's Report on the Financial Statements

# Statutory financial statements of Givaudan SA (Group Holding Company)

## Income Statement
For the year ended 31 December

| in millions of Swiss francs | Note | 2020 | 2019 |
|---|---|---|---|
| Income from investments in Group companies | 3 | 232 | 286 |
| Royalties from Group companies | | 1,040 | 997 |
| Other operating income | | 1 | 1 |
| Share of results of joint ventures and associates | 4 | 1 | 2 |
| **Total Operating income** | | **1,274** | **1,286** |
| Research and development expenses to Group companies | | (325) | (331) |
| Personnel expenses | | (2) | |
| Other operating expenses | | (66) | (60) |
| Depreciation of property, plant and equipment | | – | |
| Amortisation and impairment of intangible assets | | (61) | (61) |
| **Total Operating expenses** | | **(454)** | **(452)** |
| **Operating income** | | **820** | **834** |
| Financial expenses | | (385) | (294) |
| Financial income | | 290 | 165 |
| Non-operating expenses | | (88) | (93) |
| **Income before taxes** | | **637** | **612** |
| Income taxes | | (38) | (27) |
| **Net income** | | **599** | **585** |

## Statement of Financial Position

| in millions of Swiss francs | Note | 31 December 2020 | 31 December 2019 |
|---|---|---|---|
| Cash and cash equivalents | | 10 | 10 |
| Marketable securities | | 106 | 108 |
| Accounts receivable from Group companies | | 180 | 186 |
| Other current assets | | 52 | 41 |
| Accrued income and prepaid expenses | | 2 | 2 |
| **Current assets** | | **350** | **347** |
| Loans to Group companies | | 150 | 150 |
| Other long-term assets | | 75 | 11 |
| Investments in Group companies | 3 | 5,991 | 5,253 |
| Interests in joint ventures and investments in associates | 4 | 31 | 32 |
| Other financial assets | | 13 | 15 |
| Property, plant and equipment | | 2 | |
| Intangible assets | | 210 | 222 |
| **Non-current assets** | | **6,472** | **5,683** |
| **Total assets** | | **6,822** | **6,030** |
| Short-term debt | 5 | 468 | 290 |
| Accounts payable to Group companies | | 106 | 78 |
| Other current liabilities | | 133 | 89 |
| Deferred income and accrued expenses | | 85 | 79 |
| **Current liabilities** | | **792** | **536** |
| Long-term debt | 5 | 2,524 | 3,128 |
| Loans from Group companies | | 1,092 | |
| Other non-current liabilities | | 103 | 79 |
| **Non-current liabilities** | | **3,719** | **3,207** |
| **Total liabilities** | | **4,511** | **3,743** |
| Share capital | 7 | 92 | 92 |
| Statutory retained earnings | 7 | 18 | 18 |
| Statutory capital reserves from capital contributions - additional paid-in capital | 7 | 3 | 3 |
| Voluntary retained earnings | 7 | 1,542 | 1,542 |
| Own shares | 7,8 | (35) | (31) |
| **Available retained earnings** | | | |
| - Balance brought forward from previous year | | 92 | 78 |
| - Net income for the year | | 599 | 585 |
| **Equity** | | **2,311** | **2,287** |
| **Total liabilities and equity** | | **6,822** | **6,030** |

# Notes to the statutory financial statements

## 1. General Information
### 1.1 Structure and Description of the Activity
Givaudan SA is a holding company based in Vernier, near Geneva, whose main goal is to manage its investments in subsidiaries.

More specifically Givaudan SA invests in companies whose aim is to manufacture and commercialise natural and synthetic aromatic or fragrance raw materials as well as other related products. In addition, Givaudan SA invests in research and development and supplies services for the use of these products. Givaudan SA develops, registers and makes use of all trademarks, patents, licenses, manufacturing processes and formulas.

In March 2020 a branch in Zug (Switzerland) has been created. It's goal is to manage the intellectual property of the company.

### 1.2 Employees
The average number of employees during the year was less than ten (2019: less than ten).

## 2. Summary of Accounting Principles Adopted
The financial statements at 31 December 2020 are prepared in accordance with Swiss law.

The company is classified as a large entity as it meets the criteria to present group accounts under the definition of art. 961d al. 1 of the Swiss Code of Obligations. As Givaudan prepares and reports comprehensive consolidated financial statements under International Financial Reporting Standards (IFRS) including a cash flow statement, accompanying notes and a management report, Givaudan SA is exempt from preparing this information.

### Valuation Methods and Translation of Foreign Currencies
Investments in, and loans to, Group companies are stated at cost less appropriate write-downs. Marketable securities are shown at the lower of cost and market value. Derivatives are recorded at fair value.

The currency in which Givaudan SA operates is Swiss francs (CHF) and the accounts are presented in Swiss francs. In the statement of financial position, foreign currency assets and liabilities are remeasured at year-end exchange rates with the exception of investments in Group companies which are valued at historical exchange rates. In the income statement, expenses and income in foreign currencies are converted in Swiss francs using the daily exchange rate of the transaction date. Foreign currency gains and losses are recognised in the income statement as they occur with the exception of unrealised gains which are deferred.

## 3. Subsidiaries
List of the direct subsidiaries of the company, which are wholly-owned unless otherwise indicated (percentage of voting rights):

| | |
|---|---|
| **Switzerland** | Givaudan Suisse SA |
| | Givaudan Finance SA |
| | Prodiga AG |
| | Givaudan International SA |
| | Vamara Holding SA |
| | Kemptthal Immobilien Nord AG |
| | Givaudan Treasury International SA |
| **Argentina** | Givaudan Argentina SA |
| | Givaudan Argentina Servicios SA |
| **Australia** | Givaudan Australia Pty Ltd |
| **Austria** | Givaudan Austria GmbH |
| **Bermuda** | Givaudan Capital Transactions Ltd |
| **Brazil** | Givaudan do Brasil Ltda |
| | Naturex Ingredientes Naturais Ltda |
| **Canada** | Givaudan Canada Co |
| **Chile** | Givaudan Chile Ltda |
| **China** | Givaudan Fragrances (Shanghai) Ltd |
| | Givaudan Flavors (Shanghai) Ltd |
| | Givaudan Specialty Products (Shanghai) Ltd |
| | Givaudan Hong Kong Ltd |
| | Givaudan Flavors (Nantong) Ltd |
| | Givaudan Management Consulting (Shanghai) Ltd |
| | Givaudan Fragrances (Changzhou) Ltd |
| **Colombia** | Givaudan Colombia SA |
| **Czech Republic** | Givaudan CR, s.r.o. |
| **Egypt** | Givaudan Egypt SAE |
| | Givaudan Egypt Fragrances LLC |
| **France** | Givaudan France SAS |
| | Activ International SAS |
| | Expressions Parfumées SAS |
| | Naturex SA |
| | Albert Vieille SAS |
| | Alderys SAS (ownership of 80%) |
| **Germany** | Givaudan Deutschland GmbH |
| | drom Verwaltungsgesellschaft mbH |
| | Dr. rer.nat. Storp Vermögensverwaltungs-GmbH |

# Notes to the statutory financial statements

| | |
|---|---|
| **Guatemala** | Givaudan Guatemala SA |
| **Hungary** | Givaudan Hungary Kft |
| | Givaudan Finance Services Kft |
| **India** | Givaudan (India) Private Ltd |
| **Indonesia** | P.T. Givaudan Indonesia |
| | P.T. Givaudan Flavours and Fragrances Indonesia |
| **Italy** | Givaudan Italia SpA |
| **Japan** | Givaudan Japan K.K. |
| **Korea** | Givaudan Korea Ltd |
| **Malaysia** | Givaudan Malaysia Sdn.Bhd |
| | Givaudan Flavours & Fragrances Malaysia Sdn.Bhd |
| **Mexico** | Givaudan de Mexico SA de CV |
| | Grupo Givaudan SA de CV |
| **Netherlands** | Givaudan Nederland B.V. |
| | Virgula B.V. |
| **Nigeria** | Givaudan (Nigeria) Ltd |
| **Peru** | Givaudan Peru SAC |
| **Poland** | Givaudan Polska Sp. Z.o.o. |
| **Russia** | Givaudan Rus LLC |
| **Singapore** | Givaudan Singapore Pte Ltd |
| **South Africa** | Givaudan South Africa (Pty) Ltd |
| **Spain** | Givaudan Iberica, SA |
| **Sweden** | Givaudan North Europe AB |
| **Thailand** | Givaudan (Thailand) Ltd |
| **Turkey** | Givaudan Aroma Ve Esans Sanayi Ve Ticaret Limited Sirketi |
| **United Kingdom** | Givaudan Holdings UK Ltd |
| | Fragrance Oils Limited |
| **United Arab Emirates** | Givaudan Middle East & Africa FZE |
| **United States of America** | Givaudan United States, Inc. |
| | Ungerer Industries, Inc. |
| **Vietnam** | Golden Frog Flavor-Fragrance Manufacture Corporation |

In 2020 Givaudan SA increased its investments in Givaudan Fragrances (Changzhou) Ltd and Naturex SA and Givaudan SA also increased its investment in Givaudan Italy SpA, as a consequence of the acquisition of the cosmetics business of Indena. Furthermore Givaudan SA has increased its contribution in Givaudan Deutschland GmbH in the form of ownership of the shares of drom fragrances GmbH & Co.KG. Finally, Givaudan SA acquired Ungerer Industries, Inc. and Alderys SAS during the year 2020.

## 4. Investments in Joint Ventures and Associates

| Name of joint ventures | Principal activity | Country of incorporation | Ownership interest / Voting rights |
|---|---|---|---|
| BGN Tech LLC | Innovative natural ingredients | USA | 49% |
| Natural Extracts International Ltd | Natural ingredient derivatives production | Mauritius | 49% |
| Vanilla International Ltd | Natural ingredient collection and extract | Mauritius | 49% |

Jiangsu Xinrui Aromatics Ltd, manufacturing fragrance ingredients in China, became in 2019 an associate in accordance with the new terms and conditions set in the arrangement. The Givaudan SA's ownership interest is 49%.

# Notes to the statutory financial statements

## 5. Debt

Givaudan SA entered into the following debt transactions:

| Issue date | Type of debt | Currency of principal | Principal amount in millions | Redeemable | Interest rate | Type of interest | **2020** | 2019 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | **in millions of Swiss francs** | |
| 2011 | | CHF | 150 | 07 Dec 2021 | 2.125% | | 150 | 149 |
| 2014 | Public bonds | CHF | 100 | 18 Sep 2020 | 1.000% | Fixed | Reim-bursed | 100 |
| | | CHF | 150 | 19 Mar 2024 | 1.750% | | 150 | 150 |
| 2016 | | CHF | 100 | 07 Dec 2022 | 0.000% | | 100 | 100 |
| | | CHF | 200 | 05 Dec 2031 | 0.625% | | 200 | 200 |
| 2017 | Private placements | EUR | 100 | 20 Dec 2022 | | Floating | 108 | 108 |
| | | EUR | 200 | 20 Dec 2024 | 1.331% | Fixed | 216 | 217 |
| 2018 | Public bonds | CHF | 150 | 09 Apr 2020 | | Floating | Reim-bursed | 150 |
| | | CHF | 200 | 09 Apr 2025 | 0.375% | Fixed | 200 | 200 |
| | | EUR | 500 | 17 Sep 2025 | 1.125% | | 538 | 540 |
| | | EUR | 800 | 17 Sep 2030 | 2.000% | | 861 | 864 |
| 2019 | Group bank credit facility | CHF | 600 | 26 Jun 2023 | | Floating | Reim-bursed | 600 |
| 2020 | | | 180 | | | | | |
| | Public bonds | | 150 | 10 Nov 2028 | 0.150% | Fixed | 150 | |
| **Total debt as at 31 December** | | | | | | | **2,673** | **3,378** |

As at 31 December 2020, short term debt includes an overdraft of CHF 319 million (2019: CHF 40 million) related to the cash pooling agreements with a Group company.

## 6. Indirect Taxes

The company is part of a Group for VAT purposes with two other affiliates of the Group in Switzerland. The company is jointly and severally liable towards the tax authorities for current and future VAT payables of the VAT Group to which it belongs.

## 7. Equity

As at 31 December 2020 the share capital amounts to CHF 92,335,860, divided into 9,233,586 fully paid-up registered shares, with a nominal value of CHF 10.00 each. Every share gives the right to one vote.

The Board of Directors has at its disposal conditional capital of a maximum aggregate amount of CHF 7,481,980 that may be issued through a maximum of 748,198 registered shares, of which a maximum of CHF 1,618,200 can be used for executive share option plans.

At the Annual General Meeting held on 25 March 2020 the distribution of an ordinary dividend of CHF 62.00 per share (2019: CHF 60.00 per share) was approved. The dividend payment has been made out of available retained earnings.

# Notes to the statutory financial statements

The movements in equity are as follows:

| **2020**<br>in millions of Swiss francs | Share Capital | Statutory retained earnings | Additional paid-in capital | Voluntary retained earnings | Available retained earnings | Own shares | Total |
|---|---|---|---|---|---|---|---|
| **Balance as at 1 January** | **92** | **18** | **3** | **1,542** | **663** | **(31)** | **2,287** |
| **Registered shares** | | | | | | | |
| Issuance of shares | | | | | | | |
| Movement of shares | | | | | | (4) | (4) |
| **Appropriation of available earnings** | | | | | | | |
| Distribution to the shareholders paid relating to 2019 | | | | | (571) | | (571) |
| **Net profit for the year** | | | | | 599 | | 599 |
| **Balance as at 31 December** | **92** | **18** | **3** | **1,542** | **691** | **(35)** | **2,311** |

| 2019<br>in millions of Swiss francs | Share Capital | Statutory retained earnings | Additional paid-in capital | Voluntary retained earnings | Available retained earnings | Own shares | Total |
|---|---|---|---|---|---|---|---|
| **Balance as at 1 January** | **92** | **18** | **3** | **1,542** | **630** | **(22)** | **2,263** |
| **Registered shares** | | | | | | | |
| Issuance of shares | | | | | | | |
| Movement of shares | | | | | | (9) | (9) |
| **Appropriation of available earnings** | | | | | | | |
| Distribution to the shareholders paid relating to 2018 | | | | | (552) | | (552) |
| **Net profit for the year** | | | | | 585 | | 585 |
| **Balance as at 31 December** | **92** | **18** | **3** | **1,542** | **663** | **(31)** | **2,287** |

Statutory capital reserves from capital contributions – additional paid-in capital are presented separately in equity. Any payments made out of these reserves are not subject to Swiss withholding tax, nor subject to income tax on individual shareholders who are resident in Switzerland.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

# Notes to the statutory financial statements

## 8.  Own Shares

The movements in own shares are as follows:

| 2020 | Number | Price in Swiss francs | | | Total in millions of Swiss francs |
| --- | --- | --- | --- | --- | --- |
| | | High | Average | Low | |
| **Balance as at 1 January** | **15,541** | | | | **31** |
| Purchases at cost | 25,000 | 2,595.0 | 2,250.0 | 1,799.0 | 56 |
| Sales and transfers at cost | (23,971) | 3,634.8 | 2,170.2 | 2,141.6 | (52) |
| **Balance as at 31 December** | **16,570** | | | | **35** |

| 2019 | Number | Price in Swiss francs | | | Total in millions of Swiss francs |
| --- | --- | --- | --- | --- | --- |
| | | High | Average | Low | |
| **Balance as at 1 January** | **11,906** | | | | **22** |
| Purchases at cost | 26,000 | 2,154.0 | 1,968.3 | 1,800.0 | 51 |
| Sales and transfers at cost | (22,365) | 1,857.9 | 1,857.9 | 1,857.9 | (42) |
| **Balance as at 31 December** | **15,541** | | | | **31** |

As at 31 December 2020 and 2019, there were no other companies controlled by Givaudan SA that held Givaudan SA shares.

As at 31 December 2020, William H. Gates III (13.86%), BlackRock Inc. (5.06%), MFS Investment Management (4.99%), Nortrust Nominees Ltd (nominee; 14.98%), Chase Nominees Ltd (nominee; 7.71%) and Banque Pictet & Cie SA (nominee; 4.49%) were the only shareholders holding more than 3% of total voting rights.

## 9.  Board of Directors and Executive Committee Compensation

Information required by Swiss law, as per art. 663b bis CO, on the Board of Directors and Executive Committee compensation are disclosed in the Givaudan consolidated financial statements, Note 31.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

# Appropriation of available earnings and distribution from the statutory capital reserves from contributions – additional paid-in capital of Givaudan SA

**Proposal of the Board of Directors to the General Meeting of Shareholders**
**Available earnings**

| in Swiss francs | 2020 | 2019 |
|---|---|---|
| Net income for the year | 599,056,995 | 584,670,019 |
| Balance brought forward from previous year | 91,607,602 | 77,650,373 |
| **Total available earnings** | **690,664,597** | **662,320,392** |
| 2019 distribution proposal of CHF 62.00 gross per share | | 572,482,332 |
| 2020 distribution proposal of CHF 64.00 gross per share | 590,949,504 | |
| **Total appropriation of available earnings** | **590,949,504** | **572,482,332** |
| **Distribution not paid on Treasury shares held by the Group** | | **1,769,542** |
| **Amount to be carried forward** | **99,715,093** | **91,607,602** |

**Statutory capital reserves from capital contributions – additional paid-in capital**

| in Swiss francs | 2020 | 2019 |
|---|---|---|
| Balance brought forward from previous year | 3,322,955 | 3,322,955 |
| **Total additional paid-in capital** | **3,322,955** | **3,322,955** |
| | | |
| **Amount to be carried forward** | **3,322,955** | **3,322,955** |

# Deloitte.

Deloitte SA
Rue du Pré-de-la-Bichette 1
1202 Geneva
Switzerland

Phone: +41 (0)58 279 8000
Fax: +41 (0)58 279 8800
www.deloitte.ch

**Statutory Auditor's Report**

**To the General Meeting of GIVAUDAN SA, Vernier**

**Report on the Audit of the Financial Statements**

## Opinion

We have audited the financial statements of Givaudan SA, which comprise the income statement, the statement of financial position for the year ended 31 December 2020, and notes to the financial statements, including a summary of significant accounting policies.

In our opinion, the accompanying financial statements as at 31 December 2020, presented on pages 103 to 109, comply with Swiss law and the company's articles of incorporation.

## Basis for Opinion

We conducted our audit in accordance with Swiss law and Swiss Auditing Standards. Our responsibilities under those provisions and standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are independent of the entity in accordance with the provisions of Swiss law and the requirements of the Swiss audit profession and we have fulfilled our other ethical responsibilities in accordance with these requirements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

## Report on Key Audit Matters based on the circular 1/2015 of the Federal Audit Oversight Authority

Key audit matters are those matters that, in our professional judgement, were of most significance in our audit of the financial statements of the current period. These matters were addressed in the context of our audit of the financial statements as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters.

# Deloitte.

**Carrying value of Investments in Group companies**

| Key audit matter | How the scope of our audit responded to the key audit matter |
|---|---|
| As described in Note 3 to the financial statements, the Company holds investments in Givaudan Group companies with a carrying value of CHF 5,991 million as of 31 December 2020, representing 88% of total assets.<br><br>Each investment held is valued individually and reviewed annually for impairment. Each investment showing another than temporary impairment indicator must be tested for impairment and an impairment would need to be recorded if the recoverable amount is lower than the carrying value.<br><br>The impairment test performed by Givaudan management is subject to judgement around the valuation method, key assumptions used and the susceptibility to the expected future market developments that could affect the profitability and positive cash flows of these entities.<br><br>Accordingly, for the purposes of our audit, we identified judgements and estimates applied by management on the valuation of these investments as representing a key audit matter. | We evaluated management's implementation of accounting policies regarding the valuation of investments in Group companies.<br><br>We evaluated the design and implementation of controls around the valuation of investments in Group companies to determine whether appropriate controls are in place.<br><br>We challenged the assessment of the existence of impairment indicators done by the Company.<br><br>We tested the valuations by critically assessing the methodology applied and the reasonableness of the underlying assumptions and judgements. We assessed the impairment testing models and calculations by:<br>– checking the arithmetical accuracy of the impairment models and the extraction of inputs from source documents; and<br>– challenging the significant inputs and assumptions used in impairment testing for investments in Givaudan Group companies, such as the ability of the Group companies to generate positive cash flows in the future.<br><br>We validated the appropriateness and completeness of the related disclosures in Note 3 to the financial statements.<br><br>Based on the procedures performed, we consider judgements and estimates applied by management on the valuation of investments in Group companies to be reasonable. |

# Deloitte.

### Responsibility of the Board of Directors for the Financial Statements

The Board of Directors is responsible for the preparation of the financial statements in accordance with the provisions of Swiss law and the company's articles of incorporation, and for such internal control as the Board of Directors determines is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, the Board of Directors is responsible for assessing the entity's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the Board of Directors either intends to liquidate the entity or to cease operations, or has no realistic alternative but to do so.

### Auditor's Responsibilities for the Audit of the Financial Statements

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with Swiss law and Swiss Auditing Standards will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these financial statements.

A further description of our responsibilities for the audit of the financial statements is located at the website of EXPERTsuisse: http://expertsuisse.ch/en/audit-report-for-public-companies. This description forms part of our auditor's report.

Governance
report

Compensation
report

Consolidated
financial report

Statutory financial
report

Appendix

# Deloitte.

### Report on Other Legal and Regulatory Requirements

In accordance with article 728a paragraph 1 item 3 CO and Swiss Auditing Standard 890, we confirm that an internal control system exists, which has been designed for the preparation of financial statements according to the instructions of the Board of Directors.

We further confirm that the proposed appropriation of available earnings complies with Swiss law and the company's articles of incorporation. We recommend that the financial statements submitted to you be approved.

**Deloitte SA**

Karine Szegedi Pingoud
Licensed Audit Expert
Auditor in Charge

Laetitia Cejudo Petit
Licensed Audit Expert

Geneva, 28 January 2021

# Appendix



**In this section**

| | |
|---|---|
| 115 | Alternative performance measures |
| 117 | Givaudan registered offices |
| 123 | Our reporting suite |

# Alternative performance measures
## Appendix to the 2020 Full Year Results

### Introduction

On 1 January 2019 the Directive Alternative Performance Measures (DAPM), issued by the SIX Exchange Regulation, came into force with the purpose to promote the clear and transparent use of alternative performance measures.

The Directive prescribes that clear and comprehensible definitions must be disclosed for all alternative performance measures used. Also, for alternative performance measures that are based on a measure included in the financial statements prepared in accordance with recognised accounting standards and which have been adjusted by adding or omitting specific items, a reconciliation statement must be disclosed to a comparable measure in the financial statement according to the recognised accounting standard. Significant reconciliation items must be explained.

### Givaudan's Alternative Performance Measures

In the 2020 Full Year Results Media Release and on pages 31 to 35 of the 2020 Integrated Annual Report, the Group uses a number of Alternative Performance Measures that are listed and defined below.

### Like-for-Like (LFL)

LFL is defined as: (a) sales calculated using the invoicing exchange rates of the prior year, (b) excluding sales of businesses acquired from the acquisition date until the period end date, up to 12 months from the acquisition date, and (c) excluding sales of the businesses disposed of from the disposal date until the period end date of the comparable prior period.

Reconciliation tables of the LFL sales to the reported sales in accordance with IFRS have been included in the 2020 Full Year Results Media Release.

### EBITDA

EBITDA defined as Earnings Before Interest (and other financial income (expense), net), Tax, Depreciation and Amortisation, corresponds to operating income before depreciation, amortisation and impairment of long-lived assets.

| In millions of Swiss francs | 2020 | 2019 |
| --- | ---: | ---: |
| **Income for the period** | **743** | **702** |
| Interest and other financial (income) expense, net | 120 | 112 |
| Income taxes | 133 | 106 |
| **Operating income** | **996** | **920** |
| Depreciation | 201 | 193 |
| Amortisation | 187 | 161 |
| Impairment | 13 | 1 |
| **EBITDA** | **1,397** | **1,275** |

### Comparable EBITDA

Comparable EBITDA is the reported EBITDA, as adjusted for significant items of a non-recurring nature which have an impact on the understanding of the underlying normal operating activities.

A reconciliation table of the published EBITDA to the Comparable EBITDA (EBITDA as defined in the section EBITDA above) has been included in the 2020 Full Year Results Media Release. In that reconciliation table, all significant one-off items have been explained.

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

## Alternative performance measures

### Free Cash Flow (FCF)

FCF refers to operating cash flow after net investments, interest paid and lease payments.

| In millions of Swiss francs | 2020 | 2019 |
|---|---|---|
| **Cash flows from (for) operating activities** | **1,133** | **1,136** |
| Acquisition of property, plant and equipment | (188) | (275) |
| Proceeds from the disposal of property, plant and equipment | 8 | 74 |
| Acquisition of intangible assets | (39) | (45) |
| Proceeds from the disposal of intangible assets | 2 | – |
| Interest paid | (53) | (51) |
| Lease payments | (52) | (52) |
| **Free cash flow (FCF)** | **811** | **787** |
| Sales | 6,322 | 6,203 |
| **Free cash flow (FCF) as a % of sales** | **12.8%** | **12.7%** |

### Leverage Ratio

Leverage ratio is defined as net debt divided by the sum of net debt and equity (as defined for leverage ratio in the table below).

| In millions of Swiss francs | 31 December 2020 | 31 December 2019 |
|---|---|---|
| Short-term debt | 206 | 335 |
| Long-term debt | 4,245 | 3,796 |
| Less: cash and cash equivalents | (411) | (452) |
| **Net debt** | **4,040** | **3,679** |
| Total equity attributable to equity holders of the parent | 3,490 | 3,640 |
| Remeasurement of post-employment benefit obligations | 484 | 525 |
| **Equity (as defined for leverage ratio)** | **3,974** | **4,165** |
| **Net debt and equity (as defined for leverage ratio)** | **8,014** | **7,844** |
| **Leverage ratio** | **50%** | **47%** |

### Net debt to EBITDA Ratio

The Net debt to EBITDA ratio is calculated as follows:

| In millions of Swiss francs | 31 December 2020 | 31 December 2019 |
|---|---|---|
| Short-term debt | 206 | 335 |
| Long-term debt | 4,245 | 3,796 |
| Less: cash and cash equivalents | (411) | (452) |
| **Net debt** | **4,040** | **3,679** |
| **EBITDA** | **1,397** | **1,275** |
| Net debt to EBITDA ratio | 2.89 | 2.88 |
| | | |
| Comparable EBITDA | 1,442 | 1,331 |
| **Net debt to Comparable EBITDA ratio** | **2.80** | **2.76** |

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

# Givaudan registered offices

| Country | Legal Entity name | Address |
|---|---|---|
| **Algeria** | Givaudan International SA (Suisse) Bureau de Liaison Algérie | Tour A – 4ème Etage, Business Centre Dar El Madina, Micro Zone d'activité Hydra Lot No. 20, 16035 Algers |
| **Argentina** | Givaudan Argentina SA | Nicolàs Rodriguez Peña 1568, 5° B, 1021, C.A.B.A. |
| | Givaudan Argentina Servicios SA | Rodriguez Peña 1568, piso 5, oficina B, Ciudad Autónoma de Buenos Aires |
| **Australia** | Givaudan Australia Pty Ltd | 12 – 14 Britton Street, Smithfield, Sydney NSW 2164 |
| | drom International Pty. Ltd. | Parkview Business Centre, suite 2/1, 1 Maitland Place, Baulkham HIlls, Sydney, NSW 2153 |
| | Naturex Australia Pty Ltd | 9 Garling Road, Kings Park NSW 2148 |
| | Ungerer Australia Pty. Ltd. | P.O. Box 2143, Taren Point NSW 22229 |
| **Austria** | Givaudan Austria GmbH | Twin Tower Vienna, Wienerbergstrasse 11, 1109 Vienna |
| **Belgium** | Naska Ingredients NV | Lausbedstraat 4, 3630 Maasmechelen |
| **Bermuda** | Givaudan International Ltd | Hamilton |
| | FF Holdings (Bermuda) Ltd | Hamilton |
| | FF Insurance Ltd | Hamilton |
| | Naturex SPRL | Val d'Or, Gulledelle, 96 – 5th Floor, 1200 Brussels |
| **Brazil** | Givaudan do Brasil Ltda | Avenida Engenheiro Billings 2185, Jaguaré, São PauloSP – 05321-010 |
| | G. Nutra Industria e Comércio de Produtos. Alimenticios e Nutricionais Ltda | Rodovia Eduardo Zucari, Km 21,5 - Zona Rural - CEP 18603-970, Botucatu/ São Paulo |
| | drom Internacional Fragrâncias Ind. e Com. Ltda. | Via Natalino Verdi 120, 120 Bairro Bela Vista, 13515-000 Charqueada, São Paulo |
| | Naturex Ingredients Naturais Ltda | Avenida Buriti no. 5.391, Distrito Industrial, city of Manaus, state of Amazonas, Zip Code: 69075-000 |
| **Canada** | Givaudan Canada Co. | 2400 Matheson Blvd. East, Mississauga, Ontario L4W 5G9 |
| | Naturex Inc (Canada) | 44 Chipman Hill, Suite 1000 – Saint John, New Brunswick E2L 2A9 |
| **Chile** | Givaudan Chile Ltda | Avda Del Valle 869, oficina 203, Ciudad Empresarial, Comuna de Huechuraba, Santiago de Chile |
| | Naturex CHILE SPA | Avenida Apoquindo 3001, piso 9, Las Condes, Santiago de Chile |
| | Chile Botanics SPA | Panamericana Sur, Kilómetro 297, Comuna de Linares |

## Givaudan registered offices

| Country | Legal Entity name | Address |
|---|---|---|
| **China** | Givaudan Flavors (Shanghai) Ltd Beijing Branch | 15F Tower 2, Kun Sha Center, No. 16 Xin Yuan Li Road, Chao Yang District, Beijing 100027 |
| | Givaudan Fragrances (Shanghai) Ltd Beijing Branch | 15F Tower 2, Kun Sha Center, No. 16 Xin Yuan Li Road, Chao Yang District, Beijing 100027 |
| | Givaudan Flavors (Shanghai) Ltd | 668 Jing Ye Road, Jin Qiao Export Area, Pu Dong New Area, Shanghai 201201 |
| | Givaudan Fragrances (Shanghai) Ltd | 298 Li Shi Zhen Road, pilote Free Trade Zone, Shanghai 201303 |
| | Givaudan Flavors (Shanghai) Ltd Guangzhou Branch | 15F The Centrepoint, No 374 – 2 Beijing Road, Yue Xiu District, Guangzhou 510030 |
| | Givaudan Fragrances (Shanghai) Ltd Guangzhou Branch | 15F The Centrepoint, No 374 – 2 Beijing Road, Yue Xiu District, Guangzhou 510030 |
| | Givaudan Flavors (Shanghai) Ltd Chengdu Branch | Room 2001, 2 Fu Nian Plaza, Ji Tai Road, Gao Xin District, Chengdu 610041, Sichuan Province |
| | Givaudan Flavors (Nantong) Ltd | No. 7 Jiang Hai Road, Nantong Economic and Technology Development Area, Nantong, Jiangsu Province 226017 |
| | Givaudan Flavors (Shanghai) Ltd Zhengzhou Branch | Room A1301, Bldg 2, no. 80 Jin Shui Road (East), New Green City, Zhengzhou, He Nan Province |
| | Givaudan Fragrances (Changzhou) Ltd | Room 232, no. 238 Chunjiang Zhongyang, Huayuan, Xinbei District, Changzhou 213034, Jiangsu Province |
| | Givaudan Specialty Products (Shanghai) Ltd | 222, Jiangtian East Road, Songjiang District, 201600 Shanghai |
| | Givaudan Management Consulting (Shanghai) Ltd | 3rd floor, no. 5 building, 298 Lishizhen Road, Zhangjiang High-Tech Park, Pudong New Area, 201203 Shanghai |
| | Givaudan Hong Kong Ltd | 6th Floor Alexandra House, 18 Chater Road, Central , Hong Kong |
| | drom Fragrances International (Guangzhou) Co., Ltd. | no. 66, Hongjing Road East Section of GETDD, 510760 Guangzhou |
| | drom Asia Pacific Ltd. | 8 Sham Shing Road, Cheung Sha Wan, new Kowloon, Hong Kong |
| | Naturex Trading Shanghai Co. Ltd | 6th Floor, Building 4, no. 333 Gui Ping Rd, Xuhui DST, Shanghai, 200233 |
| | Ungerer Fragrance & Flavor (Shanghai) Co. Ltd. | #1-2 Building No. 508, Lane 2655 Fengzhe Road, Fengxian, Shanghai 201407 |
| **Colombia** | Givaudan Colombia SAS | Carrera 98 no. 25 G – 40, 151196 Bogotá D.C. |
| **Czech Republic** | Givaudan CR, s.r.o. | Klimentská 10, Praha 110 00 |
| **Egypt** | Givaudan Egypt SAE | Piece 37, Industrial Zone 3, 6th of October City |
| | Givaudan Egypt Fragrances LLC | 46 El Thawra st., 3rd floor, Appt 304, Heliopolis |
| **Finland** | Givaudan International SA, Branch in Finland | Niemenkatu 73, 15140 Lahti |
| **France** | Givaudan France SAS | 55 Rue de la Voie des Bans, CS500024, 95102 Argenteuil Cedex |
| | Expressions Parfumées | 136 Chemin de Saint-Marc, 06130 Grasse |
| | Albert Vieille SAS | 629 Route de Grasse, 6220 Vallauris |
| | drom International S.A.R.L. | 4 et 6 rue Curie, 92150 Suresnes, Paris |
| | Naturex SA | 250 rue Pierre Bayle – BP 81218, 84911 Avignon Cedex 9 |
| | Alderys | Bâtiment Mélèze, 86 rue de Paris, 91400 Orsay |

## Givaudan registered offices

| Country | Legal Entity name | Address |
|---------|-------------------|---------|
| **Germany** | Givaudan Deutschland GmbH | Giselherstrasse 11, 44319 Dortmund |
| | drom fragrances GmbH & Co. KG | Oberdiller str. 18, 82065 Baierbrunn |
| | drom Holding GmbH | Oberdiller str. 18, 82065 Baierbrunn |
| | drom perfume trade GmbH | Oberdiller str. 18, 82065 Baierbrunn |
| | drom Verwaltungsgesellschaft mbH | Oberdiller str. 18, 82065 Baierbrunn |
| | Naturex GmbH | Im Zollhafen 24, Kranhaus Süd, 50678 Köln |
| **Guatemala** | Givaudan Guatemala SA | Boulevar Los Proceres 18 Calle, Zona 10 Empresarial Zona Pradera, Torre 1 Of 1803 - 01010 |
| **Hungary** | Givaudan Hungary Kft | Királyhegyesi út 3, 6900 Makó |
| | Givaudan Business Solutions Kft | Bence utca 1. , Váci Greens B, 1138 Budapest |
| **India** | Givaudan (India) Pvt Ltd | Plot no. 26, 2nd Cross Jigani Industrial Area, Anekal Taluk, Jigani, Bangalore, Karnataka 560 105 |
| | Naturex India Pty Ltd  (ex. Valentine Agro Private Ltd) | 302, Bldge no. 2, Star Hub. Next to ITC Grand Maratha Hotel, Sahar Road, Andheri (East) Mumbai – 400 059 |
| | Ungerer Flavours India Private Limited | Plot No. F-366, Phase - Viii-B, Ind. Focal Point, Mohali, Punjab |
| **Indonesia** | PT. Givaudan Indonesia | Jl. Raya Jakarta-Bogor Km 35, Cimanggis Depok, 16951 West Java |
| | PT drom fragrances Indonesia | German Center Building, 6th floor, suites 6120-6130, Jl. Kapt. Subijanto Dj., 15321 South Tangerang City, Banten |
| | PT Fragrance Oils Indonesia | Rukan Permata Senayan blok B-22. Jalan Tentara Pelajar, Senayan,  12210 Jakarta |
| **Iran** | Givaudan International SA, Iran Branch | P.O. Box 15175/534 – No.202 – 204, Gol Bld., Gol Alley, After Park Saei, Vali Asr, Tehran |
| **Italy** | Givaudan Italia SpA | Via Borgogne 5, 20121 Milano |
| | drom International Italia Srl | Via Valassina 24, 20159 Milano |
| | Expressions Parfumées Srl | Via Varesina 162, 20156 Milano |
| | Indena S.p.A. | Via Ortles 12, 20139 Milan |
| | Naturex SPA | Caronno Pertusella, Via Galileo Ferraris, 44, 21042 Caronno Pertusella (VA) |
| **Ivory Coast** | Givaudan International. SA Côte d'Ivoire | Immeuble RMO, 5$^{ème}$ étage, Rue du Docteur Blanchard Zone 4C, Abidjan |
| | ITRAD | Abidjan Yopougon, Chaumière du Banco, 04 BP 1682 Abidjan |
| **Japan** | Givaudan Japan K.K. | 6-6 Osaki 3-chome, Shinagawa-ku, Tokyo 141-0032 |
| | Naturex K.K | 6-6 Osaki 3-chome, Shinagawa-ku, Tokyo 141-0032 |
| **Kenya** | Givaudan MEA FZE - Kenya Branch | Vienna Court, Ground floor, West Wing Building, State House Crescent Road  (P.O. Box 44168-00100) Nairobi |
| **Malaysia** | Givaudan Flavours & Fragrances Malaysia Sdn. Bhd | 48 Jalan Kota Laksamana 2/15, Taman Kota Laksamana, Seksyen 2, 75200 Melaka |
| | Givaudan Business Solutions Asia Pacific Sdn. Bhd | 1 First Avenue, Banda Utama, level 12, Bandar Utama, PJU 6, 47800 Petaling Jaya, Selangor |
| | Fragrance Oils (Malaysia) Sdn Bhd | Suite 733, Block B2, Level 7, Leisure Commerce Square, 9, Jalan PJS 8/9, 46150 Petaling Jaya, Selangor |

## Givaudan registered offices

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

| Country | Legal Entity name | Address |
|---|---|---|
| **Mexico** | Givaudan de México SA de CV | Av. Eje Norte-Sur no. 11 Civac, 62578 Jiutepec Morelos |
| | Grupo Givaudan SA de CV | Av. Eje Norte-Sur no. 11 Civac, 62578 Jiutepec Morelos |
| | Naturex Ingredientes Naturales SA de CV | Av. Paseo de la Reforma 483, Piso 21 Col. Cuauhtémoc , Ciudad de México - 06500 |
| | Ungerer Mexico S. de R. L. de C.V. | Carr. Costera del Pacifico Km. 63, Villa de Tututepec de Melchor Ocampo, Tututepec, Oaxaca 71803 |
| **Morocco** | Givaudan MEA FZE Morocco Branch | 8 Rue Ibnou Binna Aladdadi, Bourgogne, 20053 Casablanca |
| | Naturex Maroc SA | Technopole ONDA – BP 42 20240 Nouasser, Casablanca |
| **Myanmar** | Givaudan Singapore Pte Ltd (Myanmar Branch) | 46A – 2C Excellent Condo, Pantra Street, Dagon Township, Yangon |
| **Netherlands** | Givaudan Nederland B.V. | Huizerstraatweg 28, 1411 GP Naarden |
| | Givaudan Finance Europe BV | Huizerstraatweg 28, 1411 GP Naarden |
| | Vika B.V. | Nizolaan 4, 6718 ZC Ede |
| | Virgula B.V. | Nizolaan 4, 6718 ZC Ede |
| | Vika Nutrition B.V. | Nizolaan 4, 6718 ZC Ede |
| | G.A.L.M International B.V. | Nizolaan 4, 6718 ZC Ede |
| | Naturex Coöperatief U.A | Strawinskylaan 3127, 1077 ZX Amsterdam |
| **New Zealand** | Givaudan NZ Ltd | Level 1 The Lane, Botany Town Center, Te Irirangi Drive, Botany 2010 |
| | Cuisine Resources NZ limited | 15 Crosbie Road, Pukekohe 2120 |
| **Nigeria** | Givaudan (Nigeria) Limited | Plot 2 and 4, Block D, Amuwo Odofin Industrial scheme, Apapa/Oshodi Expressway, Lagos |
| | Fragrance Oils (West Africa) Limited | A2 Billings Way, Oregun, Lagos |
| **Pakistan** | Givaudan International SA Pakistan | 25th Floor, The Ocean Tower, Block – 9, Clifton, Karachi – 75600 |
| **Peru** | Givaudan Peru SAC | Av. Victor Andrés Belaúnde 147, Centro Empresarial Real, Torre Real 1, Piso 11, San Isidro 27, Lima |
| | Activ International SAC | Ambrosio Vucetich, 200 Parque Industrial Mz K – Lt 3,Arequipa |
| **Philippines** | Givaudan Singapore Pte Ltd, Regional Operating Headquarter | 37/F Robinsons Equitable Tower, ADB Avenue corner Poveda Street, Ortigas Center, Pasig City 1605 |
| **Poland** | Givaudan Polska Sp. z o.o. | Ul. Puławska 182, IO-1 Building, 02-670 Warszawa |
| | Naturex Polska Sp. z.o.o. | Ul. K.K. Baczyńskiego 29, 38-200 Jaslo |
| **Russian Federation** | Givaudan Rus LLC | Riverside Towers Business Centre, Kosmodamianskaya Naberezhnaya 52/5, 115054 Moscow |
| | Naturex LLC (Russia) | Shuhova Str, 14, building 9, Office 201, 115162 Moscow |
| **Singapore** | Givaudan Singapore Pte Ltd | 1 Woodland Avenue 8, Singapore 738972 |
| | Fragrance Oils (Far East) Pte. Ltd | 510 Thomson Rd, #04-01 SLF Building, 298135 Singapore |
| | Naturex Holdings Singapore Private Ldt | 20 Changi Business Park Central 2, #05-04A, Singapore 486031 |

# Givaudan registered offices

| Country | Legal Entity name | Address |
|---|---|---|
| **South Africa** | Givaudan South Africa (Pty) Ltd | 9 – 11 Brunei Road, Tulisa Park, Johannesburg 2197 |
| | Naturex (Pty) Ltd | Granger Bay Court Building, Block B-Ground Floor, V&A, Waterfront, Cape Town, 8002 |
| **South Korea** | Givaudan Korea Ltd | 11 – 12/F Trus Tower Building, 60 Mabang-Ro, Seocho-Gu, Seoul |
| | Naturex (Korea) | Room 503, Leaders Bldg, 14, Hwangsaeul-Ro 311 beon-gil, Bundang-gu, SeongNam-si, GyeongGi-do, 13590 |
| **Spain** | Givaudan Ibérica, SA | Pla d'en Batllé s/n, 8470 Sant Celoni, Barcelona |
| | Aromasur SL | Carretera De Santa Olalla, S/n, 41240 Almaden de la Plata, Sevilla |
| | drom spain S.L. | Sant Cugat Business Park, Edificio B2, Planta 5a, Of. Núm. 15, av. via Augusta 15-25, 8174 Sant Cugat Del Vallès, Barcelona |
| | Naturex Iberian Partners S.L.U | Autovía A3, salida 343. Camino de Torrent s/n 46930 Quart de Poblet |
| | Tierras Aromaticas del Sur SL | Carretera De Santa Olalla, Km 1, 41240 Almaden de la Plata, Sevilla |
| **Sweden** | Givaudan North Europe AB | Hyllie Vattenparksgata 12, 215 32 Malmö |
| | Swedish Oat Fiber AB | Båtafjordsvägen 12, 432 63 BUA |
| **Switzerland** | Givaudan SA | Chemin de la Parfumerie 5, 1214 Vernier |
| | Givaudan Finance SA | Chemin de la Parfumerie 5, 1214 Vernier |
| | Givaudan Suisse SA | Chemin de la Parfumerie 5, 1214 Vernier |
| | Givaudan International SA | Chemin de la Parfumerie 5, 1214 Vernier |
| | Givaudan Treasury International SA | Chemin de la Parfumerie 5, 1214 Vernier |
| | Vamara Holding SA | Mettlenweg 17, 2504 Bienne |
| | Naturex AG | Industriestrasse 8, 9220 Bischofszell |
| **Taiwan, Republic of China** | Givaudan Singapore Pte Ltd, Taiwan Branch | 7/F No 303, Hsin Yi Road, Sec 4, Taipei City Taiwan 106 |
| **Thailand** | Givaudan (Thailand) Ltd | 719 KPN Tower, Floor 16 & 25, Rama 9 Road, Bangkapi Huaykwang, Bangkok 10310 |
| **Turkey** | Givaudan Aroma ve Esans Sanayi ve Ticaret Ltd. Sirketi | Akat mahallesi, Bilge sokak, Park Maya Sitesi Barclay 19 no. 1 daire 6/7 Besiktas, Istanbul |
| | Expressions Parfumées, Turkey Liason Office | Edin&Suner Plaza, Meydan sok n°14/2B, 34335 Akatlar Istanbul |
| **UAE** | Givaudan Gulf Trading LLC | Concord Tower, Floor 20 & 36 , Media City, Dubai |
| | Givaudan Middle East & Africa FZE | Free Zone Establishment, Jafza View 19, First floor, office no. 129, Jebel Ali Free Zone, Dubai |
| | Expressions Parfumées LLC | Hamsah-A Bldg, Office 210, Khalid Bin Al Waleed St., Dubai |
| | Naturex S.A (Middle East) | Building P6 Office #132, Sharjah Airport International Free Zone (SAIF Zone), P.O. Box 121873, SHARJAH |

## Givaudan registered offices

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

| Country | Legal Entity name | Address |
|---------|-------------------|---------|
| **United Kingdom** | Givaudan UK Ltd | Kennington Road, Ashford, Kent TN24 0LT |
| | Givaudan Holdings UK Ltd | Kennington Road, Ashford, Kent TN24 0LT |
| | drom International UK Ltd. | Northline Business Consultants Ltd, 3-4 Wharfside, The Boatyard, M28 2WN Worseley, Manchester |
| | Major International Limited | Higham Business Park, Bury Close, Higham Ferrers, Rushden NN10 8HQ |
| | Naturex Ltd | Park Road, Overseal, Swadlincote, Derbyshire DE12 6JX |
| | Fragrance Oils Limited | Eton Hill Industrial Estate, Eton Hill road, Radcliffe, Manchester, M26 2FR |
| | Fragrance Oils (International) Limited | Eton Hill Industrial Estate, Eton Hill road, Radcliffe, Manchester, M26 2FR |
| | Fragrance Oils (Purchasing) Limited | Eton Hill Industrial Estate, Eton Hill road, Radcliffe, Manchester, M26 2FR |
| | Northern Aromatics (Sales) LImited | Eton Hill Industrial Estate, Eton Hill road, Radcliffe, Manchester, M26 2FR |
| | Odouraze LImited | Eton Hill Industrial Estate, Eton Hill road, Radcliffe, Manchester, M26 2FR |
| | Ungerer Ltd | Sealand Road, Sealand Industrial Estate, Chester, England CH1 4LP |
| **Ukraine** | Givaudan International SA, Representative Office | Pimonenko Str. 13 6B/18, 04050 Kiev |
| **United States of America** | Givaudan Flavors Corporation | 1199 Edison Drive, Cincinnati, OH 45216 |
| | Givaudan Fragrances Corporation | 1199 Edison Drive, Cincinnati, OH 45216 |
| | Givaudan Flavors and Fragrances Inc. | 1199 Edison Drive, Cincinnati, OH 45216 |
| | Givaudan United States Inc. | 15 East North Street, Dover, DE 19901 |
| | drom International Inc. | 5 Jacksonville Road, Towaco, NJ 7082 |
| | Naturex Inc | 251 Little Falls Drive, Wilmington, DE 19808 |
| | Naturex Holdings Inc | c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808 |
| | Naturex Cooperative LLC | 801 Adlai Stevenson Drive – Springfield, IL 62703 |
| | Ungerer & Company | 110 North Commerce Way,  Bethlehem, PA 18017 |
| | Vegetable Juices Inc | c/o Illinois Corporation Service Company , 801 Adlai Stevenson Drive – Springfield, IL 62703 |
| **Vietnam** | Givaudan Singapore Pte Ltd, Vietnam Representative Office | Giay Viet Plaza 5ᵗʰ Fl., 180 – 182 Ly Chinh Thang Street, District 3, Ho Chi Minh City |
| | Golden Frog Flavour-Fragrance Manufacture Company Ltd | 31 Road No.8, Vietnam-Singapore Industrial Park , Binh Dang Quarter, Binh Hoa Ward , Thuan An Town, Binh Duong Province |
| | Golden Frog Flavor-Fragrance Manufacture Corporation - Branch 3 | VSIP II-A, Road no 31, Vietnam-Singapore II-A Industrial Zone, Vinh Tan Commune, Tan U yenTown, Binh Duong Province |
| | Branch of Golden Frog Flavor- Fragrance Manufacture Corporation | Tan Hoa Hamlet , Tan Hoi Dong Commune Chau Thanh District , Tien Giang Province |

Governance report

Compensation report

Consolidated financial report

Statutory financial report

Appendix

# Our reporting suite

The 2020 Integrated Annual Report offers a holistic explanation of our value creation, financial and non-financial capitals and performance.

The full Governance, Compensation and Financial reports are available in one separate PDF. The GRI Sustainability Report features disclosures on a wide range of topics such as energy use, diversity in the workplace, anti-corruption and human rights. Our website hosts the online Integrated Annual Report. Readers are advised to consult our entire reporting suite to get a complete overview.

**To order publications:**
**www.givaudan.com** ▸ Media ▸ Publications

**The full suite can be found on:**
**www.givaudan.com** ▸ Investors ▸
Online annual report ▸ Download centre

**Online version**
AVAILABLE IN ENGLISH
from 29 January 2021





**2020 Integrated Annual Report**
AVAILABLE IN ENGLISH
PDF from 29 January 2021
Print from 25 March 2021







**2020 GRI Sustainability Report**
AVAILABLE IN ENGLISH
PDF from 29 January 2021

**2020 Integrated Annual Report Highlights**
AVAILABLE IN ENGLISH, FRENCH AND GERMAN
PDF in English from 29 January 2021
Print and language versions from 25 March 2021

**2020 Governance, Compensation and Financial Report**
AVAILABLE IN ENGLISH
PDF from 29 January 2021

# Givaudan SA

Chemin de la Parfumerie 5
1214 Vernier, Switzerland

**General information**
T + 41 22 780 91 11

**Media and investor relations**
T + 41 22 780 90 53

**Share registry**
Computershare Schweiz AG
Postfach
4601 Olten, Switzerland
T + 41 62 205 77 00

**Share information**
Symbol: GIVN
Security number: 1064593
ISIN: CH0010645932

Concept, design, consulting and realisation:
PETRANIX Corporate and Financial Communications AG
www.PETRANIX.com

The Givaudan 2020 Governance, Compensation and Financial Report is published in English.

All trademarks mentioned enjoy legal protection.

This report may contain forward-looking information. Such information is subject to a variety of significant uncertainties, including scientific, business, economic and financial factors. Therefore actual results may differ significantly from those presented in such forward looking statements. Investors must not rely on this information for investment decisions.

© Givaudan SA, 2021



www.givaudan.com