UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: FRAGRANCE DIRECT PURCHASER ANTITRUST LITIGATION | Civil Action No. 23-cv-02174 (WJM)(JSA) |
| IN RE: FRAGRANCE INDIRECT PURCHASER ANTITRUST LITIGATION | Civil Action No. 23-cv-3249 (WJM)(JSA) |
| IN RE: FRAGRANCE END-USER PLAINTIFF ANTITRUST LITIGATION | Civil Action No. 23-cv-16127 (WJM)(JSA) **ORAL ARGUMENT REQUESTED** *Document electronically filed* **RETURN DATE: July 15, 2024** |

**MEMORANDUM OF LAW IN SUPPORT OF
OMNIBUS MOTION TO DISMISS THE CONSOLIDATED
COMPLAINTS OF DIRECT PURCHASER PLAINTIFFS,
INDIRECT PURCHASER PLAINTIFFS, AND END-USER PLAINTIFFS**

Kevin R. Reich
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102
Tel: (973) 596-4755

Boris Bershteyn (*pro hac vice*)
Matthew Martino (*pro hac vice*)
Tansy Woan
Andrew Muscato
Evan Levicoff (*pro hac vice*)

kreich@gibbonslaw.com

Aidan Synnott (*pro hac vice*)
Eyitayo St. Matthew-Daniel (*pro hac vice*)
Hallie S. Goldblatt (*pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel: (212) 373-3000
asynnott@paulweiss.com
tstmatthewdaniel@paulweiss.com
hgoldblatt@paulweiss.com

*Attorneys for Defendants Givaudan Fragrances Corporation, Ungerer & Company, Inc., and Custom Essence LLC*

*Attorneys for Defendant Givaudan SA*

Sean P. McConnell
Sarah O'Laughlin Kulik
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA 19380
(215) 979-1947
spmcconnell@duanemorris.com
sckulik@duanemorris.com

Arthur J. Burke (*pro hac vice*)
Anna M. Kozlowski (*pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
arthur.burke@davispolk.com

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000
Boris.Bershteyn@skadden.com
Matthew.Martino@skadden.com
Tansy.Woan@skadden.com
Andrew.Muscato@skadden.com
Evan.Levicoff@skadden.com

*Attorneys for Defendant International Flavors & Fragrances Inc.*

Liza M. Walsh
Jessica K. Formichella
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
Telephone: (973) 757-1100
Facsimile: (973) 757-1090

Robert Milne (*pro hac vice*)
Martin M. Toto
William H. Bave III (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 819-8200
mtoto@whitecase.com
rmilne@whitecase.com
william.bave@whitecase.com

*Attorneys for Defendants Symrise Inc., Symrise US LLC, and Symrise AG*

ii

anna.kozlowski@davispolk.com

*Attorneys for Defendants Firmenich
Incorporated and Agilex Flavors &
Fragrances, Inc.*

*Attorneys for DSM-Firmenich AG,
Firmenich International SA, and
Firmenich SA*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................vi

PRELIMINARY STATEMENT ...........................................................1

THE COMPLAINTS' ALLEGATIONS .................................................5

    A.    Fragrance Products ............................................................6

    B.    Plaintiffs' Allegations of Ordinary Public Statements as to Price........8

    C.    Plaintiffs' Conclusory Allegations of a Conspiracy..........................10

    D.    Announcements of Government Inquiries .......................................12

    E.    Procedural History ............................................................13

ARGUMENT....................................................................................14

I.    PLAINTIFFS' SHERMAN ACT CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE FACTS TO  PLAUSIBLY SUGGEST AN AGREEMENT AMONG DEFENDANTS ........................................................................15

    A.    Plaintiffs Allege No Direct Evidence of a Price-Fixing Agreement ........................................................................16

    B.    Plaintiffs' Alleged Circumstantial Evidence Fails to Raise a Plausible Inference of a Price-Fixing Agreement .............................17

        1.    Plaintiffs Fail to Plead Parallel Pricing....................................18

        2.    The Complaints Allege Obvious, Unilateral Explanations for Any Alleged Parallel Price Increases .................................26

        3.    Plaintiffs' Purported "Plus Factors" Are Irrelevant and Fail to Plausibly Suggest the Alleged Price-Fixing Agreement ........................................................................28

    C.    Plaintiffs Fail to Plead Basic Facts of the Alleged Price-Fixing ........36

D.    Plaintiffs Fail to Plead a Conspiracy by Pointing to Undeveloped Supply or Market Allocation Agreements ...................38

II.    PLAINTIFFS' CLAIMS ARE PARTIALLY TIME-BARRED .................41

III.    IPPS AND EUPS LACK ANTITRUST STANDING ................................46

IV.    ALL STATE LAW CLAIMS FAIL FOR ADDITIONAL REASONS .......52

A.    Three Deficiencies Bar IPPs' and EUPs' State Claims.....................52

1.    IPPs' and EUPs' Multiple State Law Claims Fail Because Their Federal Sherman Act Claims Fail ...................52

2.    IPPs Lack Standing to Assert Claims Under the Laws of States in Which No Named Plaintiff Alleges Injury ...............53

3.    EUPs' Unjust Enrichment Claim Fails Because EUPs Fail to Specify on Which States' Laws It Is Premised ............54

B.    State Law Claims Fail for Additional State-Specific Reasons ...........54

1.    State-Specific Deficiencies Bar State Antitrust Claims ...........54

2.    State-Specific Deficiencies Bar Consumer Protection Claims....................................................................................56

3.    State-Specific Deficiencies Bar Unjust Enrichment Claims....................................................................................62

CONCLUSION ................................................................................................65

## TABLE OF AUTHORITIES

**CASES**                                                         **PAGE(S)**

*Abbott Laboratories v. Adelphia Supply USA*,
    No. 15-cv-5826, 2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017) .................22

*In re Aetna UCR Litigation*,
    MDL No. 2020, 2015 WL 3970168 (D.N.J. June 30, 2015)........... 30, 36, 41

*In re Aggrenox Antitrust Litigation*,
    94 F. Supp. 3d 224 (D. Conn. 2015) ........................................................53

*In re Aggrenox Antitrust Litigation*,
    No. 14-md-2516, 2016 WL 4204478 (D. Conn. Aug. 9, 2016) ..................57

*Allegheny General Hospital v. Philip Morris, Inc.*,
    228 F.3d 429 (3d Cir. 2000) ....................................................................50

*In re Allergan ERISA Litigation*,
    975 F.3d 348 (3d Cir. 2020) ....................................................................29

*In re Aluminum Warehousing Antitrust Litigation*,
    No. 13-md-2481, 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) ...............51

*Anderson News, L.L.C. v. American Media, Inc.*,
    No. 09-cv-2227, 2015 WL 5003528 (S.D.N.Y. Aug. 20, 2015),
    *aff'd*, 899 F.3d 87 (2d Cir. 2018) .............................................................33

*Apex Oil Co. v. DiMauro*,
    822 F.2d 246 (2d Cir. 1987) ....................................................................17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................................14, 18

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*,
    459 U.S. 519 (1983)....................................................................47, 48, 50

*Avery v. State Farm Mutual Automobile Insurance Co.*,
    835 N.E.2d 801 (Ill. 2005) ......................................................................62

*Baar v. Jaguar Land Rover North America, LLC*,
    295 F. Supp. 3d 460 (D.N.J. 2018).........................................................52, 53

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................passim

*In re Broiler Chicken Antitrust Litigation*,
    No. 16-cv-8637, 2023 WL 5227130 (N.D. Ill. Aug. 15, 2023)...................58

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)........................................................................27

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011)..............................................................passim

*Burtch v. Milberg Factors, Inc.*,
    No. 07-cv-556, 2009 WL 840589 (D. Del. Mar. 30, 2009),
    *aff'd*, 662 F.3d 212 (3d Cir. 2011)..................................................22

*California Crane School, Inc. v. Google LLC*,
    No. 21-cv-10001, 2023 WL 2769096 (N.D. Cal. Mar. 31, 2023) ...............31

*Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*,
    139 F.3d 1396 (11th Cir. 1998)........................................................62

*Casperson v. AAA Southern New England*,
    No. 14-cv-6139, 2015 WL 9582091 (R.I. Super. Ct.  Dec. 22, 2015)....63, 64

*In re Cast Iron Soil Pipe & Fittings Antitrust Litigation*,
    No. 14-md-2508, 2015 WL 5166014 (E.D. Tenn. June 24, 2015)..............62

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
    MDL No. 1917, 2010 WL 11488485 (N.D. Cal. Sept. 30, 2010) ...............64

*In re Cattle & Beef Antitrust Litigation*,
    No. 22-cv-3031, 2023 WL 5310905 (D. Minn. Aug. 17, 2023)..................48

*Chagares v. Monmouth Medical Center*,
    No. 21-cv-20677, 2022 WL 3588103 (D.N.J. Aug. 22, 2022)....................47

*In re Chocolate Confectionary Antitrust Litigation*,
    749 F. Supp. 2d 224 (M.D. Pa. 2010)..............................................62

*In re Chocolate Confectionary Antitrust Litigation*,
   801 F.3d 383 (3d Cir. 2015) ......................................................................31

*City of Page, Coconino County, Arizona v. Utah Associated Municipal*
   *Power Systems*,
   No. 05-cv-921, 2006 WL 1889882 (D. Utah July 7, 2006) .........................63

*City of Pittsburgh v. West Penn Power Co.*,
   147 F.3d 256 (3d Cir. 1998) ......................................................................15

*City of Pontiac Police & Fire Retirement System v. BNP Paribas*
   *Securities Corp.*,
   92 F.4th 381 (2d Cir. 2024) ......................................................................20

*Commonwealth v. Golden Gate National Senior Care LLC*,
   194 A.3d 1010 (Pa. 2018) ..........................................................................59

*In re ConAgra Foods Inc.*,
   908 F. Supp. 2d 1090 (C.D. Cal. 2012) .....................................................65

*Cootey v. Countrywide Home Loans, Inc.*,
   No. 11-cv-00152, 2011 WL 2441707 (D. Haw. June 14, 2011) .................63

*Cota v. Ralph Lauren Corp.*,
   603 F. Supp. 3d 666 (E.D. Wis. 2022) .......................................................65

*In re Dealer Management Systems Antitrust Litigation*,
   362 F. Supp. 3d 510 (N.D. Ill. 2019) ...................................................47, 55

*DHX, Inc. v. Surface Transportation Board*,
   501 F.3d 1080 (9th Cir. 2007) ...................................................................33

*In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser*
   *Antitrust Litigation*,
   No. 12-cv-169, 2013 WL 5503308 (D.N.J. Oct. 2, 2013) ..........................54

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
   516 F. Supp. 2d 1072 (N.D. Cal. 2007) .....................................................49

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
   536 F. Supp. 2d 1129 (N.D. Cal. 2008) .....................................................56

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser
    Antitrust Litigation*,
    28 F.4th 42 (9th Cir. 2022)............................................................................31

*Easterbrook v. LinkedIn Corp.*,
    No. 22-cv-01108, 2023 WL 3022497 (D. Or. Apr. 20, 2023).....................63

*In re Effexor Antitrust Litigation*,
    357 F. Supp. 3d 363 (D.N.J. 2018)..............................................................55

*Ehlers v. Ben & Jerry's Homemade Inc.*,
    No. 19-cv-00194, 2020 WL 2218858 (D. Vt. May 7, 2020)......................63

*In re Elevator Antitrust Litigation*,
    502 F.3d 47 (2d Cir. 2007)..........................................................................29

*E-Shops Corp. v. U.S. Bank National Ass'n*,
    795 F. Supp. 2d 874 (D. Minn. 2011)..........................................................60

*Fallon v. Mercy Catholic Medical Center of Southeastern Pennsylvania*,
    877 F.3d 487 (3d Cir. 2017).........................................................................15

*Five for Entertainment S.A. v. Rodriguez*,
    877 F. Supp. 2d 1321 (S.D. Fla. 2012)........................................................62

*Florida Cement & Concrete Antitrust Litigation*,
    746 F. Supp. 2d 1291 (S.D. Fla. 2010)........................................................24

*Fuentes v. Royal Dutch Shell PLC*,
    No. 18-cv-5174, 2019 WL 7584654 (E.D. Pa. Nov. 25, 2019)...................44

*Ginsburg v. InBev NV/SA*,
    623 F.3d 1229 (8th Cir. 2010).....................................................................50

*In re Graphics Processing Units Antitrust Litigation*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007)........................................... 28, 29, 61

*In re Hard Disk Drive Suspension Assemblies Antitrust Litigation*,
    No. 19-md-02918, 2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) .............61

*Hopkins v. Trans Union, L.L.C.*,
    No. 03-cv-5433, 2004 WL 1854191 (D. Minn. Aug. 19, 2004)...................59

*Host International, Inc. v. MarketPlace, PHL, LLC*,
    32 F.4th 242 (3d Cir. 2022).......................................................... 47, 49, 50, 51

*In re Humira (Adalimumab) Antitrust Litigation*,
    465 F. Supp. 3d 811 (N.D. Ill. 2020),
    *aff'd*, 42 F.4th 709 (7th Cir. 2022) ............................................................53

*Hunt v. U.S. Tobacco Co.*,
    538 F.3d 217 (3d Cir. 2008).........................................................................59

*In re Insurance Brokerage Antitrust Litigation*,
    618 F.3d 300 (3d Cir. 2010)................................................................passim

*Ireland v. Microsoft Corp.*,
    No. 00-cv-201515, 2001 WL 1868946 (Mo. Cir. Ct. Jan. 24, 2001)............56

*Jacobs v. Tempur-Pedic International, Inc.*,
    626 F.3d 1327 (11th Cir. 2010) ....................................................... 21, 22, 23

*Jones v. Micron Technology Inc.*,
    400 F. Supp. 3d 897 (N.D. Cal. 2019)..................................................35, 36

*Kanne v. Visa U.S.A. Inc.*,
    723 N.W.2d 293 (Neb. 2006)......................................................................56

*In re K-Dur Antitrust Litigation*,
    No. 01-cv-1652, 2008 WL 2660780 (D.N.J. Feb. 28, 2008)...... 54, 61, 64, 65

*Kelsey K. v. NFL Enterprises, LLC*,
    254 F. Supp. 3d 1140 (N.D. Cal. 2017),
    *aff'd*, 757 F. App'x 524 (9th Cir. 2018) ....................................................24

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)....................................................................................46

*Law v. Bioheart, Inc.*,
    No. 07-cv-2177, 2009 WL 693149 (W.D. Tenn. Mar. 13, 2009)................63

*In re Lidoderm Antitrust Litigation*,
    103 F. Supp. 3d 1155 (N.D. Cal. 2015)......................................................61

*In re Lipitor Antitrust Litigation*,
    336 F. Supp. 3d 395 (D.N.J. 2018)..............................................................58

*Litovich v. Bank of America Corp.*,
    568 F. Supp. 3d 398 (S.D.N.Y. 2021) ........................................................37

*In re Loestrin 24 FE Antitrust Litigation*,
    410 F. Supp. 3d 352 (D.R.I. 2019) ............................................................64

*Long v. SEPTA*,
    903 F.3d 312 (3d Cir. 2018) ......................................................................53

*Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*,
    No. 13-cv-01180, 2015 WL 4755335 (N.D. Cal. Aug. 11, 2015) ...............52

*Ly v. Nystrom*,
    615 N.W.2d 302 (Minn. 2000) ...................................................................59

*In re Magnesium Oxide Antitrust Litigation*,
    No. 10-cv-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) .......................50

*Miami Products & Chemical Co. v. Olin Corp.*,
    No. 19-cv-00385, 2022 WL 3701159 (W.D.N.Y. Aug. 26, 2022) ..............64

*In re Milk Products Antitrust Litigation*,
    84 F. Supp. 2d 1016 (D. Minn. 1997),
    *aff'd*, 195 F.3d 430 (8th Cir. 1999) ................................................ 44, 45, 46

*Moore v. Mars Petcare US, Inc.*,
    820 F. App'x 573 (9th Cir. 2020)........................................................25, 26

*Mosley v. GEICO Insurance Co.*,
    No. 13-cv-161, 2014 WL 7882149 (S.D. Miss. Dec. 16, 2014)..................65

*Mueller v. Harry Kaufmann Motorcars, Inc.*,
    859 N.W.2d 451 (Wis. Ct. App. 2014)......................................................60

*In re Musical Instruments & Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015)........................................................25, 26, 37

*In re National Ass'n of Music Merchants, Musical Instruments &*
    *Equipment Antitrust Litigation*,
    MDL No. 2121, 2012 WL 3637291 (S.D. Cal. Aug. 20, 2012),
    *aff'd*, 798 F.3d 1186 (9th Cir. 2015) ....................................................31, 36

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
    350 F. Supp. 2d 160 (D. Me. 2004) ..................................................... 57, 60

*In re Niaspan Antitrust Litigation*,
    42 F. Supp. 3d 735 (E.D. Pa. 2014) ..................................................... 56, 57

*Novell v. Migliaccio*,
    749 N.W.2d 544 (Wis. 2008) ................................................................... 59

*Olstad v. Microsoft Corp.*,
    700 N.W.2d 139 (Wis. 2005) ............................................................. 55, 56

*Ortiz v. Sig Sauer, Inc.*,
    No. 19-cv-1025, 2023 WL 1928094 (D.N.H. Feb. 10, 2023) ..................... 63

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
    647 N.E.2d 741 (N.Y. 1995) ................................................................... 59

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    911 F.3d 505 (8th Cir. 2018) ................................................................... 28

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
    998 F.2d 1224 (3d Cir. 1993) ................................................................... 37

*In re Plasma-Derivative Protein Therapies Antitrust Litigation*,
    MDL No. 2109, 2012 WL 39766 (N.D. Ill. Jan. 9, 2012) ..................... 51, 52

*In re Processed Egg Products Antitrust Litigation*,
    851 F. Supp. 2d 867 (E.D. Pa. 2012) ....................................................... 60

*In re Processed Egg Products Antitrust Litigation*,
    No. 08-md-02002, 2011 WL 5980001 (E.D. Pa. Nov. 30, 2011) ................ 42

*In re Processed Egg Products Antitrust Litigation*,
    No. 08-md-2002, 2013 WL 4504768 (E.D. Pa. Aug. 23, 2013) ............ passim

*In re Public Offering Antitrust Litigation*,
    No. 98-cv-7890, 2004 WL 350696 (S.D.N.Y. Feb. 25, 2004) ..................... 51

*Pyatkova v. Motorcars*,
    No. 15-cv-3263, 2016 WL 674862 (D.N.J. Feb. 2, 2016) ........................... 14

*In re RealPage, Inc., Rental Software Antitrust Litigation (No. II)*,
    No. 23-md-03071, 2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023) ............60

*In re Refrigerant Compressors Antitrust Litigation*,
    No. 09-md-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ..............64

*Robinson v. Jackson Hewitt, Inc.*,
    No. 19-cv-9066, 2019 WL 5617512 (D.N.J. Oct. 31, 2019) ........... 43, 44, 45

*Sheet Metal Workers Local 441 Health & Welfare Plan v.
    GlaxoSmithKline, PLC*,
    263 F.R.D. 205 (E.D. Pa. 2009) .................................................62

*Smith v. RecordQuest, LLC*,
    989 F.3d 513 (7th Cir. 2021) .....................................................63

*State ex rel. Fitch v. Yazaki North America, Inc.*,
    294 So. 3d 1178 (Miss. 2020) ...................................................55

*In re Suboxone Antitrust Litigation*,
    64 F. Supp. 3d 665 (E.D. Pa. 2014) ............................................57

*Superior Offshore International, Inc. v. Bristow Group Inc.*,
    738 F. Supp. 2d 505 (D. Del. 2010) ......................................passim

*Supreme Auto Transport LLC v. Arcelor Mittal*,
    238 F. Supp. 3d 1032 (N.D. Ill. 2017),
    *aff'd*, 902 F.3d 735 (7th Cir. 2018) ...........................................49

*In re TD Bank, N.A.*,
    150 F. Supp. 3d 593 (D.S.C. 2015) ............................................58

*Tijerina v. Volkswagen Group of America, Inc.*,
    No. 22-cv-18755, 2023 WL 6890996 (D.N.J. Oct. 19, 2023) .....................53

*TruePosition, Inc. v. LM Ericsson Telephone Co.*,
    844 F. Supp. 2d 571 (E.D. Pa. 2012) .....................................16, 17

*Uhr v. Responsible Hospitality Institute, Inc.*,
    No. 10-cv-4945, 2011 WL 4091866 (D. Minn. Sept. 14, 2011),
    *aff'd*, 473 F. App'x 517 (8th Cir. 2012) .....................................38

*In re Valsartan, Losartan, & Irbesartan Products Liability Litigation*,
   MDL No. 2875, 2020 WL 8970347 (D.N.J. Mar. 12, 2020)......................63

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
   873 F.3d 185 (3d Cir. 2017)...........................................................................33

*Varela v. Investors Insurance Holding Corp.*,
   81 N.Y.2d 958 (1993) ...................................................................................59

*In re Vascepa Antitrust Litig.*,
   No. 21-cv-12061, 2023 WL 2182046 (D.N.J. Feb. 23, 2023)....................65

*Washington County Health Care Authority, Inc. v. Baxter International Inc.*,
   328 F. Supp. 3d 824 (N.D. Ill. 2018)...........................................................29

*In re Wellbutrin XL Antitrust Litigation*,
   260 F.R.D. 143 (E.D. Pa. 2009) ..................................................................57

*Williams v. Foremost Insurance Co.*,
   102 F. Supp. 3d 1230 (D.N.M. 2015).........................................................58

*Wilson v. General Motors Corp.*,
   190 N.J. 336 (2007) ...............................................................................54, 56

*Woori Bank v. Merrill Lynch*,
   923 F. Supp. 2d 491 (S.D.N.Y. 2013),
   *aff'd*, 542 F. App'x 81 (2d Cir. 2013) ........................................................46

*Yee v. National Gypsum Co.*,
   No. 09-cv-8189, 2010 WL 2572976 (D. Ariz. June 22, 2010)....................64

## STATUTES

15 U.S.C. § 15(b)..............................................................................................42

73 Pa. Stat. Ann. § 201-2(4)(xxi) .....................................................................59

73 Pa. Stat. Ann. §§ 201-1 .........................................................................60, 61

740 Ill. Comp. Stat. § 10/7(2)...........................................................................55

Ark. Code Ann. § 4-88-107(a)(10)....................................................................61

Colo. Rev. Stat. Ann. § 6-4-115 .......................................................................55

Minn. Stat. Ann. §§ 325F.68 ................................................................60

Minn. Stat. § 325F.69 .........................................................................59

Mont. Code Ann. § 30-14-133(1)(a) ....................................................58

N.M. Stat. Ann. § 57-12-2-(E) ............................................................61

N.Y. Gen. Bus. Law § 349(a)...............................................................59

Nev. Rev. Stat. § 598.0977 ..................................................................62

Nev. Rev. Stat. § 598.0903 ..................................................................62

S.C. Code Ann. § 39-5-140(a).............................................................58

Wis. Stat. §100.18...............................................................................59

## RULES

Rule 9(b) of the Federal Rules of Civil Procedure..........................43, 44

## OTHER AUTHORITIES

House Bill 23-1192,
    https://leg.colorado.gov/sites/default/files/2023a_1192_signed.pdf ............55

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th & 5th ed. 2023)................17

## PRELIMINARY STATEMENT

The ambition of plaintiffs' claims stands in sharp contrast to the paucity of their factual allegations.  Nearly a year has passed since the first, barebones antitrust suit was filed against defendants—four groups of manufacturers of fragrance ingredients and compounds—on behalf of a putative class of direct purchasers of those ingredients and compounds.  That suit (like those that followed)[1] was based on nothing more than reports of government inquiries into the fragrance industry.  Now, after plaintiffs' counsel touted their "extensive" investigation to this Court (ECF No. 32 at 10) to secure the role of Interim Class Counsel, plaintiffs have filed consolidated pleadings that are just as threadbare.

These pleadings conjure a sprawling, six-year price-fixing conspiracy but rest on little more than the existence of government inquiries, non-specific financial data, and snippets from ordinary statements of business performance that certain defendants made publicly over a series of years.  This is not enough to plead an agreement among defendants—the crux of a conspiracy claim.  Nor is it enough to plead any of the related state law claims IPPs and EUPs assert.  For

---

[1] The Court has consolidated into three dockets the actions brought on behalf of those who purchased: (i) fragrance ingredients or compounds directly from defendants (direct purchasers or "DPPs"); (ii) fragrance ingredients or compounds indirectly from defendants (indirect purchasers or "IPPs"); and (iii) consumer products containing defendants' fragrance ingredients or compounds (end-users or "EUPs").  Collectively, these three groups are referred to as "plaintiffs."

multiple reasons, the complaints should be dismissed in full.

*First*, plaintiffs fail to state a conspiracy claim under Section 1 of the Sherman Act because they do not plead direct evidence of an agreement—a "conscious commitment to a common scheme"—among defendants.  Nowhere in more than 400 pages of pleadings do plaintiffs identify a single instance of an actual agreement, any person who allegedly participated in one, or where or how the alleged conspiracy formed and operated.  Nor do plaintiffs identify a single communication between or among defendants, much less any that could resemble direct evidence of a conspiracy or efforts to maintain one.

Plaintiffs likewise fail to state a federal antitrust claim with circumstantial evidence, which requires factual allegations of parallel conduct combined with "plus factors" raising a plausible inference that any such parallelism resulted from a conspiracy rather than competition.  Here, plaintiffs suggest parallel price increases by mischaracterizing a price index that: (i) is not limited to defendants and (ii) reveals no allegedly "dramatic" price increase until *five years after* the conspiracy allegedly began—and *two months after* the government inquiries were announced.  While plaintiffs also try to depict certain defendants' public statements as evidence of parallel price increases, these generic, investor-focused statements do not purport to describe fragrance prices, were released months or years apart, and did not even specify the amount of the alleged increases.

Absent plausible allegations of parallel conduct, plaintiffs' "plus factors" are irrelevant, and, in any event, insufficient.  To insinuate a conspiracy, plaintiffs rely heavily on the existence of government inquiries, but the law is clear that this is a "non-factor" at the pleading stage.  Even the regulators' press releases that plaintiffs selectively cite warn against drawing any inferences from the mere existence of these inquiries.  Plaintiffs also try to make ordinary conduct—like participating in trade associations and industry events, seeking to increase profits, and gathering competitive intelligence—seem sinister, but their conclusory allegations do not make their insinuations plausible.  If anything, plaintiffs negate any inference of a conspiracy by alleging two obvious reasons defendants might independently raise prices: in response to increased costs and to increased demand.

Unable to substantiate their central price-fixing theory, plaintiffs offer other hypotheses—for example, that defendants may have agreed to allocate and restrain the supply of fragrance ingredients or to not "appropriate" one another's unique chemical formulations for fragrance compounds.  Those assertions do not state a federal antitrust claim under Section 1 because they do not indicate who agreed with whom, about what, or when, where, and how that alleged agreement operated.  Nor would these alleged non-price understandings support the agreement "to fix,

raise, maintain, and stabilize . . . prices" that plaintiffs seek to plead.[2]  Furthermore, plaintiffs undercut the plausibility of these purported "agreements" by pleading that defendants produce overlapping (and chemically similar) ingredients and by drawing implausible conspiratorial inferences from innocuous public pledges also signed by defendants' customers, including *a former named plaintiff in this case*.

*Second*, while plaintiffs' claims should be dismissed in full, portions based on claimed damages that accrued before the applicable statutes of limitation are time-barred.  To avoid dismissal, plaintiffs seek tolling based on fraudulent concealment, but their allegations hinge on a premise that they have conceded is false: that they "could not and did not discover the existence of their claims" until March 7, 2023, when reports of the regulators' inquiries first surfaced.  Yet when vying for a lead counsel role, DPPs' counsel represented that they began "monitoring Defendants' conduct in the fragrance market *before* the government authorities announced their investigations."  (ECF No. 32 at 10 (emphasis added).)  Plaintiffs also rely on allegedly "suspicious" statements defendants made publicly and published articles as far back as 2012.  Plaintiffs cannot have it both ways.

---

[2] (Direct Purchasers' Consolidated Compl. ¶ 105, *In Re: Fragrance Direct Purchaser Antitrust Litig.*, No. 23-cv-02174, ECF No. 107 ("DC"); Producer Indirect Purchaser Plaintiffs' Consolidated Compl. ¶ 1, *In Re: Fragrance Indirect Purchaser Antitrust Litig.*, No. 23-cv-03249, ECF No. 43 ("IC")); End- User Plaintiffs' Consolidated Compl. ¶ 1, *In Re: Fragrance End-User Plaintiff Antitrust Litig.*, No. 23-cv-16127, ECF No. 38 ("EC").)

**Third**, IPPs and EUPs lack antitrust standing to assert their federal and state law antitrust claims.  Indeed, they fail to allege facts that would make their alleged injuries anything other than remote and attenuated.  IPPs' and EUPs' allegations are belied by intervening market forces, the failure to allege even rudimentary facts regarding their alleged purchases from unnamed intermediaries at unspecified times, and the lack of any plausible explanation of how the asserted injuries could be traced to defendants in a non-speculative way.  It is also undeniable that DPPs—pursuing claims based on substantively identical allegations—are more direct plaintiffs that would render any recovery by IPPs and EUPs duplicative.

**Fourth**, IPPs' and EUPs' state law claims fail for many overarching and state-specific deficiencies.  For example, they: (i) fail with the Sherman Act claims they duplicate; (ii) lack a named plaintiff with standing to assert them; (iii) are brought under unspecified state laws; (iv) lack the requisite state-specific nexus; (v) cannot proceed as class actions; and (vi) lack claim-specific elements.  For these and many other reasons below, the complaints should be dismissed.

## THE COMPLAINTS' ALLEGATIONS

Defendants[3] produce fragrance ingredients and compounds.  (DC ¶¶ 1, 20-

---

[3] Plaintiffs name as defendants International Flavors and Fragrances Inc. ("IFF"); Givaudan SA, Givaudan Fragrances Corporation, Ungerer & Company, Inc., and Custom Essence LLC (which plaintiffs collectively define as "Givaudan"); DSM-Firmenich AG, Firmenich International SA, Firmenich SA, Firmenich Inc., and

31; IC ¶¶ 28-43; EC ¶¶ 75-86.)  Plaintiffs purport to represent classes of those who

purchased: (i) fragrance ingredients or compounds directly from defendants for use

in consumer goods (DC ¶¶ 2, 14-18); (ii) fragrance ingredients or compounds

indirectly from defendants for use in those goods (IC ¶ 235); and (iii) consumer

products containing defendants' fragrance ingredients or compounds (EC ¶¶ 242-

43).  Plaintiffs allege that from January 1, 2018, unidentified individuals affiliated

with defendants entered into "an agreement . . . to fix . . . at artificially high levels

the prices they charged for Fragrance Products in the United States and elsewhere."

(DC ¶¶ 208-09; EC ¶¶ 259-60; *cf.* IC ¶¶ 259-60.)  The facts below are taken from

plaintiffs' allegations and accepted as true for purposes of this motion.

## A.    <u>Fragrance Products</u>

Each defendant group allegedly manufactures between 176 and 255

fragrance ingredients (DC ¶ 159; IC ¶ 190; EC ¶ 214) from thousands of raw

---

Agilex Flavors & Fragrances Inc. (which plaintiffs collectively define as
"Firmenich"); and Symrise AG, Symrise Inc., and Symrise US LLC (which
plaintiffs collectively define as "Symrise").  For ease of reference in this motion,
defendants adopt plaintiffs' definitions of defendants and defendant groups, but
reserve all rights regarding insufficiency of service or process, personal
jurisdiction, and other defenses on behalf of particular entities.  Specifically, DSM-
Firmenich AG (together with Firmenich International SA and Firmenich SA),
Givaudan SA, and Symrise AG have each filed motions to dismiss the complaints
for lack of personal jurisdiction and, in the case of Firmenich SA, insufficient
service of process.  The aforementioned defendants argue first that this Court lacks
personal jurisdiction over them and, in the alternative, join this motion.

materials sourced from suppliers (DC ¶¶ 41-42, 119; IC ¶¶ 59-60, 149; EC ¶¶ 96-97, 174).  Although defendants "primarily manufacture fragrance ingredients" for their "own" use (DC ¶ 66; IC ¶ 94; EC ¶ 120), they also allegedly sell them to other defendants and to customers like DPPs (DC ¶¶ 67, 186; IC ¶ 95; EC ¶ 121).

Defendants combine fragrance ingredients into fragrance compounds, which customers like DPPs, and those like IPPs who purchase from intermediaries, incorporate into their end products, such as "candles, soaps, lotions, cosmetics, perfumes, detergents, fabric care, and household cleaners."  (DC ¶¶ 2, 50; *cf.* IC ¶¶ 68, 75; EC ¶¶ 2, 104.)  These consumer products are ultimately sold to end-users, and plaintiffs allege that defendants' fragrance products are "just one portion of the overall cost of the [overall good]" sold downstream.  (IC ¶ 114; EC ¶ 138; *cf.* DC ¶ 86 (fragrances are "a very minor portion of the end product costs").)

According to plaintiffs, defendants produce "interchangeable" compounds because they have "similar fragrance profiles even if [defendants] market them as something unique or different."  (DC ¶ 62; IC ¶ 90; EC ¶ 116.)  DPPs and IPPs do not allege which, if any, fragrance ingredients or compounds they purchased, what prices they paid, or prices charged by non-defendant fragrance producers, who allegedly occupy nearly 40% of the market.  (DC ¶ 70; IC ¶ 98; EC ¶ 124.)  Likewise, EUPs do not allege what consumer products they purchased, what ingredients or compounds they contained, which defendant produced those

fragrance ingredients or compounds, or what prices they paid.

### B. Plaintiffs' Allegations of Ordinary Public Statements as to Price

Plaintiffs allege that defendants "suspiciously reported increasing prices" for fragrance ingredients and compounds in January 2018. (DC ¶¶ 107-37; IC ¶¶ 137-67; *cf.* EC ¶¶ 161-92.)  As alleged, the "beginning of the conspiracy marked a period of flat prices followed by a dramatic increase by over 37%." (DC ¶ 106; IC ¶ 136; EC ¶ 160.)  To support this claim, plaintiffs rely on a Producer Price Index (published by the U.S. Bureau of Labor Statistics), which purports to show a 37% increase in prices in May 2023. (DC ¶ 106 n.92; IC ¶ 136 n.115; EC ¶ 160 n.92.)

Plaintiffs also rely on routine public statements over months and years in which some defendants generally referred to price increases in mandatory securities filings (*e.g.*, DC ¶ 111; IC ¶ 141; EC ¶ 166), earnings calls that typically accompany those filings (*e.g.*, DC ¶¶ 110, 113, 115-16, 118-25, 128, 131-34, 136; IC ¶¶ 140, 143, 145-46, 148-55, 158, 161-64, 166; EC ¶¶ 165, 168, 170-71, 173-80, 183, 186-89, 191), and press releases (*e.g.*, DC ¶¶ 110, 112, 114, 126-27, 129-30, 135; IC ¶¶ 140, 142, 144, 156-57, 159-60, 165; EC ¶¶ 165, 167, 169, 181-82, 184-85, 190)  For example, Givaudan allegedly announced a 6% increase in the price of all of its products in January 2018 (DC ¶ 109; IC ¶ 139; EC ¶ 164), while IFF allegedly announced a goal of "about a 4% price increase" in February 2019 (DC ¶ 116; IC ¶ 146; EC ¶ 171) and 8% increases (subject to "push back from

8

customers") across its divisions in Q1 2022 (DC ¶ 128; IC ¶ 158; EC ¶ 183).

Plaintiffs cite no statements from Firmenich before August 2020 (DC ¶ 121; IC ¶ 151; EC ¶ 176), no statements from IFF between September 2019 and November 2021 (DC ¶¶ 118, 123; IC ¶¶ 148, 153; EC ¶¶ 173, 178), and no statements from Givaudan between July 2020 and April 2022 (DC ¶¶ 120, 127; IC ¶¶ 150, 157; EC ¶¶ 175, 182).  Plaintiffs cite no statements from Symrise that quantify the alleged increases.  (DC ¶¶ 110, 112, 118-19, 122, 125, 130, 136; IC ¶¶ 140, 142, 148-49, 152, 155, 160, 166; EC ¶¶ 165, 167, 173-74, 177, 180, 185, 191).  They further allege that in February and May of 2022, IFF executives publicly commented on pricing trends in the market.  (DC ¶¶ 128, 139; IC ¶¶ 158, 169; EC ¶¶ 183, 194.)

Plaintiffs allege that defendants attributed price increases to greater costs of raw materials (DC ¶¶ 4, 107, 110, 114, 127-28, 133, 136, 141; IC ¶¶ 5, 137, 140, 144, 157-58, 163, 166, 171; EC ¶¶ 4, 161, 165, 169, 172-73, 188, 191, 196) and increasing demand (DC ¶¶ 118, 122-23, 132, 135-36, 150-51; IC ¶¶ 148, 152-53, 162, 165-66, 180-81; EC ¶¶ 163, 177-78, 187, 190-91, 205-06), but "[o]n information and belief," these reasons were "pretextual" (DC ¶ 140; IC ¶ 170; EC ¶ 195).  Plaintiffs also rely on earnings call transcripts in which defendants described greater costs for other inputs such as energy, labor, and transportation.[4]

---

[4] *See, e.g.*, IFF Q-1 2022 Earnings Call Transcript (May 10, 2022) (cited by DC ¶ 128; IC ¶ 158; EC ¶ 183) ("increases in raw material, logistics and energy costs");

## C.    <u>Plaintiffs' Conclusory Allegations of a Conspiracy</u>

Plaintiffs allege that defendants agreed to fix prices for fragrance ingredients and compounds "as early as January 1, 2018 . . . in response to increased costs of the raw materials needed to manufacture Fragrance Products." (DC ¶¶ 4, 105; IC ¶¶ 5, 135; EC ¶¶ 4, 159.) Plaintiffs do not plead who reached this alleged agreement, when or where it was reached, or how it was enforced. Nor do they plead what price increase defendants purportedly agreed to impose on fragrances.

Instead, plaintiffs rely solely on allegations that defendants had general opportunities to collude because they joined trade associations, including IFRA (DC ¶¶ 91-93; IC ¶¶ 121-23; EC ¶¶ 144-46), FSAC (DC ¶¶ 94-96; IC ¶¶ 124-26; EC ¶¶ 147-49), and RIFM (DC ¶¶ 97-98; IC ¶¶ 127-28; EC ¶¶ 150-51), sometimes had employees on the boards of these organizations, and attended industry events (DC ¶¶ 89-104; IC ¶¶ 119-34; EC ¶¶ 142-58). Plaintiffs specify attendees at only one such event: In November 2022, scientific and regulatory personnel (not alleged to have any role in pricing) attended an IFRA Global Fragrance Summit in Brazil, along with customers, lawyers, and other non-defendants. (DC ¶ 93; IC ¶ 123; EC ¶ 146.) Plaintiffs further allege that unnamed executives from Firmenich,

---

Givaudan SA Q4 2022 Earnings Call Transcript (Jan. 25, 2023) (cited by DC ¶ 133; IC ¶ 163; EC ¶ 188) ("higher raw material, energy, and freight costs"); Symrise AG Q4 2022 Earnings Call Transcript (Mar. 8, 2023) (cited by DC ¶ 136; IC ¶ 166; EC ¶ 191) ("[h]igher energy costs, logistic costs, and personnel costs").

Givaudan, and IFF were photographed at a golf event hosted by the American Society of Perfumers.  (DC ¶ 102; IC ¶ 132; EC ¶ 155.)

Plaintiffs allege that defendants used these meetings to "exchange competitively sensitive pricing and volume information and organize their cartel." (DC ¶ 104; IC ¶ 134; EC ¶ 157.)  Plaintiffs do not plead who participated in any such exchanges, what information was allegedly exchanged, at which meetings the exchanges allegedly occurred, or how the information was used to "organize the[] cartel."  Plaintiffs also allege that commonplace economic characteristics of the fragrance industry render it vulnerable to cartels, including that defendants are vertically integrated, barriers to entry are purportedly significant, buyers allegedly are not concentrated, demand purportedly is inelastic, and fragrance products are nondurable commodities.  (DC ¶¶ 76-88; IC ¶¶ 96-117; EC ¶¶ 122-41.)

Plaintiffs assert that defendants "agreed" not to produce the same subset of fragrance ingredients to restrain competition.  (DC ¶¶ 155-56; IC ¶¶ 185-86; EC ¶¶ 210-11.)  According to plaintiffs, defendants' online ingredient catalogues show, for example, that IFF and Symrise make isobutyl quinoline, while Givaudan makes the "chemically similar" isopropyl quinoline.  (DC ¶ 160; IC ¶ 191; EC ¶ 215.)

Plaintiffs also allege that defendants do not produce identically formulated fragrance compounds.  (DC ¶¶ 157-58; IC ¶¶ 187-88; EC ¶¶ 212-13.)  Plaintiffs allege that articles in 2012 and 2016 asserted that differences in defendants'

product offerings, which allegedly limit competition, originated as an "informal understanding." (DC ¶¶ 157-58; IC ¶¶ 187-88; EC ¶¶ 212-13.) "At some point," plaintiffs assert, "this tacit agreement became express," as allegedly suggested by a "Perfumery Code of Ethics," which simply provides that "[b]orrowed forms shall have their original creators . . . named." (DC ¶ 158; IC ¶ 188-89; EC ¶ 213.) This public pledge, according to the website plaintiffs cite, was signed by defendants' customers, including Yosh Han, a former named plaintiff in the DPP case. (DC ¶ 158 n.159; IC ¶ 189 n.182; EC ¶ 213 n.159.) Plaintiffs also allege that an agreement not to compete is shown by a website addressing the banal question of "how . . . you make sure recognition is given equally or proportionally between all the creators" of a fragrance. (DC ¶ 158 n.160; IC ¶ 189 n.183; EC ¶ 213 n.160.)

### D.    <u>Announcements of Government Inquiries</u>

On March 7, 2023, the European Commission announced a competition investigation of the fragrance industry. (DC ¶ 163; IC ¶ 195; EC ¶ 218.) The Competition and Markets Authority of the United Kingdom ("CMA") and Switzerland's Competition Commission ("COMCO") then did the same. (DC ¶¶ 165-66; IC ¶¶ 197-98; EC ¶¶ 220-21.) Plaintiffs allege that defendants acknowledged these investigations, as well as receipt of subpoenas from the United States Department of Justice. (DC ¶¶ 167-73; IC ¶¶ 199-205; EC ¶¶ 222-228.) Plaintiffs do not allege that these investigations have resulted in any findings. In

fact, according to the government announcements plaintiffs cite, investigations "do[] not mean that the companies are guilty" of anticompetitive conduct (DC ¶ 5 n.1; IC ¶ 6 n.4; EC ¶ 6 n.1 (citing European Commission press release)), "no assumptions should be made about whether competition law has been broken" (DC ¶ 6 n.2; IC ¶ 7 n.5; EC ¶ 7 n.2 (citing CMA press release)), and "[t]he presumption of innocence applies" (DC ¶ 7 n.3; ¶ IC 8 n.6; EC ¶ 8 n.3 (citing COMCO press release)).

### E.   **Procedural History**

On April 18, 2023, the first of nine DPP complaints was filed, alleging that defendants conspired to fix prices in violation of Section 1 of the Sherman Act.  (*In Re: Fragrance Direct Purchaser Antitrust Litig.*, No. 23-cv-02174, ECF No. 1.) On June 13, 2023, the first of two IPP complaints was filed alleging a similar violation.  (*In Re: Fragrance Indirect Purchaser Litig.*, No. 23-cv-03249, ECF No. 1.)  The first of four EUP actions followed thereafter on September 5, 2023.  (*In Re: Fragrance End-User Plaintiff Antitrust Litig.*, No. 23-cv-16127, ECF No. 1.)

After these actions were consolidated into three dockets, the Court appointed Interim Class Counsel in each.  In advocating for selection as Interim Class Counsel, DPPs' counsel stated that they "started monitoring Defendants' conduct in the fragrance market before the government authorities announced their investigations," resulting in "factual allegations" that "go well beyond the

investigation announcements." (*In Re: Fragrance Direct Purchaser Antitrust Litig.*, No. 23-cv-02174, ECF No. 32, at 10.)

Plaintiffs then filed consolidated amended complaints asserting state and federal claims. DPPs assert a single *per se* price-fixing claim under Sections 1 and 3 of the Sherman Act. (DC ¶¶ 207-15.) IPPs and EUPs rehash DPPs' substantive allegations, asserting claims for injunctive relief under Section 1 of the Sherman Act, and damages for unjust enrichment and state antitrust and consumer protection violations. (IC ¶¶ 245-308; EC ¶¶ 257-324.)

## ARGUMENT[5]

To withstand dismissal, a complaint must rise "above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), by providing enough "factual content" to state a claim, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[L]abels and conclusions" do not suffice, *Twombly*, 550 U.S. at 555, nor do "factual claims that are internally inconsistent" *Pyatkova v. Motorcars*, No. 15-cv-3263, 2016 WL 674862, at *2 (D.N.J. Feb. 2, 2016). In "antitrust cases," courts "insist[] upon some specificity in pleading" because "defendant[s] should not be put to the expense of big-case discovery on the basis of a threadbare claim." *In re*

---

[5] All internal quotation marks, citations, and alterations are omitted unless otherwise noted.

*Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370 (3d Cir. 2010).[6]

Here, numerous deficiencies require dismissal of plaintiffs' claims. *First*, plaintiffs fail to plausibly allege an agreement among defendants, as required for any conspiracy claim under federal antitrust law. *Second*, plaintiffs' claims are untimely to the extent they are based on damages that allegedly accrued before applicable statutes of limitation. *Third*, IPPs and EUPs lack standing to assert antitrust claims under state and federal law because they fail to allege any antitrust injury causally connected to defendants' alleged conduct. *Fourth*, IPPs' and EUPs' state law claims are plagued by many other deficiencies, including that they mirror the deficient Sherman Act claims, are disconnected from defendants and the states that supply the claim, and fail under additional state-specific requirements.

## I.    PLAINTIFFS' SHERMAN ACT CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE FACTS TO PLAUSIBLY SUGGEST AN AGREEMENT AMONG DEFENDANTS

Under Section 1 of the Sherman Act, "[t]he crucial question" is whether the conduct "stem[s] from independent decision or from an agreement" among defendants. *Twombly*, 550 U.S. at 553. Failure to plausibly allege an agreement is

---

[6] When deciding a motion to dismiss, courts may consider "the allegations contained in the complaint . . . and matters of public record," *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998), as well as documents "integral to or explicitly relied upon in the complaint," *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487, 493 (3d Cir. 2017).

fatal, as "[u]nilateral action, regardless of the motivation, is not a violation of Section 1." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (affirming dismissal of Section 1 claim). A plaintiff cannot plead a plausible agreement when the allegations are "merely consistent with" an illicit accord, but also consistent with unilateral action. *Twombly*, 550 U.S. at 557. Instead, a plaintiff must allege facts suggesting that each defendant shared "a conscious commitment to a common scheme," and do so by pleading sufficient "direct" or "circumstantial" evidence of an agreement. *Burtch*, 662 F.3d at 225.

Here, Plaintiffs plead neither category of facts to support their alleged price-fixing agreement, let alone the alleged supply-related agreement they invoke in passing. Indeed, plaintiffs omit even basic facts about how any purported conspiracy formed and operated, and they instead rely on allegations that are either implausible or fully consistent with lawful competitive actions by defendants.

### A.    <u>Plaintiffs Allege No Direct Evidence of a Price-Fixing Agreement</u>

Plaintiffs do not plead an agreement to fix prices for fragrance products by alleging direct evidence, which must be "explicit and require[] no inferences to establish the proposition or conclusion being asserted." *Burtch*, 662 F.3d at 225 (quoting *Brokerage Antitrust*, 618 F.3d at 324 n.23). Direct evidence amounts to a "smoking gun," like "[a] memorandum . . . detailing the discussions from a meeting of a group of alleged conspirators," *TruePosition, Inc. v. LM Ericsson Tel.*

*Co.*, 844 F. Supp. 2d 571, 593 (E.D. Pa. 2012), or "[a] document or conversation explicitly manifesting the existence of the agreement," *Brokerage Antitrust*, 618 F.3d at 324 n.23.  Here, plaintiffs allege nothing of the sort.

Plaintiffs' failure to plead direct evidence is telling because purported conspiracies involving "long-term complex relationships" among firms should be "more susceptible of direct proof."  *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987).  As a leading antitrust treatise recognizes, a "long-term cartel," such as one allegedly spanning six years among a web of multi-national corporations and involving many products, could hardly arise—much less survive—without "explicit agreements" among participants.  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1413(b)(2) (4th & 5th ed. 2023).  Yet Plaintiffs do not identify a single collusive communication among defendants, much less the countless it would take to fix prices for ***hundreds*** of fragrance ingredients used in ***thousands*** of fragrance compounds, amounting to "***billions*** of dollars" of sales in ***each*** of the last ***six years***, as plaintiffs allege.  (DC ¶¶ 55 (emphasis added), 159; IC ¶¶ 73, 190; EC ¶¶ 109, 214.)  The lack of any asserted direct evidence highlights the implausibility of plaintiffs' broad, conclusory allegations.

### B.  Plaintiffs' Alleged Circumstantial Evidence Fails to Raise a Plausible Inference of a Price-Fixing Agreement

Plaintiffs' purported circumstantial evidence also falls short.  To allege an

agreement circumstantially, a plaintiff must plead facts plausibly suggesting:
(i) that defendants engaged in "parallel conduct" **and** (ii) "plus factors."
*Brokerage Antitrust*, 618 F.3d at 322-23.  Plus factors must suggest circumstances
so unusual that they create the inference that "parallel behavior . . . would probably
not result from chance, coincidence, independent responses to common stimuli, or
mere interdependence unaided by an advance understanding." *Twombly*, 550 U.S.
at 556 n.4.  Thus, allegations that are "compatible with . . . lawful,
unchoreographed free-market behavior" do "not plausibly suggest an illicit
accord." *Iqbal*, 556 U.S. at 680.  And a complaint that identifies an "obvious
alternative explanation[]" for the conduct must be dismissed.  *Brokerage Antitrust*,
618 F.3d at 322-23, 350.

Here, plaintiffs plead no parallel pricing, allege non-conspiratorial
explanations for each defendant's pricing (including rising costs and demand), and
rest on "plus factor" allegations that are insufficient to lead to a contrary inference.

## 1.   Plaintiffs Fail to Plead Parallel Pricing

Plaintiffs cannot plead parallel conduct by baldly asserting that "[s]ince at
least 2018, Defendants have coordinated price increase[s] to increase their profits."
(DC ¶ 107; IC ¶ 137; EC ¶ 161.)  Such conclusory allegations—built on pricing
index statistics and a patchwork of defendants' public statements in press releases,
earnings calls, and mandatory regulatory filings (DC ¶¶ 105-37; IC ¶¶ 135-67; EC

¶¶ 159-92)—show no "parallel" pricing.

(a)   *Plaintiffs' Data Do Not Show Parallel Pricing*

Mischaracterizing a price index from the Bureau of Labor Statistics, plaintiffs allege it shows that at "the beginning of the conspiracy," prices were "flat," but thereafter, defendants increased their prices in parallel.  (DC ¶ 106 & n.92; IC ¶ 136 & n.115; EC ¶ 160 & n.92.)  As a result, plaintiffs allege "a dramatic increase by over 37%" in prices.  (DC ¶ 106; IC ¶ 136; EC ¶ 160.)  But plaintiffs omit that this supposed "dramatic increase" does not appear in the price index until May 2023: ***more than five years*** after plaintiffs allege the parallel price increases began (DC ¶¶ 4, 109; IC ¶¶ 5, 139; EC ¶¶ 4, 164) and ***two months after*** government entities announced their investigations of the fragrance industry (DC ¶ 5; IC ¶ 6; EC ¶ 6).  These data in no way support plaintiffs' conclusory assertions that, beginning in 2018, defendants agreed to increase their prices in parallel.[7]

In addition, the price index provides no plausible factual support for plaintiffs' assertion of "a dramatic increase" in ***defendants'*** prices because the index relies on aggregated pricing data that do not distinguish between prices

---

[7] In addition, the index has remained flat since the May 2023 increase, suggesting some anomaly in the data.  *Producer Price Index by Commodity: Chemicals and Allied Products: Synthetic Organic Chemicals for Use as Flavor and Perfume Materials*, Fed. Resv. Bank St. Louis, https://fred.stlouisfed.org/series/WPU061403997 (last visited April 8, 2024).

charged by defendants and non-defendants.  In fact, the index does not speak to the prices charged by any individual companies.  It also measures only "the average change over time in the selling prices received by ***domestic*** producers for their output,"[8] necessarily excluding some of the defendants here and in no way supporting parallel pricing ***across defendants***.  Because plaintiffs' data "obscure any given [d]efendant's [alleged] contribution" to the pricing "trend" plaintiffs assert, plaintiffs "fail to demonstrate parallel conduct."  *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 401 (2d Cir. 2024) (affirming dismissal of Section 1 claim based on aggregated data).

> (b)   *Plaintiffs' Allegations of Defendants' Public*
> *Statements Do Not Plausibly Plead Parallel Pricing*

For multiple independent reasons, plaintiffs also fail to plausibly allege parallel conduct by invoking a scattershot of defendants' public statements.

***First***, conduct is not "parallel" when it is undertaken "at different time[s]," *Burtch*, 662 F.3d at 228, and here, the alleged public statements that purportedly reflect parallel price increases are separated by months—and sometimes years.  Plaintiffs allege that the first price increase announcement came from Givaudan in January 2018 (DC ¶ 109; IC ¶ 139; EC ¶ 164), but: (i) Symrise is not alleged to

---

[8] *Producer Price Indexes*, U.S. Bureau Lab. Statistics, https://www.bls.gov/ppi/ (last visited April 8, 2024).

have referred to any price increases until *over four months later*, in May 2018 (DC ¶ 110; IC ¶ 140; EC ¶ 165); (ii) IFF is not alleged to have referred to any price increases until *three months after that*, in August 2018 (DC ¶ 111; IC ¶ 141; EC ¶ 166); and (iii) Firmenich is not alleged to have referred to any price increases until August 2020, *another two years* later (DC ¶ 121; IC ¶ 151; EC ¶ 176).  Plaintiffs' allegations suffer from multiple other years-long gaps, pleading no conduct by IFF from September 2019 (DC ¶ 118; IC ¶ 148; EC ¶ 173) to November 2021 (DC ¶ 123; IC ¶ 153; EC ¶ 178), or Givaudan from July 2020 (DC ¶ 120; IC ¶ 150; EC ¶ 175) to April 2022 (DC ¶ 127; IC ¶ 157; EC ¶ 182).  Allegations of such disparate actions are even weaker than those in *Burtch*, which fell "far short of demonstrating parallel behavior" at the pleading stage because the plaintiffs alleged that one defendant began the challenged conduct on "April 23, 2003," while another did not begin until three months later on "July 22, 2003."  *Burtch*, 662 F.3d at 228.

Compounding the problem is that plaintiffs' allegations—built on excerpts of ordinary statements to investors on *quarterly* (*e.g.*, DC ¶ 120; IC ¶ 150; EC ¶ 175), *biannual* (*e.g.*, DC ¶ 124; IC 154; EC ¶ 179), or *annual* bases (*e.g.*, DC ¶ 122; IC ¶ 152; EC ¶ 177)—mask the actual "dates on which [defendants] moved prices together," if at all.  *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1343 (11th Cir. 2010) (affirming dismissal of Section 1 claim).  To take one illustration,

plaintiffs allege parallel prices in 2020 based entirely on three public statements: (i) Symrise identified "pricing" as a cause of "organic growth" while reporting its "financial results" for the year (DC ¶ 122; IC ¶ 152; EC ¶ 177); (ii) Givaudan responded to a question during its Q2 2020 earnings call by noting that "price increase[s]" had "[a] lot to do with" a 1% improvement in quarterly gross profit margins (DC ¶ 120; IC ¶ 150; EC ¶ 175); and (iii) Firmenich referenced "successful pricing" in its annual call for the twelve months ending June 2020 (DC ¶ 121; IC ¶ 151; EC ¶ 176).  Even ignoring that plaintiffs say nothing about IFF in 2020, none of what they allege comes close to pinpointing when prices supposedly moved within an 18-month window between June 2019 and December 2020—a window that far exceeds the three-month gap that warranted dismissal in *Burtch.*

*Second*, allegations are "insufficient to allow the Court to draw any inferences about whether the conduct is indeed parallel" when they say nothing about "actual prices" or price increases.  *Abbott Lab'ys v. Adelphia Supply USA*, No. 15-cv-5826, 2017 WL 5992355, at *10 (E.D.N.Y. Aug. 10, 2017); *see also Burtch v. Milberg Factors, Inc.*, No. 07-cv-556, 2009 WL 840589, at *9 n.5 (D. Del. Mar. 30, 2009) (finding "significant merit" in argument that plaintiff "fail[ed] even to allege parallel conduct" when the complaint "fail[ed] to identify the prices [the plaintiff] was being charged by each Defendant and how those prices worsened over time"), *aff'd*, 662 F.3d 212 (3d Cir. 2011); *Jacobs*, 626 F.3d at 1343

(affirming dismissal of Section 1 complaint with "no indication" of "the amounts by which the prices moved, if in fact they did").

That deficiency afflicts virtually all of plaintiffs' allegations.  (*E.g.*, DC ¶¶ 110-15, 117-27, 129-36; IC ¶¶ 140-45, 147-57, 159-66; EC ¶¶ 165-70, 172-82, 184-91.)  In addition, the generalized references to prices that plaintiffs cite were often overtly aspirational or subject to customer negotiation or "pushback," further undermining a suggestion of "parallel" pricing.  (*See, e.g.*, DC ¶ 110 (prices "in collaboration with customers"), ¶ 112 (similar), ¶ 113 (suggesting customer pushback), ¶ 114 ("collaboration with . . . customers"), ¶ 116 ("looking to achieve" price growth), ¶ 118 (suggesting "successful" price increases depended on customers), ¶ 125 (price "initiatives"), ¶ 128 (customer "pushbacks"); *see also* IC ¶¶ 140, 142-44, 146, 148, 155, 158; EC ¶¶ 165, 167-69, 171, 173, 190, 193).

Similarly deficient are the only allegations in which plaintiffs attempt to quantify any alleged price increases: (i) Givaudan's January 2018 announcement of 6% increases across "all" of its products (DC ¶ 109; IC ¶ 139; EC ¶ 164); (ii) IFF's February 2019 announcement that it was "looking to achieve" about a 4% increase in its fragrance prices (DC ¶ 116; IC ¶ 146; EC ¶ 171); and (iii) IFF's May 2022 announcement that in the prior quarter it "raised prices by approximately 8%" in unspecified business units subject to customer "pushback" (DC ¶ 128; IC ¶ 158; EC ¶ 183).  Provisional announcements, separated by years, reflecting

disparate percentage increases,[9] and referencing diverse products, suggest nothing parallel, especially when plaintiffs plead no such statements at all from half of defendants, Firmenich and Symrise.

**Third**, plaintiffs make misleading allegations that in February and May 2022, IFF responded to questions on investor calls by noting that "all of our competitors are . . . taking prices up as well," its "price increases were 'neck-to-neck' with [its] competitors," and that "everybody is basically implementing the same range of pricing in the market." (DC ¶¶ 128, 139; IC ¶¶ 158, 169; EC ¶¶ 183, 194.) These generic observations do not help plaintiffs because, on their face, they do not purport to describe the pricing of fragrances, but rather, relate to IFF's business as a whole,[10] in which its fragrance segment only represents around 20%

---

[9] *See, e.g.*, *Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1309-10 (S.D. Fla. 2010) (discounting parallel conduct allegations because "the amounts [of price increases] sometimes differed"); *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1146 (N.D. Cal. 2017) (no parallel conduct where "four examples" showed "difference[s] in price[s]"), *aff'd*, 757 F. App'x 524 (9th Cir. 2018).

[10] Notably, IFF's references to fragrance prices in the transcripts plaintiffs cite indicate that its fragrance division was an ***exception*** to general pricing trends in other lines of business. *See* IFF Q1 2022 Earnings Call Transcript (May 10, 2022) (quoted at DC ¶ 128; IC ¶ 158, EC ¶ 183) ("[T]here are some sectors, as we mentioned, ***Scent as an example, there's a lag***. So ***it's not every single customer out front here in terms of the pricing***.") (emphases added); IFF Q4 2021 Earnings Call Transcript (quoted at DC ¶ 139; IC ¶ 169; EC ¶ 194) (referring to price increases to explain growth in its Nourish and Pharma Solutions divisions, but not its Scent division, where growth was explained by "new wins and increased volume").

of net sales.[11]  Plaintiffs also inaccurately attribute general statements about price increases in August 2022 to Symrise's fragrance segment (DC ¶ 130; IC ¶ 160; EC ¶ 185), even though the cited earnings call only references increases in Symrise's Taste, Nutrition & Health segment, not its fragrance (Scent & Care) segment.[12]

Such "over-inclusive" data that capture "products outside of the relevant . . . market[]" say nothing about whether defendants priced fragrance ingredients and compounds in parallel, much less over a six-year period.  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1197 n.12 (9th Cir. 2015) (affirming dismissal of Section 1 claim based on similar data).  Moreover, because they describe actions by "everybody" (DC ¶ 139; IC ¶ 169; EC ¶ 194) with whom IFF competes, including the myriad non-defendant companies that plaintiffs allege account for nearly 40% of the market (DC ¶ 70; IC ¶ 98; EC ¶ 124), these statements do not support the inference of a conspiracy among defendants.  *See Moore v. Mars Petcare US, Inc.*, 820 F. App'x 573, 576 (9th Cir. 2020) (affirming dismissal of conspiracy claim that did "not explain or account for the role of other players in the market," including their "prices," because their behavior, "insofar as it is like that of Defendants" would "provide[] a market-based reason for what

---

[11] *See* IFF's 2021 Annual Report (Form 10-K), at 87 (Feb. 28, 2022) (cited by DC ¶ 39; IC ¶¶ 43, 57, 62, 68, 91, 98, 113; EC ¶ 95).

[12] Q2 2022 Symrise AG Earnings Call – Final, Lexis (Aug. 2, 2022).

Plaintiffs allege to be a conspiracy").

Accordingly, plaintiffs fail to plausibly allege any parallel price increases and therefore cannot state a claim through circumstantial evidence.

> 2. The Complaints Allege Obvious, Unilateral
> Explanations for Any Alleged Parallel Price Increases

Even if plaintiffs alleged parallel conduct, their Section 1 claims still fail. As the Third Circuit has warned, a claim "predicated on parallel conduct should be dismissed if common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior." *Brokerage Antitrust*, 618 F.3d at 326.

The complaints do just that in at least two respects. ***First***, plaintiffs include numerous allegations indicating that defendants raised prices to combat the rising costs of inputs needed to make fragrance products. (*E.g.*, DC ¶¶ 107, 110, 114, 127, 130, 133, 136, 150; IC ¶¶ 137, 140, 144, 157, 160, 163, 166, 180; EC ¶¶ 161, 165, 169, 182, 185, 188, 191, 205.) That includes greater costs of raw materials (*e.g.*, DC ¶¶ 4, 110, 118, 141, 151; IC ¶¶ 5, 140, 148, 171, 181; EC ¶¶ 4, 165, 173, 196, 206), as well as energy, labor, and transportation, as described in the public statements on which plaintiffs selectively rely. (*See supra* n.4.) Common economic experience confirms that "if the cost of [inputs] r[i]se[s], prices could rise," *In re Musical*, 798 F.3d at 1197 n.13, and each defendant would thus have a unilateral interest in increasing prices in "response to common stimuli," *Twombly*,

550 U.S. at 556 n.4.  Plaintiffs themselves acknowledge that "it is common" for firms to charge "higher prices" to combat rising input costs.  (DC ¶ 141; IC ¶ 171; EC ¶ 196.)  They also acknowledge "supply chain complexity" in sourcing raw materials "from all over the globe" (DC ¶ 78; IC ¶ 108; EC ¶ 132), which only escalated across the industry once the COVID-19 pandemic began in late 2019 (DC ¶ 137 (alleging "difficult economic conditions attributable to the COVID-19 pandemic, supply chain disruptions, and inflation"); IC ¶ 167; EC ¶ 192).

*Second*, plaintiffs repeatedly plead that alleged price increases corresponded with increased demand and sales volume.  (DC ¶¶ 118, 122-23, 132, 135-36, 150-51; IC ¶¶ 148, 152-53, 162, 165-66; EC ¶¶ 173, 177-78, 187, 190-91, 205-06.)  "Where, as here, output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand."  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993).  Plaintiffs even rely on third-party reports describing "increasing demand . . . driving growth." (DC ¶ 55 n.27; IC ¶ 73 n.39; EC ¶ 109 n.27.)  These allegations offer another lawful reason defendants might all raise prices—basic laws of supply and demand.

In sum, the complaints fail because they disclose obvious, non-conspiratorial reasons for any allegedly parallel price increases—a conclusion that applies with particular force here, where plaintiffs fail to allege sufficient plus factors.

27

   3. Plaintiffs' Purported "Plus Factors" Are Irrelevant and
     <u>Fail to Plausibly Suggest the Alleged Price-Fixing Agreement</u>

While "no discussion of any plus factors is necessary" where, as here,

plaintiffs have not plausibly alleged parallel conduct, *Park Irmat Drug Corp. v.*

*Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018), plaintiffs' Section

1 claims independently fail because their purported "plus factors" are of the sort

routinely held "legally insufficient."  *Brokerage Antitrust*, 618 F.3d at 321-22.

   (a) *Government Investigations Do*
     *Not Plausibly Suggest a Conspiracy*

Selectively quoting government press releases, plaintiffs suggest that a

conspiracy must exist because foreign authorities, in coordination with the DOJ,

opened investigations with which defendants are cooperating.  (DC ¶¶ 5-9, 163-77;

IC ¶¶ 6-10, 195-209; EC ¶¶ 5-10; 218-32.)  But those same press releases confirm

that such investigations "do[] not mean that the companies are guilty" of the

conduct alleged (DC ¶ 5 n.1 (citing European Commission press release); IC ¶ 6

n.4; EC ¶ 6 n.1), urge that "no assumptions should be made about whether

competition law has been broken" (DC ¶ 6 (citing CMA press release); IC ¶ 7 n.5;

EC ¶ 7 n.2), and insist that "[t]he presumption of innocence applies" (DC ¶ 7

(citing COMCO press release); IC ¶ 8; EC ¶ 8).

For these reasons, courts treat the existence of government inquiries in the

U.S. or abroad as "a non-factor" that "carries no weight in pleading an antitrust

conspiracy claim," particularly when investigations may be "broader or narrower than the allegations at issue" or yield "nothing at all."  *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007).  Thus, plaintiffs' intimations about such "investigation[s] and [d]efendants' receipt of document subpoenas . . . do not enhance the plausibility of [their] claim and do not warrant subjecting [d]efendants to the burdens of antitrust discovery."  *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010) (dismissing Section 1 claim); *see also In re Allergan ERISA Litig.*, 975 F.3d 348, 354 (3d Cir. 2020) (affirming dismissal of price-fixing claim based on allegations of price increases and government inquiries); *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 842 n.16 (N.D. Ill. 2018) (giving "no weight" to "mere fact" of an investigation, the existence of which "does not therefore signal that there must be [unlawful] conduct").[13]

> (b)   *Trade Associations and Industry Events*
>        *Do Not Plausibly Suggest a Conspiracy*

Equally insufficient are plaintiffs' efforts to mischaracterize ordinary,

---

[13] Nor can plaintiffs support their claims with allegations of investigations outside the United States (DC ¶¶ 163-66; IC ¶¶ 195-98; EC ¶¶ 218-21) or as to purported "no-poach" agreements (DC ¶ 177; IC ¶ 209; EC ¶ 232) that involve a subset of defendants and do not bear on plaintiffs' price-fixing allegations.  Those are the sort of "if it happened there, it could have happened here" allegations that courts reject.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51-52 (2d Cir. 2007) (affirming dismissal of conspiracy claim).

ubiquitous business conduct—like participation in trade association meetings and industry events—as evidence of collusion.  Contending that these activities provide "forums to collude" (DC ¶¶ 89-104; IC ¶¶ 119-34; EC ¶¶ 142-58), plaintiffs allege that defendants use them "to exchange competitively sensitive pricing and volume information and organize their cartel" (DC ¶ 104; IC ¶ 134; EC ¶ 157).  But it is "well-settled" that "participation in trade associations and other professional [events] . . . provides no indication of conspiracy."  *In re Aetna UCR Litig.*, MDL No. 2020, 2015 WL 3970168, at *20 (D.N.J. June 30, 2015).  That activity, commonplace across the economy, serves "legitimate and beneficial function[s]," *id.*, as plaintiffs concede by alleging that fragrance trade associations "promote the safe use and enjoyment of fragrances around the world" (DC ¶ 91; IC ¶ 121; EC ¶ 144), assure compliance with "relevant legislation and the standards of safety and conduct" (DC ¶ 97, IC ¶ 127; EC ¶ 150), and track U.S. FDA and EPA requirements (DC ¶ 99; IC ¶ 129; EC ¶ 152).  Thus, such activity lends no support to plaintiffs' claims, especially when plaintiffs fail to plausibly connect the timing or content of any industry events to any allegedly "parallel" price increases.

Even had plaintiffs properly alleged opportunities for defendants to conspire, "[p]roof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place."  *Superior Offshore*, 738 F. Supp. 2d at 516 (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1242

n.15 (3d Cir. 1993)).  As with other dismissed complaints, the complaints here fail to allege even one instance in which "defendants actually communicated or exchanged information at these trade association meetings, much less that they entered an agreement to coordinate . . . decisions while there."  *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 52 (9th Cir. 2022).[14]  Plaintiffs also allege that the same events that supposedly furnished "forums to collude" were attended by non-conspirators and customers. (*See, e.g.*, DC ¶¶ 91, 94 (FSAC includes customer Bath and Body Works, and IFRA includes non-defendants BASF, Robertet Group, and Takasago International Corp.); IC ¶¶ 121, 124; EC ¶¶ 144, 147.)  "The presence of numerous uninvolved observers at such meetings tends to dispel any specter of illegality."  *In re Nat'l Ass'n of Music Merchs., Musical Instruments & Equip. Antitrust Litig.*, MDL No. 2121, 2012 WL 3637291, at *2 (S.D. Cal. Aug. 20, 2012), *aff'd*, 798 F.3d 1186 (9th Cir. 2015).  Indeed, it is highly implausible to suggest that defendants fixed prices in the presence of customers—the purported *victims* of the supposed cartel.

---

[14] Similarly misplaced is plaintiffs' reliance on "pictures show[ing] [unnamed] executives from Firmenich, Givaudan, and IFF paired in groups together" at a golf event.  (DC ¶ 102; IC ¶ 132; EC ¶ 155.)  Allegations that "executives from the [industry] were in the same place at the same time" are "insufficient to support a reasonable inference of" a conspiracy.  *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 409 (3d Cir. 2015); *see also Cal. Crane Sch., Inc. v. Google LLC*, No. 21-cv-10001, 2023 WL 2769096, at *5 (N.D. Cal. Mar. 31, 2023) (dismissing Section 1 claim supported by "photos" of executives at a restaurant).

Plaintiffs' most specific allegation—that from November 8-10, 2022, several representatives of defendants attended an IFRA summit in Brazil—fares no better. That is because most of the referenced attendees hold scientific and regulatory positions and they are ***not*** alleged to have any role in pricing.[15]  Allegations of "chit chat" among "persons with no pricing authority should be given little, if any weight," as there is nothing suspect about refusing to live in a "plastic bubble." *Superior Offshore*, 738 F. Supp. 2d at 516 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 133 (3d Cir. 1999)).  The agenda plaintiffs cite also confirms that these meetings were "***open to all***" and included customers and lawyers.  *See* Global Fragrance Summit (São Paulo, Brazil 2022) (cited at DC ¶ 93; IC ¶ 123; EC ¶ 146) (listing fragrance customers, *e.g.*, from Chanel, Unilever, L'Occitane, and Natura & Co., as co-panelists with defendants' personnel and attendance by Mayer Brown lawyers).  Again, that does not support an inference of a conspiracy.

(c)   <em>Purported "Information Exchanges"<br>Do Not Plausibly Suggest a Conspiracy</em>

Also baseless is plaintiffs' invented "super plus factor" that defendants allegedly shared "firm-specific competitively sensitive information" through trade

---

[15] (*See* DC ¶ 93 (listing attendee titles such as Senior Vice President of Global Regulatory Affairs, Head of Science and Technology, Chief Consumer and Innovation Officer, Global Regulatory Strategic Lead, and Head of Product Safety and Chemical Management); IC ¶ 123; EC ¶ 146.)

associations.  (DC ¶ 104; IC ¶ 134; EC ¶ 157.)  This self-serving "super plus factor" designation is no more than a "label conjured up for litigation." *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-cv-2227, 2015 WL 5003528, at *3 (S.D.N.Y. Aug. 20, 2015) (excluding expert opinion as to alleged "super-plus factors"), *aff'd*, 899 F.3d 87 (2d Cir. 2018).  But whatever the label, "naked assertions"—like a claim that firms "shared highly confidential information"—are "not entitled to the assumption of truth." *Burch*, 662 F.3d at 224-25.  Here, plaintiffs allege no facts about what "competitively sensitive pricing and volume information" was exchanged, who exchanged it, or when and where any such exchange supposedly occurred.  (DC ¶ 104; IC ¶ 134; EC ¶ 157.)

Nor do plaintiffs further their case by citing a February 22, 2022, statement that IFF knew "how an 'awful lot of [its] competitors' were pricing their products." (DC ¶ 104; IC ¶ 134; EC ¶ 157.)  Under binding law, "allegations that each [defendant] knew about [competitors' conduct] manifestly do not describe a horizontal conspiracy." *Brokerage Antitrust*, 618 F.3d at 331.  Indeed, "[a]ll businesses . . . monitor their competitors' pricing," *DHX, Inc. v. Surface Transp. Bd.*, 501 F.3d 1080, 1092 (9th Cir. 2007), and often "watch each other like hawks," *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 191 (3d Cir. 2017).  Plaintiffs allege no facts suggesting that supposed awareness of market prices resulted from anything other than the ordinary process of gathering

33

competitive intelligence.

Finally, even if plaintiffs had plausibly alleged any information exchanges, "[t]he Third Circuit has clearly ruled" that "unfettered exchange[s]" of "information . . . do not permit an inference of an agreement . . . unless those communications rise to the level of an agreement." *Superior Offshore*, 738 F. Supp. 2d at 516.  Plaintiffs' conclusory allegations fall far short of this mark.

(d)   *The Alleged Market Structure
Does Not Plausibly Suggest a Conspiracy*

Likewise inadequate are plaintiffs' generic and contradictory allegations that the market is "conducive to anticompetitive conduct."  (DC ¶¶ 68-88; IC ¶¶ 96-108; EC ¶¶ 122-41.)  For example, plaintiffs allege that the fragrance market is susceptible to collusion because demand for fragrances is inelastic (DC ¶¶ 84-86; IC ¶¶ 114-15; EC ¶ 138), yet also allege that "buyers generally remain sensitive to price" (DC ¶ 57; IC ¶ 76).  Similarly, plaintiffs allege that "high shifting costs for customers" serve as a barrier protecting incumbent firms from competition (DC ¶ 80; IC ¶ 110; EC ¶ 134), but then also allege that fragrance compounds from different producers are "to a large extent, interchangeable," thus enabling buyers to switch to an alternative supplier (DC ¶¶ 62-64; *cf.* IC ¶¶ 90-92; EC ¶¶ 116-18). These contradictions undermine an inference of a conspiracy.

Binding law is also clear that allegations about a market—rather than about anything defendants did—do not plausibly suggest a conspiracy.  As the Third

34

Circuit recognizes, market characteristics may "indicate that defendants operate in an oligopolistic market," but that "simply restat[es] the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism." *Burtch*, 662 F.3d at 227; *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 916-17 (N.D. Cal. 2019) ("barriers to entry," firms "control[ling] 96%" of the market, and "inelastic" demand for a "fungibl[e]" product are "just as likely to be consistent with innocent" behavior and thus are "neutral facts").

> (e)  *Defendants' Alleged "Motives" Do Not Plausibly Suggest a Conspiracy*

Plaintiffs' assertion that defendants shared a motive to "protect their profits" (DC ¶ 4; EC ¶ 4; *cf.* IC ¶ 5) does not "constitute evidence of a plus factor" because "all entrepreneurs have a legitimate understandable motive to increase profits." *Burtch*, 662 F.3d at 229.  Rather, "[m]ost courts rely on the ***absence*** of motivation" or an action against each defendants' "self-interest" to infer a conspiracy.  *Id.* (emphasis in original).  Plaintiffs plead no such facts.  (*See supra* Section I.B.2.)

> (f)  *Alleged Public Statements Do Not Suggest a Conspiracy*

Finally, plaintiffs cannot salvage their claims by mislabeling certain defendants' generic statements on earnings calls, in regulatory filings, and in press releases as "suspicious" or "signals" to collude.  (DC ¶¶ 107, 109, 117, 131, 137; IC ¶¶ 137, 139, 147, 161; EC ¶¶ 172, 192.)  If anything, the "relatively public settings" in which they were made "weigh[] against their illegality." *Jones*, 400 F.

35

Supp. 3d at 920.  That is particularly true where, as here, the alleged statements are made "publicly on earnings call[s] with investors" or in "response to investor questions, addressing topics about which investors would be concerned."  *Id*.  That is "precisely the type of information companies legitimately convey," and courts are "properly reluctant to characterize such statements as evidence of unlawful conspiracies."  *Id*.[16]

In sum, plaintiffs do not plausibly allege parallel pricing and "plus factors" as needed to plead a price-fixing agreement with circumstantial evidence.

### C.    **Plaintiffs Fail to Plead Basic Facts of the Alleged Price-Fixing**

Plaintiffs' Section 1 claims separately fail because they omit basic facts needed to plausibly establish the contours of the purported conspiracy.  To allege a plausible conspiracy, plaintiffs must allege "precisely (1) who was in agreement with whom, and (2) about what."  *Brokerage Antitrust*, 618 F.3d at 339.  That includes identifying "which individuals were involved in [the conspiracy's] formation," a "specific time [and] place" it happened, and a "sensible timeline of the conspiracy itself."  *In re Aetna*, 2015 WL 3970168, at *22; *Burtch*, 662 F.3d at

---

[16] *See also Superior Offshore*, 738 F. Supp. 2d at 515 (dismissing Section 1 claim based on similar public statements "about Defendants' alleged rate increases, improved revenue and earnings, and stock prices"); *In re Musical Instruments*, 2012 WL 3637291, at *5 (dismissing Section 1 claim, explaining that "making announcements about new practices or developments is common and doesn't imply illicit or surreptitious signaling was going on").

225 (similar). Plaintiffs also must plead basic facts such as "how the alleged conspiracy was organized and carried out." *In re Musical*, 798 F.3d at 1190.

Plaintiffs provide none of those basics. Instead, they baldly assert that a conspiracy somehow sprang to life "as early as January 1, 2018" among unnamed individuals at an unspecified place. (DC ¶ 4; IC ¶ 5; EC ¶ 4.) But plaintiffs allege no communications on or before that date involving any of defendants' personnel.

Also missing are facts regarding how defendants' alleged agreement operated, even though "a cartel cannot survive absent some enforcement mechanism because otherwise the incentives to cheat are too great." *Petruzzi's*, 998 F.2d at 1233. This omission is especially glaring given plaintiffs' sweeping allegations that defendants fixed the prices of hundreds of fragrance ingredients, used in thousands of fragrance compounds, amounting to "billions of dollars" of sales in each of the last six years. (DC ¶¶ 55, 159; IC ¶¶ 73, 190; EC ¶¶ 109, 214.) Nor do plaintiffs plausibly explain how defendants could eliminate competition from non-conspiring suppliers occupying nearly 40% of the market (DC ¶ 70; IC ¶ 98; EC ¶ 124). *See Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398, 431 (S.D.N.Y. 2021) (finding "no basis to assume" that an "agreement among that large a number of banks would be easy to reach or, once reached, easy to enforce, particularly when other market participants—not part of the alleged conspiracy— already controlled the remaining 35% of the market").

Rather than plausibly suggest any enforcement mechanism, plaintiffs rely on conclusory and contradictory allegations—entitled to no weight—that defendants "monitored" the alleged price fixing conspiracy by selling ingredients to each other.  (DC ¶¶ 67, 138-39; IC ¶¶ 95, 168-69; EC ¶¶ 121, 193-94.)  Such contentions are at odds with allegations that defendants "primarily manufacture fragrance ingredients" for "their *own* fragrance compound business" (DC ¶ 66; IC ¶ 94; EC ¶ 120),[17] and actually agreed to "maintain[] a significant amount of non-overlapping fragrance ingredients" so "they would not have the ingredients to make [each other's] fragrances" (DC ¶¶ 155-56; IC ¶¶ 185-86; EC ¶¶ 210-11).  Plaintiffs' monitoring allegations are also at odds with acknowledgments that defendants negotiate prices on a customer-by-customer basis.  (*See supra* at 23.)  Thus, plaintiffs' allegations fail to plausibly suggest that defendants monitored—much less enforced—the alleged conspiracy, further confirming their inadequacy.

## D.  Plaintiffs Fail to Plead a Conspiracy by Pointing to Undeveloped Supply or Market Allocation Agreements

In a final effort to conjure a Section 1 claim, plaintiffs allege supposed

---

[17] Why defendants would allegedly inflate prices of fragrance ingredients that they primarily use for their own benefit and sell to each other is a question plaintiffs leave unaddressed.  *See Uhr v. Responsible Hosp. Inst., Inc.*, No. 10-cv-4945, 2011 WL 4091866, at *11 n.11 (D. Minn. Sept. 14, 2011) (dismissing Section 1 claim where plaintiff did not "provide any plausible reason" to explain why alleged conspirators would agree to fix prices in a way that "would likely hurt" themselves), *aff'd*, 473 F. App'x 517 (8th Cir. 2012).

agreements to "restrain the supply" and "allocate the markets for Fragrance Products" but plead no facts to support them.  (DC ¶ 4; EC ¶ 4; *cf.* IC ¶ 5; *see also* DC ¶¶ 155-62; IC ¶¶ 185-94; EC ¶¶ 210-17.)  Nowhere do plaintiffs suggest who formed the alleged agreement "not to produce other Fragrance Products produced by their competitors" (DC ¶ 155; EC ¶ 210; *cf.* IC ¶ 185), when and where it formed, and how it supposedly operated.  The minimal allegations plaintiffs do include reveal multiple fatal deficiencies.

*First*, the existence of supply or market allocation agreements is belied by allegations that "[d]efendants do manufacture and sell competing products . . . even if they market them as something unique or different."  (DC ¶ 62; IC ¶ 90; EC ¶ 116.)[18]  Plaintiffs further allege that both IFF and Symrise produce the ingredient "isobutyl quinoline," which is "chemically similar" to the isopropyl quinoline produced by Givaudan.  (DC ¶ 160; IC ¶ 191; EC ¶ 215.)  Plaintiffs do not plausibly explain how defendants could have agreed to a purported supply or market allocation agreement yet at the same time compete with overlapping and chemically similar ingredients.  Nor could plaintiffs plausibly plead any such agreement without any reference at all to the 206 ingredients they claim Firmenich

---

[18] (DC ¶ 64 ("[A]ny fragrance producer can and does produce any fragrance . . . and can switch production relatively easily from one fragrance to another."); IC ¶ 92; EC ¶ 118.)

produces.  (DC ¶ 159; IC ¶ 190; EC ¶ 214.)

   **Second**, plaintiffs invoke two public documents to suggest that defendants

reached a "consensus" to not "appropriat[e]" each other's compound formulas (DC

¶¶ 157-58; IC ¶¶ 187-89; EC ¶¶ 212-13), but the documents themselves foreclose

that suggestion.  On their face, a Perfumery Code of Ethics from December 2022,

allegedly "authored by a former IFF employee,"[19] as well as a September 2022

speech by a society of perfumers, are anti-"plagiarism" statements that say nothing

about a purported agreement among defendants to restrict supply or allocate the

market for fragrance products.

   Instead, both are innocuous statements concerned with preventing theft of

formulas and ensuring proper attribution for the use of fragrance products, i.e., that

"[b]orrowed forms shall have their original creators . . . named and rewarded" (DC

¶ 158; IC ¶ 189; EC ¶ 213) and that a "perfumer's name" be "linked to their

creation."  *ISPC Speaks at WPC 2022: Three Goals*, ISPC (Sept. 7, 2022) (cited by

DC ¶ 158 & n.160; IC ¶ 189 & n.183; EC ¶ 213 & n.160).  Contrary to plaintiffs'

contentions, their own sources make clear that the issue of attribution is "***totally***

***separated*** from . . . manufacturing, distribution, commercialization and so on" and

"isn't linked with compensation."  *Id.* (emphasis added).  Given the nature of these

---

[19] The website plaintiffs cite does not identify any signatory as being affiliated with
any defendant.  (DC ¶ 158 (citing Perfumery website); IC ¶ 189; EC ¶ 213.)

documents, it is no surprise that signatories to the Code of Ethics include defendants' customers, including ***former named plaintiff Yosh Han***.[20]  It is implausible to suggest that a public pledge signed by members of the putative class reflects a conspiracy designed to harm them.

*Third*, plaintiffs allege that defendants conspired in January 2018, but implausibly plead that some of the conduct happened well before then.  For example, plaintiffs allege a "non-appropriation consensus" that supposedly existed among defendants as far back as 2012.  (DC ¶¶ 157-58 (citing articles from 2012 and 2016); IC ¶¶ 187-89; EC ¶¶ 212-13.)  Yet plaintiffs also allege that defendants did not hatch a conspiracy until January 2018, in response to rising costs of raw materials.  (DC ¶ 4; IC ¶ 5; EC ¶ 4.)  These mismatched timelines confirm that plaintiffs' contradictory claim should be dismissed.  *See In re Aetna*, 2015 WL 3970168, at *22 (dismissing Section 1 claim because the "same data points have been in use . . . decades before the inception of the alleged agreement").

## II.    <u>PLAINTIFFS' CLAIMS ARE PARTIALLY TIME-BARRED</u>

If plaintiffs' claims are not wholly barred, applicable statutes of limitations bar portions seeking damages under state and federal law.  Federal antitrust laws

---

[20] Perfumery Code of Ethics, https://perfumeryethics.org/pledgers/page/3/ (cited by DC ¶ 158 n.159; IC ¶ 189 n.182; EC ¶ 213 n.159); No. 23-cv-02174, ECF No. 72 (consolidating Yosh Han's case with others).

have a four-year statute of limitations, *see* 15 U.S.C. § 15(b), which "begins to run when a defendant commits an act that injures a plaintiff's business." *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-02002, 2011 WL 5980001, at *1 (E.D. Pa. Nov. 30, 2011). The majority of the state law claims at issue here also apply a three- or four-year limitations period. (*See* App'x B (listing applicable statutes of limitations for relevant state law claims).)

Here, plaintiffs attempt to allege a conspiracy stretching back to January 1, 2018. (DC ¶ 4; IC ¶ 5; EC ¶ 4.) But because the first DPP complaint was not filed until April 18, 2023, the federal statute of limitations bars their claim for any damages that allegedly accrued before April 18, 2019. Similarly, because the first IPP and EUP complaints were not filed until June 13, 2023, and September 5, 2023, respectively, the following damages claims are time-barred under each relevant state statute of limitations, as set forth in Appendix B:

- EUPs' MT consumer protection claim based on damages that allegedly accrued before September 5, 2021;
- IPPs' KS, MS, and TN antitrust claims, IL, SC, and WI consumer protection claims, and AR, D.C., NH, KS, MI, MS, NH, NC, NY, SC, and TN unjust enrichment claims based on damages that allegedly accrued before June 13, 2020;
- EUPs' KS, MS, and TN antitrust claims, and D.C., IL, NY, SC, and WI consumer protection claims based on damages that allegedly accrued before September 5, 2020;
- IPPs' AZ, CA, CO, CT, D.C., HI, IL, IA, MI, MN, NE, NV, NH, NM, NY, NC, ND, OR, RI, SD, UT, and WV antitrust claims, CA, FL, NM, NC consumer protection claims, and AZ, CA, FL, NE, NV, NM, UT unjust

42

enrichment claims based on damages that allegedly accrued before June 13, 2019;

- EUPs' AZ, CA, CO, CT, D.C., HI, IL, IA, MI, MN, NE, NV, NH, NM, NY, NC, OR, SD, UT, and WV antitrust claims, and CA, FL, HI, MA, NE, NV, NM, and NC consumer protection claims based on damages that allegedly accrued before September 5, 2019;

- IPPs' AR consumer protection claim, and IL, IA, and MO unjust enrichment claims based on damages that allegedly accrued before June 13, 2018; and

- EUPs' AR and MO consumer protection claims based on damages that allegedly accrued before September 5, 2018.

Seeking to evade the statute of limitations, plaintiffs wrongly assert that fraudulent concealment and the continuing violations doctrine excuse their delay. (DC ¶¶ 178-85; IC ¶¶ 227-34; EC ¶¶ 233-41.)  They do not.

To plead fraudulent concealment, Rule 9(b) of the Federal Rules of Civil Procedure requires plaintiffs "to allege particularized facts sufficient to suggest" that: (i) "the defendant actively misled the plaintiff"; (ii) defendant's conduct "prevented the plaintiff from recognizing the validity of her claim" during the limitations period; and (iii) "the plaintiff's ignorance is not attributable to her lack of reasonable due diligence."  *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2013 WL 4504768, at *3 (E.D. Pa. Aug. 23, 2013) ("*Eggs II*").  Such tolling is an "extraordinary remedy which should be extended only sparingly." *Robinson v. Jackson Hewitt, Inc.*, No. 19-cv-9066, 2019 WL 5617512, at *5

(D.N.J. Oct. 31, 2019).[21]

Plaintiffs do not meet this burden.  ***First***, plaintiffs fail to allege—let alone with particularity—that defendants affirmatively concealed the alleged agreement. All they offer is the bare contention that the "conspiracy was inherently self-concealing" and that defendants "provided pretextual reasons for their price increases."  (DC ¶¶ 180-81; IC ¶¶ 229-30; *cf.* EC ¶¶ 236-39.)  But "merely stat[ing] in a conclusory fashion that the defendants' fraud was self-concealing" does not plead concealment, let alone satisfy Rule 9(b).  *Fuentes v. Royal Dutch Shell PLC*, No. 18-cv-5174, 2019 WL 7584654, at *3 n.5 (E.D. Pa. Nov. 25, 2019). Nor does alleging that defendants gave "pretextual explanations" for the conduct. *Robinson*, 2019 WL 5617512, at *5.  If "failure to own up to illegal conduct" established fraudulent concealment, it would "nullify the statute of limitations." *Id.*[22]

***Second***, plaintiffs cannot plead that defendants prevented them from discovering a claim during the limitations period.  To try to show this, plaintiffs

---

[21] Similar tolling standards apply to the relevant state law claims that IPPs and EUPs assert here.  (*See* App'x B.)

[22] *See also Eggs II*, 2013 WL 4504768, at *6 (blaming "exports" for increase in egg prices was insufficient to plead concealment); *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022-23 (D. Minn. 1997) (collecting cases and rejecting that a plaintiff can plead fraudulent concealment by alleging a defendant "attributed their high profits" to other factors "instead of admitting to a conspiracy"), *aff'd*, 195 F.3d 430 (8th Cir. 1999).

advance a premise that they have conceded is false: that they "could not and did not discover the existence of their claims" until March 7, 2023, when reports of the regulators' inquiries surfaced.  (DC ¶ 178; IC ¶ 227; *cf.* EC ¶ 235.)  To persuade the Court to select them as Interim Class Counsel, DPPs' counsel admitted to "monitoring Defendants' conduct in the fragrance market ***before*** the government authorities announced their investigations," resulting in "factual allegations" that "***go well beyond***" the investigation announcements.  (ECF No. 32 at 10 (emphasis added).)  That concession is fatal to a claim of fraudulent concealment.

Moreover, even if they could now claim otherwise, plaintiffs' heavy reliance on "publicly available information" is "inconsistent with any claim of fraudulent concealment." *Robinson*, 2019 WL 5617512, at *5.  Plaintiffs' claims rest on nine public statements from ***before*** April 18, 2019, that plaintiffs label "suspicious[]" (DC ¶¶ 109-16; IC ¶¶ 139-46; EC ¶¶ 164-71), as well as articles from 2012 and 2016 (DC ¶¶ 157-58; IC ¶¶ 187-88; EC ¶¶ 212-13).  Even defendants' participation in trade associations was public when it occurred, just as the industry's structure has been readily observable for decades.  Nor can DPPs claim they did not know about price increases when they allegedly happened.  That, too, supports dismissal because knowledge that "prices were raised and stabilized" would "alone . . . excite attention and thus put [p]laintiffs on inquiry notice." *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d at 1024; *Eggs II*, 2013 WL 4504768, at *5

("aware[ness] that egg prices were increasing" gave notice).

At bottom, plaintiffs cannot "simultaneously claim[] that the generalized evidence cited as the basis of [their] complaint" is "sufficiently detailed to state a cognizable claim for relief and that, nevertheless, these facts were somehow insufficiently particular to cause the statute of limitations to run." *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 495-96 (S.D.N.Y. 2013), *aff'd*, 542 F. App'x 81 (2d Cir. 2013). The Court should reject plaintiffs' attempt to have it both ways.

Finally, the "continuing violations" doctrine does not save plaintiffs. (DC ¶ 185; IC ¶ 234; EC ¶ 233.) While each "overt act" (i.e., each sale) that "is part of the violation and that injures the plaintiff" might "start[] the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times," the doctrine "does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997). Thus, plaintiffs cannot seek damages allegedly associated with sales prior to the limitations periods above.

## III.   IPPS AND EUPS LACK ANTITRUST STANDING

IPPs and EUPs lack antitrust standing to pursue their claims, and their complaints should be dismissed for that reason alone. Antitrust standing—which is distinct from Article III standing—"is a threshold requirement, and when a case alleging antitrust violations fails to meet this requirement, the claim must be

dismissed as a matter of law." *Chagares v. Monmouth Med. Ctr.*, No. 21-cv-20677, 2022 WL 3588103, at *4 (D.N.J. Aug. 22, 2022).  In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), the Supreme Court identified multiple factors to guide this analysis, noting that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Id.* at 534.  The Third Circuit distills the *AGC* factors to five:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 249 (3d Cir. 2022).  The *AGC* analysis applies to IPPs' and EUPs' claims for damages under state antitrust law because those states adopt *AGC* or a similar analysis.[23]

---

[23] Courts in 14 states (CT, IL, IA, KS, ME, MI, NE, NV, NM, NY, NC, ND, WV, and WI) and D.C. expressly adopt *AGC* (*see* App'x C), while federal courts recognize that another 11 states (AZ, CA, HI, MS, NH, OR, RI, SD, TN, UT, and VT) likely would apply *AGC* or similar factors (s*ee* App'x C).  Relatedly, Colorado antitrust law, like antitrust law in other states, has been construed in harmony with federal law (*see* App'x C), which "absent any countervailing statutory law or case law . . . is sufficient" to apply *AGC*.  *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 545 (N.D. Ill. 2019).  While Minnesota does

Here, the *AGC* factors weigh decidedly in favor of dismissal. ***First***, causation and intent—the first *AGC* factor—cuts against standing where a series of "vaguely defined links" separate defendants' alleged conduct from plaintiffs' alleged injury. *AGC*, 459 U.S. at 540. That is exactly the case here. IPPs and EUPs, who did not buy anything from defendants (IC ¶¶ 235-36; EC ¶¶ 242-43), allege that defendants produce "uniform chemicals"—with "no meaningful difference" (IC ¶ 86; EC ¶ 112)—then sell them "to each other, to other fragrance compound makers, and to consumer product manufacturers" (EC ¶ 103; IC ¶ 80), for use in an array of consumer products ranging from fine fragrances to home and body care products (EC ¶ 95; IC ¶ 75). IPPs and EUPs make no attempt to trace defendants' alleged price increases through this complex distribution chain to the prices they ultimately paid to non-defendant third parties. Indeed, IPPs and EUPs do not even specify what they bought, from whom, or when. For EUPs, any such tracing is especially hopeless after plaintiffs' acknowledgment that fragrances represent "just one portion of the overall cost of the overall good" (IC ¶ 114; EC ¶ 138; *cf.* DC ¶ 86), and that many wholly unrelated factors—such as the supply chain, labor, transportation, the pandemic, and fluctuating demand—may affect the

---

not apply *AGC per se*, its antitrust law is similarly limited by prudential concerns of "foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law." *In re Cattle & Beef Antitrust Litig.*, No. 22-cv-3031, 2023 WL 5310905, at *7 (D. Minn. Aug. 17, 2023).

prices that unnamed intermediaries decide to charge EUPs.  (*See supra* at 26-27.)

These allegations, requiring speculation about injury allegedly owing to varied pricing decisions of many independent nonparty actors—including entities that sold IPPs fragrances, consumer goods manufacturers, and retailers selling to EUPs—cannot support standing.  *See, e.g.*, *Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1042 (N.D. Ill. 2017) (dismissing indirect purchaser claims given "the presence of many intermediate parties along the supply chain," the "commingling of [allegedly price-fixed products] with other materials," and "the absence of plausible evidence of any link" to defendants), *aff'd*, 902 F.3d 735 (7th Cir. 2018); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1092 (N.D. Cal. 2007) (dismissing indirect purchaser claims where many factors "***collectively*** determine the final price actually paid" for a "final product" containing allegedly price-fixed components).

***Second***, IPPs and EUPs fail to plausibly allege antitrust injury—the second *AGC* factor—which alone requires dismissal, as "antitrust injury is a necessary condition of antitrust standing."  *Host Int'l, Inc.*, 32 F.4th at 249.  IPPs and EUPs fail to specify a single purchase subject to an overcharge, much less when and where the sale occurred, the amount of the alleged overcharge, or the defendant allegedly responsible for it.  Instead, they simply allege that they indirectly purchased non-specified fragrance compounds or ingredients manufactured by

49

defendants, or non-specified consumer goods containing those compounds or ingredients from third parties.  (IC ¶¶ 13-27; EC ¶¶ 17-74.)

Conclusory allegations like these that "fail to specify which . . . products . . . [were] purchased," and baldly claim that "a product contains" a purportedly price-fixed component, do not plead antitrust injury.  *In re Magnesium Oxide Antitrust Litig.*, No. 10-cv-5943, 2011 WL 5008090, at *7 (D.N.J. Oct. 20, 2011) (dismissing claims based on alleged purchase of products containing a single chemical component, not the hundreds or thousands of unspecified chemical components implicated here); *see also Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010) ("any antitrust injury" would be "speculative and localized" where beer was sold through a complex distribution system).

*Third*, the remaining three factors weigh strongly against standing.  The third and fourth factors—the directness of the alleged injury and the existence of more direct victims—weigh against standing when purported injuries are "derivative" of others who transacted with defendants directly.  *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 441 (3d Cir. 2000).  Indeed, "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them" to sue defeats any "justification for allowing a more remote party" to assert a claim.  *AGC*, 459 U.S. at 542.  A contrary holding invites "the potential for duplicative recovery or complex apportionment of damages," *Host Int'l, Inc.*,

50

32 F.4th at 249, to which the fifth *AGC* factor is addressed. *See also In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481, 2014 WL 4277510, at *23 (S.D.N.Y. Aug. 29, 2014) (dismissing claims where "upstream plaintiffs" were closer "to industry dynamics," sought "relief that might better address any unlawful conduct," and would prevent "duplicative relief, even if [injunctive]").

The injury IPPs and EUPs allege here is wholly derivative of that of DPPs, the only plaintiffs to transact directly with defendants and who assert claims, based on identical substantive allegations, about the same alleged conduct. Thus, "if both suits were to continue and [p]laintiffs were successful, the Court would be faced with apportioning damages to the respective parties, just what courts have tried to avoid" through the *AGC* analysis. *In re Pub. Offering Antitrust Litig.*, No. 98-cv-7890, 2004 WL 350696, at *6 (S.D.N.Y. Feb. 25, 2004). Avoiding the risk of duplicative recovery is particularly acute here, where apportionment is complicated by a winding distribution chain and heterogenous products containing fragrance ingredients or compounds.

That IPPs and EUPs also seek injunctive relief does not save their complaints, as the applicable standing analysis remains "effectively the same." *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, MDL No. 2109, 2012 WL 39766, at *8-9 (N.D. Ill. Jan. 9, 2012) (dismissing injunctive claims given "the causal connection between the violation and the harm, and the directness of the

injury"); *Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, No. 13-cv-01180, 2015 WL 4755335, at *17 (N.D. Cal. Aug. 11, 2015) (similar). Because IPPs and EUPs lack standing, each of their claims should be dismissed.

## IV.   ALL STATE LAW CLAIMS FAIL FOR ADDITIONAL REASONS

IPPs' and EUPs' state antitrust, consumer protection, and unjust enrichment claims are defective for the distinct and independent reasons discussed below.

### A.   Three Deficiencies Bar IPPs' and EUPs' State Claims

IPPs' and EUPs' state law claims fail for three broadly applicable reasons: (i) the absence of a plausible federal antitrust claim defeats IPPs' and EUPs' related state law claims; (ii) IPPs lack a named plaintiff in multiple states; and (iii) EUPs fail to specify which states' unjust enrichment laws they invoke.

#### 1.   IPPs' and EUPs' Multiple State Law Claims Fail Because Their Federal Sherman Act Claims Fail

The same flaws that defeat IPPs' and EUPs' Sherman Act claims also defeat their state law claims—whether antitrust, consumer protection, or unjust enrichment—because they are "tethered to the alleged illegal antitrust conduct." *Baar v. Jaguar Land Rover N. Am., LLC*, 295 F. Supp. 3d 460, 464, 467 (D.N.J. 2018) (Martini, J.). In particular, the Court should dismiss claims under the 27 state and D.C. antitrust statutes IPPs and EUPs invoke because those statutes mirror federal antitrust law through statutory or common law harmonization rules. (*See* App'x D.) Courts also dismiss state law claims when, "as a whole, the

complaint sounds in antitrust" and "is understood to not state [an antitrust claim]." *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 848 (N.D. Ill. 2020), *aff'd*, 42 F.4th 709 (7th Cir. 2022).  In such circumstances, "many state laws" may be "*listed*," but plaintiffs "have not truly *pleaded*" them.  *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255 (D. Conn. 2015).  This Court has itself dismissed—with prejudice—claims under "24 state antitrust laws," "26 state consumer protection laws," and "unjust enrichment [claims] under 48 States' common law" that hinged on deficient Sherman Act allegations.  *Baar*, 295 F. Supp. 3d at 462, 467.  Because IPPs and EUPs simply append several state law claims—supported by only conclusory references to state statutes—they fail with the core price-fixing claims they duplicate.  (IC ¶¶ 258-308; EC ¶¶ 268-324.)

> 2.      IPPs Lack Standing to Assert Claims Under the
>         Laws of States in Which No Named Plaintiff Alleges Injury

IPPs also falter because "[n]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury." *Tijerina v. Volkswagen Grp. of Am., Inc.*, No. 22-cv-18755, 2023 WL 6890996, at *8 (D.N.J. Oct. 19, 2023).  Indeed, "named plaintiffs who represent a class must allege . . . that they personally have been injured, not that injury has been suffered by other, unidentified members of the class." *Long v. SEPTA*, 903 F.3d 312, 325 (3d Cir. 2018).  Here, IPPs assert claims under the antitrust, consumer protection, and common law of 30 states and D.C., even though named

plaintiffs reside in only 11 of those states (CA, FL, IL, MI, MN, MS, NV, NM, NY, NC, and WI).  Thus, IPPs lack standing to assert claims in D.C. and the 19 states where no named plaintiff is alleged to reside (AZ, AR, CO, CT, HI, IA, KS, ME, NE, NH, ND, OR, RI, SC, SD, TN, UT, VT, and WV).

### 3.  EUPs' Unjust Enrichment Claim Fails Because EUPs Fail to Specify on Which States' Laws It Is Premised

Because the law will "vary state by state," courts routinely "dismiss[] unjust enrichment claims for failure to specify the state law under which the plaintiffs proceed."  *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, No. 12-cv-169, 2013 WL 5503308, at *8 (D.N.J. Oct. 2, 2013).  EUPs' failure to specify which states' laws they invoke is fatal to their claim in Count 4.[24]

### B.  **State Law Claims Fail for Additional State-Specific Reasons**

IPPs' and EUPs' state law claims fail for multiple state-specific reasons, in addition to the broadly applicable grounds described above.

### 1.  State-Specific Deficiencies Bar State Antitrust Claims

***Indirect purchaser class actions are barred.***  The Court should dismiss IPPs' and EUPs' class action claims under Illinois and Colorado antitrust law.

---

[24] Applying the law of the forum leads to the same result.  In New Jersey, "indirect purchasers . . . have no standing to assert a private right of action under the New Jersey Antitrust Act," *Wilson v. Gen. Motors Corp.*, 190 N.J. 336, 339 (2007), and EUPs "cannot circumvent [this] statutory framework by recasting an antitrust claim as one for unjust enrichment."  *In re K-Dur Antitrust Litig.*, No. 01-cv-1652, 2008 WL 2660780, at *5 (D.N.J. Feb. 28, 2008).

Under Illinois' statute, *see* 740 Ill. Comp. Stat. § 10/7(2), "no person" besides the state attorney general "shall be authorized to maintain a class action in any court of [Illinois]," and this "restriction[] on indirect purchaser actions must be applied in federal court." *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 391 (D.N.J. 2018). Colorado law is similar: while in 2023, it amended its statute to allow indirect purchaser actions, *see* Colo. Rev. Stat. Ann. § 6-4-115, the bill "applies to conduct occurring on or after the effective date of this act." Section 7, House Bill 23-1192, https://leg.colorado.gov/sites/default/files/2023a_1192_signed.pdf. Because IPPs and EUPs allege no conduct after June 7, 2023, their claims under Colorado's antitrust statute, like Illinois', must be dismissed.

   ***No in-state conduct or substantial in-state injury.*** IPPs and EUPs fail to state claims under Mississippi, North Carolina, and Wisconsin antitrust law because they provide no plausible state-specific allegations, even though courts hold that each state's antitrust law applies only to intrastate activity and/or conduct with a substantial effect within the state.[25] Dismissal is therefore warranted.

_____

[25] *See, e.g.*, *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1188 (Miss. 2020) (a "material element" under the Mississippi Antitrust Act "is that the illegal objective of the trust be accomplished in part at least by transactions lying wholly within the state"); *In re Dealer Mgmt.*, 362 F. Supp. 3d at 549 (North Carolina's Unfair Trade Practices Act "reaches only conduct causing a substantial in-state injury" and alleging "that indirect purchasers [paid] inflated prices are not sufficient"); *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 158 (Wis. 2005) (under

2.      State-Specific Deficiencies Bar Consumer Protection Claims

The additional deficiencies below further preclude IPPs' and EUPs'

consumer protection claims under the laws of D.C. and 16 states (AR, FL, IL, MA,

MN, MO, MT, NE, NV, NM, NJ, NY, PA, SC, VT, and WI).

***The state applies AGC to consumer protection claims***.  Because Nebraska

and New York consumer protection statutes incorporate an *AGC* analysis, EUPs

lack standing for the reasons discussed above (*see supra* Section III).  *See, e.g.*,

*Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 302 (Neb. 2006) (applying *AGC* and

affirming dismissal of Nebraska Consumer Protection Act claim because alleged

overcharge injuries were "derivative and remote"); *In re Dynamic Random Access

Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1142-43 (N.D. Cal. 2008)

(applying *AGC* to dismiss Nebraska and New York consumer protection claims).

***Consumer protection claims cannot end-run bars on indirect purchaser

suits.***  EUPs' consumer protection claims under Missouri and New Jersey law and

EUPs' and IPPs' claims under South Carolina law fail because each state bars

antitrust suits by indirect purchasers.[26]  IPPs and EUPs cannot elide this prohibition

_____

Wisconsin's antitrust act, requiring conduct that "occurred within [the] state" or
that "substantially affects the people of Wisconsin and has impacts in this state").

[26] *See, e.g.*, *Ireland v. Microsoft Corp.*, No. 00-cv-201515, 2001 WL 1868946, at
*1 (Mo. Cir. Ct. Jan. 24, 2001) (federal rule against indirect purchaser suits is
"controlling" under Missouri antitrust law); *Wilson*, 190 N.J. at 339 (same under
the New Jersey Antitrust Act); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735,

by recasting deficient price-fixing allegations as consumer protection violations. *See, e.g.*, *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 701-02 (E.D. Pa. 2014) (dismissing end payors' consumer protection claim under Missouri law because it "would provide an end-run around [Missouri's] prohibition of antitrust claims by indirect purchasers"); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 195 (D. Me. 2004) (similar under New Jersey law); *In re Aggrenox Antitrust Litig.*, No. 14-md-2516, 2016 WL 4204478, at *9 (D. Conn. Aug. 9, 2016) (similar under South Carolina law).  These claims fail.

Similar concerns that "indirect purchaser plaintiffs' are too remote from the allegedly" illegal conduct also warrant dismissal under New York's consumer protection law.  *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 165 (E.D. Pa. 2009) (dismissing indirect purchaser claim under New York Gen. Bus. Law § 349). Indeed, "indirect injuries are not cognizable under the state's consumer protection law," such as where an indirect purchaser's alleged injury is "entirely derivative of injuries" alleged by upstream entities.  *Id.* at 164.  Because any alleged injury by EUPs, who did not directly purchase fragrance products manufactured or sold by defendants, is entirely derivative of upstream entities, the Court should dismiss their attenuated New York consumer protection claim.

---

762-63 (E.D. Pa. 2014) (no "indirect purchasers may bring an antitrust or consumer-protection claim" under South Carolina law).

***IPPs are not proper plaintiffs.*** Because IPPs are retailers and producers (IC ¶¶ 1, 13-27), the Court should dismiss their consumer protection claims under Minnesota, South Carolina, New Mexico, and Vermont law, which allow only consumers to sue. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8637, 2023 WL 5227130, at *3 (N.D. Ill. Aug. 15, 2023) (Minnesota, South Carolina, and Vermont consumer protection statutes "apply to only consumer transactions as opposed to purchases for business purposes"); *Williams v. Foremost Ins. Co.*, 102 F. Supp. 3d 1230, 1240 (D.N.M. 2015) ("no basis to expand [New Mexico's Unfair Trade Practices Act] to give standing to a non-consumer third-party").

***EUPs and IPPs cannot bring claims under laws that bar class actions.*** EUPs and IPPs invoke Montana and South Carolina consumer protection laws, even though they permit only individual suits, not class actions. *See* Mont. Code Ann. § 30-14-133(1)(a) ("[A] consumer . . . may bring an individual action but not a class action."); S.C. Code Ann. § 39-5-140(a) ("Any person . . . may bring an action individually, but not in a representative capacity."). Because these class action bars control in federal court, EUPs' and IPPs' claims should be dismissed.[27]

---

[27] *See In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 413-16 (D.N.J. 2018) (enforcing "class action bar[] incorporated in the Montana . . . consumer protection law[]" to dismiss claim because bar is "not preempted by Rule 23"); *In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 635 (D.S.C. 2015) (similar for South Carolina).

58

***No plausible allegations of actionable deception or misrepresentations.***

EUPs and IPPs fail to state claims under Minnesota, New York, Pennsylvania, and Wisconsin consumer protection law because they allege no actionable deception or misrepresentation, as required under each states' laws.[28]  These states also require factual allegations that plaintiffs relied on such conduct[29] and that the alleged deception or misrepresentations target consumers.[30]  Here, IPPs and EUPs support these claims with their same allegations of price-fixing.  (IC ¶¶ 297, 302; EC ¶¶

---

[28] *See* Minn. Stat. § 325F.69 (covers "[f]raud, misrepresentation, deceptive . . . practices"); N.Y. Gen. Bus. Law § 349(a) (prohibiting "[d]eceptive acts or practices in the conduct of any business"); 73 Pa. Stat. Ann. § 201-2(4)(xxi) (covers "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding"); Wis. Stat. §100.18 (covers "[f]raudulent representations").

[29] *Hopkins v. Trans Union, L.L.C.*, No. 03-cv-5433, 2004 WL 1854191, at *6 (D. Minn. Aug. 19, 2004) (Minnesota law requires "an intentional misrepresentation relating to the sale of merchandise" that "caused damage to the plaintiff"); *Varela v. Invs. Ins. Holding Corp.*, 81 N.Y.2d 958, 961 (1993) (New York law requires that defendant engage in an act or practice that is deceptive or misleading in a material way and that injured plaintiff); *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 227-29 (3d Cir. 2008) (Pennsylvania law requires that lead plaintiff "and other putative class members justifiably relied" on deceptive conduct); *Novell v. Migliaccio*, 749 N.W.2d 544, 553 (Wis. 2008) (under Wisconsin law, "[r]eliance is an aspect of the third element, whether a representation caused the plaintiff's pecuniary loss").

[30] *Ly v. Nystrom*, 615 N.W.2d 302, 308 (Minn. 2000) (Minnesota's consumer protection statute enacted to address deceptive practices aimed at "consumers"); *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995) (alleged misrepresentation must be "consumer-oriented" under New York law); *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1023 (Pa. 2018) (same in Pennsylvania); *Novell*, 749 N.W.2d at 553 (Wisconsin requires "a representation to the public").

307, 314, 318.)  But alleged price-fixing does not constitute the requisite deceptive conduct, and IPPs and EUPs fail to plausibly allege that they were deceived by (or even read) defendants' purportedly "pretextual" statements (IC ¶¶ 139-67; EC ¶¶ 164-91) attributing price increases to factors other than a conspiracy.[31]  This is especially so because defendants' alleged statements were made to investors, not consumers.  Each of these claims should be dismissed.[32]

*Price-fixing claims are not cognizable consumer protection claims.*  IPPs' and EUPs' consumer protection claims, which rest on their deficient price-fixing allegations, are not cognizable under: (i) the Arkansas Deceptive Trade Practices

---

[31] *See, e.g.*, *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 190 (D. Me. 2004) (dismissing Minnesota consumer protection claim, as "stat[ing] a price for a car while knowing that the conspiracy maintained prices at an artificially high level" is not "deceptive"); *In re Processed Egg Prod. Antitrust Litig.*, 851 F. Supp. 2d 867, 909 (E.D. Pa. 2012) (dismissing New York consumer protection claim where plaintiffs did "not plausibly suggest that the purported pretextual explanations for the rising egg prices are the actual cause of the Plaintiffs' alleged harm of paying artificially-inflated prices for eggs"); *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, No. 23-md-03071, 2023 WL 9004806, at *36 (M.D. Tenn. Dec. 28, 2023) (Pennsylvania's consumer protection statute "does not pertain to antitrust violations such as price-fixing"); *Mueller v. Harry Kaufmann Motorcars, Inc.*, 859 N.W.2d 451, 457 (Wis. Ct. App. 2014) (Wisconsin statute "prohibits false, deceptive, or misleading representations or statements of fact in public advertisements or sales announcements").

[32] IPPs' and EUPs' vague allegations of "pretextual" statements further fail under Minnesota law because they do not satisfy the heightened pleading standard applicable to claims of fraud or deceit.  *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 795 F. Supp. 2d 874, 879 (D. Minn. 2011) (holding that Rule 9(b) applies to the Minnesota Consumer Fraud Act, Minn. Stat. Ann. §§ 325F.68, *et seq.*).

Act, Ark. Code Ann. § 4-88-107(a)(10), because it "does not extend to . . . price inflation claims," *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1166-67 (N.D. Cal. 2015); and (ii) Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1, *et seq.*, because "Pennsylvania has no general antitrust statute and no statute that creates a private right of action against restraints of trade." *In re K-Dur*, 2008 WL 2660780, at *4. These claims fail.

***No plausible allegations of unconscionable conduct.*** EUPs and IPPs assert that their price-fixing allegations state claims under Section (D) of New Mexico's Unfair Practices Act (EC ¶ 313; IC ¶ 298), but price-fixing cannot "be characterized as fitting within" the definition of such conduct covered by Section (D). *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, No. 19-md-02918, 2021 WL 4306018, at *13 (N.D. Cal. Sept. 22, 2021). Nor could EUPs or IPPs save their claims by invoking Section (E), which makes "unconscionable trade practice[s]" actionable only if "a gross disparity" exists "between the value received by a person and the price paid." N.M. Stat. Ann. § 57-12-2-(E). EUPs and IPPs plead no gross disparity, which "requires something more than merely alleging that the price of a product was unfairly high." *In re Graphics*, 527 F. Supp. 2d at 1029-30. These claims fail. *See id.*

***Plaintiffs allege no state-specific conduct or injury.*** IPPs and EUPs fail to state claims under Florida, Illinois, Massachusetts, and New York consumer

protection law because, as noted above, they do not plausibly plead the required intrastate conduct. *See In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 14-md-2508, 2015 WL 5166014, at *33 (E.D. Tenn. June 24, 2015) (dismissing consumer protection claims, including under New York and Florida law).[33]

**_EUPs fail to plead that they are elderly or disabled as Nevada law requires._** EUPs allege that defendants violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*, yet only "an elderly person or a person with a disability" may invoke this statute. Nev. Rev. Stat. § 598.0977. Because "Nevada class plaintiffs are not alleged to be either elderly or disabled," this claim should be dismissed. *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 234 (M.D. Pa. 2010) (dismissing Nevada consumer protection claim).

### 3. State-Specific Deficiencies Bar Unjust Enrichment Claims

IPPs' unjust enrichment claims under the laws of 30 states and D.C. should

---

[33] *See, e.g.*, *Five for Ent. S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1331 (S.D. Fla. 2012) (requiring conduct "within the territorial boundaries of Florida"); *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853-54 (Ill. 2005) (conduct must "occur primarily and substantially in Illinois"); *Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1410 (11th Cir. 1998) (same under Massachusetts Unfair Trade Practices Act); *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 263 F.R.D. 205, 214 (E.D. Pa. 2009) ("Numerous courts have held that the deceptive conduct giving rise to the section 349 claim must have occurred in New York state.").

be dismissed for the additional reasons below.[34]

    ***Plaintiffs have an adequate remedy at law.***  IPPs' duplicative unjust enrichment claims—based on the same allegations as their antitrust claims (IC ¶¶ 303-08)—warrant dismissal under many states' laws.  For example, under the laws of Florida, Hawaii, Illinois, Iowa, Kansas, New Hampshire, Oregon, Tennessee, Utah, Vermont, and Wisconsin, equitable claims for unjust enrichment are unavailable when a plaintiff has an available remedy at law.[35]  In addition, Rhode Island law recognizes that when a statute creates a right of action that otherwise does not exist in common law—like an action under the antitrust laws—the statutory "remedy given is the only remedy" available.  *Casperson v. AAA S. New*

---

[34] The 30 states are AZ, AR, CA, CT, FL, HI, IL, IA, KS, ME, MI, MN, MS, MO, NE, NV, NH, NM, NY, NC, ND, OR, RI, SC, SD, TN, UT, VT, WV, and WI.  As noted above (*see supra* Section IV.A.3), EUPs do not specify which states' laws they invoke in their unjust enrichment claims.  While that alone requires dismissal of their claims, the bases for dismissal below would apply equally to the extent EUPs may assert that they invoked claims under the laws of these states and D.C.

[35] *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, MDL No. 2875, 2020 WL 8970347, at *2 (D.N.J. Mar. 12, 2020) (FL, IL, IA, KS); *Cootey v. Countrywide Home Loans, Inc.*, No. 11-cv-00152, 2011 WL 2441707, at *12 (D. Haw. June 14, 2011) (HI); *Ortiz v. Sig Sauer, Inc.*, No. 19-cv-1025, 2023 WL 1928094, at *13 (D.N.H. Feb. 10, 2023) (NH); *Easterbrook v. LinkedIn Corp.*, No. 22-cv-01108, 2023 WL 3022497, at *4 (D. Or. Apr. 20, 2023) (OR); *Law v. Bioheart, Inc.*, No. 07-cv-2177, 2009 WL 693149, at *17 (W.D. Tenn. Mar. 13, 2009) (TN); *City of Page, Coconino Cnty., Ariz. v. Utah Associated Mun. Power Sys.*, No. 05-cv-921, 2006 WL 1889882, at *6 (D. Utah July 7, 2006) (UT); *Ehlers v. Ben & Jerry's Homemade Inc.*, No. 19-cv-00194, 2020 WL 2218858, at *10 (D. Vt. May 7, 2020) (VT); *Smith v. RecordQuest, LLC*, 989 F.3d 513, 520 (7th Cir. 2021) (WI).

*England*, No. 14-cv-6139, 2015 WL 9582091, at *9 (R.I. Super. Ct. Dec. 22, 2015). And because antitrust remedies are exclusive under laws of 11 other states (HI, MN, MS, NE, NV, NY, NC, TN, VT, WV, and WI),[36] duplicative unjust enrichment claims should be dismissed.

**IPPs allege no direct benefit conferred on defendants.** Unjust enrichment claims under Arizona, Florida, Maine, Michigan, New York, and North Dakota law fail because IPPs do not allege that they conferred a benefit directly on defendants, as each state's law requires.[37] Indeed, they allege no plausible link between themselves and any transaction with defendants.

**Unjust enrichment claims cannot end-run bars on IPP suits.** IPPs cannot state unjust enrichment claims under Florida, Illinois, Missouri, and South Carolina law, each of which recognizes that because "applicable state law bars antitrust actions for damages by indirect purchasers," a plaintiff "cannot circumvent the statutory framework by recasting an antitrust claim as one for unjust enrichment."

---

[36] *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2010 WL 11488485, at *5 (N.D. Cal. Sept. 30, 2010) (collecting cases).

[37] *See, e.g.*, *Yee v. Nat'l Gypsum Co.*, No. 09-cv-8189, 2010 WL 2572976, at *4 (D. Ariz. June 22, 2010) (dismissing Arizona unjust enrichment claim for failure to plead a direct benefit conferred on defendant); *Miami Prods. & Chem. Co. v. Olin Corp.*, No. 19-cv-00385, 2022 WL 3701159, at *3 (W.D.N.Y. Aug. 26, 2022) (same as to Florida and North Dakota); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 384 (D.R.I. 2019) (same as to Maine); *In re Refrigerant Compressors Antitrust Litig.*, No. 09-md-02042, 2013 WL 1431756, at *25 (E.D. Mich. Apr. 9, 2013) (same as to Michigan and New York).

*In re K-Dur*, 2008 WL 2660780, at *5; *In re Vascepa Antitrust Litig.*, No. 21-cv-12061, 2023 WL 2182046, at *11 (D.N.J. Feb. 23, 2023) (dismissing unjust enrichment claims under Florida, Illinois, Missouri, and South Carolina law).

**No cognizable claim for unjust enrichment.**  Because unjust enrichment is not a cognizable cause of action under California and Mississippi law, IPPs' claims under those states' laws fail.  *See In re ConAgra Foods Inc.*, 908 F. Supp. 2d 1090, 1114 (C.D. Cal. 2012) ("[U]nder California law, a cause of action for unjust enrichment is not cognizable."); *Mosley v. GEICO Ins. Co.*, No. 13-cv-161, 2014 WL 7882149, at *5 (S.D. Miss. Dec. 16, 2014) (similar under Mississippi law).

**No unjust enrichment claims in connection with the purchase of goods.**  Under Wisconsin law, "unjust enrichment involves getting something for nothing, not providing a product for a price."  *Cota v. Ralph Lauren Corp.*, 603 F. Supp. 3d 666, 675 (E.D. Wis. 2022).  Because IPPs allege unjust enrichment based on product purchases (IC ¶¶ 13-27), their claim should be dismissed.

## CONCLUSION

For the foregoing reasons—summarized for the Court's convenience in Appendix A—each of DPPs', IPPs', and EUPs' claims should be dismissed.

Dated: April 8, 2024                          Respectfully submitted,

*s/ Kevin R. Reich*                           *s/ Tansy Woan*
Kevin R. Reich                                Boris Bershteyn (*pro hac vice*)
GIBBONS P.C.                                  Matthew Martino (*pro hac vice*)
One Gateway Center                            Tansy Woan
Newark, New Jersey 07102                      Andrew Muscato
Tel: (973) 596-4755                           Evan Levicoff (*pro hac vice*)
kreich@gibbonslaw.com                           SKADDEN, ARPS, SLATE,
                                                MEAGHER & FLOM LLP
Aidan Synnott (*pro hac vice*)                One Manhattan West
Eyitayo St. Matthew-Daniel (*pro hac*         New York, New York 10001
*vice*)                                       (212) 735-3000
Hallie S. Goldblatt (*pro hac vice*)          Boris.Bershteyn@skadden.com
PAUL, WEISS, RIFKIND,                         Matthew.Martino@skadden.com
WHARTON & GARRISON LLP                        Tansy.Woan@skadden.com
1285 Avenue of the Americas                   Andrew.Muscato@skadden.com
New York, New York 10019                      Evan.Levicoff@skadden.com
Tel: (212) 373-3000
asynnott@paulweiss.com                        *Attorneys for Defendant*
tstmatthewdaniel@paulweiss.com                *International Flavors & Fragrances*
hgoldblatt@paulweiss.com                      *Inc.*

*Attorneys for Defendants Givaudan*           *s/ Liza M. Walsh*
*Fragrances Corporation, Ungerer &*           Liza M. Walsh
*Company, Inc., and Custom Essence*           Jessica K. Formichella
*LLC*                                         WALSH PIZZI O'REILLY
                                              FALANGA LLP
*Attorneys for Defendant Givaudan*            Three Gateway Center
*SA*                                          100 Mulberry Street, 15th Floor
                                              Newark, New Jersey 07102
*s/ Sean P. McConnell*                        Telephone: (973) 757-1100
Sean P. McConnell                             Facsimile: (973) 757-1090
Sarah O'Laughlin Kulik
DUANE MORRIS LLP                              Robert Milne (*pro hac vice*)
30 S. 17th Street                             Martin M. Toto
Philadelphia, PA 19380                        William H. Bave III (*pro hac vice*)
(215) 979-1947                                WHITE & CASE LLP
spmcconnell@duanemorris.com                   1221 Avenue of the Americas
sckulik@duanemorris.com                       New York, New York 10020

66

Arthur J. Burke (*pro hac vice*)
Anna M. Kozlowski (*pro hac vice*)
DAVIS POLK & WARDWELL
LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
arthur.burke@davispolk.com
anna.kozlowski@davispolk.com

*Attorneys for Defendants Firmenich*
*Incorporated and Agilex Flavors &*
*Fragrances, Inc.*

*Attorneys for DSM-Firmenich AG,*
*Firmenich International SA, and*
*Firmenich SA*

(212) 819-8200
mtoto@whitecase.com
rmilne@whitecase.com
william.bave@whitecase.com

*Attorneys for Defendants Symrise*
*Inc., Symrise US LLC, and Symrise*
*AG*

67